UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PACKGEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-cv-00080-JAW |
| | ) | |
| BERRY PLASTICS | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

In this breach of contract case, Berry Plastics Corporation and Covalence Specialty Coatings, LLC move for summary judgment, asserting that Packgen's claims are barred by the parties' contractual statute of limitations period. Packgen argues that the provision in both of Berry's invoices stating that a one-year statute of limitations applied to the contracts at issue does not render its claims untimely because the invoices never became part of the parties' contract. Packgen also argues that if the invoices are determined to be a confirmation of acceptance, the one-year limitation provisions are not part of the contracts because they are material alterations to the original agreement. The Court denies Berry's motion for summary judgment because under section 2-207(2)(b) of title 11 of the Maine Revised Statutes, there is a genuine dispute of material fact as to whether the one-year statute of limitations terms materially altered the parties' contracts.

**I.      BACKGROUND**

### A.     Procedural History

Packgen filed a five-count complaint against Berry Corporation and Covalence Specialty Coatings, LLC (Berry) with the Court on March 7, 2012 alleging breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, and negligence.[1]   *Compl.* (ECF No. 2-2).   On November 30, 2012, Berry filed a motion for summary judgment on all counts.  *Defs.' Mot. for Summ. J.* (ECF No. 33) (*Defs.' Mot.*).   Packgen filed a memorandum opposing Berry's motion on December 21, 2012.  *Pl. Packgen's Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 36) (*Pl.'s Opp'n*).  Berry responded to Packgen's opposition on January 4, 2013.  *Defs.' Reply to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 41) (*Defs.' Reply*).

The parties submitted a joint stipulated statement of facts on November 30, 2012.  *Stipulated Joint Summ. J. R.* (ECF No. 35) (JSMF).  The same day, Berry filed its statement of material facts in support of its motion.  *Statement of Material Facts in Supp. of Defs.' Berry Corporation and Covalence Specialty Coatings' Mot. for Summ. J.* (ECF No. 34) (DSMF).  Packgen responded to Berry's statement of material facts and submitted a statement of additional material facts on December 21, 2012.  *Pl.'s Responses to Defs.' Statement of Material Facts & Pl.'s Statement of Material Facts* (ECF No. 37) (PSMF & PSAMF).  On January 4, 2013, Berry filed a reply to Packgen's statement of additional material facts.  *Defs.' Reply Statement to Pl.'s Opp'n and Statement of Additional Material Facts* (ECF No. 42) (DRPSAMF).

---

[1]     Covalence Specialty Materials Corporation merged into Berry Corporation and Berry now owns Covalence Specialty Adhesives, LLC and Covalence Specialty Coatings, LLC; the Court refers to the Defendants collectively as "Berry".  *See Des.' Mot. for Summ. J.* at 1 n.1 (ECF No. 33).

At Packgen's request, the Court held oral argument on August 1, 2013. *Pl.'s Mot. Requesting Oral Argument* (ECF No. 43); *Order Granting Mot. for Oral Argument* (ECF No. 44); *Minute Entry* (ECF No. 48).

### B.     Statement of Facts[2]

Packgen manufactures intermediate bulk containers (IBCs), which are used by petroleum refineries for the transportation and storage of fresh and spent catalyst.   DSMF ¶ 1; PRDSMF ¶ 1.   Berry supplied Packgen with woven polypropylene fabric that was chemically bonded to a layer of aluminum foil.  DSMF ¶ 2; PRDSMF ¶ 2.   On September 25, 2007, Packgen sent Covalence Coated Products a purchase order for 61-inch laminated polypropylene foil.   DSMF ¶ 3; PRDSMF ¶ 3.   On November 26, 2007, Packgen sent a purchase order to Berry requesting 48-inch laminated polypropylene.  DSMF ¶ 9; PRDSMF ¶ 9.

In the second half of November 2007, Ron Silen, strategic accounts manager for Berry, told Donald Roberts, purchasing agent for Packgen, that everything was all set with the purchase order for the 61-inch laminated polypropylene and that Berry had ordered the raw materials (woven polypropylene) that it was purchasing from a sister company in Mexico.  PSAMF ¶ 1; DRPSAMF ¶ 1.  On November 28, 2007, Mr. Silen sent Mr. Roberts an e-mail concerning the purchase orders for the

---

[2]      Keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Packgen's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).   In compliance with this obligation, the Court recites supported facts as true even if Berry disputes them.

61-inch laminated polypropylene and the 48-inch laminated polypropylene.[3]

PSAMF ¶ 2; DRPSAMF ¶ 2.  The e-mail stated:

> Here is the update on the two PO's:
>
> 1.   For the 61" order: The woven material from Mexico will be shipping on 12/7 and we expect an arrival to Homer, no later than 12/14.  Based on this schedule, we will run this order on the extruder on Sat, 12/15 and will [sic] ready to ship on 17th or 18th.  I will follow-up with you to confirm any expedited shipment you might want us to proceed with.  As a side note, our Purchasing group will continue to try and get an earlier delivery to see if [sic] can gain any extra days.
>
> 2.   The 48" order that you placed yesterday:  this PO has still not been entered into our new system (JD Edwards) and entry of any new orders will not occur until Friday and into the weekend.  I have communicated that you need a commitment date ASAP especially that you asked for first of the year delivery of this order (in accordance with the leadtime I had stated).  All I can do at this point is to continue to press production scheduling of the situation and then get you a date when we are up under our new system which I hope will be early next week.  I have discussed the situation with my management and plant management early this evening.  I will continue to work with Jade, through customer service, to get you a date and hope that we can honor the 4-5 lead time that I communicated to you.

PSAMF ¶ 2; DRPSAMF ¶ 2.  On December 13, 2007, Mr. Silen sent Mr. Roberts an e-mail concerning the purchase orders for the 61" laminated polypropylene and the 48" laminated polypropylene.  PSAMF ¶ 3; DRPSAMF ¶ 3.  The e-mail states:

---

[3]      Berry objected to paragraph 2 because it relies on inadmissible hearsay, which does not fall under one of the hearsay exceptions.  DRPSAMF ¶ 2.  The Court overrules Berry's hearsay objection because the e-mail is not hearsay.  According to Rule 801(c), hearsay is an out of court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement."  FED. R. EVID. 801(c).  A statement is not hearsay if it is offered against the opposing party in a lawsuit and it was made by "the party's agent or employee on a matter within the scope of that relationship and while it existed."  FED. R. EVID. 801(d)(2)(D).  Here, Ron Silen, Berry's employee, made the statements in the e-mail in the scope of his employment relationship with Berry and while he was employed by the corporation.  *See E-mail from Ron Silen to Don Roberts* (Nov. 28, 2007 09:53).  The Court includes Packgen's paragraph 2.

4

Here is the update on your orders:

- 61": The woven material is in the US, has cleared customs, and will be delivered into our Homer plant by noon tomorrow.  The plant is [sic] will run as received and will run into the weekend if need be.  I will seek approval to get the order expedited, likely team drivers, assuming the order will be ready to ship by Monday/Tuesday.
- 48": Right now, the shipment (from Mexico) of the woven is still at 1/4/08 which means about a week to get to Homer.  I'm still pushing to see if we can get it before the end of Dec.  I will keep you updated.[4]

PSAMF ¶ 3; DRPSAMF ¶ 3.  Berry shipped the 61-inch material on December 22, 2007.  DSMF ¶ 4; PRDSMF ¶ 4.  The term "vendor's dock" in Packgen's purchase orders for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene specifies that the goods were to be delivered by Berry to a common carrier at the loading dock at Berry's plant in Homer, Louisiana for shipment to Packgen's plant in Auburn, Maine.[5]  PSAMF ¶ 5; DRPSAMF ¶ 5.

### 1.    Shipment of the 61-inch Polypropylene

---

[4]     Berry also objected to paragraph 3 because it relied on inadmissible hearsay.  DRPSAMF ¶ 3.  Because Mr. Silen's statements in his December 13, 2007 e-mail are statements of an opposing party and not hearsay, the Court overrules Berry's objection and includes paragraph 3.  *See* FED. R. EVID. 801(c), 801(d)(2)(D).

