

September 10, 2012

**EXHIBIT C**

CONFIDENTIAL
Phillip S. Bixby, Esq.
Friedman, Gaythwaite, Wolf & Leavitt
25 Pearl Street
P.O. Box 4726
Portland, Maine  04112

PACKGEN V. BERRY PLASTICS CORPORATION AND COVALENCE SPECIALTY COATINGS, LLC
REVIEW OF PLAINTIFF'S DAMAGE ANALYSIS

Dear Attorney Bixby:

We were asked to review the damages claimed by the plaintiff in the matter of Packgen ("Plaintiff")
v. Berry Plastics Corporation ("Berry") and Covalence Specialty Coatings, LLC (together, the
"Defendants").  Specifically, we have been asked to review the damages calculated by Mr. Filler
("Filler"), as submitted in the Plaintiff's Expert Witness Designations dated May 24, 2012.

The documents and information we have relied upon can be found in **Appendix A.**

The balance of this letter will be arranged in the following manner:

1. Background
2. Terms of supplier agreement
3. Review of damages claimed by Packgen

**Background**
Packgen claims that the Defendants supplied flawed material to them (the "Berry laminated
product" or the "accused product"), which they further assert resulted in product failures.[1]  They
claim that these alleged product failures resulted in "substantial damages, including, but not limited
to, costs for the recovery and/or destruction of IBCs [intermediate bulk containers] manufactured
from the Berry laminated product, costs of producing and shipping IBCs, the sale price of the IBCs,
mitigation expenses and other incidental damages, consequential damages, including lost profits... ."[2]
Packgen's brand name for their IBC is "Cougar".

The plaintiff's lost profits claims as calculated by Filler were disclosed in the May 24, 2012 Plaintiff's
Expert Witness Designation.[3]  In addition, the plaintiff claims losses in the form of expenses related
to: unpaid customer invoices, costs of unusable raw materials, testing of containers, capital expenses
for CRI containers and mitigation costs.[4]

---

[1] Complaint, paragraph 17.
[2] Complaint, paragraph 18.
[3] Plaintiff's Expert Witness Designations beginning at page 1.
[4] Plaintiff's response to Defendants' First Request for Production of Documents ("Plaintiffs first answers") No. 3.

100 Commercial Street, Suite 300                                      Phone: 207.775.5111
Portland, Maine  04101                                                        Fax: 207.775.5101

SEP 1 0 2012

Phillip S. Bixby, Esq.
September 10, 2012
Page 2

**Terms of supplier agreement**
Sales of Berry's products were accompanied by *Berry Plastics Corporation and Its Subsidiaries and Affiliates Standard Terms and Conditions for Customers' Purchase of Goods* ("Terms and Conditions") which apply to "all purchases of Goods from Berry by any purchaser."[5] We make the following observations in the event that these Terms and Conditions are found applicable.

Mr. Lapoint ("Lapoint") indicated that the terms and conditions did not come until after Packgen received the goods.[6]   Packgen's records indicate, as an example, that the 48" accused product had a purchase order issued for it 11/26/2007.[7]  The product was invoiced January 21, 2008.[8]  The invoice indicated that "All sales are subject to the standard terms and conditions attached herewith."[9]   The product was received by Packgen January 22, 2008.[10]   On January 23, 2008, Mr. Don Roberts ("Roberts") of Packgen advised Mr. Silen ("Silen") of Berry that there were problems with the first roll, indicating he would be unable to use it if it was curved.

According to the Plaintiff's Answers to Defendants' First Set of Interrogatories ("Plaintiff's first answers"), the "root cause of the delamination was the change from polypropylene supplied by Packgen to Polypropylene manufactured by Berry's sister company,"[11] a change that Packgen had requested Berry make.[12]

Material that Packgen alleges contained defects included the following two shipments:

- 61" 20,000LY/58,430LF Laminated Polypro Foil roll for $48,200 (19,476 received by Packgen 12/31/2007)[13] (used for the cover); and
- 48" 40,000LY/110,300LF Laminated Polypro Foil rolls for $66,800 (37,400 received by Packgen 1/22/08)[14] (used for body of cougar).

Packgen's obligation to examine and test
The Terms and Conditions specified that:

> All Goods are sold on the condition that the Purchaser will examine and test samples prior to purchase to determine whether the Goods: (i) meet Purchaser's requirements

---

[5] Revised November 21, 2007 P00042; Revised January 2008 PACKGEN470.  Language substantially similar between these two agreements as to the relevant provisions discussed herein.
[6] Deposition of John Lapoint page 108, lines 10-12.  Note that all references to LaPoint's deposition are to the "Draft Copy" of the deposition and pagination references may differ from the Final Copy.
[7] P00027
[8] P00050
[9] P00050; in addition, Covalence quotations issued to Wrangler indicate on the quote "ORDERS SUBJECT TO OUR STANDARD TERMS AND CONDITIONS OF SALE".  See, for example, P00017.
[10] P00048
[11] Plaintiff's first answers page 6 and email from Don Roberts of Packgen to Anne Easley at Berry Plastics, P00091
[12] Note that although Packgen complained that the product used "a base material that differed from the original manufacturing specification provided by Packgen (P000115), it was Packgen itself who had requested the change in material.  See also PACKGEN 282.
[13] P00039
[14] P00048

Phillip S. Bixby, Esq.
September 10, 2012
Page 3

and (ii) comply with all compatibility and use requirements including those referred to
in sections 11 (Thermoplastic characteristics) and 14 (Miscellaneous).[15]

Accordingly, on December 26, 2007, Silen of Berry Plastics emailed Roberts at Packgen, asking if
the 61" material had arrived, and requesting feedback "on the material since this was made with
woven from our sister company in Mexico."[16]   On January 23, 2008, Roberts advised Silen that there
were problems with the first roll, indicating he would be unable to use it if it was curved.   Silen
advised Roberts to submit a formal complaint.[17]   On February 11, 2008, Roberts submitted two
non-conformance reports: the first "nonconformance I talked to you a couple of weeks ago on it"
and the second on "rolls of 48" material and the lamination between the foil and the woven is not
holding....This is a major problem."[18]

On February 12, 2008, in response to a question from Silen asking Lisa White ("White") at Berry to
review "why the 48" order has issues with bonds vs. the 61" order", White responded (copying
Roberts) that she found it "surprising on the delamination", going on to talk about the tests she had
looked at, and asking further questions about the failure.[19]   On February 25, 2008, Silen requested
that Roberts advise him "if there were any of the 61" that ran without issue", requesting that
Roberts further advise which roll #'s were "good rolls".[20]   It is these emails Roberts indicated he
interpreted as Berry saying the product was acceptable to be used.[21]   However, neither email says any
such thing.

Several rolls were sent back to Berry to be re-run, only one of which Packgen used "very little."[22]
On April 4, 2008, Silen emailed Roberts asking him if he had reviewed "the rest of the 5 rolls that
we re-shipped to you."[23]   On April 14, 2008, Anne Easley of Berry further inquired of Roberts "how
did the other rolls look?"[24]   Again, no response to this request was provided in discovery.   On April
21, 2008, Easley again inquired of Roberts: "You didn't specifically mention your findings on the
rest of the rolls in our most recent shipment— just wanted to know what you found in your
examination.  If you could comment on this, I'd appreciate it."[25]   Silen followed up with an email to
Roberts on April 22, 2008, asking "Please let us know where we stand on the payment of the 48
[inches].  I know you and Anne have been communicating on the rolls that you have there especially
on the 5 rolls that was sent back to us and re-run/re-shipped to you... "[26]   No responses to these
repeated requests by Berry regarding the suitability of the material was provided in discovery in this
case.   While Lapoint testified that Berry notified Packgen they could "cut out" the bad parts and use
the rest of the material,[27] no documentation exists to support this.

---

[15] P00041
[16] P00038
[17] P00059
[18] P00060
[19] P00065
[20] P00067
[21] Deposition of Don Roberts, September 7, 2012.
[22] P00077
[23] P00083
[24] P00089
[25] P00094
[26] P00096
[27] Deposition of John Lapoint, page 90, lines 12-15.

Phillip S. Bixby, Esq.
September 10, 2012
Page 4

On May 9, 2008, Silen provided Roberts with a "corrective action" letter, indicating that Berry would be sending "an RGA for 8 rolls that you have deemed not usable based on the poor/inconsistent bonds."[28]  In mid-May 2008, Packgen pursued Berry to obtain the "root cause" and corrective action Berry intended to take,[29] which Berry provided.[30]  Berry, at the same time, pursued Packgen to pay for the rolls that Packgen had *not* claimed were defective.[31]  At the end of May 2008, Berry received a Notice of Claim from Packgen's legal counsel, advising that Packgen had "used the material in the manufacture of rigid containers that hold catalyst" and that "Packgen recently received reports that several containers have failed, causing property damage.  Upon investigation, it is clear that the source of the failures was the faulty material provided by Covalence"[32]  Until this time, and despite repeated requests regarding the suitability of the product, there was no evidence produced that would allow us to know if Packgen had either (1) tested and found the material to be faulty, but still used it, or, (2) failed to test the remaining product (when they knew parts of the same shipments were faulty), and used it.

In addition, Packgen did not produce any documentation that traces which customers received product made with the accused product.  They indicate they are aware of customers that "may" have received product that had been manufactured from the Berry laminated product,[33] but Lapoint indicated that Packgen had no way to know for sure.[34]

On August 11, 2009 (after having severing its relationship with Berry), Packgen advised a potential customer that in addition to having severed its relationship with Berry, "modifications have been made to the Containers to prevent the likelihood of the seam unraveling ever occurring in the future."[35]  No evidence was produced regarding the modifications that were required to prevent "unraveling" from occurring, which could have been caused by a design issue, and not the accused material.

Filler did not investigate (and evidence was not produced that would allow us to determine) whether Packgen either failed to test material, or knowingly used flawed material.  If Packgen had tested the accused material (as the Terms and Conditions required, and as Berry repeatedly requested they do) and *not* proceeded to make Cougars with it, the damages claim would be under different circumstances.  However, Filler did not consider this.

<u>Limitation of liability</u>
The Terms and Conditions further provided:

> Berry's liability for breach of contract, breach of warranty, strict liability, product liability, recall liability, negligence or other cause or theory is limited to replacement of defective goods or refund of the purchase price upon timely

---

[28] P00097
[29] P000106
[30] P000107
[31] P000109
[32] P000115
[33] Plaintiff's Response to Defendants' Second Request for Production of Documents, 10b.
[34] Deposition of John Lapoint, page 207, lines 4-14.
[35] P03826

Phillip S. Bixby, Esq.
September 10, 2012
Page 5

receipt of notice within one year from date of delivery regardless of whether Berry has or has not been advised of the possibility of such damages or other damages. *Under no circumstances will Berry be responsible for special, incidental, or consequential damages regardless of cause....*Written advice provided by Berry relating to the goods is subject to the foregoing disclaimer of warranties and limitation of damages provision.[36]  (italics added)

Despite this limitation, Packgen claims lost profits.

**Review of damages claimed by Packgen**
Filler was not aware of the Terms and Conditions,[37] nor was he aware of any legal theory that would negate or modify in any way the Terms and Conditions, and therefore, his lost profit damage calculations simply assume it does not exist.[38] Further, Filler did no assessment of the reasons for Packgen's claimed loss of customers, but rather, was asked by Packgen's attorney, Mr. Olafsen ("Olafsen") to "assume that the cause of the lost sales was the defective product supplied by Berry Plastics and Covalence Coating Products." Filler believes that "if that assumption is incorrect, then the lost profits would still be correct. Just might have to be a different defendant."[39] As we review Filler's methodology and conclusions, we will examine other possible causes for Packgen's inability to keep or obtain customers, each of which would have led to either no, or a different, damage calculation than that which was performed by Filler, or a different defendant, as admitted by Filler.

We begin with a general discussion of lost profits damages.

Lost profits generally
Lost profits are generally calculated as the difference between (1) what would have happened, and (2) what did happen. In order to be able to calculate a loss, "the plaintiff must demonstrate that defendant's wrongful conduct was the proximate cause of the damages."[40]

Such an analysis requires:

(1) What would have happened:
   a. A forecast of revenues the company would have enjoyed, but for the defendant's alleged actions;
   b. Calculation of costs that the company avoided ("incremental costs") by not making the forecasted revenue.
(2) What did happen during the damage period (actual revenues minus avoided costs for the loss period)

---

[36] P00041
[37] Deposition of Mark G. Filler, page 23, lines 1-5.  Note that all references to Filler's deposition are to the "Draft Copy" of the deposition and pagination references may differ from the Final Copy.
[38] Deposition of Mark G. Filler, page 23, lines 13-25.
[39] Deposition of Mark G. Filler, page 22, lines 11 to 24.
[40] Fannon, Nancy, *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys*, 2011 Edition, Chapter 9, "Lost Profits Calculations—Methods and Procedures", Gray, Robert and Obrien, James. © Business Valuation Resources 2010.