[5]     Berry objected to paragraph 5 because it "calls for a legal conclusion as to the responsibilities of the parties imposed by the term 'vendor's dock.'"  DRPSAMF ¶ 5.  Berry answered the paragraph asserting that the "documents speak for themselves" and denied the statement "to the extent that Donald Roberts misstates or mischaracterizes the shipping arrangement between the parties."  DRPSAMF ¶ 5.

The term "vendor's dock" in both purchasing orders is undefined within the orders.  *See* JSMF Attach 1, *61-inch Laminated Polypro Foil Purchase Order (*ECF No. 35-1) (*61-inch Purchase Order*); JSMF Attach 2, *48-inch Laminated Polypro Foil Purchase Order* (ECF No. 35-2) (*48-inch Purchase Order*).  The Court views the term as self-defining, namely, the dock of the seller, and to the extent it is not self-explanatory, it is a term within a trade that a lay witness, such as Mr. Roberts, is competent to explain.  The best evidence objection is frivolous.  The purpose of the statements of fact is to focus the Court's attention on the significant portions of documents instead of placing the entire document before the Court.

The shipment of 61-inch laminated polypropylene was received by Packgen on December 27, 2007.  PSAMF ¶ 6; DRPSAMF ¶ 6.  On December 28, 2007, Berry sent Packgen an invoice for the 61-inch material by regular, first class U.S. Postal Service mail.[6]  DSMF ¶ 5; PRDSMF ¶ 5.  Berry attached its standard terms and conditions to its December 28, 2007 invoice.  DSMF ¶ 6; PRDSMF ¶ 6.  As a part of its regular business practice, Berry staples its standard terms and conditions to the back of its invoices; however, prior to its September 25, 2007 order, on at least seven occasions when Packgen ordered laminated polypropylene, no terms and conditions were attached or included with Berry's invoices.[7]  DSMF ¶ 7; PRDSMF ¶ 7.  The front of the invoice contained a notice that the order was subject to the attached terms and conditions.  DSMF ¶ 8; PRDSMF ¶ 8.  Prior to the September 25, 2007 purchase order for the 61-inch laminated polypropylene, Packgen had purchased laminated polypropylene from Berry, Covalence Specialty Coatings and their predecessor at least seven times and no terms and conditions were attached to the

---

[6]     Packgen interposed a qualified response to clarify that Berry sent them an invoice on December 28, 2007 via regular mail.  PRDSMF ¶ 5; *see Decl. of John Lapoint* ¶¶ 5-9 (ECF No. 38) (*Lapoint Decl.*).  As Packgen's qualification is supported by the record citation, the Court includes it.

[7]     Packgen denied paragraph 7 and disputes Berry's assertion that it regularly sent its standard terms and conditions with invoices because prior to Packgen's September 25, 2007 purchase order, Berry never sent any terms and conditions with its invoices for laminated polypropylene.  PRDSMF ¶ 7; *see Lapoint Decl.* ¶ 24.  Packgen also argues that the standard terms and conditions were not printed on the back of the invoices, but rather were stapled to the invoices.  PRDSMF ¶ 7; *Lapoint Decl.* ¶ 16.  Berry objects to Packgen's reliance on Mr. Lapoint's declaration pursuant to Federal Rule of Civil Procedure 56(c)(4) because he was never employed by Berry and does not have personal knowledge of their regular business practices.  DRPSAMF at 1; *see* FED. R. CIV. P. 56(c)(4).

The Court does not strike Packgen's response to paragraph 7 because Mr. Lapoint's testimony related to his personal knowledge of Packgen's receipt of Berry's invoices.  *See Lapoint Decl.* ¶¶ 1-3, 24.  Both parties' factual assertions are supported by sworn declarations.  *Compare Lapoint Decl.* ¶ 24, *with Decl. of Diana Canterbury* ¶¶ 3-4 (ECF No. 34-3) (*Canterbury Decl.*).  Viewing the facts in the light most favorable to Packgen, the Court includes Packgen's qualification regarding the location of Berry's terms and conditions because the record supports the assertion.  *See Lapoint Decl.* ¶ 16.

6

invoices that Packgen received for any of these purchases.  PSAMF ¶ 24; DRPSAMF ¶ 24.

### 2.    Shipment of the 48-inch Polypropylene

On January 17, 2008, Mr. Silen sent an e-mail to Mr. Roberts concerning the purchase order for the 48-inch laminated polypropylene.   The e-mail stated as follows:

> The 48" order is in slitting and will be ready to ship tomorrow and we estimate an ETA delivery to Packgen on Monday, 1/21.  I'll let you know the carrier information when it leaves Homer, LA tomorrow.[8]

PSAMF ¶ 4; DRPSAMF ¶ 4.    Berry shipped the 48-inch order on January 18, 2008.  DSMF ¶ 10; PRDSMF ¶ 10.  The shipment of 48-inch laminated polypropylene was received by Packgen on January 21, 2008.   PSAMF ¶ 7; DRPSAMF ¶ 7.   On January 21, 2008, Berry mailed Packgen an invoice for the 48-inch order by regular, first class Postal Service Mail, which included Berry's Terms and Conditions.[9]  DSMF ¶ 11; PRDSMF ¶ 11.  The front of the invoice stated, "all sales are subject to the standard terms and conditions attached herewith."  DSMF ¶ 12; PRDSMF ¶ 12.

### 3.    The Invoices

The invoices for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene were formatted as follows: the first page was titled

---

[8]    Berry objected to paragraph 4 because it relies on inadmissible hearsay not subject to an exception.  DRPSAMF ¶ 4.  Mr. Silen's e-mail was an opposing party statement pursuant to Rule 801(d)(2)(D) and not hearsay and the Court includes paragraph 4.  *See* FED. R. EVID. 801(c), 801(d)(2)(D).

[9]    Packgen denied paragraph 11 because the invoice was not "sent" on January 21, 2008 as it was Martin Luther King Day, a federal holiday.  PRDSMF ¶ 11; *see Lapoint Decl*. ¶¶ 5-10, 12. Viewing the facts in the light most favorable to Packgen, the record supports the assertion that the invoice was "mailed" rather than "sent" on January 21, 2008 via regular, first class mail.  The Court overrules Berry's Rule 56(c)(4) objection to Mr. Lapoint's declaration as the statement retains its original meaning.  *See* FED. R. CIV. P. 56(c)(4).

"INVOICE," a sheet of paper with text on both sides was stapled to the first page, and each side of the second sheet of paper contained the title "BERRY CORPORATION STANDARD TERMS AND CONDITIONS FOR CUSTOMERS' PURCHASE OF GOODS."[10]   PSAMF ¶ 18; DRPSAMF ¶ 18.   The first page of the invoice also stated, "All sales are subject to the standard terms and conditions attached herewith."   DRPSAMF ¶ 18.   The "Notice" at the beginning of Berry's standard terms and conditions states, in part, as follows:

> *Notice: These terms and conditions are the commercial terms of purchase of the goods ("Goods") from Berry Corporation and its subsidiaries and affiliates ("Berry") and apply to all purchases of Goods from Berry by any purchaser ("Purchaser") with notice of these terms however gained, including the use of Berry's website ("Website").   No additional or different terms or attempted exclusions or modifications (by way of purchase order ("P.O."), acceptance, confirmation communication, course of performance or otherwise, all of which may be hereafter referred to jointly and severally as "Reply") shall be effective against Berry in the absence of the express written consent of Berry; any attempt by Purchaser to add, exclude, or modify terms shall be deemed to be material, is objected to and will be of no legal effect.   Neither the submission of this document nor anything herein contained shall be construed to be an acceptance or confirmation of any prior or subsequent Reply; this document shall be a rejection and counter-offer with respect to any such Reply . . . .*