Phillip S. Bixby, Esq.
September 10, 2012
Page 6

The difference between these two items constitutes the loss. If the loss extends to future years, it is subject to discounting (present value) based on the risk associated with the forecast that was made. The calculated losses are intended to restore the plaintiff to the same position it would have been in, but for the alleged damaging actions of the defendant. [41] Further, "nearly every United States jurisdiction has adopted the rule that lost profits must be proven with reasonable certainty."[42]

Evidence to support the revenue and cost forecasts are typically obtained by use of either a "before-and-after" method, in which the plaintiff's results both before and after are used to measure the loss period, or a "yardstick" method, in which benchmark or comparable companies are used to estimate what the company would have done, but for the alleged damaging actions. A further method, the "sales projection" method, utilizes company-specific forecasts, preferably using pre-litigation profit projections. The final model is referred to as a market model method, where the expert considers the plaintiff's market share before the loss. [43]

We now turn to Filler's calculations of lost profits.

Filler's lost profits calculations generally
Having been provided by Olafsen the assumption that the Berry product was the *sole reason* Packgen lost CRI as a customer, and was unable to obtain refinery customers, Filler calculated losses.[44] All of Packgen's calculated losses are attributed to the CRI incident by Filler. CRI ultimately terminated their relationship with Packgen in April 2008.

Filler's remaining calculated losses involve 37 refineries, 6 of whom were already customers.[45] Filler relied on Lapoint for the assertion that "All of the 36 (*actually 37*) accounts listed are locations we haven't sold due to the CRI incident."[46] (italics section added)

Based on the assumption that the product supplied by Berry resulted in the loss of CRI as a customer (and ignoring the Terms and Conditions), and relying on management's assertion that the loss of CRI further led to the inability to gain refineries as customers[47], Filler prepared 4 lost profits analyses:

1. "Deterministic" method of calculating CRI losses
2. Statistical calculation of CRI losses ("Simulation")
3. Statistical calculation of losses to refineries ("Simulation")

---

[41] Fannon, Nancy, *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys*, 2011 Edition, Chapter 9, "Lost Profits Calculations—Methods and Procedures", Gray, Robert and Obrien, James. © Business Valuation Resources 2010.

[42] Fannon, Nancy, *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys*, 2011 Edition, Chapter 10, "The Reasonable Certainty Requirement in Lost Profits Litigation: What it Really Means", Lloyd, Robert M., © Business Valuation Resources 2010.

[43] Fannon, Nancy, *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys*, 2011 Edition, Chapter 9, "Lost Profits Calculations—Methods and Procedures", Gray, Robert and Obrien, James. © Business Valuation Resources 2010.

[44] Deposition of Mark G. Filler, page 22, lines 23-24.

[45] Filler0001, Filler000155-000165.

[46] Filler000126

[47] Filler000126

Phillip S. Bixby, Esq.
September 10, 2012
Page 7

    4.  A revised version of his Deterministic method.

Filler originally calculated only the statistical models. However, Olafsen requested that Filler also do the "deterministic" model for CRI.[48] At the request of Olafsen, Filler also later revised his "deterministic" calculation of CRI losses in which certain assumptions are modified.[49] As a result, three of the calculations (1 and the revision of it, and 2) all calculate the alleged loss relating to CRI, each arriving at materially different determinations of lost profits. However, Filler could not say which his opinion was until after he consulted with Olafsen as to which scenario will be presented at trial.[50]

When discussing the statistical model Filler used to calculate the refinery loss, he indicated that "if we had proof of sales, we wouldn't need a simulation. We would have historical data."[51] He went on to explain that he meant sufficient historical data, which he felt the refineries did not have. However, Packgen did have a history of quoting and getting (or not getting) refineries as customers.[52] Filler did not consider this prior history, instead relying on a simulation model that does not require any proof of actual sales or actual success rates.[53] Conversely, CRI did have a prior history (pre-dating October 2007),[54] which Filler failed to consider in his deterministic model. If, as Filler testified, a statistical model was not appropriate where there was "proof of sales" and "historical data,"[55] the statistical model for CRI was not needed. However, he used the statistical for CRI until he was asked by Olafsen to calculate damages using his "deterministic" model.

Filler's calculations each generally follow the following format:

> Number of bins that would have been sold (to CRI or refineries, respectively)
> <u>X Price bins would have sold for</u>
> = Lost revenues
> - Cost of bins (material, labor and freight)
> <u>- Factory overhead and Selling, General & Administrative costs</u>
> = Plaintiff damages

To support each of his various opinions, Filler relies on "determinations" that he has made in each of the following areas:

- **Determination # 1:** Berry/Covalence caused Packgen to lose CRI and not gain refineries as customers
- **Determination #2:** Number of bins that would have been sold (to CRI or refineries, respectively)
- **Determination # 3:** Price the bins would have sold for

---

[48] Deposition of Mark G. Filler, page 21, lines 9-10.
[49] Deposition of Mark G. Filler, page 53, line 21.
[50] Deposition of Mark G. Filler, page 54.
[51] Deposition of Mark G. Filler, page 112, lines 5-6.
[52] Deposition of John Lapoint, pages 156-157, lines 22-10.
[53] Deposition of Mark G. Filler, page 111, lines 14-16.
[54] P0671-P0702
[55] Deposition of Mark G. Filler, page 112, lines 5-6.

Phillip S. Bixby, Esq.
September 10, 2012
Page 8

- **Determination # 4:** Cost of bins (material, labor and freight)
- **Determination # 5:** Factory overhead and Selling, General and Administrative costs

Typically, each of these determinations would be supported by facts and evidence, usually obtained by use of the methods discussed above— before-and-after, yardstick, sales projection, or market model. As we will discuss, Filler used none of these; rather, for each of these determinations for each of his four calculations, Filler relies heavily on management's and Olafsen's representations; assumptions he has made; data he doesn't fully understand; and *ipse dixit* (i.e., because he asserted it himself). As a result, there is insufficient evidence to support Mr. Filler's lost profits (or any calculation of lost profits).

In the following sections, we review the foundation for Filler's various opinions.

<u>Determination # 1: Berry/Covalence caused Packgen to lose CRI and not gain refineries as customers</u>
Olafsen asked Filler to make the assumption that "the cause of the lost sales was the defective product supplied by Berry Plastics and Covalence Coating products."[56] He investigated no other possible causes of the loss of CRI, or the inability to gain refineries as customers.

*Use of flawed material*
As was discussed earlier in this report, Filler did not investigate whether Packgen either failed to test material, or knowingly used flawed material. He further did not investigate the effect of the modification to correct unraveling. As noted above, if Packgen had tested the accused material and *not* proceeded to make Cougars with it, circumstances could have played out very differently. However, Filler did not consider this. Further, Filler considered no evidence regarding the modifications that were required to prevent "unraveling" from occurring, which could have been caused by a design issue, and not the accused material.

*Relationship with CRI*
Lapoint stated that CRI had previously sued another one of its suppliers of flexible IBCs because of a container failure, indicating that CRI may have had a "short fuse" with all IBC companies.[57] Packgen was under considerable pressure to provide product in the first quarter of 2008. Catalyst Recovery Singapore Pte Ltd. had complained that Packgen had missed booking a vessel scheduled for 10/29/2007, resulting in making the product late. CRI indicated that "there can be no further delays in shipping and the cut off dates must be met."[58] Medicine Hat further noted on their Purchase Orders that "dates provided are required delivery dates to the Medicine Hat facility. Each shipment is to be shipped via inter-modal transport in time to meet the delivery date specified,"[59] specifically starring this section (**) so that it could not be missed. Don Roberts indicated that CRI was pushing them, wanting to make sure that Packgen could supply CRI uninterrupted.[60] In the

---

[56] Deposition of Mark G. Filler page 22, lines 11-24
[57] Deposition of John Lapoint, pages 150-151, lines 20-12.
[58] P000129
[59] P000138
[60] Deposition of Donald Roberts, September 7, 2012.

Phillip S. Bixby, Esq.
September 10, 2012
Page 9

midst of this, Packgen advised CRI that it did not (at that time) have the capacity to handle CRI's orders, and was requesting various facilities to switch delivery dates based on priority.[61]

If Packgen had tested the remaining material (which they now claim was flawed) and found it flawed at the time, they would not have (or should not have) used it. Further delays could have caused problems in the CRI relationship, which was already tenuous because of prior late shipments. Taken together with other issues going on at the time of the alleged incident, this could have led to an entirely different set of circumstances.

Criterion advised Packgen of "Sack Failure 4" on April 7, 2008.[62]   Several others followed, culminating in CRI putting orders on hold on April 8, 2008.[63]  Regarding a site visit planned to deal with the bottom seam failure, CRI representative Linda Deason ("Deason") advised Packgen that "this has and may further create relationship issues for Criterion with our customers. We feel that Packgen's unrestricted participation in this or other visits would create risk of further damage to this business and therefore do not consent to Packgen's direct interaction with our customer representatives." CRI's customer at issue was also a direct customer of Packgen.[64]  Packgen was instructed to "respect the rules of the parties and that Packgen is participating strictly to consult with Criterion on issues as they arise and are observed... .If you cannot abide by these conditions we will seek to have our customer exclude (Packgen) from the site."[65]  Several terse emails ensued between Packgen and Criterion, culminating in an email from Deason advising Lapoint on April 16 that he was no longer to contact her; rather, if he required additional information, he should contact CRI's Global Manager Procurement.[66]

Filler did not consider whether CRI's jaded relationship with IBC companies, or whether missed shipments, might have also endangered Packgen's relationship with CRI, which could have led to greater risk in a continued relationship.

*Non-payment for backorders and credit terms*
Packgen's inability to meet demand would have been compounded by back-orders for material that Berry was waiting to ship to Packgen, but Berry was holding back awaiting (1) payment for product Berry believed to be good[67] (because they had repeatedly requested to be advised if otherwise), and (2) Packgen's agreement with Berry's new credit terms.[68]  No evidence was provided in discovery indicating that Packgen agreed to the new credit terms. We do not know (and Filler did not investigate) whether alternate, suitable material could have been received and used, but for Packgen's non-payment or agreement with credit terms. If alternate material could have been received and used, it might have caused Packgen to be late in producing product, but again, this would have resulted in a different scenario than that presented by Filler.

---

[61] P000145
[62] P000172
[63] P000184
[64] Deposition of John Lapoint, pages 145-146, lines 23-14.
[65] P000186
[66] P000208
[67] P00096
[68] P00088; P00083; P00080; P00063

Phillip S. Bixby, Esq.
September 10, 2012
Page 10

*Pricing and competition*

According to Lapoint and Filler, the Cougar saved their customers significant money, leaving the door open to charge virtually as much as they wanted— according to Lapoint, this could have been "in excess of $500" or even over $1,000 a Cougar, but that Packgen never got to implement the price increase "because of the incident."[69] We do not know how CRI reacted to Packgen's August 2007 nearly doubling of their price to CRI[70] (because we have no response to the email advising CRI of it). However, a doubling of price would cause CRI, or any other customer, to re-evaluate their options. If nearly unlimited price increases were Packgen's strategy, this would subject Packgen to competitive risk.

Packgen did, indeed, have significant competition. According to Lapoint, the most significant competition was CHEP. Mr. David Berman ("Berman"), Packgen's industry expert, indicated that "CHEP is an aggressive competitor, and it has a tremendous market presence in the catalyst, refinery, and metals reclamation industries."[71] As an aggressive competitor, it is unrealistic to think that Packgen, a much smaller company, could raise prices without consideration of the advantages its customers and prospects saw in its competition. As we will discuss, Filler believes he overcame this by assuming prices would only increase by cost increases. However, regardless of the treatment of price by Filler's model, the company intended to raise prices,[72] which would have affected their competitive advantage and subjected them to greater risk of competition.

*Lack of patents*

Packgen did not seek patents on the Cougar product, as Lapoint indicated he made a business decision to instead invest money in technology, equipment and employees.[73] Further, he indicated that barriers to entry would offer 15 to 20 years of protection.[74] Without a patent, a competitor would be free to copy their design, putting Packgen at competitive risk.