PSAMF ¶ 17; DRPSAMF ¶ 17 (emphasis in original).   The Terms and Conditions contained a provision stating that "[t]o the extent it may apply," the limitations

---

[10]   Berry interposed a qualified response to paragraph 18 because the front of the invoices also contained a notice stating, "All sales are subject to the standard terms and conditions attached herewith."   DRPSAMF ¶ 18.   As Berry's qualification is supported by the record citation, the Court includes it.   *See Invoice for 61-inch Laminated Polypropylene* (ECF No. 35-3) (*61-inch Invoice*); *Invoice for 48inch Laminated Polypropylene* (ECF No. 35-4) (*48-inch Invoice*).

period in Indiana's statute of limitations is reduced to one year.[11]   DSMF ¶ 13;

PRDSMF ¶ 13.  Specifically, the Terms and Conditions stated:

> The Agreement shall be interpreted under Indiana law without regard to choice of law principles and shall not be governed in whole or in part by the United Nations Convention on Contracts for the International Sale of Goods; as allowed by that Convention, the parties specifically disclaim its application.   Purchaser consents to jurisdiction of state and federal courts in Indiana and venue of Vanderburgh County to resolve any dispute between the parties; provided, however, that Berry may institute an action for equitable relief in a different jurisdiction at the site of an alleged wrong.  For all matters not covered by the terms of the agreement, the UCC shall control.  Each party waives any right to trial by jury in enforcement of this Agreement.   Until receiving payment in full, Berry shall have all rights as a secured party as to goods sold under UCC article 9.   All remedies are intended to be cumulative and in addition to all other remedies available at law and in equity.  To the extent it may apply, the limitation period in I.C. 26-1-2-725 is reduced to one (1) year.  The parties shall not contest the validity or enforceability of any electronic transmissions based on the statute of frauds; such transmissions will be governed by the Indiana uniform electronic transactions act (I.C. 26-2-8).

DSMF ¶ 14; PRDSMF ¶ 14.  Paragraph twelve of the terms and conditions attached

to Berry's invoices for the 61-inch and 48-inch laminated polypropylene is on the

reverse, i.e., back side, of the page stapled to the invoices.  PSAMF ¶ 19; DRPSAMF

¶ 19.  The only portions of the terms and conditions attached to Berry's invoices for

the 61-inch laminated polypropylene and the 48-inch laminated polypropylene that

appear in all capital letters are the third through last sentences of paragraph 8.

PSAMF ¶ 20; DRPSAMF ¶ 20.  Beyond the notice on the front page of the invoices

which stated "[a]ll sales are subject to the standard terms and conditions attached

---

[11]      Packgen objected to paragraph 13 as conclusory and, without waiving its objection, denied the paragraph because it mischaracterizes the statute of limitations provision.  PRDSMF ¶ 13.  The Court concludes that Berry's statement of fact is not conclusory; however, viewing the facts in Packgen's favor, the Court changes "requiring" to "stating" and includes Packgen's characterization of the contractual provision as supported by the record.

herewith", Berry never advised Packgen that its terms and conditions contained a provision reducing the limitations period for claims to one year.[12]   PSAMF ¶ 21; DRPSAMF ¶ 21.

Upon receipt of the shipments of the 61-inch laminated polypropylene and the 48-inch laminated polypropylene, Packgen immediately moved these materials to its production floor and began using them without delay to manufacture catalyst containers.[13]   PSAMF ¶ 8; DRPSAMF ¶ 8.   The original invoices received by Packgen for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene had been folded three times to allow them to fit in a standard-size business mail envelope.[14]   PSAMF ¶ 9; DRPSAMF ¶ 9.   Packgen maintains its records for purchase orders in letter-size file folders, and therefore the original invoices for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene would not have been folded after they arrived at Packgen.[15]   PSAMF ¶ 10; DRPSAMF ¶ 10.

---

[12]     Berry interposed a qualified response to paragraph 21 because the first page of the invoice stated, "[a]ll sales are subject to the standard terms and conditions attached herewith", and the terms contained the one-year statute of limitations.   DRPSAMF ¶ 21.   As Berry's qualification is supported by the record, the Court includes it.   *See 61-inch Invoice*; *48-inch Invoice*.

[13]     Berry interposed a qualified response to paragraph 8 because "immediately" and "without delay" are vague and imprecise.   DRPSAMF ¶ 8.   Berry also qualifies the paragraph because it is unclear whether the 61-inch polypropylene was used immediately or used when the 48-inch polypropylene arrived.   DRPSAMF ¶ 8.   Drawing all reasonable inferences in the light most favorable to Packgen, the Court does not find "immediately" and "without delay" to be imprecise or vague.   *See Lapoint Decl.* ¶ 18.

[14]     Berry objected to paragraph 9 on the ground that the facts "are not material to this motion and need not be considered by the Court."   DRPSAMF ¶ 9.   "Evidence is relevant if . . . it has any tendency to make a fact more or less probable . . . and [ ] the fact is of consequence in determining the action."   FED. R. EVID. 401.   The facts in paragraph 9 are material to Packgen's argument that the language about the reduced statute of limitations was a material alternation and inconspicuous.   *See Pl.'s Opp'n* at 14-17.   The Court overrules Berry's materiality objection.

[15]     Berry objected to paragraph 10 because it is irrelevant.   DRPSAMF ¶ 10.   For the same reasons the Court includes paragraph 9, the Court includes paragraph 10 over Berry's objection

The invoices for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene list Packgen's mailing address in the upper left-hand corner of the first page and do not contain Packgen's e-mail address or fax number.[16]  PSAMF ¶ 11; DRPSAMF ¶ 11.  The original invoices for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene do not have any notations indicating that they were sent or received by fax or by e-mail.[17]  PSAMF ¶ 12; DRPSAMF ¶ 12.  Packgen's files for the purchase orders attached to the Stipulated Joint Summary Judgment Record as Exhibits A and B do not contain any invoices received by e-mail, fax, or any means other than U.S. Postal Service mail.[18]  PSAMF ¶ 13; DRPSAMF ¶ 13.  The invoices for the 61-inch laminated polypropylene and the 48-inch laminated polypropylene were sent from Berry to Packgen by mailing the invoices to Packgen at its Auburn, Maine mailing address using regular, first class U.S. Postal Service mail.  PSAMF ¶ 14; DRPSAMF ¶ 14. The earliest date that Packgen would have received the invoice for the 61-inch laminated polypropylene by mail is January 2, 2008.  PSAMF ¶ 15; DRPSAMF ¶ 15. The earliest date that Packgen would have received the invoice for the 48-inch

---

because the facts contained within the paragraph are relevant to Packgen's material alternation argument.  *See* FED. R. EVID. 401; *Pl.'s Opp'n* at 14-17.

[16]     Berry objected to paragraph 11 because it is irrelevant.  DRPSAMF ¶ 11.  The Court concludes that the facts in paragraph 11 are relevant to Packgen's contract formation argument and includes them.  *See* FED. R. EVID. 401.

[17]     Berry objected to paragraph 12 because it is irrelevant.  DRPSAMF ¶ 12.  The Court concludes that the facts in paragraph 12 are relevant to Packgen's contract formation argument and includes them.  *See* FED. R. EVID. 401.

[18]     Berry objected to paragraph 13 because it is irrelevant.  DRPSAMF ¶ 13.  The Court concludes that the facts in paragraph 13 are relevant to Packgen's contract formation argument and includes them.  *See* FED. R. EVID. 401.

laminated polypropylene by mail is most likely January 24, 2008.[19]  PSAMF ¶ 16; DRPSAMF ¶ 16.