*DOT issue*

On April 23, 2008, Deason again wrote to Lapoint, advising him that it had come to their attention that "there are discrepancies between your Competent Authority Approval… and the Wrangler bag that is sold to Criterion. Given these discrepancies, Criterion is unable to transport any bags without prior approval from DOT (*Department of Transportation*) on this matter" (italic section added). Packgen's inventory costing sheet for item number 320451 for CRI's Medicine Hat location dated 9/14/2007 contains the language:   "WARNING!! Container does not meet DOT testing requirements.  WARNING!!"[75]  Deason requested to be copied on all correspondence with the DOT.[76] The DOT responded to Packgen's inquiry on April 24, 2008, indicating "the current design that has not passed top lift testing is no longer being manufactured and new manufacture will not begin until the design is modified with a fabric that is capable of passing the required testing and full certification testing is run on the new design."[77]  CRI was not satisfied with the response, asking for

---

[69] Deposition of John Lapoint, pages 166-167, lines 20-10 and page 274, line 23.
[70] P03418
[71] Plaintiff's Expert Witness Designations, page 13.
[72] Deposition of Mark G. Filler, pages 32-33, lines 19-1.
[73] Deposition of John Lapoint, page 135, lines 4-12.
[74] Deposition of John Lapoint, page 135, lines 15-16.
[75] Filler00057
[76] P000209
[77] P000216

Phillip S. Bixby, Esq.
September 10, 2012
Page 11

responses to further questions, and requesting that a special permit application be sent to the DOT.[78]  Ultimately, on April 28, 2008, CRI took matters into their own hands, seeking the required permit with the DOT.[79]  Lapoint indicated that there is no other documentation regarding the DOT issue raised in 2008 than that which was produced in this matter.[80]  If CRI could not transport Packgen bags without proper regulatory approval, this would impact their ability to continue to sell the products.  Filler makes no mention of this.

*Rumors spread by CHEP*
Packgen's customer service representative, Celest Davis/Horton ("Davis/Horton"), and Lapoint both point to negative "rumors" being spread about Packgen's product by CHEP,[81] a competitor supplier of flow bins, as a primary reason for losing the refineries.  Lapoint indicated that Packgen did not close sales with refineries as a direct result of rumors spread by CHEP.[82]  If customers did not purchase Packgen's products as a result of the false rumors Lapoint accuses CHEP of spreading, then CHEP could be the reason for not gaining the customer.  Notably, Filler had indicated that if the assumption he was provided by Olafsen that Berry alone was the cause of Packgen's losses was incorrect, "then the lost profits would still be correct.  Just might have to be a <u>different defendant</u>."[83]

*Other incidents involving the Cougar product*
A summary schedule was produced by Packgen and provided to Filler indicating the reasons they did not gain refineries as customers.  Filler relied on this schedule, indicating "I have seen... Celeste [sic] Horton's notes for each of the refineries as to the problems she's having making sales... there are constant references back to the Criterion incident and remarks like they want to wait and see."[84]

While Filler attributed all of the reasons customers were lost to the CRI incident, the schedule provided by Packgen to Filler (Exhibit 27 of Lapoint deposition) indicates the following "issues" Davis/Horton may have been having with different refineries in her sales territory:[85]

- BP Cherry Point:  "**Small test of Cougars melted down.**  Faulty material played a role.  They have big concerns about using cougars after the incident."  "Faulty material" refers to the "very reactive material" being put into the containers when it should not have been.[86]

---

[78] P000226
[79] P000226
[80] Deposition of John Lapoint, pages 216-217, lines 24-3.
[81] Deposition of John Lapoint, pages 224-225, lines 17-14; Lapoint Deposition Exhibit 27 "Cougar and CRI Sales 2007 through 2010." Davis/Horton indicated that CHEP sent an email of a "flaming cougar, but it wasn't even...our UN string, so its not even a Packgen container...but they were passing it around" (Deposition of Celest Davis/Horton deposition page 37, lines 16-20; Note that all references to Davis/Horton's deposition are to the "Draft Copy" of the deposition and pagination references may differ from the Final Copy) and that CHEP had created a "brochure and it was all targeted at our product" that said "just all the negatives...They didn't necessarily in that brochure say a negative story—false story, but, you know, they were just definitely trying to get negative word and negative thoughts out there about our particular product." (Deposition of Celest Davis/Horton, page 38, lines 13-24).
[82] Deposition of John Lapoint, pages 224-225, lines 17-14.
[83] Deposition of Mark G. Filler, page 22, lines 11 to 28.
[84] Deposition of Mark G. Filler, page 25, lines 8 to 16.
[85] Deposition of Celest Davis/Horton, referring to Lapoint Deposition Exhibit 27, "Cougar and CRI Sales 2007 through 2010," pages 11-12, lines 19-1.  Note that all references to Davis/Horton's deposition are to the "Draft Copy" of the deposition and pagination references may differ from the Final Copy.
[86] Deposition of Celest Davis/Horton, page 77, lines 16-18.

Phillip S. Bixby, Esq.
September 10, 2012
Page 12

Moreover, (1) BP Cherry Point was not included in the group of refineries that received cougars that "may have been manufactured from the Berry laminated product"[87] and (2) the only Cougars they bought were in 2007 and 2009, time periods in which the Cougars could not have been manufactured using the accused product at issue. (A second version of reasons for losses simply indicated "Worried about putting pyrophoric material in the cougars," which Davis/Horton confirmed had the same meaning.[88])

- ExxonMobil Torrance, CA: "My once best customer now lost due to a **fire onsite** due to faulty material." However, on the listing of sales included on the same spreadsheet, the Torrance refinery had sales from 2007 through 2010, indicating that the customer was not lost after the CRI incident in 2008, a fact that Davis/Horton confirmed in her deposition.[89] Furthermore, Davis/Horton explained that the fire was a result of putting in "material that they should not have put in there."[90]  The Torrance fire was referred to as the reason three other ExxonMobil locations were lost on Exhibit 27.  The CRI incident did not involve fire.[91]  The Torrance incident did not have any of the same characteristics as the CRI incident.

- Tesoro Wilmington, CA Refinery: "This refinery point blank told me that he heard that no fresh catalyst vendors are using our containers and mentioned the **Tesoro-Golden Eagle fire**." According to Davis/Horton, the Tesoro Golden Eagle fire was a handling issue due to a Packgen container being punctured by a forklift,[92] an issue raised by another customer discussed below.  Tesoro Golden Eagle bought Cougars both before 2008, and through 2010.  Davis/Horton indicated that the Tesoro-Golden Eagle fire occurred after the Criterion incident[93] and that these were "all added worries on top of the CRI thing."[94]  The Chevron Richmond refinery was also told by the trucking company about the fire that occurred in transit to Tesoro.[95]

- Rumors, stories or gossip from CHEP were listed as the "reason for loss" 13 times on Exhibit 27.  For example, Davis/Horton testified that Packgen had been "blackballed through all of ConocoPhillips" as a result of CHEP's "incestuous relationship" with customers.[96]  "Negative industry gossip" was cited as reasons for another seven refineries that did not buy from Packgen listed on Exhibit 27.

Exhibit 20 provided at Lapoint's deposition indicated the following additional incidents discussed by Davis/Horton:

- There was a fire at Shell Australia involving Cougar products in 2005[97] because of improper filling of self-heating material by the catalyst handlers.[98]  This incident was referred to in notes regarding why other Shell refineries were lost.

---

[87] Plaintiff's Response to Defendants' Second Request for Production of Documents, 10b.
[88] P11197, Deposition of Celest Davis/Horton, page 77, lines 14-20.
[89] Deposition of Celest Davis/Horton, page 88, lines 8-9.
[90] Deposition of Celest Davis/Horton, page 88, lines 14-19.
[91] Deposition of Celest Davis/Horton, page 17, lines 2-10.
[92] Deposition of Celest Davis/Horton, page 83, lines 9-17.
[93] Deposition of Celest Davis/Horton, page 85, lines 5-7.
[94] Deposition of Celest Davis/Horton, page 85, lines 19-22.
[95] Deposition of Celest Davis/Horton, page 83, lines 6-17.
[96] Deposition of Celest Davis/Horton, pages 50-51, lines 10-11.
[97] Deposition of Celest Davis/Horton, page 55, lines 15-21.

Phillip S. Bixby, Esq.
September 10, 2012
Page 13

- Davis/Horton also indicates that ExxonMobil (and the related Imperial refineries) have a "negative story of an incident" on their intranet, which she thinks (but is not certain) is a picture of a container fire unrelated to any Packgen product.[98]

According to Davis/Horton, "all of the incidents other than Criterion were misuse by the customer,"[100] confirming that there are other reasons why companies may have decided not to use Packgen's product.  Other causes not discussed at the Davis/Horton deposition, but included in notes and correspondence produced by Packgen:

- CCRL (1/21/2009): "... we didn't have any incidents but experienced several "**rips and holes**" at the top plastic "neck" of the bags... **Any progress on installing a nitrogen purge connection on the containers as we discussed in April 2008?**"[101] (Davis/Horton responded that "There haven't been any new design improvements since CCRL last used the Cougars."[102])
- Motiva Enterprises-Port Arthur (11/2/2009): Davis/Horton's meeting notes indicate that "He would be **more confident in the Cougar if it had a solid bottom as to prevent the innerds [sic] from falling in-between the pallet slats and leading to greater opportunity for puncture.**"[103]  A puncture and resulting fire was an issue for another customer discussed above. Davis/Horton's notes on 8/11/2009 indicate that she informed Motiva that Packgen's relationship had been severed "with the particular raw material supplier.  Also told him that design modifications have been made to the Containers to prevent the likelihood of the seam unraveling ever occurring in the future."[104]

If it is true that the sole reason for the failure of the Cougar product was the accused Berry product, and Packgen had ceased using the accused product, then "design modifications" to prevent the seam from unraveling— the very issue they blame on Berry— should not have been necessary.  However, as design modifications were made to address the reason the product failed, some investigation should have been made to determine how much of the failure was the accused Berry product, and how much was the container design that required modification.  There is no evidence that this was done.

Packgen produced two different schedules documenting reasons why they were unable to obtain new customers.[105]  These two schedules, which have several markedly different reasons why some customers were lost, on the whole generally attribute the inability to gain customers to: CHEP; Cougar product meltdown; fires; "worries about putting pyrophoric [self-igniting] materials in the Cougars"; industry gossip; and "concern throughout the BP group."

---

[98] Deposition of Celest Davis/Horton, page 97, lines 8-18.
[99] Deposition of Celest Davis/Horton, pages 89-90, lines 21-7.
[100] Deposition of Celest Davis/Horton, page 111, lines 8-9.
[101] P03315
[102] P03314
[103] P03828
[104] P03826
[105] Lapoint Deposition Exhibit 27, "Cougar and CRI Sales 2007 through 2010" and P11197.

Phillip S. Bixby, Esq.
September 10, 2012
Page 14

Filler did not investigate any of these other incidents and explanations, or the effect they might have had on Packgen's ability to keep or gain customers.

*Lawsuit against large industry player*

On April 20, 2010, the *Deepwater Horizon* exploded and caused a major oil spill in the Gulf of Mexico. Packgen responded by assembling boom.[106] Packgen's efforts to sell its boom made national news, being reported in newspapers, television news, and on-line blogs and newspapers.[107] However, Packgen filed a lawsuit against BP in 2011. As Mr. David Berman, Packgen's industry expert indicates:

> Although the catalyst industry is substantial in terms of revenue and volume, only a few people staff the key positions in the industry. As a result, word of new developments, problems, and other issues relating to catalyst and its storage and transportation spread quickly throughout the catalyst industry. Key members of the catalyst industry also interact frequently with employees of petroleum refineries and discuss issues relating to the storage and transportation of catalyst with refinery personnel. In similar fashion, there are relatively few key decision-makers within the refining industry; many routinely interface with one another within multi-refinery conglomerates as at petroleum refining conventions. As a result... new developments are efficiently conveyed throughout the catalyst and refining industry's sparsely populated, well-connected grapevine.[108]

Lapoint also confirmed that bad new spread like fire in the industry.[109] This would indicate that major and minor players in the catalyst industry could be aware that Packgen sued a major industry participant for failure to purchase its product. Being at odds with, and bringing suit against, such a large industry player could not be a positive development for Packgen's business, and could have affected sales. Filler did not investigate this.

One example of corporate communications at BP is the references about the Cherry Point incidents in Davis/Horton's notes discussed above. In the notes on Lapoint Deposition Exhibit 20, Davis/Horton indicated that the BP's corporate-wide catalyst coordinator meetings raised concern about a fire at Cherry Point in 2009 and this was spread throughout the BP group. Individual refineries represented to Davis/Horton that they had heard about the two incidents (the unrelated CRI and improper handling incidents) through corporate wide meetings.[110] Again, this indicates that there are numerous other reasons why potential customers might not choose Packgen's product.

---

[106] Complaint, Packgen v. BP Exploration & Production, Inc., and BP America Production Company, and BP, p.l.c.
[107] See, for example: Tapper, Jake, "Why Isn't That Maine Boom Being Deployed to the Gulf?" ABC News. June 13, 2010. http://abcnews.go.com/blogs/politics/2010/06/why-isnt-that-maine-boom-being-deployed-to-the-gulf/; Metzler, Rebekah, "Oil spill cleanup needs more government oversight, Snowe says." Maine Sun Journal. June 3, 2010. http://www.sunjournal.com/state/story/856325; and Skelton, Kathryn, "Packgen tests booms in Range Pond, now awaits BP word next week." Lewiston-Auburn Sun Journal. July 10, 2010. http://www.sunjournal.com/city/story/876155.
[108] Plaintiff's Expert Witness Designations, pages 11-12.
[109] Deposition of John Lapoint, pages 129-130, lines 14-1.
[110] Deposition of Celest Davis/Horton, page 80, lines 8-20.