### 4.    The Breakdown of the Parties' Contractual Relationship

On February 11, 2008, Mr. Roberts submitted two non-conformance reports identifying alleged defects in the products.  DSMF ¶ 15; PRDSMF ¶ 15.  Although Packgen admits that it received each set of Terms and Conditions before notifying Mr. Silen of the alleged defects in the product, Packgen claims it was not aware before the failure of Berry's goods that Berry's terms and conditions contained a provision reducing the statute of limitations period for claims to one year.[20]  PSAMF ¶ 22; DRPSAMF ¶ 22.  Packgen did not expressly agree to the terms and conditions attached to Berry's invoices for the 61-inch and 48-inch laminated polypropylene.[21] PSAMF ¶ 23; DRPSAMF ¶ 23.  On December 9, 2011, Packgen filed suit against Berry claiming breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, and negligence.  DSMF ¶ 16; PRDSMF ¶ 16.

---

[19]     Berry objected to paragraph 16 insofar as it is based on Mr. Lapoint's knowledge about when Berry placed the 48-inch polypropylene invoice in the mail and alternatively denied the paragraph because the invoice indicates that it was mailed on January 21, 2008.  DRPSAMF ¶ 16.  The Court overrules Berry's objection and includes paragraph 16 over its denial because the statement concerns the date the invoice was received rather than mailed.  *See* PSAMF ¶ 16; *Lapoint Decl.* ¶¶ 10, 12.  Even considering the date the invoice was mailed, Mr. Lapoint's statement about the invoice's earliest receipt date appears accurate as June 21, 2008 was a federal holiday when the Post Office does not deliver mail.

[20]     Berry interposed a qualified response stating that although Packgen claims it was not aware of Berry's terms and conditions, it acknowledges that it received the terms and conditions prior to complaining of any product defects.  DRPSAMF ¶ 22.  Because Berry's qualification is supported by the record, the Court includes it in paragraph 22.

[21]     Berry objected to paragraph 23 because it is conclusory and argumentative and does not account for the fact that parties can agree to the terms of a contract implicitly through conduct.  DRPSAMF ¶ 23.  After reviewing the record citations, the Court rephrases paragraph 23 to reflect that Packgen did not expressly agree to Berry's terms and conditions, which leaves open the possibility that Packgen did so implicitly.  *See* PSAMF ¶ 23; *Lapoint Decl.* ¶ 23; *Roberts Decl.* ¶ 14.

## II.    THE PARTIES' POSITIONS

### A.    Berry's Motion

Berry states that this motion requires the Court to decide "whether Berry's Standard Terms and Conditions are part of the contract for Packgen's purchase of certain laminated polypropylene from Berry." *Defs.' Mot.* at 5.  To answer that question, Berry asserts that the Court must determine whether Maine or Indiana law applies.  *Id.*  Given that Maine has more significant contacts to the parties and the lawsuit, Berry insists that Maine law should apply to the Court's assessment of the enforceability of its standard terms and conditions.  *Id.* at 5-6.

Applying Maine's Commercial Code, Berry contends that (1) under section 2-207(1) the invoice sent by Berry to Packgen operated as a written confirmation of acceptance even though it stated additional terms and (2) that the terms become part of the contract pursuant to section 2-207(2) because both parties are merchants and Berry's terms do not materially alter the contract.  *Id.* at 7-8.  Berry emphasizes that Packgen did not expressly limit its acceptance to the terms of its offer and never objected to Berry's terms and conditions.  *Id.* at 8.  Further, citing several federal cases, Berry points out that the reduced statute of limitations term is not a material alteration because "the Maine legislature made clear that a one-year time-bar restriction is per se statutorily acceptable and, therefore, reasonable and customary." *Id.* at 9.

Finally, Berry asserts that if the Court finds the provision limiting the statute of limitations to be part of the parties' contract, Indiana law must be used to

interpret the provision, pursuant to the choice of law provision in paragraph 12 of the Terms and Conditions. *Id.* at 10. Berry points out that Indiana, like Maine, allows parties to contractually limit the statute of limitations to one year. *Id.* at 10-11. Thus, because Packgen discovered the defects in Berry's products no later than February 11, 2008 and commenced litigation on December 9, 2011, after the expiration of the statute of limitations on February 10, 2009, Berry urges the Court to grant its motion for summary judgment because Packgen's lawsuit is untimely. *Id.* at 11.

### B.    Packgen's Opposition

Packgen points out that "there is no dispute that two distinct contracts exist for the sale of the 61-inch and 48-inch laminated polypropylene" given the parties' conduct. *Pl.'s Opp'n* at 5. But Packgen asserts that the "contract bell had rung before Berry issued its additional terms" because Packgen only received Berry's additional terms and conditions after Berry shipped the goods and fully performed on its end of the contract. *Id.* at 6. In support of its argument that the contracts were formed before Berry's proposal of new terms, Packgen contends: (1) Berry unconditionally accepted Packgen's purchase orders by beginning production; (2) section 2-207(2)(b) of the Maine Commercial Code is inapplicable because Berry's additional terms constituted an express rejection rather than an acceptance of Packgen's offer; (3) Berry's terms and conditions represented a counteroffer that Packgen did not accept; and (4) even if section 2-207(2)(b) applied to the contracts,

14

the one-year statute of limitations would not apply because it materially alters the parties' agreements. *Id.* at 1.

Packgen claims that Berry accepted its purchase order offers either (a) when it purchased raw materials and began production or (b) when it shipped the finished goods to Packgen. *Id.* at 8. Thus, "because Berry unconditionally accepted the purchase orders by its conduct before presenting its forms, there was no [ ] battle [of the forms] here", which would trigger section 2-207. *Id.* at 6. As Berry's "terms arrived after the contracts were formed, Packgen's purchase orders govern the terms of the transactions between the parties . . . [and] the four-year limitations period of 11 M.R.S.[] § 2-725(1) controls Packgen's claims." *Id.* at 9.

Even if the contract bell did not ring before Berry's additional terms were received by Packgen, Packgen asserts that Berry cannot show it satisfied section 2-207(1)'s contract formation requirements because its terms and conditions expressly stated that the invoice and its contents could not be considered an acceptance "of any prior or subsequent Reply." *Id.* at 10. Accordingly, Packgen argues that Berry's additional terms represented a rejection and counteroffer to Packgen's purchase order. *Id.* Further, Packgen claims that Berry did not present its additional terms and conditions to Packgen within a reasonable time as required by section 2-207(1). *Id.* at 11. In the event the Court finds that Berry accepted Packgen's offer within a reasonable time, Packgen still argues that the contract falls out of section 2-207(1) because Berry's terms and conditions "explicitly and unambiguously declare[] that it is a counteroffer," and under section 2-207(1) the

conditions are therefore "part of the contracts . . . only if Packgen affirmatively assented to the offer." *Id.* at 12-13. In sum, Packgen contends, the parties did not form valid contracts under section 2-207(1); rather, they formed their contracts under section 2-207(3). *Id.* at 11.

Finally, Packgen argues that even if the Court determines the parties' contract was formed under section 2-207(1), Berry's statute of limitations term does not apply because it materially alters the contracts. *Id.* at 14. Packgen claims it was surprised by Berry's reduced statute of limitations term because it was inconspicuous—stapled to the back of the invoice—and Berry never alerted Packgen to the term. *Id.* at 14-16. Moreover, Packgen points out that the wording of the limitation was confusing and vague. *Id.* at 16. In summary, Packgen asserts that "a reasonable merchant in Packgen's shoes cannot be presumed to have consented to the greatly reduced limitations period . . . ." *Id.* Packgen concludes that "[a]s such . . . this term materially altered the contracts between the parties" under section 2-207(2)(b). *Id.*

### C.   Berry's Reply

Berry asserts that Packgen's opposition boils down to "whether M.R.S. § 2-207(2) applies to the agreement between the parties." *Defs.'s Reply* at 1. First, Berry argues that even if the contracts were formed when it shipped the laminated polypropylene foil to Packgen, its terms and conditions still become part of the contract under section 2-207(2) as a confirmation sent after the goods are shipped. *Id.* Berry analogizes the facts of this case to those of *Glyptal, Inc. v. Engelhard*

16

*Corp.*, 801 F. Supp. 887 (D. Mass. 1992). *Id.* at 2. Because Packgen did not seasonably object to Berry's terms and conditions, it argues that "[t]he additional terms included in the invoices, even if sent after shipment of goods, must be analyzed under UCC § 2-207 rather than some other provision of the UCC." *Id.* at 3.