Phillip S. Bixby, Esq.
September 10, 2012
Page 15

*Industry relationships*
Given the above description of how closely-knit the catalyst industry is, Packgen should have known the difficulties they would face trying to keep and gain customers. Any customer that Packgen gained (or kept) would be one that they would have to take or keep away from an "aggressive" industry competitor, CHEP, who Berman indicated dominates the catalyst container market.[111] Davis/Horton indicated in her deposition that she does not understand how it is that CHEP is in so closely with their customers;[112] however, as noted above, Berman's explanation indicates that this industry is built on tight relationships. This could indicate it would be difficult to make headway as a relative newcomer.

*Summary of other causes for Packgen's loss of CRI and failure to obtain refineries*
In sum, Filler did not investigate:

- What the impact would have been if Packgen had properly tested the material before using it;
- The risk that CRI's "short fuse" with IBC providers, and Packgen's failure to meet CRI's deadlines, may have affected Packgen's relationship with CRI;
- Packgen's failure to communicate regarding non-payment for backorders, agreement to credit terms, and their ability to get replacement material;
- The competitive risks resulting from the lack of a patented product;
- The impact that price increases (and most notably, Packgen's attitude regarding price increases) might have given the aggressive industry competition;
- The impact the DOT issue had;
- The impact of the rumors CHEP was spreading;
- The effect of fires, "melting", and ripped bags as detailed above;
- The effect that Packgen's lawsuit against BP would have on customers and potential customers; and
- Aggressive competition.

Any of these issues individually could have materially affected Packgen's ability to obtain or keep customers, or effected who was responsible for such inability. The failure to consider any or all of them taken together would magnify such effect.

The following sections will review the evidence supporting each of the models (Determinations 2-5, described above) used by Filler, given that he accepted the only reason for the loss of CRI and the inability to gain refineries as customers was the accused product. We begin with Filler's use of the so-called "Deterministic model".

Lost sales to CRI/Criterion - Deterministic Model
As discussed earlier, Filler was asked to do a deterministic model for his calculation of losses related to CRI by Olafsen.[113] He was later asked by Olafsen to do a second version of it, using a different

[111] Plaintiff's Expert Witness Designations, page 13.
[112] Deposition of Celest Davis/Horton, pages, 51-52, lines 6-8.
[113] Deposition of Mark G. Filler, page 90, lines 16-17.

Phillip S. Bixby, Esq.
September 10, 2012
Page 16

price. In the following sections, we will discuss Filler's calculations and underlying assumptions in each of the following areas:

- **Determination #2:** Number of bins that would have been sold
- **Determination # 3:** Price the bins would have sold for
- **Determination # 4:** Cost of bins (material, labor and freight)
- **Determination # 5:** Factory overhead and Selling, General and Administrative costs

*Determination #2: Number of bins that would have been sold*
Filler's deterministic model relies on six months of historical unit sales as presented in the Plaintiff's Expert Witness Designations Exhibits 2 and 3. Sales to CRI had been volatile. Filler acknowledged that "earnings and cash flows are volatile"[114], but could not explain the reasons for the volatility in sales and profitability.[115] The 6-month time period selected by Filler had a significant increase in purchases by CRI of Cougars over the prior 5 year historical period. Cougar sales to CRI for the five and a quarter years prior to the CRI incident are presented below:[116]

| | 2003 | 2004 | 2005 | 2006 | 2007 | 1/1/2008-3/31/2008 |
|---|---|---|---|---|---|---|
| Units | 3,920 | 6,688 | 10,040 | 5,706 | 8,034 | 3,796 |

Filler based his use of only the most recent 6-month historical period on management representations, specifically, a conversation with Lapoint and an "enthusiastic email."[117] (At his deposition, Filler was unaware of ever seeing the email.[118]) Lapoint testified that in late '07 or early '08, CRI indicated that they would be ramping up orders— and indeed they did, for 6 months.[119] Filler had no evidence (nor did Packgen present any evidence) of whether the six months of sales were or were not a seasonal surge.[120]

Filler states that CRI had been a Packgen customer for "years" and that CRI had been purchasing catalyst Cougar for only six months prior to the alleged incident. Prior to this, Filler believed that CRI had been purchasing "environmental pop-ups" for "probably five years."[121] However, Lapoint confirmed that CRI had been buying the same product before October 2007 (with modifications).[122]

Only relying on the last 6 months, Filler concludes that Packgen would have sold an average of 1,261 units per month (Filler Designation Exhibit 2). While CRI had provided a first quarter 2008 forecast[123] that was similar to the CRI sales in the fourth quarter of 2007, Packgen had requested,

---

[114] Deposition of Mark G. Filler, page 123, line 8.
[115] Deposition of Mark G. Filler, pages 132-135, lines 15-10.
[116] Plaintiff's Expert Witness Designations, Exhibit 3.
[117] Deposition of Mark G. Filler, page 52, lines 9-18
[118] Deposition of Mark G. Filler, page 60, lines 4.
[119] Deposition of John Lapoint, pages 163-164, lines 6-1; Lapoint Deposition Exhibit 27, "Cougar and CRI Sales 2007 through 2010"
[120] Deposition of Mark G. Filler, page 113, lines 16-25.
[121] Deposition of Mark G. Filler, page 26, lines 11-21.
[122] Deposition of John Lapoint, pages 135-137, lines 21-18.
[123] P000144

Phillip S. Bixby, Esq.
September 10, 2012
Page 17

but did not receive, a forecast for future quarters.[124]   In their responses to interrogatories, Packgen represented that they had no forecast of any kind.[125]

Therefore, Filler's only basis for contending that the most recent 6 months of sales would continue was the Plaintiff's CEO, Lapoint.

Filler does not rely on any supplier or sales contract between Packgen and CRI indicating CRI agreed to buy Cougars for ten years.[126]   Filler indicated he based his 10-year period on his contention that "there would be no reason to go back to flow bins" because of "all the money he [LaPoint] was saving them."[127]   Filler could not quantify the amount CRI was saving.   Rather, Lapoint provided this assertion to Filler.[128]   Lapoint testified that he provided Filler "his experience" of the time it takes to regain a customer.[129]   Lapoint further testified that the high barriers of entry to the Cougar niche market offered 15 years of protection.[130]

There are many other issues besides high barriers to entry that should be considered in the selection of a term, including such things as historical company results, contractual relationship with customer and aggressiveness of competition, price competitiveness, regulatory requirements, protection of the product (through, for example, patents), and industry outlook.   Filler indicated he did no industry or economic research, relying on Berman's report to determine that the production of catalyst would grow 3 to 5 percent a year "into the foreseeable future."[131]

Filler therefore relied on Lapoint for his damage term, ten years, the length of time he (through Lapoint) assumed sales at the rate of 1,261 per month.

*Determination # 3: Price the bins would have sold for*
Filler used a price of $225 per Cougar, however, Lapoint confirmed that CRI never purchased Cougars at the price of $225.[132]   Filler relied on LaPoint's representation that Packgen was going to raise the price to CRI to $275.[133]   No evidence was provided that this price increase had been communicated to, or would be accepted by, CRI.

In August 2007, Packgen had increased the size of the bin and made other modifications to the construction of the Cougars, resulting in a more than doubling the price to CRI, to $194.55.[134]   While CRI had previously vigorously questioned a $2 increase (from $94 to $96[135]), there is no evidence of CRI's reaction to, or questions about, this further price increase of approximately $100 per unit.

---

[124] P000145-000146
[125] Plaintiff's Response to Defendants' Second Request for Production of Documents, No. 5 and 6.
[126] Deposition of Mark G. Filler, pages 25-26, lines 23-10.
[127] Deposition of Mark G. Filler, page 59, lines 15-18.
[128] Deposition of Mark G. Filler, page 106, lines 2-3.
[129] Deposition of John Lapoint, page 275, lines 3-24.
[130] Deposition of John Lapoint, page 135, line 15.
[131] Deposition of Mark G. Filler, page 10, lines 12-23.
[132] Deposition of John Lapoint, page 165, lines 4-13; page 248, lines 8-17.
[133] Deposition of Mark G. Filler, pages 32-33, lines 19-1.
[134] P03418
[135] P03417

Phillip S. Bixby, Esq.
September 10, 2012
Page 18

Filler then concluded that no other factors would affect price.[136]  Lapoint indicated to Filler that
"geography has a great influence on pricing, more so than quantity purchased."[137]  Filler made no
effort to determine the location that the claimed sales would have been sold to (likely because
management had no forecast to provide this information.)  Given Lapoint's assertion that geography
affected price, this information is relevant to Filler's analysis.

Therefore, in addition to relying on Lapoint for units and term, he also relied on Lapoint for price.

A revised version of Filler Designation Exhibit 1 was presented at Filler's deposition (Filler
Deposition Exhibit 5).  The only change, made at the request of Olafsen, was to change Lapoint's
$225 per unit to $196.86 per unit.  As a result, the two calculations arrive at materially different
determinations of lost profits.  However, Filler could not say which his opinion was until he
consulted with Olafsen as to which scenario will be presented at trial.[138]  Filler had no opinion as to
whether the $225 price or the $196.86 price was the appropriate one to use for a damage calculation,
and when asked which his expert opinion was, replied "I think they both are."[139]

Filler then took his annual units (1,261 X 12) times price ($225), for revenue of $3,404,700 annually
related to CRI.[140]  This resulted in a calculation that presented sales to CRI alone for each year of his
forecast that was $500,000 more than 2007 total Cougar sales to *all* customers.[141]  Filler's second
version of Exhibit 1 reduces annual revenue to $2,978,882[142], still greater than sales of Cougars to all
customers in 2007.  Mr. Filler was unable to reconcile this finding with any proof that the most
recent 6-month period was the best representation of sales to CRI for ten years into the future.  The
CRI Terms and Conditions have no requirement that CRI purchase goods from Packgen in any
specific quantity or for any specific duration of time.  There was no contract produced requiring
CRI to purchase goods for 10 years, as Filler assumed that they would do.

*Determination # 4:  Cost of bins (material, labor and freight)*
Filler selected the components of unit costs from the evidence provided on costing sheets[143] which
had been prepared by Packgen[144] and were presented in Filler Designation Exhibit 4.  In his
deposition, Filler was unable to explain why there were different costs presented within Filler
Designation Exhibit 4; he could only say that he knew costs "went down."[145]  Lapoint indicated in
his deposition that it was because the conflicting costs had not been updated on the spreadsheet.

---

[136] Deposition of Mark G. Filler, page 38, lines 6-8.
[137] Filler000125
[138] Deposition of Mark G. Filler, pages 53-54, lines 22-13.
[139] Deposition of Mark G. Filler, page 55, lines 23-25.
[140] Filler Designation Exhibit 1.
[141] Filler00002
[142] Filler Deposition Exhibit 5.
[143] Filler Designation Exhibit 4.
[144] Deposition of Mark G. Filler, page 74, lines 7-8.
[145] Deposition of Mark G. Filler, pages 69-70, lines 5-1.  Filler further testified that increased manufacturing
efficiencies would lead to cost reductions. Filler indicated that in 2007 and 2008, Packgen was producing about
three Cougars a minute (or, 20 seconds each), but that a "big change" came "shortly after the incident", resulting in
30 seconds per Cougar.  Filler indicated that the former process "took longer and it was a lot less efficient".
(Deposition pages 38-39).  However, Filler's analysis of this does not appear to support this contention.  Lapoint

Phillip S. Bixby, Esq.
September 10, 2012
Page 19

Filler Designation Exhibit 4 presented two cost conclusions, one at $66.75 and another at $85.71. Filler did not know which cost sheet was relevant, so he averaged them to arrive at an average cost of sales.[146]

Lapoint concluded that Filler's blending of labor and material costs from Exhibit 4 overstated costs.[147] Filler took Lapoint's schedules at face value. He did not compare Lapoint's calculated cost to Packgen's experience "before and after" the alleged incident. Such a comparison would have revealed the following:

| | 2005 | | 2006 | | 2007 | | Filler's cost | | 2008 | | 2009 | | 2010 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | P01501 | | P01559 | | P01619 | | Desig. Ex. 1 | | P01684 | | P01759 | | P01829 | |
| Sales | $3,326,624 | | $3,028,096 | | $5,173,505 | | $ 225 | | $4,527,366 | | $3,797,707 | | $4,663,032 | |
| Materials cost | $1,203,496 | | $1,141,833 | | $1,952,759 | | $ 65 | | $1,688,282 | | $1,352,302 | | $2,262,772 | |
| Direct Labor cost | $ 315,622 | | $ 317,159 | | $ 686,729 | | $ 12 | | $ 501,734 | | $ 543,481 | | $ 618,047 | |
| Freight cost | $ 115,765 | | $ 109,698 | | $ 143,896 | | $ 2 | | $ 114,187 | | $ 93,688 | | $ 150,523 | |
| Total cost of sales | $1,634,883 | 49% | $1,568,690 | 52% | $2,783,384 | 54% | $ 79 | 35% | $2,304,203 | 51% | $1,989,471 | 52% | $3,031,342 | 65% |
| Gross margin | $1,691,741 | 51% | $1,459,406 | 48% | $2,390,121 | 46% | $ 146 | 65% | $2,223,163 | 49% | $1,808,236 | 48% | $1,631,690 | 35% |

The trend in cost of sales, from 49% of revenue in 2005 to 52% of revenue in 2009 and 65% of revenue 2010 reflected the fact that costs were volatile.[148] Filler's cost of sales was significantly less than before or after results would indicate. Despite volatile in the costs of inputs, Filler simply assumed that any cost increase would be offset by price increases (as a justification for leaving both level for ten years). This did not appear to be supported by the Company's historical costs compared to sales. Further, Filler indicated that his assumption about labor (to the extent he made one, although we cannot see that he did other than to accept Packgen's costing schedules) was not speculative, "because it's more conservative."[149]

Based on his review of standard costs sheets and going to Packgen "to watch them make the stuff," Mr. Filler concludes any minor price increases would be "wiped out" with increased efficiencies.[150] This conclusion is inconsistent with Packgen's historical track record.