Next, Berry insists that the reference to a "counteroffer" in the terms and conditions does not determine the substance of its invoices because the Court must "look to the totality of the circumstances to determine the function of a document." *Id*. Berry also notes that the timing of the invoices establishes they were not intended to be counteroffers. *Id*. Thus, Berry's invoices should be analyzed as confirmations sent after goods are shipped under section 2-207(2) and Berry's one-year statute of limitations should be considered part of the parties' contracts. *Id.* at 4.

Finally, Berry dismisses Packgen's claim that its contractual limitation provision was inconspicuous because "the clause is no less conspicuous than the rest of the document." *Id*. at 5. Ultimately, Berry asserts that "Packgen cannot be absolved because it did not read the Terms and Conditions, did not object to them, and now claims to be ignorant to the law." *Id.* at 6.

### D.    Oral Argument

At oral argument, Berry urged the Court to adopt the reasoning of the Eighth Circuit Court of Appeals in *Shur-Value Stamps, Inc. v. Phillips Petroleum Co.*, 50 F.3d 592 (8th Cir. 1995), because, like Texas, the Maine Legislature has adopted the

UCC's statute of limitations term in contracts for sale. Given the Maine Legislature's decision to adopt the same language as the UCC in Maine Revised Statutes, title 11, section 2-725, Berry argued that a one-year statute of limitations term is per se customary and reasonable and therefore not a material alteration. Accordingly, Berry insisted that the Court does not need to consider other facts such as industry custom and the parties' prior course of dealing to determine the materiality of the limitations term.

Packgen disagreed and pointed to the language in section 2-725 which states, "[b]y original agreement the parties may reduce the period of limitations" to one year as evidence that the legislature only finds one-year limitation terms immaterial and reasonable when they are expressly agreed upon by the parties. 11 M.R.S. § 2-725. As it is unclear whether the one-year limitations term was part of the parties' "agreement", Packgen argued that the Court must look to industry custom and the parties' prior course of dealing to determine whether the term materially alters the parties' agreement. In response, Berry distinguished the process of forming an agreement from the document which embodies the parties' agreement to support its argument that the "[b]y original agreement" language refers to its terms and conditions. Finally, Packgen voiced concerns about the applicability of *Glyptal* and section 2-207 to the facts of this case.

## III.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).  An issue is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy*, 56 F.3d at 315).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "In determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* at 61 (citing *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004)).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

## B.   Maine Law Applies

The parties agree that Maine law governs the validity and enforceability of Berry's terms and conditions in its invoices.[22]  *See Defs.' Mot.* at 5-6; *Pl.'s Opp'n* at 2 n.1.  Given the parties' agreement that Maine law should apply, and the fact that

---

[22]     At oral argument, the parties agreed that there is no dispute concerning choice of law.

there is no true conflict between Indiana and Maine law,[23] the Court bypasses the choice of law issue and will reference Maine's Commercial Code to determine the validity and enforceability of Berry's reduced statute of limitations term.  *See Ionics, Inc. v. Elmwood Sensors,* 110 F.3d 184, 187 n.2 (1st Cir. 1997) (bypassing choice of law issue because Massachusetts and Rhode Island had "virtually identical" versions of section 2-207 of the Uniform Commercial Code); *Dermalogix Partners, Inc. v. Corwood Labs., Inc.,* No. 99-149-P-C, 2000 WL 760732, at *2 n.5 (D. Me. Mar. 14, 2000) (referring to the Maine version of the code for convenience when there was no true conflict between Maine and New York law).

### C.   Contract Formation

#### 1.   Berry Accepted Packgen's Offer Before Sending Packgen the Invoices

Berry argues that its additional terms constitute a written confirmation of its acceptance of Packgen's offer under section 2-207 and that the terms satisfy section 2-207(2)'s requirements.  *Defs.' Mot.* at 7; *Defs.' Reply* at 1.  In response, Packgen contends that the parties did not form contracts under section 2-207(1) but instead under section 2-206, and that therefore section 2-207(2) does not apply.  *Pl.'s Opp'n* at 6-8.  According to Packgen, the terms could only be added to the contracts pursuant to a section 2-209 modification because the "contract bell" rang before Packgen received Berry's additional terms.  *Id.*

---

[23] Packgen is a Maine corporation, Berry is a Delaware corporation with its principal place of business in Indiana, and the parties acknowledge that contract negotiations and contracting took place in both Maine and Indiana. *Defs.' Mot.* at 5-6; *Pl.'s Opp'n* at 2 n.1. Indiana and Maine adopted the same relevant provisions of the UCC—specifically, sections 2-206, 2-207, and 2-725. *Compare* 11 M.R.S. § 2-207, *with* IND. CODE § 26-1-2-101; *compare* 11 M.R.S. § 2-725, *with* IND. CODE § 26-1-2-725.

In *Glyptal, Inc. v. Engelhard Corp.*, a district court entertained similar legal arguments when Glyptal, Inc. (Glyptal) sued Engelhard Corp. (Engelhard) for breach of warranty claims on three contracts.  801 F. Supp. at 887.  Engelhard supplied Glyptal with paint three times after receiving purchase orders from Glyptal.  *Id.* at 890-91.  For each transaction, Engelhard shipped the paint before mailing Glyptal an acknowledgment form, which contained various terms and conditions of the sale printed on the back of the form.  *Id.*  Ultimately, the paint Engelhard sent Glyptal did not meet Glyptal's specifications and Glyptal sued.  *Id.* at 891-92.  In its motion for summary judgment, Engelhard argued that the remedy-limiting provisions in its terms and conditions attached to its acknowledgment form prevented Glyptal from obtaining consequential or incidental damages.  *Id.* at 892.  Glyptal argued that the parties' contract was fully formed when Engelhard shipped the goods to Glyptal, and therefore the terms in its acknowledgment were mere proposals for additional terms that should not be incorporated into the parties' contracts under U.C.C. § 2-207.  *Id.*

The *Glyptal* Court agreed that Engelhard had accepted Glyptal's offers when it shipped the goods to Glyptal, pursuant to U.C.C. § 2-206(1)(b).  *Id.* at 893-94.  The Court then—adopting the approach recommended by Professors James White and Robert Summers in their treatise on the UCC—treated the acknowledgment forms as proposals for additional terms to the contracts, "which either would be excluded from or incorporated into the parties' agreement depending upon the outcome of an analysis performed in accordance with section 2-207(2) of the Uniform Commercial

21

Code." *Id*. After analyzing whether the remedy-limiting provisions constituted a material alteration to the parties' agreement under section 2-207(2), the *Glyptal* Court concluded that the additional terms fell outside of the contract. *Id*. at 894-95.

Applying the Court's analysis in *Glyptal*, this Court concludes that the parties here formed their contract when Berry accepted Packgen's offer by shipping the laminated polypropylene. *See id*. at 891-95. Section 2-206(1) of the Maine Commercial Code states that a contract is formed through offer and acceptance when:

> 1) Unless otherwise unambiguously indicated by the language or circumstances
>
>> a) An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;
>>
>> b) An order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods . . . .

11 M.R.S. § 2-206. The commentary to section 2-206 notes that "[a]ny reasonable manner of acceptance is intended to be regarded as available unless the offeror has made quite clear that it will not be acceptable." 11 M.R.S.A. § 2-206, cmt. 1. Further, the UCC's understanding of acceptance embraces

> [t]he common law idea that the offeror is the master of the offer. However, it reflects an underlying assumption that the offeror is often indifferent as to what words or non-verbal conduct will create an acceptance . . . [c]onsequently, a buyer's offer for the current shipment of goods may be accepted not only by shipment or promise to ship, but also by commencement of performance, as, for example, the preparation of the goods for shipment.

CORBIN ON CONTRACTS § 3.8 (2013).