*Determination # 5: Factory overhead and Selling, General and Administrative costs*
Factory overhead and selling, general and administrative costs are determined by a regression formula derived from six months of actual sales and normalized costs (Filler Designation Exhibits 5 and 6). We understand that another expert is commenting on Filler's use of statistics in this matter, and therefore we will not be commenting on Filler's use and application of statistical models. However, the formula results in overhead costs at 22.67% of sales, lower than the normalized range of 26.7% to 43.3% presented on Filler Designation Exhibit 6. If you assume lower overhead costs,

---

testified that Filler measured the timing of the production of a Cougar on the production floor (pages 228-229, lines 25-4).
[146] Deposition of Mark G. Filler, page 71, lines 17-23.
[147] Deposition of John Lapoint, August 28, 2012.
[148] See, for example, P00117 and P00020; Filler 000102; P00118; P00087; and P00082.
[149] Deposition of Mark G. Filler, page 50, lines 4-19.
[150] Deposition of Mark G. Filler, page 38, lines 15-22.

Phillip S. Bixby, Esq.
September 10, 2012
Page 20

then net profits included in the damages increases.   Mr. Filler did not include inflation in overhead costs.[151]

*Summary— Lost sales to CRI/ Criterion - Deterministic Model*
Filler stated that both his original and revised "deterministic" calculations of lost profits are reasonably certain, even though they differed materially.[152]  He further states that both prices (Filler Designation Exhibit 1 and revised version on Filler Deposition Exhibit 5) are "reasonably certain" based on Lapoint's representation that he was saving CRI/Criterion money.[153]   He did not independently investigate the economics of a catalyst Cougar,[154] or take into consideration its relative advantages or disadvantages compared to other products in the market.   Filler investigated virtually none of the evidence that he would need to ensure that he had the best possible evidence to support the claim, relying on Lapoint for units, damage term, price (or in his alternative version, price at the direction of Olafsen), and the contention that costs would go down (based on timing production with a stopwatch, with the resulting calculation not supporting his contention).

Lost sales to CRI - Statistical Model
Mr. Filler presents a second calculation of CRI/Criterion lost profits using a statistical model (Filler Designation Exhibit 11).   As noted, we are not commenting on Filler's statistical calculations. However, we will comment on the inputs to his model.

Like Filler's deterministic model, revenues and costs are held constant for the entire assumed loss period of ten years.   One of the simulation model "snapshots" is shown in Designation Exhibit 11.[155]  He further uses three inputs for price: $196.86, $225, and $275.  $225, as noted earlier, was provided by Lapoint.  Filler indicates that Lapoint "was going to ask for $275."[156]

Inputs into the model for direct costs and overhead were the same as the deterministic model, with the result that the XLSim program "spins"[157] out a damage conclusion that was approximately $464,000 higher than the first version of his Deterministic model.  Filler did not make the same price change to his statistical model that he did to his Deterministic model.  When asked why he did not, he responded that "the number would be very close to the new Exhibit 1."[158]  However, his original simulation model was nearly $500,000 greater than his deterministic model.  We do not know how far apart the revised Deterministic model would be from a revised statistical model, because he did not do it.

The same exhibits and assumptions that supported Filler's deterministic model, which are a combination of un-vetted management representations or misunderstood data, were used to support the statistical model.

---

[151] Deposition of Mark G. Filler, page 36, lines 1-4.
[152] Deposition of Mark G. Filler, page 55, lines 23-25.
[153] Deposition of Mark G. Filler, page 56, lines 9-14.
[154] Deposition of Mark G. Filler, page 55, lines 18-22.
[155] Deposition of Mark G. Filler, pages 85-86, lines 17-2.
[156] Deposition of Mark G. Filler, page 32, lines 19-25.
[157] Deposition of Mark G. Filler, pages 86-87.
[158] Deposition of Mark G. Filler, page 88, lines 9-21.

Phillip S. Bixby, Esq.
September 10, 2012
Page 21

Lost sales to refineries

Filler used only a statistical model to support his calculations relating to refineries. As noted, here, too, we will not comment on Filler's model, but rather, his inputs to it for units, revenues and costs. We will do this by examining Filler's determinations for each of these inputs.

*Determination #2: Number of bins that would have been sold and Determination # 3: Price the bins would have sold for*

The list of 37 refineries was provided by Packgen. Lapoint indicated that the 37 refineries had been obtained from a marketing plan that resided only in "Lapoint's head" and that Packgen was close to getting sales with these refineries in February 2008.[159]   Davis/Horton also had no marketing plan other than one in her head,[160] and indicated that she hadn't issued quotes for refineries yet.[161]  The basis of Filler's opinion that Packgen would sell to these 37 refineries is Lapoint's representation to him, and Berman's assessment that the Cougars would save them "substantial amounts of money."[162]   We are unable to confirm these or any other verbal representations of Lapoint, as despite Filler meeting with Lapoint or teleconferencing with him *eighteen times*, he indicated he did not take any notes of their conversations.[163]  Further, there is no evidence that Filler did any analysis to confirm or deny Lapoint's assertions. Irrespective of this, price is not the only consideration buyers make when selecting products, but Filler made no reference to the many other aspects product selection entails, including quality, convenience, ease of use, additional services offered along with the product, and regulatory requirements, among other issues.

Because there was "no proof of sales," no historical data, and "not enough history to project the future," Filler indicated that he used "common sense, informed judgment and reasonableness to project out what we would expect sales to be but for the incident."[164]  However, what he actually did was rely on Lapoint for the price of those units.[165]  Best and worst case scenarios of units being sold in simulation model were representations of LaPoint and Berman.[166]  Davis/Horton indicated she was involved in coming up with these figures as well.[167]  Based on these representations, Filler backs into expected Cougar sales to refineries using Mr. Berman's catalyst forecasts, required cubic feet of containers and the price represented by Mr. LaPoint. Filler relied on Berman's designation and stated that the production of catalyst will continue to at grow 3-5% per year for the "foreseeable future" of six years,[168] but provides no basis for assuming ten years in his forecast.

Using this refinery list, Filler prepares a statistical model that is based on "the assumption that during the year beginning on April 1, 2008 and for each year thereafter, Packgen had a one in ten chance of selling Cougars to each of the 37 refineries. The simulations also assume that once sales to a particular refinery begin, Packgen will continue to sell Cougars to this refinery through March

---

[159] Deposition of John Lapoint, page 129, lines 3-14; pages 170-172, lines 22-14.
[160] Deposition of Celest Davis/Horton, page 46, line 9.
[161] Deposition of Celest Davis/Horton, page 47, lines 24-25.
[162] Deposition of Mark G. Filler, page 27, line 25, and page 28, lines 1-4.
[163] Deposition of Mark G. Filler, page 13, lines 6-10.
[164] Deposition of Mark G. Filler, page 112, lines 2-24
[165] Deposition of Mark G. Filler, pages 94-95, lines 15-9.
[166] Deposition of Mark G. Filler, page 45, lines 15-25
[167] Deposition of Celest Davis/Horton, August 30, 2012.
[168] Deposition of Mark G. Filler, page 10-11, lines 18-7.

Phillip S. Bixby, Esq.
September 10, 2012
Page 22

31, 2018."[169]   Other than stating "I thought 10 percent was pretty small" [170] and that he "wanted something that was small, but not inconsequential,"[171] Mr. Filler provides no factual basis for assuming a 10% probability rate for sales to refineries, indicating it was "conservative."[172]  However, whether it was conservative or generous is not the point; rather, the point is he has no basis for his selection.  His explanation further states that "they are all independent, so it's 10 percent for each one."[173]

Filler points to Davis/Horton's sales notes as the reason refineries didn't buy, indicating "there are constant references back to the Criterion incident and remarks like they all want to wait and see."[174]  However, as we discussed earlier, Davis/Horton's notes indicated several other incidents and reasons that customers were not buying, including several fires involving Packgen's product (which had nothing to do with CRI), rumors spread throughout the industry by CHEP, and problems with Cougars melting when tested.

According to Filler, he, Lapoint and Olafsen discussed the length of the damage period Filler would use, selecting 10 years because "we assumed it would take about five years for the whole effect of the product failure at Criterion to blow over and it would take another five years to get sales up to where they would have been."[175]

Even though he agrees that there were no sales (or not enough history to project the future), Mr. Filler states "that doesn't mean there wouldn't have been sales."[176]  Mr. Filler has shown no proof, evidence or data that indicates why he assumed sales would be expected to grow.

*Determination # 4:  Cost of bins (material, labor and freight)*
Filler stated that Packgen was selling the same Cougars to refineries but with modifications, the extent of which were represented to him by Lapoint when determining costs.  Filler made no other confirmation of costs associated with modifications.  He further indicated that as he didn't know what the modifications (and related costs) were, he captured that uncertainty by using a "triangular distribution"[177] (part of his statistical model).  In other words, he felt he didn't need to know, as the statistical model would take care of it.

Filler states that refineries were "almost like a new business" because there had been no existing sales to refineries (he later changes this statement to "not enough history").  To account for this, Filler again indicates he built his uncertainty into his model with statistical calculations involving material, freight and labor costs.[178]  Filler did not think this was speculation because it's more

---

[169] Plaintiff's Expert Witness Designations, page 5.
[170] Deposition of Mark G. Filler, page 94, lines 1-6.
[171] Deposition of Mark G. Filler, page 96, lines 21-25.
[172] Deposition of Mark G. Filler, page 96 lines 18-25.
[173] Deposition of Mark G. Filler, page 94, lines 11-12.
[174] Deposition of Mark G. Filler, page 25, lines 14-16.
[175] Deposition of Mark G. Filler, page 24, lines 8-17.
[176] Deposition of Mark G. Filler, page 112, lines 15-17.
[177] Deposition of Mark G. Filler, pages 48-49, lines 21-22.
[178] Deposition of Mark G. Filler, page 49, lines 4-22.

Phillip S. Bixby, Esq.
September 10, 2012
Page 23

conservative.[179]  Filler purports to capture the uncertainty in the "spread" of the costs, which he determined was a "pretty good spread" by talking about it with Mr. LaPoint.[180]

Filler used costs on Exhibit 13 from Filler Designation Exhibit 20 (which he indicated was an average of the costs from Filler Designation Exhibit 4, previously discussed, and Filler Designation Exhibit 20,[181] but it does not appear to have actually been averaged.  Instead, it appears he began with the costs as listed on Filler Designation Exhibit 20 plus or minus 10%).  He then assumed a range of plus/minus 10% to get triangular costs.[182]  Filler provides no basis for why a plus/minus 10% range was appropriate.

*Determination # 5:  Factory overhead and Selling, General and Administrative costs*
Overhead costs were calculated in the same manner as they were for the claimed losses related to CRI.

**Out of Pocket Costs**
We were not asked to review claims for out of pocket costs, which are detailed in the Plaintiff's Answers to Defendants' First Set of Interrogatories, No. 3.[183]  However, we note that Berry would only be responsible for these amounts to the extent that Berry caused the loss of CRI.  There has been no evidence produced that rules out the impact of other causes, including the effect of late deliveries and Packgen pricing issues, DOT issues, competitive forces, as well as other issues with the product itself.