According to Packgen, Berry accepted its purchase order offers either when it began performance or when it shipped the goods to Packgen. *Pl.'s Opp'n* at 7-8. Berry does not directly contest that point but argues that its invoices confirmed its acceptance of both purchase orders and therefore the invoices' terms may still form part of the contracts pursuant to sections 2-207(1)-(2). *Def.'s Reply* at 1. Packgen stated that "[f]ollowing its receipt of each purchase order, Berry informed Packgen that Berry was purchasing raw materials, beginning production, completing production, and shipping the goods to Packgen." *Pl.'s Opp'n* at 6. The record establishes that the parties were in contact and were negotiating the details of their deals from around the time Packgen sent Berry its purchase orders until Berry shipped the polypropylene. PSAMF ¶¶ 2-4; DRPSAMF ¶¶ 2-4. Thus, given that Packgen did not expressly limit the manner in which Berry could accept its offers and section 2-206 confirms that Berry could accept Packgen's offer either through commencement of performance or shipment of the laminated polypropylene, the Court agrees with Packgen that Berry accepted Packgen's offers before it sent Packgen the relevant invoices. *See Glyptal,* 801 F. Supp. at 893 ("a seller's acknowledgment that arrives after the seller ships the goods would not constitute a counter-offer or even an acceptance because, pursuant to section 2-206(1)(b) of the Uniform Commercial Code, the shipment would constitute the seller's acceptance").

## 2.    Section 2-207(1) and (2) Apply

### a.    Confirmation of Acceptance

Because the Court has determined that the parties formed a contract before Packgen's receipt of Berry's invoices, the Court must decide whether section 2-207(1) and (2) apply to Berry's proposed additional terms and conditions. Section 2-207 provides:

Additional Terms in Acceptance or Confirmation.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) the offer expressly limits acceptance to the terms of the offer;

    (b) they materially alter it; or

    (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writing of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the Act.

11 M.R.S. § 2-207. Packgen asserts that where the parties' contracts are not formed under section 2-207(1), section 2-207(2) does not apply because there is no "battle of the forms." *Pl.'s Mot.* at 6. Yet, there does not have to be a classic "battle of the forms" for section 2-207(1) and (2) to apply to a contractual dispute, as:

Notwithstanding its popular characterization as the "battle of forms" section, the original section 2-207 was not limited to "battle of the

> forms" situations.  Where, for example, an oral contract was followed
> by the issuance of one form containing terms that were not mentioned
> in the oral agreement, section 2-207 clearly applied.  The "battle" in
> such cases was one between the terms in one form and the terms of the
> oral contract, but not between two forms.

CORBIN ON CONTRACTS § 3.37A (2013); MURRAY ON CONTRACTS § 50[D] (2011)

("While the paradigm situation involves two forms, a purchase order and a seller's

acknowledgment containing additional or different terms, a not uncommon

situation involves only one form"); *see Continental Can Co. v. Poultry Processing,*

*Inc.,* 649 F. Supp. 570, 574 (D. Me. 1986) (applying section 2-207(2) to an orally

assigned contract where the parties' confirmation letters each included additional

terms).  Accordingly, "Section 2-207 applies to 'written confirmations of agreements

already reached.'"  *ICC Chem. Corp. v. Vitol.*, 425 F. App'x 57, 59 (2d Cir. 2011)

(quoting *Aceros Prefabricados, S.A. v. TradeArbed, Inc.*, 282 F.3d 92, 98 (2d Cir.

2002)).

    The same reasoning applied to oral contracts and confirmations applies to the

contracts here and persuades the Court to conclude that Berry's invoices were

confirmations of the parties' agreements.[24]  *See* MURRAY ON CONTRACTS § 51[G] ("A

*confirmation* is necessary subsequent to the formation of the oral contract . . .

Section 2-207(1) treats a confirmation *as if it were an acceptance* so that any

---

[24]    Notably, although section 2-207(3) references parties' conduct that evidences a contract even
though the writings otherwise would not, that section only applies to situations where the parties
exchange writings before performance and a parties' "response to the offer is a counter offer but the
parties proceed to perform as if a contract had been formed."  MURRAY ON CONTRACTS § 51[H][4].
Here, the parties' writings were not fully exchanged until Berry performed and accepted Packgen's
offers by shipping the polypropylene.  Thus, the Court rejects Packgen's section 2-207(3) argument.
*Pl.'s Opp'n* at 10-11; *cf. Ionics, Inc. v. Elmwood Sensors*, 110 F.3d 184, 185, 189 (1st Cir. 1997)
(finding that because the seller's acknowledgment was received prior to shipment of the goods and
contained terms that contradicted terms in the buyer's purchase order, the parties' contract fell out
of section 2-207(1) and into 2-207(3)).

different or additional terms are subject to § 2-207(2) like any other definite expression of acceptance") (emphasis in original).

Moreover, a comment to section 2-207 that the *Glyptal* Court found persuasive when forming its decision states:

> Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the confirmation or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different terms.

U.C.C. § 2-207, cmt. 2; 11 M.R.S.A. § 2-207, cmt. 2; s*ee Aceros Prefabricados,* 282 F.3d at 98-99 (noting that whether writings are treated as confirmations or acceptances of the parties' contracts, any additional terms will be reviewed as proposals for additional terms and analyzed under section 2-207(2)); *Glyptal,* 801 F. Supp. at 893. Here, given Packgen's purchase order and Berry's shipment of the goods, it is clear that the parties had a deal which in a commercial understanding constituted a contract prior to Packgen's receipt of Berry's invoices. *See* 11 M.R.S.A. § 2-207, cmt. 2. Thus, under section 2-207(1), Berry's invoices were confirmations of its acceptance that contained proposals for additional contractual terms. *See Aceros Prefabricados*, 282 F.3d at 98; *Glyptal*, 801 F. Supp. at 893.

### b.    Sent Within a Reasonable Time

Packgen asserts that it did not receive Berry's terms and conditions within a reasonable time as required by section 2-207(1). *Pl.'s Opp'n* at 11; *see* M.R.S. § 2-207(1). Section 1-205 of the UCC states that "whether a time for taking an action required by [the Uniform Commercial Code] is reasonable depends on the nature,

purpose, and circumstances of the action." U.C.C. § 1-205. Accordingly, "the transactional context of the particular action" must be analyzed when assessing the reasonableness of the timing when Packgen received Berry's invoices. *Id.* at cmt. 1.

Given the timeline in the record, the Court concludes that Berry sent Packgen the invoices within a reasonable amount of time pursuant to section 2-207(1). The record establishes that Packgen sent Berry a purchase order for the 61-inch laminated polypropylene foil on September 25, 2007. DSMF ¶ 3; PRDSMF ¶ 3. The parties continued to exchange e-mails while Berry secured final dates for delivery of materials, production, and shipment. PSAMF ¶¶ 2-3; DRPSAMF ¶¶ 2-3. Berry shipped the polypropylene to Packgen on December 22, 2007, Packgen received the 61-inch polypropylene on December 27, 2007, and Berry sent the relevant invoice to Packgen on December 28, 2007. DSMF ¶¶ 4, 5; PRDSMF ¶¶ 4, 5; PSAMF ¶ 6; DRPSAMF ¶ 6. The 48-inch polypropylene shipment followed a similar time trajectory as Packgen sent a purchase order on November 26, 2007, Berry shipped the polypropylene on January 18, 2008, Packgen received the 48-inch polypropylene on January 21, 2008, and Packgen received the relevant invoice on or after January 24, 2008. DSMF ¶¶ 9-10; PRDSMF ¶¶ 9-10; PSAMF ¶¶ 7, 16; DRPSAMF ¶¶ 7, 16.