**Conclusion**
Filler's calculations rest primarily on untested assumptions provided by management for each element of his calculations:  units that would have been sold, the price they would have been sold for, and how long they would have been sold.  The projected revenues are neither grounded to historical sales, nor are they attached to any forecast that Packgen could produce.  When considering historical sales, he misunderstood that Cougars had, in fact, been sold before his selected 6-month time period.

Where he does not rely on management for revenue assumptions, he makes his own unsupported assumptions (such as, 10% of the refineries would have been obtained each year and kept thereafter).  He used conflicting methodology between his calculations for CRI and the refineries.  For example, while he considered only six months of CRI revenue to be a sufficient time period to form a historical basis, he ignored historical sales to refineries for all of 2007, as he deemed it to be inconsequential.

He further relies on management for the costs of inputs, which he fails to compare to historical cost of sales.  Where he does not understand which source of cost data is appropriate, he responds by taking such steps as averaging costs, or by ignoring conflicting cost data and assuming it to be unreliable without basis.

---

[179] Deposition of Mark G. Filler, page 50, lines 11-19.
[180] Deposition of Mark G. Filler, page 51, lines 7-18.
[181] Deposition of Mark G. Filler, page 47, lines 5-6.
[182] Deposition of Mark G. Filler, pages 46-47, lines 19-24
[183] Plaintiff's First Answers, No. 3.

Phillip S. Bixby, Esq.
September 10, 2012
Page 24

He believes he is being "conservative", when in fact, he is merely speculating (such as his assumption of 10% sales per year to refineries, which lacked any evidentiary basis, or his costs to the refineries). To select his models, Filler relied on Olafsen, who requested a deterministic model, after only the statistical models were presented.

Filler's 10-year forecasts do not consider the impact of price changes, aggressive competitors and competitive threat. He fails to consider any intervening factors or other causes for Packgen's inability to keep or obtain customers, including risks related to a lack of patents; risk related to regulatory issues; the impact other incidents involving cougars may have had; and any impact from the lawsuit against BP.

Given the limited analysis performed and lack of supporting information relied upon by Filler, I would have been unable to calculate losses with reasonable certainty if engaged to do so.

I reserve the right to update my opinions in the event that additional material information is made available or becomes known to me. My hourly rate is $390 per hour. I was assisted by my staff, who worked all times at my direction.

Sincerely,
FANNON VALUATION GROUP

Nancy J. Fannon

NJF/jvt
Att.



**Fannon** Valuation Group

100 Commercial Street, Suite 300                    (ph) 207-775-5111 (fax) 207-775-5101
Portland, Maine 04101                               (email) nancy@fannonval.com

Nancy J. Fannon, CPA, ASA, MCBA, ABV
Curriculum Vitae

**Background**
    Ms. Fannon is the owner of Fannon Valuation Group, a nationally recognized business valuation, economic damages, and litigation support services firm located in Portland, Maine.
    Ms. Fannon has more than twenty years of professional valuation and damages experience, and is frequently retained to provide expert witness services relating to the value of a business; an opinion on the amount of financial damages relating to the lost profits or the loss of a business or segment of a business; a determination of reasonable compensation; and other financial matters. She has been appointed by courts or mediators as a court-appointed expert, and has served as an arbitrator in valuation cases.
    Nancy is a frequent speaker both locally and nationally on the topic of business valuation and damages. She is a regular contributing author and editorial board member for several national valuation and financial expert journals, and has written and/or technically reviewed several valuation and commercial damage textbooks.
    In 2007 and 2008 she published two professional reference books on valuation, and published a text on commercial damages in 2009. The third edition of her most recent publication, *The Comprehensive Guide to Lost Profits Damages for Experts and Attorneys,* will be published in October 2012.

**Expert Testimony**
    Ms. Fannon has been recognized as a qualified expert witness in federal and state courts, and has provided testimony before arbitration panels, on valuations involving lost-profit damages, shareholder disputes, shareholder dissent, divorce, and other financial matters. She has also served as an arbitrator in valuation matters.

**Employment**
*Fannon Valuation Group*, 2004-Present. Owner.
*Baker Newman & Noyes, Partner* (originally employed as Senior Manager), 1986-2004. Head of Business Valuation and Litigation Practice; Tax Partner
*TJX Corp.*, Tax Manager, 1983-1986. Tax Department Manager; Internal Audit Staff.
*Apparel Retail Corporation*, 1980-1983. Internal Audit and Tax Staff.

**Professional Designations**
Accredited Senior Appraiser, American Society of Appraisers
Master Certified Business Appraiser, Institute of Business Appraisers
Accredited in Business Valuation, American Institute of Certified Public Accountants
Certified Public Accountant, American Institute of Certified Public Accountants

**Education**
BS Accounting, University of Massachusetts, Amherst, Massachusetts, 1980
Numerous educational courses attended and taught in business valuation and financial damages through the American Institute of Certified Public Accountants, The Institute of Business Appraisers, the American

© Valuation Consulting Division of baker Newman & Noyes, LLC; All rights reserved.
This report and all attachments are to be used as a single document; no page of the report or attachments to it should be removed and used out of the context of the entire report.

Society of Appraisers, the National Association of Certified Valuation Analysts, and other professional valuation and legal organizations.

**Editorial Boards**
Member of Panel of Experts, *Financial and Litigation Expert,* 2006-Present
Editorial Advisory Board, *Business Valuation Update,* November 2005-Present
Editorial Board, *CPA Expert,* 2005-Present
Past Member Editorial Advisory Board, *Valuation Examiner,* 2007-2009

**Activities**
Institute of Business Appraisers, Board of Governors, 2010-2012
Co-Chair, Joint Business Valuation Standards Unification Committee for the National Association of Certified Valuation Analysts and the Institute of Business Appraisers, 2010
American Society of Appraisers, Member
American Institute of Certified Public Accountants, Member
CFA Institute, Member
American Finance Association, Member
Frequent speaker and teacher for national, state, and local accounting, expert and legal associations
Past Member S Corporation Association Technical Advisory Board, 2005-2009
American Institute of Certified Public Accountants, ABV Credential Committee, 2003-2005
American Institute of Certified Public Accountants, Business Valuation Committee, 1999-2002
AICPA Accredited in Business Valuation, Review Course Committee, Past Chair and Instructor
AICPA Advanced Business Valuation Studies Committee, 2002
AICPA 2001 Business Valuation Conference Chairperson and 2003 Committee Member
Co-Chair, National Law Education Institute, Business Valuation Section, January 2008-9
Financial Accounting Standards Board ("FASB"), Purchase Price Method/Business Combination Task Force, past member
Camp Calumet Internal Audit Committee, past member
American Heart Association "Go Red For Women" Executive Leadership Team for Maine, 2010

**Awards**
2011 Institute of Business Appraisers "Volunteer of the Year" Award Recipient
2007 Inducted into AICPA Business Valuation "Hall of Fame," awarded for substantial contributions to the advancement of the business valuation profession
1999 AICPA Business Valuation "Volunteer of the Year" Award Recipient
1997 Tribute to Women in Industry ("TWIN") Award Recipient, awarded to women who have made substantive civic and business contributions in their communities

## Texts and Publications

**Books and Journals (Author or Contributing Author)**
*The Comprehensive Guide to Lost Profit Damages: For Experts and Attorneys, 2011 edition*
    Author and Editor, Business Valuation Resources, January 2011
*The Comprehensive Guide to Lost Profit Damages: For Experts and Attorneys*
    Author and Editor, Business Valuation Resources, June 2009
*The Comprehensive Guide to the Use and Application of the Transaction Databases*
    Co-author with Heidi Walker, Business Valuation Resources, 2008
*Fannon's Guide to the Valuation of Subchapter S Corporations*
    Business Valuation Resources, 2007
*Financial Valuation, Applications and Methods, Second Edition*
    co-author with James Hitchner, copyright 2006 by John Wiley and Sons;
    authored chapter on S-corporation valuation, copyright 2006 by Nancy J. Fannon
*Financial Valuation: Applications and Models*
    co-author with James Hitchner, copyright 2003 by John Wiley & Sons
*Business Valuation and Taxes: Procedures, Law and Perspective*
    contributed chapter on S-corporation valuation for Tax Court Judge David Laro and Shannon P. Pratt,
    copyright 2005 by John Wiley & Sons
*The Business Appraiser and Litigation Support*
    contributing author, with Michelle Miles, copyright 2001 by John Wiley & Sons

**Books and Journals, Technical Reviewer**
*A Reviewer's Handbook to Business Valuation: Practical Guidance to the Use and Abuse of a Business Appraisal*
    L. Paul Hood, Jr. and Timothy R. Lee, copyright 2011 John Wiley & Sons Inc.
*Valuing a Business, Fifth Edition*
    Shannon P. Pratt, copyright 2008 McGraw-Hill
*Standards of Value: Theory and Application*
    Jay E. Fishman, Shannon P. Pratt, and William J. Morrison, copyright 2006 John Wiley & Sons Inc.
*The Market Approach to Valuing Businesses*
    Shannon P. Pratt, copyright 2002 by John Wiley & Sons
*Business Valuation Body of Knowledge*
    Shannon P. Pratt, copyright 2002 by John Wiley & Sons

**Publications (Author and co-author)**
"When and How to Use a Business Valuation Expert"
    *Maine Lawyers Review*, December 1997
"Family Limited Partnerships and Family LLCs: An Effective Estate Planning Tool"
    *Maine Lawyers Review*, 1998
"Determining the Value of a Business for Transfer Tax Purposes"
    *Maine Lawyers Review*, 1999
"Valuing Manufacturing Companies"
    *Business Valuation Update*, May 1999
"Recasting the Financial Statements"
    published in *The 2000 Business Reference Guide*, January 2000
"Business Valuation in the Context of Capital Formation for the Emerging Business"
    *Maine Lawyers Review*, January 2000

"Lost Profits Damages: A Natural Extension of Business Appraisal Skills"
*Business Valuation Update*, March 2000
"Valuing Small- to Mid-Sized Manufacturing Companies"
*FairShare, the Matrimonial Law Monthly*, April 2000
"Tackling Valuation Issues in the Context of Divorce"
*CPA Consultant*, January-April 2000
"Lost Profits Damages: A Natural Extension of Business Valuation Skills"
*CPA Expert*, Spring 2001
"Determining Value of Your Business Can Be Complex"
*Portland Press Herald*, July 13, 2001
"Buy-Sell Agreements: write 'em right!"
*Judges & Lawyers Business Valuation Update*, December 2001
"Practice Tips"
*National Litigation Consultant's Review*, January 2002
"It is Not All Fair Market Value, All the Time!... and Other Tips for Setting Out on a Successful Engagement"
*CCH Business Valuation Alert*, April 2003
"The Direct Market Data Method: Common Errors in Application and a Closer Look at the Transaction Databases"
*CCH Business Valuation Alert*, October 2003
"Valuation of Pass-Through Tax Entities: Minority and Controlling Interests"
Submitted to the Internal Revenue and the Treasury Department, February 2004, www.s-corp.org
"Uses and Abuses of Market Data: an In-Depth Look at the Tools of our Trade"
*Business Valuation Review*, Summer 2006
"Presumed Innocent – Presumed Advocate"
*Valuation Strategies*, January/February 2007
"S Corporation Value: Big Dollars at Risk: Tax, Divorce, Corporate"
*Maine Lawyers Review*, February 2007
"S Corporations: Getting Down to Basics"
*Valuation Examiner*, March/April 2007 (similarly published in *CPA Expert*, Spring 2007, and *Business Valuation Review*, Spring 2007)
"What Every Valuation Expert Needs to Know to Prepare a Lost Profits Calculation"
*Business Valuation Update*, March 2007
"How Much is this Business Worth?"
*Maine Lawyers Review*, May 2007
"Subchapter S Corporation Valuation – A Simplified View"
*Business Valuation Review*, Spring 2007
"Using Financial Experts in a Lost Profits Case"
*Maine Lawyers Review*, June 2007
"Rates of Return: Don't Ignore Public Market or Transactional Data"
*Business Valuation Update*, September 2007
"Is 'Vigorous Cross-Examination' Enough?"
*Maine Lawyers Review*, September 2007
"The Shortest Distance Between Two Points"
*Business Valuation Review*, 2007
"Valuing Controlling versus minority interests in S corporations"
*Business Valuation Review, Winter 2007*
"The Real S Corp. Debate: Impact of Embedded Tax Rates from Public Markets"
*Business Valuation Update March 2008,*
*CPA Expert Spring 2008,*
*Business Valuation Review, 2009*
*Business Appraisal Practice, 2008*