Although approximately three months passed between the time Packgen sent its purchase orders and Berry sent its invoices, each invoice followed Packgen's receipt of the polypropylene by only a few days and the parties appeared to be negotiating and finalizing the details of their deals until the time Berry shipped

each order.  *See* DSMF ¶¶ 3-5; PRDSMF ¶¶ 3-5; PSAMF ¶¶ 2-3, 6; DRPSAMF ¶¶ 2-3, 6.  Because the parties continued to negotiate the terms of the deals and the invoices constituted confirmations of the parties' final agreements, the Court concludes that a reasonable juror could find that the circumstances and transactional context of the parties' dealings show that Berry sent Packgen the invoices within "a reasonable time."  *See* M.R.S. § 2-207(1); *Pl.'s Opp'n* at 11 (noting that after Packgen sent the purchase orders "the parties had engaged in a number of communications concerning the purchase orders"); *Defs.' Reply* at 2 ("Indeed, Packgen's purchase order does not provide all of the terms of the agreement because negotiations between the parties continued through telephone calls and e-mails after Packgen sent the purchase orders to Berry").

### c.    Conditional Assent

Next, Packgen asserts that the terms and conditions contained in Berry's invoices fall within section 2-207(1)'s proviso because "they comprise a definite expression that Berry does not accept Packgen's purchase orders and rejects them." *Pl.'s Opp'n* at 10.  Thus, Packgen argues that Berry's "terms and conditions are a counteroffer and as such are expressly conditional on Packgen's assent."  *Id.* at 11. Section 2-207(1) states, "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the

additional or different terms." 11 M.R.S. § 2-207(1). Packgen directs the Court to a portion of Berry's terms and conditions, which states, in part:

> *Notice. . . . No additional or different terms or attempted exclusions or modifications (by way of purchase order ("P.O."), acceptance, confirmation, communication, course of performance or otherwise, all of which may hereafter be referred to jointly and severally as "Reply") shall be effective against Berry in the absence of the express written consent of Berry, any attempt by Purchaser to add, exclude or modify terms shall be deemed to be material, is objected to and will be of no effect. Neither the submission of this document nor anything herein contained shall be construed to be an acceptance or confirmation of any prior or subsequent Reply; this document shall be a rejection and counter-offer with respect to any such Reply.*

*61-inch Invoice* at 2*; 48-inch Invoice* at 2 (emphasis in original).

At first glance, the language in Berry's "Notice" may appear to expressly condition the parties' agreement on Packgen's assent to its additional terms; however, Berry had already accepted Packgen's offer before Packgen's receipt of the invoices containing the conditional language. *See* Part III.C.1; *see also* CORBIN ON CONTRACTS § 3.37A (discussing the proviso and how it applies to "definite expression[s] of acceptance"). Accordingly, contrary to Packgen's position, the Court concludes that Berry's invoices were not "traditional counteroffer[s]" but rather constituted confirmations of the parties' prior agreements. *See Pl.'s Opp'n* at 11-13. Whether the additional terms and conditional language in the invoices become part of the parties' contracts depends on whether the proposed terms survive the Court's section 2-207(2) analysis.

### D.   The Terms of the Parties' Agreements

Applying section 2-207(2) to Berry's invoices, the central issue is whether the reduction of the default statute of limitations for breach of contract for a sale of goods from four years to one year would materially alter the parties' contract. *See* 11 M.R.S. § 2-725. Typically, "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." 11 M.R.S. § 2-725. The statute also allows parties to reduce the "period of limitation to not less than one year." *Id.* If the one-year statute of limitations in Berry's invoices applies, Packgen's lawsuit will be untimely and barred by the statute of limitations. *See Def.'s Mot.* at 11; *Def.'s Reply* at 6.

### 1. Section 2-207(2): Subsections (a) and (c) Do Not Bar Berry's Additional Term

Section 2-207(2) provides that in an acceptance or confirmation:

> 2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> a) The offer expressly limits acceptance to the terms of the offer;
>
> b) They materially alter it; or
>
> c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

11 M.R.S. § 2-207(2). Here, both parties are merchants within the meaning of the statute, so the "additional terms" in Berry's acceptances are to "become part of the contract unless" one of the three subsection-exceptions in Section 2-207(2) applies. *Id.*; *see* 11 M.R.S. § 2-104(1) (defining "merchant"); *Def.'s Mot.* at 8 n.5.

30

Neither subsection (a) nor subsection (c) of Section 2-207(2) applies to Berry's one-year statute of limitations terms. Section 2-207(2)(a) does not apply because Packgen's purchase orders—the offers—did not "expressly limit" Berry's acceptances to the terms contained within Packgen's orders. *See 61-inch Purchase Order; 48-inch Purchase Order*. Also, Berry was not placed on "notice" that Packgen objected to its reduced statute of limitations terms under section 2-207(2)(c). *See 61-inch Purchase Order, 48-inch Purchase Order*. Packgen's purchase orders did not contain an express provision on the applicable statute of limitations, *id.*, and here, unlike in *Ionics, Inc. v. Elmwood Sensors*, there is no indication that the forms contained conflicting clauses. 110 F.3d at 189 (holding that "where the terms in two forms are contradictory," such terms do not "become part of the contract under [2-207(2)] because notification of objection has been given by the conflicting forms" under 2-207(2)(c)). Thus, subsections (a) and (c) of section 2-207(2) do not excise Berry's additional one-year statute of limitations term from the parties' contracts.

### 2.    Subsection (b): Material Alteration

The Court turns to the key issue: Whether Berry's one-year statute of limitations terms "materially alter" the contracts between Packgen and Berry. Comment three to section 2-207 states:

> If [additional terms] are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, there are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.

31

11 M.R.S.A. § 2-207, cmt. 3.  The Maine Law Court has held that under section 2-207(2), "[a]n additional term materially alters the . . . agreement if it would result in unreasonable surprise or hardship to the buyer." *A.E. Robinson Oil Co. v. County Forest Prods.*, 2012 ME 29, ¶ 9, 40 A.3d 20 (citing 11 M.R.S.A. § 2-207, cmts. 4-5). "The test for materiality is objective." *Id.* ¶¶ 9, 10 n.3. "Considerations relevant to the issue of surprise include 'the parties' prior course of dealing and the number of written confirmations that they exchanged, industry custom and the conspicuousness of the term.'" *Dermalogix Partners,* 2000 WL 760732, at *4 (quoting *LTV Energy Products v. Northern States Contracting*, 162 B.R. 949, 957 (S.D.N.Y. 1994)).  According to comment four of section 2-207:

> Examples of typical clauses which would "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party [include] . . . a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

11 M.R.S.A. § 2-207, cmt. 4.  Comment five of section 2-207 gives some examples of contractual clauses that "involve no element of unreasonable surprise" such as "a clause fixing a reasonable time for complaints within customary limits." *Id.* cmt. 5.

Although there is no First Circuit case on point, other federal courts have concluded that if a state adopts the UCC's statute of limitations provision authorizing parties to reduce their limitations term to one year, a one-year limitations period that is an "additional term" under section 2-207 is per se reasonable.  In *Shur-Value*, the plaintiff claimed that the district court erred when it concluded that the limitations term became part of the parties' agreement under

Texas Business and Commercial Code, section 2-207(2)(b), arguing that there were disputed factual issues for the jury regarding whether the term resulted in hardship or surprise to the plaintiff. *Id.* at 597-99. In response, the Eighth Circuit upheld the district court's decision and concluded that "[i]f a contractual provision stipulates a limitations period that falls within statutorily defined parameters . . . then presumably the provision is not only legal, but also reasonable, customary, acceptable and accepted." 50 F.3d at 598. Citing comments four and five to section 2-207, the Eighth Circuit recognized that "[c]onsiderations of surprise and hardship must remain part of the analysis," but determined that those considerations were already taken into account by the Texas Legislature when it adopted UCC section 2-725, thereby expressly allowing parties to include a one-year statute of limitations in contracts. *Id.* at 599. Accordingly, the Court declined to conduct a separate factual analysis of whether the reduced limitations term resulted in unreasonable surprise or hardship to the plaintiff because "the per se reasonableness of the POA's one-year time-bar" entitled the defendant to summary judgment. *Id.*

Other courts have arrived at the same conclusion under section 2-207(2) when determining the "reasonableness" of reduced statute of limitations terms. In *Aceros Industriales, S.A. de C.V. v. Florida Steel Corp.*, the district court held that the contract's one-year statute of limitations term was not a material alteration because "the fixing of a reasonable time period for complaints to be brought does not constitute a material alteration of a prior agreement for the sale of goods." 528 F. Supp. 1156, 1158 (S.D.N.Y. 1982) (citing New York Uniform Commercial Code, § 2-

207, cmt. 5); *see Therma-Coustics Manufacturing v. Borden*, 167 Cal. App. 3d 282, 295-96 (Ct. App. 1985) (holding one-year limitations term to be per se reasonable in light of UCC 2-207, comment 5, and because California statutory law allowed for one-year limitation term).   In dictum, the Tenth Circuit observed that a one-year statute of limitations term "likely" would be excluded as a material alteration under Colorado law because Colorado had not adopted UCC section 2-725, while it was "possible" that an identical term would not be considered a material alteration under New York law, because New York had adopted that section.   *See Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1285-86 (10th Cir. 1997).