*Financial Valuation and Litigation Expert, December 2008/January 2009*
"Financial Expert Exclusions— are you prepared to defend yourself?"
*Business Valuation Alert October 2009 and January 2010*
"Keeping Your Financial Damages Expert in the Case"
*For the Defense, March 2010*
"The Hidden Cost of the Appraisal"
*Maine Lawyers Review, March 2010*
"A New View of an Old Debate – Rethinking the Benefit of Pass-Through Entities"
*Financial Valuation and Litigation Expert, August/September 2010*
"Daubert and the Financial Damages Expert"
*Maine Bar Journal, Spring 2011*
"Evolution of Valuation Professional Standards"
*Financial Valuation and Litigation Expert, June/July 2011*
"Do Appraisers Need to Specialize to Survive?"
*BVUpdate, February 2012*
"Valuation of Pass-Through Entities: Looking at the Bigger Picture"
*Social Science Research Network, February 2012*
"Rethinking the Benefits of Pass-Through Entities"
*FVS Consulting Digest, March 2012*


**Articles and Interviews**
"How I Work: Interview with Nancy J. Fannon"
*Business Appraisal Practice*, Institute of Business Appraisers, Fourth Quarter 2011
"We Need to Challenge the Assumptions We Make When Using S Corp Models"
*Business Valuation Update, May 2012, Vol. 18, No. 5*

## Speeches and Seminars

*Valuing My Business Fairly: Intellectual Property and Venture Capital in Maine*
    The Cambridge Institute, June 1998
*Accredited in Business Valuation Review Course*
    American Institute of Certified Public Accountants, September 1998
*Appraisals in the Manufacturing Industry*
    Institute of Business Appraisers Annual National Conference, February 1998
*Buying and Selling Private Companies, Divisions and Subsidiaries in Maine*
    Finance Authority of Maine, June 1998
*Difficult Valuation Issues in Divorce*
    Maine Bar Association, February 1999
*Valuation of Flooring Distributorships*
    NRF Distributor Network, 1999
*Accredited in Business Valuation Review Course*
    American Institute of Certified Public Accountants, September/October 1999
*Ethics and Profits in Business Valuation – Obtainable or Mutually Exclusive?* and
*Divorce Valuation: Schizophrenic Valuation at Its Best*
    AICPA Annual Business Valuation Conference, December 1999
*Lost Profit Damages Are a Natural Extension of Business Appraisal Skills*
    American Business Appraisers Annual Conference, May 2000
*Valuation in the Context of Divorce*
    CPA Associates Annual Conference, August 2000
*Buying and Selling a Business the Street Smart Way*
    Street Smart Seminars, June 2000
*Preparing Your Practice for Litigation Support* and
*Litigation Support Roundtable*
    AICPA Annual Business Valuation Conference, November 2000
*Business Valuation in the Context of Divorce*
    Maine Bar Association, February 2001
Valuation Game Show Panel
    Institute of Business Appraisers Annual Conference, May 2001
Difficult Valuation Issues Panel
    Financial Consulting Group Annual Conference, September 2001
*Valuation of Family Limited Partnerships*
    Maine State Bar Association, Estate Section, 2001
*Business Valuation*
    Maine State Bar Annual Conference, October 2001
*Effectively Using the Expert Witness*
    Roundtable of Judges & Lawyers, 2002
*Taxation of Pass-Through Entities*
    Financial Consulting Group, September 2002
*Litigation Support and the Business Appraiser*
    CPA Associates Annual Conference, August 2003
*Advising Business Owners: Tax Saving Strategies & Planning Considerations*
    Lorman Education Services, August 2003
*Valuation of Pass-Through Entities: What's all the Fuss?*
    AICPA National Business Valuation Conference, November 2003
*Valuation in the Context of Divorce*
    New Hampshire Family Law Section, New Hampshire State Bar, January 2004
*Hiding Behind the Numbers*
    Maine Corporate Law Section, Maine State Bar, March 2004

*Valuation of Professional Practices*
    Maine Family Law Section, Maine State Bar, March 2004
*Valuation of Pass-Through Entities*
    Institute of Business Appraisers National Business Valuation Conference, June 2004
*Freeze out, Fiduciary Duty and Oppression: Litigating Pursuant to the New Maine Business Corporations Statute*
    Maine Bar Summer Meeting (Panel), June 2004
*Valuation of Pass-Through Entities*
    CPA Associates, August 2004
*Advising Small Business Owners in Maine*
    Tax Valuation and Estate Planning Strategies, September 2004
*Valuation of Subchapter S Corporations and Other Pass-Through Entities*
    American Society of Appraisers Annual Advanced Business Valuation Conference, October 2004
*The Uses and Abuses of Direct Market Data*
    American Society of Appraisers Annual Advanced Business Valuation Conference, October 2004
*Valuation of Pass-Through Entities*
    Moderator of Leading National Experts, American Institute of Certified Public Accountants Annual
    National Business Valuation Conference, November 2004
*The Uses and Abuses of Direct Market Data*
    Foundation for Education, New York Society of Appraisers Annual Business Valuation Conference, May
2005
*Valuation of Pass-Through Entities*
    National Association of Certified Valuation Analysts Annual Business Valuation Conference, June 2005
*The Uses and Abuses of Direct Market Data*
    The Valuation Roundtable of San Francisco, Monterey, California, June 2005
*Valuation of Pass-Through Entities* and
*Litigation Support for the Valuation Practitioner*
    Michigan Society of CPAs Annual Business Valuation Conference, June 2005
*Valuation of Pass-Through Entities*
    Minnesota Society of CPAs Annual Business Valuation Conference, October 2005
*Market Approach to Valuing a Business – Avoiding Common Pitfalls*
    CPA Associates Business Valuation National Teleconference, January 9, 2006
*Marketing your Valuation Practice*
    Business Valuation Resources National Audio Conference, March 9, 2006
*Valuation of Lost Profits Damages*
    Maine State Bar Association, May 11, 2006
*Valuation of Pass-Through Entities*
    Business Valuation Resources National Audio Conference, June 2006
*The Transaction Method: Uses and Abuses of Market Data*
    AICPA National Audio Conference, August 2006
*Divorce Practice Areas*
    AICPA National Fraud & Litigation Conference, September 2006
*Valuation of Lost Profit Damages*
    AICPA National Fraud & Litigation Conference, September 2006
*S Corporation Valuation – It Ain't Over Yet*
    AICPA National Business Valuation Conference and Financial Consulting Group Annual Business
    Valuation Conference, December 2006
*Presumed Innocent – Presumed Advocate?*
    Financial Consulting Group Annual Business Valuation Conference, December 2006
*The Transaction Method: Uses and Abuses of Market Data*
    AICPA National Business Valuation Conference, December 2006
*Lost Profits Damages*
    National CLE and Ski Conference, Colorado Bar Association, January 2007

*S Corporation Valuation – It Ain't Over Yet* and
*The Transaction Method: Uses and Abuses of Market Data*
    PKF North America National Business Valuation Conference, January 2007
*S Corporation Valuation – It Ain't Over Yet* and
*The Transaction Method: Uses and Abuses of Market Data*
    California Business Valuation and Litigation Society Meeting, February 2007
*S Corporation Valuation – It Ain't Over Yet* and
*The Transaction Method: Uses and Abuses of Market Data*
    Illinois CPA Society, Business Valuation Section, May 2007
*S Corporation Valuation – It Ain't Over Yet*;
*The Transaction Method: Uses and Abuses of Market Data* and
*Lost Profits Damages*
    AGN International, May 2007
*Lost Profits Damages*
    Business Valuation Resources National Teleconference, May 2007
*The Transaction Method: Uses and Abuses of Market Data*
    CPA Associates, July 2007
*Valuation Discounts & Chapter 14*
    Maine Bar Estate Planning Conference, September 2007
*The Transaction Method: Uses and Abuses of Market Data* and
*S Corporation Valuation*
    FCG Fall Business Valuation Conference, September 2007
*The Transaction Method: Uses and Abuses of Market Data*
    Minnesota Society of CPAs Business Valuation Conference, October 2007
*The Transaction Method: Uses and Abuses of Market Data*;
*Ethics and Advocacy in Expert Testimony* and
*Hardball* – a panel discussion of difficult valuation and litigation matters
    AICPA National Valuation Conference, December 2007
*Lost Profits Damages and Use of Experts*;
*Valuation Discounts & Chapter 14* and
*Understanding & Interpreting Appraisals*
    Law Education Institute, January 2008
*Lost Profits Damages and Use of Experts*;
*S Corporation Valuation* and
*The Transaction Method: Uses and Abuses of Market Data*
    Rhode Island Society of CPAs, January 2008
*Valuation in the Context of Shareholder Dissent in New Hampshire*
    New Hampshire State Bar Association Conference, May 2008
*S Corporation Valuation—2008 Update*
    NY Chapter of the American Society of Appraisers May 2008, NY Society of CPA's May 2008,
    National Association of Certified Valuation Analysts Annual Business Valuation Conference, June 2008
*Lost Profit Damages*
    CPA Associates National Webinar, August 2008
*Calculating Lost Profits Damages: A Natural Extension for the Business Appraiser* and
*Uses and Abuses of Transaction Data*
    Litigation/Valuation Resource Group Joint Conference, NJSCPA, September 2008
*The Ins and Outs of Transaction Databases*
    Business Valuation Resources Teleconference, October 2008
*Valuation of Subchapter S Corporations*
    Illinois State Chapter Meeting, October 2008
*S Corporation Valuation: The Next Frontier*
    AICPA/ASA National Business Valuation Conference, November 2008

*Avoiding Daubert Challenges*
    Law Education Institute, Vail CO January 2009
*Lost Profit Damages: Lessons Learned from Nine Years of Excluded Experts*
    National Webinar, Business Valuation Resources March 2009
*Lost Profits Damages, Lessons Learned from Nine Years of Excluded Experts*
    National Association of Certified Valuation Analysts Annual Valuation & Litigation Conference, June 2009
*Lost Profits Damages—Controversial Issues*
*Motions to Exclude Financial Experts*
    AICPA National Fraud and Forensic Litigation Conference, September 2009
*The Impact of Taxes on Value in the Private Capital Markets*
    University of San Diego School of Law, October 2009
*Lost Profits Damages—Lessons Learned from Nine Years of Excluded Experts*
    AICPA National Business Valuation Conference, November 2009
*The Effect of Tax Policy on Value in the Private Capital Markets*
    Business Valuation Resources National Webinar, December 2009
*Tax issues and Valuation*
    New Hampshire State Bar, December 2009
*Financial Issues in Family Law—Business Valuation*
    Maine State Bar, April 2010
*Adeptly Handling Damages Experts in Business Litigation: Practical Dos, Don'ts and Tips*
    DRI Business and Intellectual Property Litigation Seminar, April 2010
*Commercial Damages*
    New Hampshire State Bar Association, May 2010
*The Effects of Taxes on Value in the Private Capital Markets*
    New Jersey Chapter of the National Association of Certified Valuation Analysts, June 2010
*Keynote Address: Issues Facing Litigation Support and Business Valuation Practices*
    Michigan Association of CPAs, June 2010
*Effectively Serving as a Damages Expert*
    Virginia Society of CPAs, September 2010
*Making Sense of Business Valuation*
*The Use and Application of Transaction Databases*
*S Corporation Valuation*
    Wisconsin Chapter of the National Association of Certified Valuation Analysts, October 2010
*Context of Lost Profits Damages Claims and Case Law Update*
    Business Valuation Resources National Webinar, October 2010
*Lost Profits Damages* and
*The Use and Application of Market Transaction Databases*
    AICPA National Business Valuation Conference, November 2010
*Keeping Your Expert in the Case: Avoiding the Landmines of Expert Exclusions*
    DRI Webcast, February 2011
*Pass-Through Entity Valuation Update: The Significant Impact of Academic Research on the Debate*
    Business Valuation Resources Webinar, May 2011
*Valuation in Bankruptcy: Understanding Valuation Evidence*
    Maine State Bar Association: Courtroom Evidence for Business and Bankruptcy Attorneys, June 2011
*Industry Standards: Ready to Protect and Serve*
    NACVA/IBA 2011 Annual Consultants' Conference, June 2011
*The Transaction Approach: Its Importance and Relevance*
    CPA Associates International Business Valuations Seminar, July 2011
*Supporting Your Case: Discovery and Evidence*
    Business Valuation Resources Litigation and Economic Damages Webinar Series, November 2011
*Scope and Data Limitations and Practical Issues in Conforming to SSVS1*