Like Texas, New York, and California, the Maine Legislature has adopted UCC § 2-725.   *See* 11 M.R.S. § 2-725.   Accordingly, the reasoning for upholding the limitations terms in *Shur-Value*, *Aceros Industriales*, and *Therma-Coustics* appears to apply to the one-year limitations term at issue here.   Yet, at oral argument, Packgen highlighted the "[b]y the original agreement" language in section 2-725(1) and argued that *Shur-Value*'s reasoning should not apply because the parties never actually agreed on a statute of limitations term for their contract.   *Id.* § 2-725(1). Packgen insists that to determine the materiality of the limitations term and whether it should be part of the parties' contractual agreement, the Court must assess whether the term unreasonably surprised or would impose hardship on Packgen according to the factors listed in *Dermalogix Partners*.   2000 WL 760732, at *4; *see A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20.   *Dermalogix Partners* stated that "[c]onsiderations relevant to the issue of surprise include 'the parties' prior

34

course of dealing and the number of written confirmations that they exchanged, [and] industry custom . . . ."  2000 WL 760732, at *4.  With respect to hardship, section "2-207 has been held to prevent a party from 'rely[ing] upon a boilerplate clause in a boilerplate form and a corresponding operation of law to shift substantial economic burdens from itself to a nonassenting party when it had every opportunity to negotiate such a term if it desired.'"  *Welsh v. Tex-Mach, Inc.,* No. 08-cv-11401-DPW, 2009 WL 2922955, at *9 (D. Mass. Aug. 28, 2009) (quoting *Trans-Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1263 (7th Cir. 1989)).

This Court concludes that there is a genuine dispute of material fact as to whether the one-year statute of limitations terms in this case "materially altered" the contract between Packgen and Berry.  *See* 11 M.R.S. § 2-207(2); *A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20.  Under *A.E. Robinson Oil*, "material alteration" under Maine law is an added term that would "result in unreasonable surprise or hardship to the buyer."[25] 2012 ME 29, ¶ 9, 40 A.3d 20.  The Maine Law Court supported this definition by citing comments four and five of section 2-207.  *Id.* Consequently, the Court must parse the language in comments four and five to determine whether the addition of the one-year statute of limitations "'materially alter[s]' the contract and so result[s] in surprise or hardship . . . ."  11 M.R.S.A. § 2-207, cmt. 4.

Comment four provides "[e]xamples of typical clauses which would normally 'materially alter' the contract," including "a clause requiring that complaints be

---

[25]   "Unreasonable surprise or hardship" is assessed according to an objective standard.  *A.E. Robinson Oil*, 2012 ME 29, ¶ 9 ("[t]he test for materiality is objective").

made in a time materially shorter than customary *or* reasonable." *Id.* (emphasis added). Comment five provides "examples of clauses which involve no element of unreasonable surprise and are therefore to be incorporated in the contract unless notice of objection is seasonably given," including "a clause fixing a reasonable time for complaints within *customary* limits." 11 M.R.S.A. § 2-207, cmt. 5 (emphasis added). Although "customary" and "reasonable" may overlap in these examples, they remain separate parts of the material alteration inquiry; elsewise, the word "customary" would be surplusage. *Compare id.*, cmt. 4 ("customary or reasonable"), *with id.*, cmt. 5 ("reasonable time for complaints within customary limits").

Accordingly, a determination as to reasonableness alone is not sufficient to conclude whether there was no material alteration as a matter of law. A statute of limitations provision could be a "reasonable" modification, but still materially alter the contract, if the term is "materially shorter than customary" or otherwise results in "unreasonable surprise or hardship to the buyer." *See A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20. This conclusion further supported by the First Circuit's observation that the examples in comments four and five are not comprehensive: "Comments 4 and 5 are illustrative only and the UCC provides no further elucidation of the terms 'surprise' or 'hardship.'" *JOM, Inc. v. Adell Plastics, Inc.*, 193 F.3d 47, 59 (1st Cir. 1999). Therefore, assuming without deciding that Berry's limitations terms are "per se reasonable" under Maine law—based upon the reasoning in *Shur-Value, Aceros Industriales*, and *Therma-Coustics* as applied to 11 M.R.S. § 2-725—this reasoning would still not satisfy the larger material alteration

36

inquiry.[26]  *See* 11 M.R.S.A. § 2-207, cmt. 4-5; *A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20; *Shur-Value*, 50 F.3d at 598.

Viewing the record in the light most favorable to Packgen, a disputed issue of material fact remains as to whether Berry's one-year statute of limitations provisions resulted in "unreasonable surprise or hardship to the buyer."  *See* 11 M.R.S.A. § 2-207, cmt. 4; *A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20; *Phair*, 708 F. Supp. 2d at 61.   Packgen has asserted that the limitations period was inconspicuous, vague, and that Packgen was neither informed of the proposed change nor aware of it.  *Pl.'s Opp'n* at 16.  Packgen supports these assertions by describing how the limitations period was found within a one-page double-sided document that was stapled to Berry's invoice, "buried in the eighth sentence of a paragraph on the back side of the page" in small print.  *Id.* at 15-16.  These facts make out an allegation of unreasonable surprise, consistent with the "[c]onsiderations relevant to the issue of surprise" set out in *Dermalogix Partners*. *See* 2000 WL 760732, at *4 (listing factors to be considered as including "the parties' prior course of dealing and the number of written confirmations that they exchanged, industry custom and the conspicuousness of the term") (internal citations omitted).  *See* 11 M.R.S.A. § 2-207, cmt. 4.  Giving Packgen the benefit of all reasonable inferences in its favor, *Phair*, 708 F. Supp. 2d at 61, a reasonable

---

[26]      The Court acknowledges that *Shur-Value*'s holding on reasonableness was dispositive to the larger question of whether a limitations period was a material alteration.  *See* 50 F.3d at 598 ("[i]f a contractual provision stipulates a limitations period that falls within statutorily defined parameters . . . then presumably the provision is not only legal, but also reasonable, customary, acceptable and accepted").  Based on the Maine Law Court's guidance in *A.E. Robinson Oil*, however, this Court interprets comments 4 and 5 of 11 M.R.S.A. section 2-207 to prevent this Court from treating "reasonableness" as the dispositive factor in the material alteration inquiry.  *See* 2012 ME 29, ¶ 9, 40 A.3d 20.

person could conclude that the one-year statute of limitations provisions resulted in "unreasonable surprise" to Packgen, and thus materially altered the contracts at issue. *See id.*; *A.E. Robinson Oil*, 2012 ME 29, ¶ 9, 40 A.3d 20; *Dermalogix Partners*. *See* 2000 WL 760732, at *4.

The Court concludes that there remains  a genuine dispute of material fact as to whether Berry's one-year statute of limitations terms materially altered the two contracts between Packgen and Berry.

## IV.    CONLUSION

The Court DENIES Berry's Motion for Summary Judgment (ECF No. 33).

SO ORDERED.

<u>John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 23rd day of September, 2013

38