AICPA National Business Valuation Conference, November 2011
*Pass-Through Entity Valuation 2012: Research and Methods*
American Institute of Certified Public Accountants, January 2012
*Business Valuation and Choice of Entity*
American Tax Association 2012 Midyear Meeting: Journal of Legal Tax Research Conference, February 2012
*Case Law Update: The Latest in Lost Profits and Motions to Exclude Experts*
Business Valuation Resources Webinar, August 2012
*Developing Your Expert Witness Protocol*
SEAK Expert Witness Training, August 2012

| APPENDIX A |
|---|
| File Index |
| Packgen v. Berry Plastics/Covalence |
| Phil Bixby & Jonathan Dunitz, Friedman Gaythwaite Wolf Levitt |

| Folder | Document Title | Source | Date Rec/Accessed |
|---|---|---|---|
| **Correspondence** | | | |
| | F000004-F000006  Berry Plastics Consulting EL 6.14.12 sent 6.14.12 | Fannon | Sent 6/14/2012 |
| | F000010-F000013  Berry Plastics EL 9.6.12 sent 9.6.12 | Fannon | Sent 9/6/2012 |
| | F000007-F000009  Berry Plastics Doc and Info Checklist sent 7.9.2012 | Fannon | Sent 7/9/2012 |
| | F000001-F000003  Berry Plastics - Invoices | Fannon | |
| | F000014-F000015  Letter and W-9 - Berry Plastics sent 7.12.12 | Fannon | |
| **Reports** | | | |
| | Filler Rebuttal | Fannon | |
| | File Index | Fannon | |
| **Other Documents:** | | | |
| | F000071-F000111  Packgen notes | Fannon | |
| | F000162-F000168  Fannon Notes from Roberts Dep | Fannon | |
| | F000016-F000051  Berry Plastics emails | Fannon | |
| | F000154  Bids | Fannon | |
| | F000052-F000043  Celeste Horton | Fannon | |
| | F000055-F000065  Deposition questions | Fannon | |
| | F000146-F000153  Reasons | Fannon | |
| | F000112-F000125  Packgen v. Berry | Fannon | |
| | F000129-F000145  Packgen v. BP America | FGWL | 8/30/2012 |
| | F000126-F000128  Packgen v. BP America Exhibit 1 to Complaint | FGWL | 8/30/2012 |
| | F000066-F000070  Packgen BP News Articles | Fannon | 9/4/2012 |
| | F000169  cost of sales | Fannon | |
| | Berry Plastics Terms and Conditions | Fannon | |
| **Court filings** | | | |
| | 2-2 Complaint | FGWL | 6/13/12 |
| | 5 Answer and Aff Defenses to Complaint | FGWL | 6/13/12 |
| | 2012.05.24 PF's Expert Witness Designations w attachs | FGWL | 8/10/12 |
| | Ex 13 Economic Damages - Lost Sales to 37 Refineries | FGWL | 8/10/12 |
| | Report of James Rancourt re expert Witness Designation | FGWL | 8/10/12 |
| | 2012.07.25 Plt's Answers to Def's First Set of Ints.pdf | FGWL | 8/27/12 |
| | 2012.07.25 Plt's Response to Def's First RFP.pdf | FGWL | 8/27/12 |
| | Plt's Exhibit A to document request | FGWL | 8/27/12 |
| | Plt's Exhibit B to document request | FGWL | 8/27/12 |
| | FGWL-Container Claim 8-12 | FGWL | 8/23/12 |
| | Rough Draft of Horton Depo Trx | FGWL | 9/5/12 |
| | Rough Draft of Lapoint Depo Trx | FGWL | 9/6/12 |
| **Document Production from Plt and Defs** | | | |
| | 2012.07.25 Plt's Response to Def's First RFP.pdf | FGWL | 8/27/12 |
| | PACKGEN 1-480 | FGWL | 7/18/12 |
| | PACKGEN 481-482 | FGWL | 7/18/12 |
| | PACKGEN P0001-P00302 | FGWL | 7/18/12 |
| | PACKGEN P0500-P0706 CONFIDENTIAL | FGWL | 7/18/12 |
| | P707-P1447 CD-Wrangler with disclaimer | FGWL | 8/10/12 |
| | P01448-P02432 | FGWL | 8/15/12 |
| | P02433-P03846 | FGWL | 8/15/12 |
| | P10000-P11169 | FGWL | 8/15/12 |
| | FILLER0001-FILLER000165 | FGWL | 8/17/12 |
| | Exhibit 20 John Lapoint Deposition Refinery Notes | FGWL | 8/29/12 |
| | Exhibit 27 to John Lapoint Deposition Refinery Notes "Cougar and CRI Sales 2007 through 2010" | FGWL | 8/31/12 |
| **Filler Designation** | | | |
| | Packgen expert designation exhibits | FGWL | 6/13/12 |
| | Packgen expert witness designations | FGWL | 6/13/12 |
| | Ex 13 Economic Damages - Lost Sales to 37 Refineries | FGWL | 6/18/12 |
| | F000155-F000156  Filler calculations | Fannon | |
| | F000157-F000161  Filler review | Fannon | |
| | Filler transcript August 21 2012 rough draft | FGWL | 8/23/12 |
| | Filler deposition exhibits | FGWL | 8/21/12 |
| | **Filler File** | | |
| | Business Descrip | FGWL | 8/22/12 |
| | Business descriptions | FGWL | 8/22/12 |
| | Complaint | FGWL | 8/22/12 |

| | | |
|---|---|---|
| Computation of costs | FGWL | 8/22/12 |
| Costed Bill of Material | FGWL | 8/22/12 |
| cougar OFS58 Total Component Cost | FGWL | 8/22/12 |
| CRI Item numbers | FGWL | 8/22/12 |
| Criterion Damages - Simulated Model | FGWL | 8/22/12 |
| Explanation increase-decrease | FGWL | 8/22/12 |
| Explanation of unusual-sudden Inc-dec expenses | FGWL | 8/22/12 |
| Fed Rule 26 | FGWL | 8/22/12 |
| financial information | FGWL | 8/22/12 |
| Increases-decreases 2007-2008 | FGWL | 8/22/12 |
| Lonestar with Disch | FGWL | 8/22/12 |
| Lonestar with Discharge | FGWL | 8/22/12 |
| Mark Filler Emails | FGWL | 8/22/12 |
| Notice of Deposition | FGWL | 8/22/12 |
| Packgen Computation of weighted avg cost of capital | FGWL | 8/22/12 |
| Packgen Cougar Catalyst Container | FGWL | 8/22/12 |
| Plantif's Expert Witness Desg draft | FGWL | 8/22/12 |
| Plt's Expert Designation draft | FGWL | 8/22/12 |
| Questions | FGWL | 8/22/12 |
| Sales by the Month | FGWL | 8/22/12 |
| Sales | FGWL | 8/22/12 |
| Simulation Statics -3 | FGWL | 8/22/12 |
| Simulatioin Statistics -2 | FGWL | 8/22/12 |
| Simulation Statistics -1 | FGWL | 8/22/12 |
| SMonthly Sales 2005-2008 | FGWL | 8/22/12 |
| XL SIM Simulation Statics | FGWL | 8/22/12 |
| XLSim Simulated Statistics | FGWL | 8/22/12 |
| **Filler Electronic Files** | | |
| **37 Refineries Folder** | | |
| Cougar Sales 2004 thru 2011 9-16-11 | FGWL | 8/22/12 |
| Cougar Sales since February 2008 | FGWL | 8/22/12 |
| **Criterion Folder** | | |
| Cougar CRI Freight Cost Master sheet 071910.xlsx | FGWL | 8/22/12 |
| CRI and Cougar info Monthly200(2).xls | FGWL | 8/22/12 |
| CRI and Cougar info Monthly200.xls | FGWL | 8/22/12 |
| Criterion Copy of CRI and Cougar info Monthly100 041409.xls | FGWL | 8/22/12 |
| Criterion Copy of CRI and Cougar info Monthly Master Sheet 052009.xls | FGWL | 8/22/12 |
| Criterion shipping by location 20072008 .xls.htm | FGWL | 8/22/12 |
| **Packgen** | | |
| Cougar Accts Effected by Incident.xls | FGWL | 8/22/12 |
| Criterion Damages.xls | FGWL | 8/22/12 |
| **Raw Material Worksheets** | | |
| 320122 2003 Raw Material Costs CRI (9).xls | FGWL | 8/22/12 |
| 320188 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320194 2003 Raw Material Costs CRI (9).xls | FGWL | 8/22/12 |
| 320219 2004 Raw Material Costs CRI (8).xls | FGWL | 8/22/12 |
| 320219 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320219 2006 Raw Material Costs CRI (5).xlsm | FGWL | 8/22/12 |
| 320219 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320272 2004 Raw Material Cost CRI.xls | FGWL | 8/22/12 |
| 320272 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320272 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320272 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320308 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320308 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320308 2006 Raw Material Costs COU (5).xls | FGWL | 8/22/12 |
| 320308 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320308 2008 Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320309 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320309 2006 Raw Material Costs COU (5).xls | FGWL | 8/22/12 |
| 320309 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320309 2008 comparison to 2009Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320310 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320310 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320310 2008 Raw Material Costs compared to 2009 COU.xls | FGWL | 8/22/12 |
| 320310 2009 WITH SOME 2008 PRICES ADDED Raw Material Costs COU (11) (1).xlsm | FGWL | 8/22/12 |
| 320310 2009 WITH SOME 2008 PRICES ADDED Raw Material Costs COU (11).xlsm | FGWL | 8/22/12 |
| 320311 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320311 2008 Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320330 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320341 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320341 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320449 2007 Raw Material Costs CRI(3).xls | FGWL | 8/22/12 |

| | | |
|---|---|---|
| 320449 2008 Raw Material Costs CRI.xls | FGWL | 8/22/12 |
| 320451 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320451 2008 Raw Material Costs CRI.xls | FGWL | 8/22/12 |
| 320453 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320559 2003 Raw Material Costs COU (9).xls | FGWL | 8/22/12 |
| 320559 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320993 2002 Raw Material Costs COU (10).xlsm | FGWL | 8/22/12 |
| 320994 2002 Raw Material Costs COU(10).xlsm | FGWL | 8/22/12 |
| **Raw Material Worksheets** | | |
| 320122 2003 Raw Material Costs CRI (9).xls | FGWL | 8/22/12 |
| 320188 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320194 2003 Raw Material Costs CRI (9).xls | FGWL | 8/22/12 |
| 320219 2004 Raw Material Costs CRI (8).xls | FGWL | 8/22/12 |
| 320219 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320219 2006 Raw Material Costs CRI (5).xlsm | FGWL | 8/22/12 |
| 320219 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320272 2004 Raw Material Cost CRI.xls | FGWL | 8/22/12 |
| 320272 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320272 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320272 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320308 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320308 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320308 2006 Raw Material Costs COU (5).xls | FGWL | 8/22/12 |
| 320308 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320308 2008 Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320309 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320309 2006 Raw Material Costs COU (5).xls | FGWL | 8/22/12 |
| 320309 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320309 2008 comparison to 2009Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320310 2005 Raw Material Costs COU (7).xls | FGWL | 8/22/12 |
| 320310 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320310 2008 Raw Material Costs compared to 2009 COU.xls | FGWL | 8/22/12 |
| 320310 2009 WITH SOME 2008 PRICES ADDED Raw Material Costs COU (11) (1).xlsm | FGWL | 8/22/12 |
| 320310 2009 WITH SOME 2008 PRICES ADDED Raw Material Costs COU (11).xlsm | FGWL | 8/22/12 |
| 320311 2007 Raw Material Costs COU (3).xls | FGWL | 8/22/12 |
| 320311 2008 Raw Material Costs COU.xls | FGWL | 8/22/12 |
| 320330 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320341 2005 Raw Material Costs CRI (7).xlsm | FGWL | 8/22/12 |
| 320341 2006 Raw Material Costs CRI (5).xls | FGWL | 8/22/12 |
| 320449 2007 Raw Material Costs (3).xls | FGWL | 8/22/12 |
| 320449 2007 Raw Material Costs CRI(3).xls | FGWL | 8/22/12 |
| 320449 2008 Raw Material Costs CRI.xls | FGWL | 8/22/12 |
| 320449 2008 Raw Material Costs.xls | FGWL | 8/22/12 |
| 320451 2007 Raw Material Costs (3).xls | FGWL | 8/22/12 |
| 320451 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320451 2008 Raw Material Costs CRI.xls | FGWL | 8/22/12 |
| 320451 2008 Raw Material Costs.xls | FGWL | 8/22/12 |
| 320453 2007 Raw Material Costs (3).xls | FGWL | 8/22/12 |
| 320453 2007 Raw Material Costs CRI (3).xls | FGWL | 8/22/12 |
| 320453 2008 Raw Material Costs.xls | FGWL | 8/22/12 |
| 320559 2003 Raw Material Costs COU (9).xls | FGWL | 8/22/12 |
| 320559 2004 Raw Material Cost COU.xls | FGWL | 8/22/12 |
| 320993 2002 Raw Material Costs COU (10).xlsm | FGWL | 8/22/12 |
| 320994 2002 Raw Material Costs COU(10).xlsm | FGWL | 8/22/12 |
| **Sales & Cost Activity Oct 07 - Mar 08** | | |
| Cougar and CRI sales 2007 to 2010-2.xlsx | FGWL | 8/22/12 |
| Cougar and CRI sales 2007 to 2010.xlsx | FGWL | 8/22/12 |
| Medical Insurance break out to actual.xls | FGWL | 8/22/12 |
| Sales & Costs - Oct 07 - Mar 08.xlsx | FGWL | 8/22/12 |