UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

PACKGEN,                              CIVIL ACTION

          Plaintiff            Docket No: 2:12-cv-80-JAW


     -versus-                    **Volume II**


BERRY PLASTICS CORPORATION, et al.,

          Defendants

_____


Transcript of Proceedings



Pursuant to notice, the above-entitled matter came on
for **Hearing on Motion** held before **THE HONORABLE JOHN A.
WOODCOCK, JR.,** United States District Chief Judge, in
the United States District Court, Edward T. Gignoux
Courthouse, 156 Federal Street, Portland, Maine on the
3rd day of March, 2014 at 10:30 a.m. as follows:

Appearances:

For the Plaintiff:  Kurt E. Olafsen, Esquire

For the Defendants:  Phillip S. Bixby, Esquire
                     Jonathan M. Dunitz, Esquire


Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography and
 computer aided transcription)

## I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Nancy Fannon | 263 | 297 | 334 | 343 |
| Mark Filler | 345 | 363 | | |

## E X H I B I T S

| Number | Description | Page/Admit |
|--------|-------------|------------|
| 17 | Spreadsheet | 327 |
| 13 | Economic Damages | 347 |
| 14 | Simulation Stats | 347 |
| 15 | Simulation Stats | 347 |
| 16A | Simulation Stats | 347 |

**SIDE BAR CONFERENCES**

**CHAMBERS CONFERENCES**

```
 1                    (Open court.  Parties present).
 2              THE COURT:  Good morning.
 3              MR. OLAFSEN:  Good morning, Your Honor.
 4              MR. DUNITZ:  Good morning, Your Honor.
 5              THE COURT:  Ready to proceed?
 6              MR. DUNITZ:  Yes, Your Honor.  We call Nancy
 7    Fannon.
 8              THE CLERK:  Please raise your right hand.  Do
 9    you solemnly swear that the testimony you will give in
10    the cause now in hearing will be the truth, the whole
11    truth, and nothing but the truth, so help you God?
12              THE WITNESS:  I do.
13              THE CLERK:  Thank you.  Please be seated.
14    Please state your name and spell your first and last
15    name for the record.
16              THE WITNESS:  Nancy Fannon, N-A-N-C-Y
17    F-A-N-N-O-N.
18              THE COURT:  You may proceed.
19                    DIRECT EXAMINATION
20    BY MR. DUNITZ:
21    Q.   Good morning, Ms. Fannon.  Could you briefly
22    describe your background to the Court.
23    A.   Yes.  I'm currently the partner in charge of
24    litigation services for the accounting firm Meyers
25    Harrison & Pia.  In that regard, I'm in charge of all
```

Fannon-Direct/Dunitz

1    the business valuation work that runs through our

2    Portland, Maine, office, which is a national practice,

3    as well as all of the litigation commercial damage work

4    that runs through the entire firm.  We're based in New

5    Haven and Manhattan.

6            I have a degree in accounting.  I also have

7    several credentials related to business valuation.

8    I've authored a number of textbooks on valuation, as

9    well as a textbook on commercial damages of which I'm

10   an editor.  I've also technically reviewed and

11   participated in numerous other business valuation

12   textbooks and I teach valuation and damages frequently

13   all around the country to judges, lawyers, my peers,

14   IRS agents, anyone that would ever have use of these

15   services.

16   Q.    How many times have you been retained as a lost

17   profit damages expert?

18   A.    Probably at least 500.

19   Q.    Do you recall how many times you've testified as

20   a damages expert?

21   A.    I've testified about a hundred times.  Some of

22   those case are business valuation, some are damages.

23   Q.    And have you ever been excluded from testifying?

24   A.    I have not.

25   Q.    Did you endorse Mr. Filler's statistics book?

Fannon-Direct/Dunitz

1    A.    No, I didn't at all.  In fact, the first time I

2    realized that I was even mentioned in the book was last

3    Wednesday to my surprise.

4    Q.    Were you asked permission to use your name in the

5    book?

6    A.    I was not, and perhaps I should provide a little

7    bit of context for how he thinks my name got in there.

8    A number of years ago -- I knew that Mr. Filler used

9    statistics in some of his analyses so I asked him if he

10   was interested in writing a chapter for my damages

11   book.

12        When I reviewed it, I ultimately had some

13   issues with it so I had it technically reviewed by a

14   statistician and made the decision to reject the

15   materials and it's my understanding that he went on and

16   used those materials in the book that he subsequently

17   published.

18   Q.    Before we move on, I notice you took a couple of

19   package of documents up.  Just so Kurt knows what you

20   have with you, can you identify what you brought with

21   you.

22   A.    Yes.  I have my report and I have Mr. Filler's

23   report, as well as the additional documents that we

24   received about a week ago, the revised exhibits.

25        MR. DUNITZ:  Do you have any objection to her

1    using that?

2           MR. OLAFSEN:  No objection.

3    BY MR. DUNITZ:

4    Q.    Ms. Fannon, can you tell the Court what Berry

5    Plastics engaged you to do in this case?

6    A.    I was engaged to review the opinions that had

7    been offered by Mr. Filler.

8    Q.    And what did you find?

9    A.    It was my ultimate opinion that the work that he

10   did, based on the work that he did and the lack of

11   information that he had, he could not have expressed an

12   opinion to a degree of economic certainty.

13   Q.    And how do you define reasonable certainty?

14   A.    I define it as best available proof.  When I

15   think about reasonable certainty, I first think to our

16   standards that we hold, that we have that guide us as

17   experts and those standards require us to do our work

18   relying on sufficiently reliable data and I also know

19   that the court -- courts have interpreted reasonable

20   certainty and, in general, studies of what the courts

21   mean by that is to have the best available proof.

22   Q.    Are you aware of any cases that identify it as

23   being better than 50 percent?

24   A.    No, I've not heard that before.

25   Q.    You were here last Thursday for Mr. Filler's

Fannon-Direct/Dunitz

1   testimony; is that correct?

2   A.    Yes, I was.

3   Q.    And did any of his testimony from Thursday affect

4   your opinions in this case?

5   A.    Yes, it did.

6   Q.    Can you describe for the Court how those -- your

7   opinions were impacted?

8   A.    Last Thursday was the first time that I heard Mr.

9   Filler express that -- his opinion that there had been

10  a complete destruction of a segment of Packgen's

11  business, so to me that's a very material statement and

12  I think I can best explain why that is if I start by

13  explaining when you do certain damage calculations,

14  what the circumstances are that would lead you to do

15  one damage calculation versus another, and then how --

16  generally how those calculations are done and then

17  compare that to what Mr. Filler has done.

18  Q.    So if you could explain the difference between

19  the two models for the Court.

20  A.    Generally when a loss has occurred, one of the

21  first things the expert has to assess is has there been

22  a complete destruction of a business or a segment of a

23  business or does the company have a temporary loss from

24  which they are expected to recover.

25          In this case, Mr. Filler testified last week

Fannon-Direct/Dunitz

1    that he believes there was a complete destruction in

2    the business related to CRI.  If that was the case,

3    then the only proper measure of damages is to calculate

4    a loss of business value, how much did the stock value

5    go down because of this permanent loss from which they

6    would never recover.

7         The way that loss of business value is

8    typically calculated is by doing a business valuation

9    using all of the information and methodologies that you

10   would typically employ in a business valuation, and the

11   most common of those would be to do a discounted cash

12   flow calculation where you forecast out what the net

13   cash flow, and by that I mean net after-tax cash flow

14   of the business because that's what we use in the

15   business valuation or of the segment of the business,

16   and you apply a risk-adjusted rate to that.  So that's

17   a loss of business value.

18        In a lost profits calculation, it's

19   appropriate to do that calculation when you believe

20   that the company will recover, so this is a temporary

21   loss that the business is claiming they have suffered

22   and, in fact, up until last Thursday, Mr. Filler was

23   claiming he had done a lost profits calculation.  So a

24   lost profits calculation is for a temporary loss with

25   recovery based on the incremental profits of the

Fannon-Direct/Dunitz

1    business.

2           Now, if we step back and compare that to what

3    Mr. Filler actually did, he made a calculation of what

4    he called the net profits of the business for a

5    ten-year period and in making that calculation, he

6    testified that he deducted all direct costs, all

7    variable costs and all fixed costs which are, in fact,

8    all of the costs of the business and which would be

9    appropriate to deduct for a loss of business value

10   claim.

11          In a lost profits claim --  I'm sorry, a lost

12   value claim, you would then go on and tax affect the

13   earnings, take other cash flow items in consideration,

14   like working capital needs, capital expenditure needs,

15   and that gives us the net after-tax cash flow that you

16   then apply a risk-adjusted rate to and, in fact, the

17   risk-adjusted rate that Mr. Filler used was relevant

18   for -- to be applied to net after-tax cash flow.

19          One of the things you would do in a valuation

20   is you would look and see when you're forecasting, does

21   the forecast that I've arrived at for net pre-tax

22   profit make sense in light of the company's historical

23   track record and for this segment of the business that

24   he's saying was totally destroyed, he's determined that

25   the profitability of the segment of the business was

Fannon-Direct/Dunitz

1    37 percent of revenues.

2         Well, in a valuation, you would say how can I

3    test that and make sure that makes sense and, in fact,

4    if you look at the four years prior to the year of the

5    alleged incident, their average profitability was only

6    3.6 percent.  So he's forecasting the segment would

7    have had ten times greater profitability than the

8    company has had historically.

9         In terms of the ten-year term, he went out --

10   he indicated that that was a rule of thumb to go out

11   ten years.  There is no such rule of thumb as a

12   ten-year rule of thumb and he further indicated that

13   going out ten years captured 90 percent of the value.

14        Well, I'm not sure how only capturing

15   90 percent of a value calculation gives you a complete

16   picture of it as well.  So we don't really have a

17   calculation that reflects the value of that segment of

18   the business such as would be appropriate for a loss of

19   value calculation.

20        Now, prior to last Thursday, Mr. Filler had

21   indicated he had done a lost profit calculation and as

22   I testified a moment ago, when you do a lost profit

23   calculation, the issue is the temporary loss, so you

24   forecast out the difference between what you believe

25   would have happened but for the alleged incident and

Fannon-Direct/Dunitz

1   what you now believe will happen.  Well, he ignored the

2   second part of that calculation.

3          One of the things he also testified to last

4   week was he didn't consider mitigation, he didn't ask

5   about mitigation, he didn't know anything about

6   mitigating sales and we know there were other sales.

7   He never brings his lost profits back together again to

8   the point at which the company would have recovered.

9   So what we have is something that is neither a loss of

10  business value calculation nor is it a lost profit

11  calculation.

12  Q.    And when you calculated his weighted average cost

13  of capital, he determined the value of the business and

14  is that consistent with his opinions?

15  A.    No.  In fact, he's got some internal

16  inconsistency in his analysis.  The exhibit that he

17  calculated his revised weighted average cost of capital

18  on purported to calculate the value of the company so

19  that he could use the -- what he determined was the

20  equity value of the company and the debt of the company

21  in the weighting to determine the weighted average cost

22  of capital.

23         When he made that calculation, he determined

24  that the equity value of the company was 4 and a half

25  million dollars.  Well, he also determined that the

Fannon-Direct/Dunitz

1   loss of the segment from the CRI business alone was, I

2   think it was, $4.6 million.  You can't lose more than

3   the value of the entire company to begin with.

4   Q.    Ms. Fannon, do you recall on Thursday Judge

5   Woodcock asked why the experts were raising forecasts

6   instead of actual results six years after the incident?

7   A.    Yes, I do.

8   Q.    Now, regardless of causation or blame, if the

9   segment of a business remains entirely without sales

10  six years after the loss, is the appropriate

11  methodology loss of business or lost profits?

12  A.    It would be loss of business value if it's a

13  permanent destruction of the business.

14  Q.    And here again, this is for CRI, do we have an

15  opinion based on loss of segment of the business?

16  A.    Well, no.  As I just indicated, we don't have

17  either a loss of the value of the business calculation

18  that was properly made or a lost profit calculation.

19  Q.    Do you recall last week when Mr. Filler testified

20  that he used a sales projection method to determine the

21  lost profits of CRI?

22  A.    I do.

23  Q.    What data is typically used by a lost profits

24  expert to determine lost profits using the sales

25  projection method?

Fannon-Direct/Dunitz

1    A.    Well, let me first explain what a sales

2    projection method is.  Every lost profit calculation is

3    really nothing more than making a sales projection of

4    what you think the company would have done but for the

5    alleged incident and comparing that to a sales

6    projection of what either they did in the past or what

7    you now expect them to do going forward, so every lost

8    profit calculation is a sales projection method.

9         However, when we talk about methodology in

10   lost profit damages, when we use the terms like -- we

11   used sales projection method or we've used a before and

12   after method or a market model method, what we're

13   really talking about is the way that experts go about

14   collecting evidence to support their forecasts that

15   they're making.

16        In the actual method that he used, although

17   this is really just a matter of terminology, the actual

18   method that he used was a before and after method.  I

19   think he said I couldn't have done a before and after

20   because there was no after.  There's often no after

21   that you can use in your calculation, so very often,

22   you'll just rely on before and, in fact, that's what he

23   did.  He relied on a very limited slice of time, six

24   months, to project the next ten years.

25   Q.    Is there a specific document that you would need

Fannon-Direct/Dunitz

1    to do a sales projection method when you're gathering

2    the evidence?  What is it that you're looking for?

3    A.   Usually when you use a sales projection method,

4    what you're talking about is using a sales projection

5    that was prepared pre-litigation, so it's a

6    pre-litigation profit projection that was prepared by

7    either the defendant or the plaintiff.

8    Q.   And did you find any internal sales projections

9    in your review of the financial documents here?

10   A.   No.  In fact, we specifically asked the company

11   if they had made any forecasts and they indicated that

12   they did not.  If there is a sales projection, you want

13   to go back and you want to test that against historical

14   forecasts that the company had made and they indicated

15   that --  so that we can see how accurate they are when

16   they do their forecasting.  They indicated they had no

17   such forecasts to test.

18         I only know then of one forecast the company

19   had historically made and that was when they forecasted

20   that they were going to sell millions of dollars of

21   boom to BP and, in fact, they didn't sell any, so that

22   would give me some indication of the reliability of

23   their ability to forecast.

24   Q.   Ms. Fannon, on Thursday do you recall whether Mr.

25   Filler testified that his calculation on inflation was

Fannon-Direct/Dunitz

1    conservative?

2    A.    I do, yes.  He indicated that he had made a

3    conservative --  by applying inflation to his bottom

4    line profits in his damage calculation, he said he was

5    being conservative because if he had instead applied

6    inflation to sales, and then separately applied

7    inflation to costs, costs would have grown at a slower

8    rate than sales would have grown.  Well, that's not

9    actually how you do it from a methodology point of

10   view.

11            I agree, he could have applied inflation to

12   his revenue figures, but then costs would grow in

13   proportion to those revenues.  You don't grow costs by

14   inflation, you grow it in proportion to revenue.  So,

15   in fact, the way he did it was the way you would do it

16   or I should say the results you would get so to me,

17   that doesn't indicate anything about it being

18   conservative.

19   Q.    Do you recall what Mr. Filler testified his

20   purpose for going to Packgen -- his visit to Packgen

21   was?

22   A.    Yes.  He indicated that he was going there to

23   test the capacity constraints of the company.

24   Q.    Based upon the evidence that you've heard and the

25   testimony you've heard, was it possible for him to do

Fannon-Direct/Dunitz

1    that?

2    A.    I don't believe that it was possible for him to

3    use those visit to assess capacity of the company.  He

4    can't even tell us how many units he was forecasting

5    they would have sold to the refineries, so if you don't

6    even know how much the company is projected to sell,

7    it's impossible to assess capacity.

8           In addition, we have three different opinions

9    from him as to the time that he was up there testing

10   how quickly they made the product, which is what he

11   said he relied on for his capacity analysis.  He said

12   one thing in his deposition, he said another thing in

13   his errata sheet and then he said a completely

14   different thing last Thursday.

15          Unfortunately, we can't really tell which is

16   correct because that's supposedly work that he did on

17   the floor and there are no notes that we can go back

18   and look and see what that actually was, so there's no

19   way to actually test that with the information that he

20   had.

21   Q.    And hypothetically, in order to meet its

22   capacity, Packgen had to add shifts to its production

23   schedule.  Is there data that you would need to see in

24   order to calculate whether it could increase its

25   capacity?

Fannon-Direct/Dunitz

1    A.    Well, I'd want to know at each stage along the

2    way, as they reached certain levels of production, how

3    much more capacity would they have to add and what

4    would be the costs of adding that capacity.

5    Q.    And was that -- any of that evidence in the

6    documents that you reviewed in this case?

7    A.    I didn't see any.

8    Q.    When you're conducting a lost profits analysis

9    for a manufacturing facility, is there a method that

10   you use to test the accuracy of the company's

11   manufacturing process?

12   A.    Well, I mean the manufacturing costs are, of

13   course, a matter of what the evidence says they are for

14   a particular product line.  As we know, Mr. Filler used

15   an average of two different costs, but one of the

16   things that you do is you go back and you look

17   historically to say how do these manufacturing costs

18   that I'm using compare with their actual historical

19   manufacturing costs.  Mr. Filler didn't do that

20   analysis to look and see.  In fact, if we look at

21   Packgen's financial statements both before and after

22   the alleged incident, their manufacturing costs ran in

23   the range of 50 to 55 percent of revenues and in Mr.

24   Filler's analysis -- and my initial report was his

25   opinion was based on a price of $225, he calculated

1    that manufacturing costs would be only 35 percent.

2    Obviously --  of revenues and, obviously, that would

3    increase the profit.

4            If you use the $196 revenue that I didn't know

5    about at the time I did my report, then it still comes

6    out to only 40 percent of revenues.  So that would be

7    something that you would typically look at to see if

8    the information that you have is grounded in historical

9    results.

10   Q.   Do you have an opinion regarding Mr. Filler's

11   calculation of Packgen's overhead using statistical

12   theory?

13   A.   I don't.  I specifically did not provide any

14   opinions on Mr. Filler's statistical models in this

15   case, but I just noted that he did use --  it wasn't

16   just the simulation models that he ran for CRI and for

17   the refineries, it was also the CRI deterministic model

18   involved the use of statistics to determine overhead.

19   Q.   When you are determining lost profits in your

20   practice, do you use statistics to calculate overhead?

21   A.   No, I don't.

22   Q.   Why not?

23   A.   Because I don't believe that accountants, as a

24   matter of course, should typically be using statistics

25   unless they hold themselves out as a statistician and

Fannon-Direct/Dunitz

1    have that relevant training.

2    Q.    Do you recall Mr. Filler's testimony on Thursday

3    that the prior success rate of selling to 37 refineries

4    was irrelevant because of a new marketing plan that

5    they had?

6    A.    Yes, I do.  That was also something that was -- I

7    had not heard before, but the reason he said that we

8    couldn't rely on their historical sales to refineries

9    was because they had this great new marketing effort in

10   place and he described that marketing effort as being

11   the refineries would see CRI pull up with Cougar bags

12   and, in fact, that would be, I think he called it, a

13   stamp of approval to the refineries that would make

14   them want to buy the bag too.

15        Well, if that was true, then the reverse would

16   also be true.  In other words, if the refineries had

17   reasons why they were rejecting using Packgen's bags,

18   then the reverse would be true and they could say to

19   CRI we don't want that bag on our facility, we don't

20   want you to buy it and bring it here.

21        The other thing is we don't even know, and I

22   don't believe --  I know Mr. Filler didn't have this in

23   his report or has not testified about it, how many of

24   those refineries were actually buying their catalyst

25   from CRI, so we don't even know if that theory would

Fannon-Direct/Dunitz

1    hold true if they didn't even see CRI pull up with the

2    bags.

3    Q.     And were there any --  did you see any evidence

4    that would suggest there was a reason that the

5    refineries would not want Cougars on their facility, at

6    their facilities other than the Berry product?

7    A.     Yes.  I saw significant evidence why the

8    refineries were not buying.  Ms. Horton had a listing

9    of the 37 refineries that she had been contacting and

10   attempting to make sales to.

11          Of that list of 37 refineries, and all of the

12   reasons that she documented why they weren't buying

13   from CRI, only one refinery listed CRI as the only

14   reason why they weren't buying.  There were a few other

15   refineries that had listed CRI plus other reasons why

16   they weren't going to buy the Packgen product, but the

17   vast majority of reasons why the refineries were

18   telling Packgen they weren't going to buy their product

19   was because of things like fires that had occurred

20   using the Packgen product and these fires had nothing

21   to do with the accused product.  These fires had to do

22   with the faulty material that the customer was putting

23   into the bags, and she clarified that the material

24   that -- the highly pyrophoric material that the

25   customer was putting into the bags had nothing to do

Fannon-Direct/Dunitz

1   with the Berry product.

2          Other reasons given were there were a couple

3   of customers that expressed concerns about the bags

4   puncturing.  They complained about the fact that the

5   bottom was not solid and that it slid through the slats

6   of the pallets and then when a forklift came to pick it

7   up, it would puncture the bags and that could cause a

8   fire.

9          There was an incident of the bags melting when

10  a customer --  as Ms. Horton testified, or testified at

11  her deposition -- again put the wrong material into the

12  bags.

13         The most common reason cited on Ms. Horton's

14  list was because of rumors that were being spread by

15  CHEP and in her deposition, she clarified that what she

16  meant by those rumors was that CHEP, who is their very

17  aggressive competitor and has the majority of the

18  market share, was sending around or passing around

19  rumors about what they alleged was the Packgen bag on

20  fire and, in fact, she said it wasn't even the Packgen

21  bag, it was someone else's bag in the picture.

22         She also complained about Packgen --  I'm

23  sorry, CHEP having an incestuous relationship with all

24  of their customers and that they had used very

25  aggressive marketing techniques.

1          Well, Mr. Filler testified in his deposition,

2    and I believe he testified again on Thursday, that if

3    the reason why the customers weren't buying the Packgen

4    bags for something other than the Berry product, he

5    believes his damage calculation is correct, it just

6    might be a different defendant.  Well, maybe that

7    different defendant was CHEP.  They were the ones who

8    were listed more than any other reason for why the

9    customers weren't buying.

10          In addition, one of the customers was -- or

11    one of the refineries that they had on their list was

12    BP and they sued BP in 2011.  In fact, I think they

13    sold to BP in 2009 and 2011 and then BP stopped buying

14    from them after they sued them.

15          Well, we can't tell in Mr. Filler's analysis,

16    and he can't tell us which of the refineries he's

17    saying would have bought, but if the reason they're not

18    buying --  if his ten percent analysis came out and

19    selected through his statistical model BP or Shell or

20    Imperial or any of these other refineries, 36 out of

21    the 37 of them basically which provide other reasons,

22    then we know they were buying --  not buying for

23    completely unrelated reasons to the CRI alleged

24    incident.

25    Q.    Do you recall Mr. Filler's testimony on Thursday

Fannon-Direct/Dunitz

1    that Packgen's projection for sales to the 37

2    refineries exceeded his ten percent?

3    A.    Yes.

4    Q.    And in your work as lost profits expert, have you

5    been faced with the rosy prognostications of a client?

6    A.    Yes.  In almost every case I do, the client

7    presents rosy forecasts.

8    Q.    And what do you do to determine what the

9    appropriate forecast is; do you just guess at ten

10   percent?

11   A.    Well, no, absolutely not.  In this case we had a

12   couple of things that Mr. Filler could have looked at.

13   He could have looked to their actual success rate at

14   selling to the refineries, and they did have some

15   success in 2007 selling to the refineries.

16         We also would have looked to the reasons why

17   the refineries weren't buying and that would have

18   informed us as to what a likely success rate was for

19   the --  with a group of refineries that actually may

20   have bought the product but for the alleged incident.

21   Q.    And from the methodological standpoint, are there

22   circumstances under which a lost profits expert can

23   assume that once a sale is made to a certain customer,

24   sales will continue for an extended period of time?

25   A.    You would not make that assumption without doing

Fannon-Direct/Dunitz

1     some form of testing.

2     Q.    What kind of testing would you typically do?

3     A.    Well, in this case what you would do is you would

4     go back and you would get evidence of their actual

5     historical customer retention rates, which is

6     information that they would have had available, but was

7     not produced.

8     Q.    And Ms. Fannon, do you have an opinion regarding

9     Mr. Filler's application of Pratt's Stats and how that

10    impacted methodology?

11    A.    Yes, I do.  Mr. Filler used the Pratt's Stats

12    transaction database in calculating his weighted

13    average cost of capital and he did that by first

14    calculating the value of the business, which he

15    calculated to be $4.4 million by use of a -- I believe

16    it was around a .7 multiple that he obtained from

17    Pratt's Stats and then he used that equity weighting in

18    his weighted average cost of capital.

19          A couple things about the Pratt's Stats data

20    that he used.  The first thing is the companies that he

21    selected were basically companies that were sewing

22    things like awnings and other canvas products that I

23    don't believe have a similar risk profile to what a

24    company like Packgen would have for the product that

25    they were making in the markets that they were serving,

1    but also, his application of Pratt's Stats was

2    incorrect.

3              He testified last Thursday that Pratt's Stats

4    provides a multiple that gives you the indicated value

5    for intangible assets and fixed assets of a company.

6    That may be true for a random number of transactions

7    that comes up, but Pratt's Stats is a database that

8    basically tells the analyst the transaction as the

9    transaction actually occurred.

10             So some companies buy working capital and

11   fixed assets and intangible value.  Some companies buy

12   accounts receivable, inventory, fixed assets so you

13   actually have to go in and look at the data and figure

14   out what was actually bought in each of these

15   transactions before you can just take a multiple that

16   goes across the entire database.

17   Q.   Before we move on, can you just explain what you

18   mean by risk profile between the sewing companies and

19   what would have been the appropriate method for finding

20   the correct SIC code.

21   A.    Well, I would have looked for SIC codes that

22   dealt with customers that had a similar risk profile to

23   the customers that Packgen served because that's --

24   when we choose a market multiple, what we're really

25   trying to say is --  a market multiple is just the

Fannon-Direct/Dunitz

1    inverse of a discount rate or a capitalization rate

2    which measures the risk related to a particular

3    business, so what we're trying to do is we're trying to

4    assess the risk profile of a particular company.

5    Q.    And can you explain to the Court how Mr. Filler's

6    use of Pratt's Stats impacts the reliability of the

7    model?

8    A.    Well, we don't really --  we don't really know if

9    the .72 multiple is accurate or not because he didn't

10   provide -- he didn't have the information about what

11   assets and liabilities were actually acquired in each

12   of the transactions.

13   Q.    Just for the moment I want to go back to the

14   overall methodology that he uses because I want to make

15   sure that it's clear here.

16         Do we have an actual method, a cogent method

17   for determining profits in Mr. Filler's opinion?

18   A.    We don't have a reliable method for determining

19   profits in his methodology in either -- in neither the

20   --  well, if you call it a loss of business value

21   calculation, which would be appropriate for the total

22   destruction of the business because we know he hasn't

23   captured all of the expenses and we also don't for the

24   lost --  if he calls it a lost profit calculation.

25   Q.    And why is it inaccurate if it's a lost profits

1    calculation?

2    A.    Well, it really goes back to the same thing about

3    fixed versus variable costs.  First of all, the cost of

4    goods sold that he used, I believe, does not accurately

5    reflect the full cost of goods to the company and we

6    know that because that doesn't compare with their

7    historical results.

8            In the overhead that he used, he testified

9    that he applied both a variable and fixed costs.  Well,

10   that's all of the costs of the company and if he really

11   did --  and I agree for the volume that he was

12   forecasting, there's a point at which even fixed costs

13   become variable because you're increasing the business

14   so much, which is what he was forecasting.  He clearly

15   hasn't captured all of the costs of the company, again

16   because he's forecasting 37 percent profit compared to

17   their 3.6 percent historical.

18   Q.    And where you're doing a lost profits

19   calculation, is it possible to do one --  sorry, let me

20   strike that.

21           How does the complete lack of mitigating sales

22   impact his lost profits calculations, assuming that's

23   what he did?

24   A.    Well, it renders it not really a lost profit

25   calculation because in a lost profit calculation, you

1    demonstrate when the company is going to recover and

2    usually that's through mitigating sales, either to the

3    customer that you're alleging was lost or to other

4    customers where you eventually get to the point where

5    you would have gotten anyway.  So he left out that

6    second part of his calculation.

7    Q.    And so without mitigating sales, what's the

8    appropriate measure of the loss here?

9    A.    Well, if the business is never going to recover,

10   the appropriate measure of the loss is loss of business

11   value.

12   Q.    And other than Mr. Filler's testimony last week

13   that he was basing his ten-year period on destruction

14   of a segment of the business, have you seen any

15   reliable data that would establish a ten-year period

16   for the loss?

17   A.    No, I have not.

18   Q.    I just want to look at your report now a little

19   bit.  I believe that covers last Thursday.

20         Is it reliable to project ten years of sales

21   based on six months of sales?

22   A.    I don't believe that it is.  Again, this is one

23   of the things that you could do some backtesting on and

24   you could see -- if I just take this six-month surge,

25   does it make sense if I use this surge to predict the

Fannon-Direct/Dunitz

1    --  or this limited period of a surge to predict the

2    next ten years.

3            So what I mean by backtesting here is you

4    could go back and look at how much sales the company

5    had made to CRI historically and seen if once they had

6    a surge, did they always continue to have that surge.

7            So one of the things I talked about in my

8    report is we know what units were sold to CRI

9    historically and, in fact, they did have a surge and,

10   in fact, if I can just reference my reports so I get

11   the right numbers.

12           If we look -- it's on Page 16 of my report --

13   in 2003, they sold 3,920 units; in 2004, 6,688; in

14   2005, 10,040; in 2006, 5,706.  So that would tell me if

15   we were back in 2005 and trying to forecast what the

16   company was going to sell to CRI in the next year, if

17   we just assumed that that level was going to increase

18   into infinity or ten years, we'd be wrong because the

19   next year they only sold about half of what they had

20   sold in the prior year, so that would tell me there is

21   volatility in their sales over time.

22   Q.    Is there a way to deal with the volatility in

23   sales?

24   A.    Well, often what you'll do is you'll go back and

25   you'll take some longer term historical average of

Fannon-Direct/Dunitz

1    sales.

2    Q.    Do you have an opinion about the reliability of a

3    lost profits model where an expert is directed to

4    assume causation?

5    A.    Yes, I definitely do.  I don't believe --  when

6    we make a forecast, which you do --  you make a

7    forecast both when you're doing a lost profit

8    calculation and you also make a forecast when you're

9    doing a loss of business value calculation and when you

10   make a forecast, it's our job to consider all of the

11   things that would have affected that forecast because

12   you can't --  not just the alleged incident and assume

13   nothing else is going to affect the company, you have

14   to take into consideration all the other things that

15   were going on at the time, otherwise you'd have a

16   forecast that's completely irrelevant and not tied to

17   the facts.

18   Q.    And when you're talking about causation here,

19   you're not talking about the same thing we talked about

20   in liability, about whether the accused product

21   actually caused the bags to be defective; is that

22   correct?

23   A.    That's right.  I'm talking about what are all of

24   the other things that would have caused the forecast to

25   be one thing or another.

Fannon-Direct/Dunitz

1    Q.    And was there evidence in this case that would

2    have impacted the forecast?

3    A.    Yes.  There are numerous things that I believe

4    should have affected any forecast that was made that

5    Mr. Filler either wasn't aware of or just didn't take

6    into consideration at all.

7              For example, we know that Packgen had a tense

8    relationship with CRI and, in fact, they had a tense

9    relationship with them for quite an extended period of

10   time.  Going back to 2005, there's e-mail

11   correspondence documenting Packgen's concern that they

12   were going to lose CRI as a customer at that time.  We

13   know in the fall of 2007, there was a number of tense

14   e-mails about missed deadlines and how no further

15   deadlines could be missed.  They had missed getting a

16   shipment on time to CRI and CRI was very unhappy about

17   that.

18             Mr. Lapoint had testified in his deposition

19   that CRI had a very short fuse with all IBC

20   manufactures so we know that there was already a

21   tendency for them to have this short fuse and this was

22   documented well in their e-mails.

23             Also, in late April, 2008, which is a few

24   weeks after CRI put their orders on hold with Packgen,

25   not terminated but put them on hold, there's also

Fannon-Direct/Dunitz

1    evidence of tense e-mails between CRI and Packgen about

2    two issues.  One of those issues has to do with meeting

3    Department of Transportation regulatory requirements

4    and one -- the other issue had to do with Packgen's

5    involvement in dealing with their customers who had

6    issues related to the accused product.

7            With respect to the Department of

8    Transportation regulatory issues, we know that as far

9    back as September of 2007, we know that at least one of

10   the products did not meet Department of Transportation

11   regulations and there was a big warning sign across an

12   internal document discussing how this product didn't

13   meet Department of Transportation regulatory

14   requirements.  There was another e-mail subsequently

15   discussing it and then in April of 2008, CRI indicated

16   to Packgen that it had come to their attention that the

17   product didn't meet Department of Transportation

18   requirements.

19           Now, we know that this at least started back

20   in September of 2007.  We asked if there were any

21   further documents at all related to the Department of

22   Transportation regulatory issues and were told there

23   are no other documents, so we don't really know what

24   happened between September of 2007 and the end of

25   April, 2008, but we do know that CRI was not happy with

Fannon-Direct/Dunitz

1    Packgen's handling and responses which related to the

2    regulations and CRI ended up taking the matter into

3    their own hands.

4         The e-mails with respect to the other issue

5    that I mentioned, which is the -- Packgen's involvement

6    with their customers after the alleged incident.  CRI

7    was very terse with Packgen about what their

8    involvement could be.  Packgen very strongly wanted to

9    be involved in those discussions.  There were e-mails

10   back and forth about it where CRI was very, again,

11   terse about what their involvement -- what they wanted

12   it to be and, in fact, it got to the point where the

13   key person that they had correspondence with at CRI

14   told them don't --  you can't even contact me anymore,

15   you've got to talk to somebody else because I'm not

16   going to even talk to you about this anymore.

17        So that whole series of issues is one thing

18   that I think would have and should have affected any

19   forecast or risk profile or term that was used in the

20   calculation.

21        There is also pricing issues.  We know back

22   in, I believe it was, 2005, CRI had vigorously

23   questioned a $2 price increase in the product.  In the

24   fall of 2007, they increased the price of their product

25   by $100 and we don't know how CRI reacted to that price

Fannon-Direct/Dunitz

1   increase other than, as Mr. Filler testified, they paid

2   it for six months, but we don't really know what their

3   reaction was to that significant a price increase.

4        Beyond that, Mr. Lapoint testified that he

5   believed he could increase the prices by as much as up

6   to $500 or even a thousand dollars from the 196 they

7   were charging CRI.  Well, Mr. Filler believed --  I

8   think he thinks he was being conservative because he

9   kept the price at 196, but, in fact, it was apparently

10  the company's intention to continue to raise the prices

11  and that would have --  eventually CRI would have said

12  this doesn't make any economic sense.  We don't even

13  really know how much economic sense the 196 price made.

14  Mr. Filler indicated he didn't investigate that so

15  there was a pricing issue.

16       There was also the issue of their very

17  significant competitor in the form of CHEP.  CHEP was a

18  very aggressive competitor.  Ms. Horton testified in

19  her deposition about their aggressive marketing

20  techniques, but yet despite this, Mr. Filler just

21  assumes that CHEP would sit back and allow Packgen to

22  compete and take away market share and I think that was

23  not realistic.

24       There is also other things to consider, by the

25  way, I should have mentioned when I was talking about

Fannon-Direct/Dunitz

1   price, particularly with respect to CHEP.  The only

2   really -- real thing that Mr. Filler accounted for was

3   how much more economically advantageous the Cougar

4   product was.  Again, he didn't actually investigate the

5   advantage economically, but there's a lot of other

6   things that goes into a customer's decision whether or

7   not they're going to buy a product from one company to

8   another, many other things, and none of those things

9   came into it.

10          Additionally, the product was not patented so

11   they had developed this product, didn't patent it.  Mr.

12   Lapoint testified that he didn't feel it was necessary

13   to patent it.  He wanted to invest his money elsewhere

14   and also, he felt that they just -- they had 15 to

15   20 years of protection just by the barriers to entry.

16          Well, certainly CHEP didn't have those

17   barriers to entry, but also it's clear that the company

18   does think a patent is important because their website

19   for years has listed the fact -- or not the fact, has

20   listed the Cougar bag as being a patented product and

21   it's not been -- according Mr. Lapoint's testimony,

22   it's not a patented product.

23          Then there are all the other reasons why

24   customers weren't buying, significant reasons why 36 of

25   the 37 customers indicated they were not buying Cougar

1    bags.

2    Q.    And those you discussed earlier with the fires?

3    A.    Yes.

4    Q.    Now, you say that we know all of these various

5    reasons and how do you know those various reasons?

6    A.    Well, I know them on the document that Ms. Horton

7    prepared.  She prepared a list of these 37 refineries

8    and said why they weren't buying and by the way, when

9    you're -- as a methodology issue, one of the things

10   that you want to do when you're trying to predict how

11   much someone would buy or if they buy or reasons why

12   they wouldn't is you take a survey and, in fact, I

13   think we had a survey.  We had this survey in the form

14   of this evidence that Ms. Horton produced.

15   Q.    And how would the failure to consider these

16   issues impact the reliability of a lost profits model?

17   A.    I think they impact it hugely.  I think you have

18   a completely unreliable model.  If you're including in

19   your pool of companies that might buy companies that

20   clearly would not buy, then you have a meaningless

21   calculation.

22   Q.    Does it also impact the determination of the

23   term?

24   A.    Well, sure, and again, with respect to impact of

25   the term on the refineries, the assumption was once

Fannon-Cross/Olafsen

1    they obtained the customer, they would remain a

2    customer forever, or at least through the ten-year

3    term, and that was something that could have been

4    tested by looking back historically.

5              MR. DUNITZ:  I have nothing further.

6              THE COURT:  Cross-examination.

7              MR. OLAFSEN:  Thank you, Your Honor.

8                    CROSS EXAMINATION

9    BY MR. OLAFSEN:

10   Q.    I've already started with something too heavy for

11   one arm, I think.  Good afternoon, Ms. Fannon.

12   A.    Good afternoon.

13   Q.    You believe that to the extent Mr. Filler applied

14   a methodology, it was the before and after methodology;

15   correct?

16   A.    Yes.

17   Q.    And you would agree that the before and after

18   methodology is, in fact, an accepted methodology used

19   by damage experts?

20   A.    Yes.

21   Q.    And you would also agree that the sales

22   projection methodology is also an accepted methodology?

23   A.    Yes, they are.  They're both used as ways to

24   gather evidence to support the damage claim.

25   Q.    And when that evidence is gathered, wouldn't you

Fannon-Cross/Olafsen

1    agree that damage experts can reasonably disagree about

2    how to interpret the available evidence?

3    A.    Yes.

4    Q.    And wouldn't you also agree that damage experts

5    can reasonably disagree about how the available

6    evidence affects damage calculations in the case?

7    A.    Yes.  I think there is a line that you cross when

8    you say they can reasonably disagree about the

9    interpretation.  I think there is a time that you reach

10   a point where the information is so unreasonable that

11   it renders a meaningless calculation.

12   Q.    But you've seen many cases, have you not, in

13   which damage experts have reasonably disagreed about

14   the same evidence?

15   A.    Yes, of course.

16   Q.    And this is not a math exercise; correct?

17   A.    That's right.

18   Q.    So since we're not dealing with two plus two

19   equals four, there's got to be interpretations and

20   reasonable professional judgments made by damage

21   experts?

22   A.    Yes, along with the procedures that you would

23   typically do when you're doing such a calculation.

24   Q.    And you've seen, for example, that damage experts

25   often arrive at very different discount rates in the

Fannon-Cross/Olafsen

1  same case?

2  A.    Yes, I have seen it.

3  Q.    And that competent damage experts often arrive at

4  very different conclusions as to the amount of lost

5  profits or whether there even are any lost profits?

6  A.    Yes.

7  Q.    And you would agree, would you not, that it's not

8  the role of damage experts to resolve factual disputes

9  in a case?

10  A.    Right.  I mean it's not our job to determine --

11  it is our job to use sufficient relevant evidence and

12  the best available proof that we can find.

13  Q.    But it's not the job of the damage expert to

14  resolve factual disputes?

15  A.    Right.

16  Q.    And it's true, is it not, that sometimes damage

17  experts have to rely on assumptions provided by counsel

18  on a case?

19  A.    Yes.  Sometimes they do rely on assumptions that

20  were provided, but certainly not when those assumptions

21  are in opposition to other facts and evidence that are

22  available in the case.

23  Q.    It's not unreasonable per se to rely on an

24  assumption given you by a lawyer in the case; is it?

25  A.    If it is at odds with other facts in the case, it

Fannon-Cross/Olafsen

1   is.

2   Q.    But assuming the damage expert does not see any

3   information indicating the assumption is unreasonable,

4   it's okay to rely on that assumption?

5   A.    Yes.  I believe it is if the facts support it.

6   Q.    And in fact, the damage expert can run damage

7   calculations using assumptions; correct?

8   A.    They can, but thereto, I think you reach a point

9   where you are really just engaging in a math

10  calculation; in other words, anybody can run --  you

11  know, a discounted cash flow analysis is a pretty

12  straightforward math exercise.  Anybody can run a

13  discounted cash flow method with any training in math

14  and finance at all.

15        So if you're just running a calculation that's

16  based on a bunch of assumptions that you've been

17  provided without testing those assumptions, I don't

18  know how you're reasonably certain that what you've

19  determined means anything.

20  Q.    But if you're provided certain assumptions and

21  those assumptions appear to fit with the other evidence

22  you're seeing, there is nothing wrong with a damage

23  expert relying on those assumptions to prepare damage

24  calculations; is there?

25  A.    If they fit with the evidence.

Fannon-Cross/Olafsen

1  Q.    And it's also true that a damage expert sometimes

2  has to rely on statements and representations made by

3  the business that's involved in the case; correct?

4  A.    Yes and again, as long as the statements are not

5  in opposition to facts, other facts in evidence in the

6  case.

7  Q.    I mean if, for example, Packgen had told Mr.

8  Filler that it was a Fortune 500 company, he couldn't

9  rely on that statement, obviously, but it's not

10  unreasonable per se to rely on information you obtain

11  from a company; is it?

12  A.    It should be --  you shouldn't just rely on those

13  assumptions.  I mean it's our job to vet the

14  assumptions we've been provided and make sure that

15  they're not in opposition to the evidence provided.

16  Q.    If they're not in opposition, it's okay to rely

17  on them?

18  A.    Well, right, but then you're supporting them with

19  the actual evidence in the case.

20  Q.    Wouldn't you agree that the company probably is

21  the entity that best knows its products and its

22  industry?

23  A.    You know, I have no doubt about that, but the

24  company also has a great interest in providing you with

25  rosy projections and information that affects their

1   perspective which is why it's so important to do things

2   like checking the evidence and the backtesting kinds of

3   things that I was talking about.

4   Q.    But in cases like this, you start off by actually

5   interviewing the company that's hired you; don't you?

6   A.    Yes, of course.

7   Q.    And in fact, you spend a lot of time interviewing

8   company personnel about the case and their products and

9   the industry and their business?

10  A.    As one piece of the evidence that we gather.   I

11  mean we also gather significant documentary evidence,

12  we look to independent research and so forth to

13  determine the evidence that we're going to use.

14  Q.    I understand that, but it is an important piece

15  to actually sit down with company representatives and

16  find out from their perspective what's going on with

17  this product, with their industry, with their business,

18  with their financial records?

19  A.    Right.  I do agree that's an important piece and

20  again, I want to emphasize in the hundreds of damage

21  cases that I've been involved in, I can't think of a

22  business owner that hasn't presented me with a very

23  rosy picture for their future.

24  Q.    Always have an eye open, but nevertheless, you

25  want that information as part of what you're doing?

Fannon-Cross/Olafsen

1    A.    Yes.

2    Q.    And it's also appropriate for a damage expert to

3    rely on other experts; correct?

4    A.    Yes.

5    Q.    For example, in a case such as this, it would be

6    appropriate for a damage expert to rely on a materials

7    expert as to why the product failed?

8    A.    Yes.

9    Q.    And it would also be appropriate for a damage

10   expert to rely on an expert in the catalyst industry in

11   a case such as this?

12   A.    Yes.

13   Q.    And you wouldn't expect Mr. Filler, for example,

14   to be an expert in the catalyst industry?

15   A.    No, I would not.

16   Q.    When a damage expert makes a reasonable

17   professional judgment as to the significance of the

18   available evidence, that judgment has to be based, at

19   least in part, on the expert's experience and common

20   sense; isn't that true?

21   A.    Yes, certainly it does.  I mean they've got to --

22   they've got to know that they have sufficient relevant

23   evidence.

24   Q.    And in this case, Mr. Filler's role here, as I

25   understand what you're saying, was that he should have

Fannon-Cross/Olafsen

1    considered the available evidence and made a reasonable

2    professional judgment as to what would have happened at

3    Packgen but for the alleged damaging action?

4    A.    Well, first I want to pick up on your statement

5    there that you just said he should have considered the

6    available evidence.  Certainly that's true, consider

7    what's available, but also make inquiries so that you

8    make sure you have all of the evidence that you need to

9    support your claim.

10   Q.    And once someone in Mr. Filler's position gets

11   all that evidence, then he needs to make a reasonable

12   professional judgment that's based, at least in part,

13   on his experience and common sense?

14   A.    Yes.

15   Q.    And that's necessary because what we're trying to

16   do here is predict a future that never occurred;

17   correct?

18   A.    Yes.  Well, at least with respect to the

19   refineries.  We do know in the future what occurred

20   with most of the customers.

21   Q.    And as I understand, one of your criticisms of

22   Mr. Filler is that he did not look for other possible

23   causes of the losses suffered by Packgen?

24   A.    Other possible causes and issues that would

25   affect either the forecast or the risk profile of the

Fannon-Cross/Olafsen

1   company or the term over which you would carry out

2   damages.

3   Q.    And in this case, you've done no damage

4   calculations yourself; have you?

5   A.    I wasn't asked to do that.

6   Q.    And what you did do though is you went through

7   all of the documents produced in the case and pulled

8   out documents that you thought were significant?

9   A.    I reviewed Mr. Filler's analysis and the

10  documents that he relied on.  I don't know what you

11  mean by I went and pulled out.

12  Q.    Okay.  Well, you've mentioned a number of

13  documents, for example, an e-mail and things of that

14  sort.  In the documents that we have in this case, you

15  took some of those documents, put them in your report

16  and used them as evidence that Mr. Filler didn't

17  consider that issue?

18  A.    Yes.  Well, I mean Mr. Filler specifically said

19  he didn't consider any other issues other than the loss

20  of CRI, of the alleged incident, so it's not just that

21  there was documentary evidence showing that other

22  issues existed, it was the fact that he also said he

23  didn't consider them.

24  Q.    Did you hear him testify last Thursday that he

25  did consider other possible causes of the losses?

Fannon-Cross/Olafsen

1   A.    I heard him say, which I had not heard him say

2   before, that he considered the fact that CHEP existed

3   as a competitor.

4   Q.    And did you hear him testify that he looked at

5   other possible causes, including legal or regulatory

6   matters and he did not see that those affected his

7   calculation?

8   A.    I can't see anywhere in his analysis that he

9   considered those things.  He testified in his

10  deposition that he did not consider those things.

11  Q.    Well, the question was last Thursday, did you

12  hear him testify that he did consider legal and

13  regulatory issues?

14  A.    Yes.

15  Q.    And as I understand what you're saying, Ms.

16  Fannon, you believe that first, a damage expert in this

17  case would have to make a reasonable professional

18  judgment as to whether the issues that you've raised

19  would affect the damage calculations here?

20  A.    Yes.

21  Q.    And if the damage expert concludes that they

22  would affect the damage issues, then the damage expert

23  has to make a reasonable professional judgment as to

24  how to quantify that affect in the damage calculation?

25  A.    That's right.

Fannon-Cross/Olafsen

1   Q.    And would you agree that the issue raised

2   generally are not susceptible to a mathematical

3   calculation?

4   A.    No, I would not agree with that.

5   Q.    Well, let's take a look, for example, at the lack

6   of patents which you referred to.  You believe that Mr.

7   Filler should have considered whether lack of patents

8   affected the damages in this case?

9   A.    Yes.

10  Q.    Now, assuming that that's the case, there's no

11  particular data that would tell you how to quantify

12  that affect in damage calculations; is there?

13  A.    You know, Mr. Filler testified at his deposition

14  that when he was asked if he considered patents and he

15  said he had not, he was asked could that affect his

16  calculation and he said he agreed, it could, and he

17  agreed that another company could come along and steal

18  their ideas and do something with it.

19        Well, that says to me he should have

20  considered the likelihood of that either in his risk

21  rate that he applies to his discounted cash flow or in

22  his actual forecast.  Can I tell you exactly right now

23  how it would have affected the forecast?  No, because I

24  didn't make a forecast, but he admitted himself it

25  could have affected his calculation, but he hadn't

Fannon-Cross/Olafsen

1    considered it.

2    Q.    Well, we will get to the patents in a little more

3    detail later on, but my question now really is if

4    patents were an issue here, and you're not saying they

5    are, but that they could have been; correct?

6    A.    Yes.

7    Q.    If they were an issue that affected damage

8    calculation, then the damage expert has to somehow

9    factor that into damage calculations; correct?

10   A.    Correct.

11   Q.    And that would include things like reducing the

12   term from ten years to something less than ten years?

13   A.    It might have affected his term, it might have

14   affected his forecast, it might have affected his

15   discount rate.

16   Q.    And in making that determination of how to

17   quantify the effect of that, there's no particular data

18   that you can use to make a calculation; is there?

19   A.    No.  You would do further investigation of the

20   issue.

21   Q.    And make a professional judgment as to how to

22   quantify the lack of evidence?

23   A.    Yes.

24   Q.    Same thing would apply to what you've referred to

25   as a jaded relationship with Criterion; correct?

Fannon-Cross/Olafsen

1    A.    Yes.

2    Q.    Once again, there's no particular data that you

3    would use to quantify that effect?

4    A.    There's no particular data, no, but you would

5    certainly consider it again in your term or in your

6    discount rate.

7    Q.    You'd have to make a reasonable professional

8    judgment as to what degree that would affect the term

9    on the discount rate?

10   A.    Right, or whether any damages would exist at all.

11   I mean we know they placed the orders on hold in early

12   April as they had done in the past.  They didn't

13   terminate them until after there was further tense

14   conversations about the regulatory issues and the way

15   Packgen was dealing with their customers.

16   Q.    But you have to quantify things that really

17   aren't readily susceptible to quantification?

18   A.    Right, by doing further investigation.

19   Q.    Let's talk about what you referred to as a jaded

20   relationship with Criterion.  First of all, you

21   referred to an e-mail, and we don't have it here today,

22   but an e-mail in which Criterion vigorously contested

23   an increase in sale long before this product and my

24   question is the vigorously questioned is your

25   characterization; isn't it?

Fannon-Cross/Olafsen

1    A.    Yes.

2    Q.    And you yourself did not determine whether the

3    relationship between Packgen and Criterion would affect

4    the damage calculations in this case?

5    A.    I think what I'm saying is that I think further

6    investigation should have been done into that issue and

7    taking into consideration the fact that, you know, as

8    Mr. Lapoint testified, they did have a short fuse with

9    IBC companies, they just sued another IBC company, so

10   somehow I think that should have been taken into

11   consideration.

12   Q.    You're aware there is plenty of countervailing

13   evidence; isn't there?

14   A.    I'm aware that they had a relationship with them

15   for a period of time, if that's what you mean.

16   Q.    No.  They had been a long time customer before

17   the product failure; correct?

18   A.    Yes.

19   Q.    Also, Criterion and Packgen had worked together

20   to develop this new foil based catalyst container that

21   was being sold to Criterion; correct?

22   A.    Yes.

23   Q.    And that this container was customized to

24   Criterion's needs through this process where the

25   companies worked together?

Fannon-Cross/Olafsen

1    A.    Yes.

2    Q.    And that after this new product was brought --

3    was made available to Criterion, that Criterion then

4    had six months of purchases, which totaled about a

5    million and a half during that six months?

6    A.    Yes, I'm aware of that.

7    Q.    And that at the time of the product failure, that

8    there was another full month of orders pending that

9    ultimately were canceled?

10   A.    Yes.

11   Q.    And you're also aware that immediately after the

12   product failure, that Criterion terminated its

13   long-term relationship with Packgen and never bought

14   anything else from Packgen?

15   A.    I don't know how immediate it was.  In April,

16   early April, they terminated their -- or they canceled

17   their orders and then later in April, terminated the

18   relationship.

19   Q.    A matter of a few weeks, perhaps?

20   A.    Yes, but after they had further issues going on,

21   like the issues of the Department of Transportation and

22   Packgen's involvement with their customers.

23   Q.    We'll get to that.  You talked about Mr.

24   Lapoint's testimony about planned price increases.

25   Now, it's true, is it not, that Mr. Filler uses

Fannon-Cross/Olafsen

1   historical prices for Criterion rather than Mr.

2   Lapoint's hoped for price increases?

3   A.    Yes, he does, but if Mr. Lapoint, in fact,

4   intended to continue to raise price increases, then

5   that would have affected the point in time at which CRI

6   would have evaluated other options as being more

7   economical.

8   Q.    But those price increases never happened, did

9   they, because of the product failure?

10  A.    Right.

11  Q.    And you would assume --

12  A.    Well, excuse me.  Those price increases never

13  happened.

14  Q.    And you wouldn't assume that Mr. Lapoint would

15  irrationally price himself out of the market; wouldn't

16  you?

17  A.    Well, he indicated he could go as high as 500 or

18  a thousand dollars and Mr. Filler didn't know really

19  what the economics of that were.

20  Q.    My question is would you expect a businessman,

21  and in the case of Mr. Lapoint the owner of a company,

22  to price himself irrationally out of his market?

23  A.    No.

24  Q.    You also mentioned in your report, I believe, and

25  discussed today that you don't know how Criterion

Fannon-Cross/Olafsen

1    reacted to the doubling of price from 96 to $196 in

2    August of 2007; correct?

3    A.    Right.  I said other than the fact that they paid

4    for it for six months.

5    Q.    That's what I was going to clarify.  They did pay

6    in this million and a half of sales that started with

7    the new product, they did pay that price; correct?

8    A.    They did pay it, but we don't know how much it

9    caused them to go back and evaluate the economics of

10   it.

11   Q.    Okay, but they were paying it; correct?

12   A.    Yes.

13   Q.    And in the month following the product failure,

14   they had orders for almost $270,000 at that same price,

15   orders that they had made?

16   A.    I don't recall 270 exactly, but I do know it was

17   in that order of magnitude.

18   Q.    So the answer is yes?

19   A.    Yes.

20   Q.    And Mr. Filler also considered that Packgen was

21   selling to Criterion for much less than it was selling

22   to some other customers; correct?

23   A.    I'm sorry, can you say that again?

24   Q.    Sure.  Are you aware that Packgen was selling to

25   Criterion at a unit price lower than it was selling to

Fannon-Cross/Olafsen

1    many other customers?

2    A.    Yes, I'm aware of that.

3    Q.    And the report of Mr. Berman, the catalyst

4    industry expert, says that there are substantial

5    economic advantages to the IBC container versus the

6    flow bin sold by CHEP?

7    A.    Yes, I know he said that.

8    Q.    And I believe you said earlier that's the sort of

9    information that a damage expert could rely on?

10   A.    Yes, but again, you wouldn't only consider the

11   economic advantages.

12   Q.    Understood.  And it's also an important fact

13   here, is it not, that the only place that Criterion oil

14   refineries could buy an IBC catalyst container was from

15   Packgen?

16   A.    Yes, of the type that they manufactured.  There

17   were other types of containers that customers could

18   use.

19   Q.    There was the flow bin and the IBC?

20   A.    Yes.

21   Q.    But nobody else sold the IBC containers?

22   A.    Right.

23   Q.    Which gets us then to the patents.  You would

24   agree, would you not, that a damage expert wouldn't be

25   qualified to determine whether a particular design or

Fannon-Cross/Olafsen

1    technology needs to be protected by a patent?

2    A.    No, absolutely not.  I would agree to that, yes.

3    Q.    I was going to --  all right, so you do agree

4    with that statement.  And you had mentioned that you

5    were aware that Packgen's president testified at his

6    deposition that there were barriers to entry that he

7    felt gave him 15 to 20 years of protection?

8    A.    Yes.

9    Q.    You mentioned earlier today that that wouldn't

10   protect against CHEP, that CHEP had a whole different

11   technology and a whole different product; correct?

12   A.    They did, but they were already in with the same

13   customers that Packgen hoped to get in with.

14   Q.    But they had a whole different product and they

15   weren't selling IBC containers, they were selling steel

16   flow bins?

17   A.    Right, an alternative product.

18   Q.    And in assessing issues such as patent issues,

19   the damage expert certainly would be expected to ask

20   management if management was concerned about patents

21   and protection of the product?

22   A.    Yes.

23   Q.    And it would be appropriate to rely on

24   management, as long as it fit with the other evidence

25   you saw?

Fannon-Cross/Olafsen

1   A.     Right.

2   Q.     And you're aware that six years have passed with

3   the product failure with no competitor putting on the

4   market an IBC catalyst container?

5   A.     I am.

6   Q.     And you're not aware of any issue during the last

7   six years creating any problems for Packgen because it

8   didn't have patents on its products?

9   A.     I'm not.

10  Q.     And in fact, Packgen is still selling catalyst

11  containers; correct?

12  A.     Yes.

13  Q.     You also referred to a Department of

14  Transportation issue and that did happen after the

15  product failure; correct?

16  A.     Well, there was a Department of Transportation

17  issue in the fall of 2007 as well.

18  Q.     Are you aware that any issues for the Department

19  of Transportation were quickly resolved by Packgen?

20  A.     I'm aware that Packgen provided CRI with an

21  answer that had been given by the Department of

22  Transportation and that CRI wasn't satisfied with that

23  and they wanted to take it into their own hands.

24  Q.     If, in fact, the evidence will be that Packgen

25  quickly resolved any DOT issues, you would agree, would

1   you not, that that wouldn't affect damage calculations?

2   A.    In part.  Again, because there was definitely

3   some tenseness over this issue between Packgen and CRI,

4   it could have affected their -- and, in fact, did

5   affect their attitude towards Packgen.

6   Q.    But you don't know one way or the other whether

7   that affected anything that went on here, just

8   something that should have been looked at by Mr.

9   Filler, according to what you testified to?

10  A.    Right.  I mean if that was the ultimate issue

11  that caused them to stop buying, then that would lead

12  to a different conclusion.

13  Q.    You also referred to other incidents with the

14  Packgen catalyst container; correct?

15  A.    Yes.

16  Q.    Are you aware that what had come on the market

17  and what actually failed was a new type of catalyst

18  container that was foil laminated?

19  A.    I'm aware that there were fires that were going

20  on, melting product before the Berry product.

21  Q.    And the Berry product was, in fact, a new version

22  of the Cougar catalyst container, was it not, as far as

23  you understand it?

24  A.    Yes.  It was made with a different material.

25  Q.    And Packgen representatives testified at their

Fannon-Cross/Olafsen

1   depositions that these incidents you referred to were

2   isolated incidents; correct?

3   A.   Well, they may have been isolated incidents, but

4   they were the ones that the refineries were referring

5   to as reasons why they didn't want to buy the product.

6   Q.   You were talking to a list that you saw that was

7   a pre-litigation list of refineries; correct?

8   A.   Yes.

9   Q.   And Packgen's representatives testified that

10  after or -- I'm sorry, a pre-incident, I should say

11  pre-incident, meaning pre-product failure list of

12  refineries?

13  A.   Yes.

14  Q.   And Packgen's representatives testified at the

15  deposition, did they not, that after the product

16  failure, they believed the reason refineries were not

17  buying from them was because of the product failure and

18  rumors that spread relating to that product failure?

19  A.   No, actually.  When Ms. Horton was asked about

20  the reasons that were listed on her listing, she talked

21  about the fires that occurred by putting faulty

22  material in them.  She talked about the CHEP rumors

23  that had been spread which had nothing to do with the

24  Berry product.

25  Q.   And so you don't recall any testimony that the

Fannon-Cross/Olafsen

1    product failure was the reason that Packgen felt that

2    this list of refineries that they thought were likely

3    customers, why those refineries didn't buy it?

4    A.    I -- yes, Ms. Horton did testify -- after she

5    went through explaining her sheet and saying yes,

6    here's my explanation for various reasons they were

7    saying and saying that they had to do with the

8    pyrophoric material that was being put into them and

9    the rumors by CHEP and explaining what all of that

10   meant, after -- several pages later in her deposition,

11   she said oh, yeah, there was the Criterion incident too

12   that was preventing them, but she didn't have that.

13   She had that on a few of them on her list, but only a

14   few of them and if that was a significant concern at

15   the time, why wasn't that on there?  That wasn't listed

16   as a significant concern that she was providing.

17   Q.    That's going to be up to the jury to decide what

18   these incidents were and how they affected the sales

19   versus the product failure; correct?

20   A.    Well, if you're now trying to say oh, she meant

21   to put CRI on there, but didn't, I mean to me she was

22   making that list saying here's the significant issues.

23   She explained what those significant issues meant in

24   her deposition.

25   Q.    That wasn't my point.  My point was simply

Fannon-Cross/Olafsen

1   perhaps there's a factual dispute here and it's not up

2   to the damage expert to resolve that factual dispute.

3   A.    You know, to me the evidence shows what it shows.

4   Q.    Okay.  You also referred to competition and Mr.

5   Filler not considering competition; do you recall that?

6   A.    At the time of his report, yes.

7   Q.    Do you recall Mr. Filler saying that even if the

8   but for sales had occurred, Packgen would have about a

9   four percent share of the market catalyst containers?

10  A.    Yes.

11  Q.    And it's true, is it not, that the competitive

12  environment in which Packgen was selling catalyst

13  containers did not change after the product failure,

14  other than the effects of the product failure?

15  A.    Right.

16  Q.    For example, there are no new competitors selling

17  IBC catalyst containers?

18  A.    Right.

19  Q.    And CHEP is still selling the flow bins?

20  A.    That's right.

21  Q.    So it's the same competitive environment that

22  Packgen operated in before the product failure?

23  A.    Yes, I understand that and I understand when he

24  testified that there was going to be something like, I

25  thought he said, three percent of the market is what

1  they've had, but he also was assuming that they'd be

2  able to capture 51 percent of the market, of the

3  refineries that they were going after.

4  Q.   You also referred to companywide costs and a

5  chart in your report; do you recall that?

6  A.   Yes.

7  Q.   In which you said the companywide cost of sales

8  ranged from, I think you said, 60 to 65 percent today

9  and I think your report says 49 to 54 percent; correct?

10 A.   Okay.

11 Q.   So we're looking at companywide costs?

12 A.   Yes.

13 Q.   And this case is involving the foil laminating

14 Cougar catalyst container; correct?

15 A.   Yes.

16 Q.   And in fact, Mr. Filler had very specific cost

17 information related to the cost of that particular

18 product; did he not?

19 A.   Yes.  He had two fairly different costs.

20 Q.   And just because that product is perhaps more

21 profitable than other products Packgen sold doesn't

22 mean that Mr. Filler's analysis is incorrect in anyway;

23 is it?

24 A.   No, but I think he should have gone back and

25 analyzed and compared the historical and inquired and

Fannon-Cross/Olafsen

1    ascertained that this actually was more profitable than

2    other lines.

3    Q.    Didn't he do that by looking at the cost of this

4    particular product and factoring only in those costs?

5    A.    Well, what you're telling me then is that they

6    have significant product lines that they're losing a

7    lot of money on and I would want to know if that makes

8    sense, that they're losing money on their other product

9    lines.

10   Q.    But here what's relevant is the foil based or

11   foil laminated catalyst Cougar?

12   A.    Yes.

13   Q.    And you also refer in your report to the fact

14   that there was no written supply contract between

15   Packgen and Criterion; do you recall that?

16   A.    Yes.

17   Q.    And you're not saying, are you, that a company

18   can only recover damages if it has a long-term supplier

19   contract?

20   A.    No, I'm not saying that at all.  It would be one

21   consideration.

22   Q.    You referred to using internal pre-litigation

23   forecasts for the sales projection method; do you

24   recall that?

25   A.    Yes.

Fannon-Cross/Olafsen

1    Q.    In this case with respect to Criterion, Mr.

2    Filler actually used, instead of a forecast, actual

3    sales in the six-months before the product failure; did

4    he not?

5    A.    Right and as I said, that's a terminology issue.

6    He just used what I would call the before and after

7    method.

8    Q.    But wouldn't you agree that actual sales, as a

9    general rule, would be more reliable than any

10   pre-litigation forecast by a company?

11   A.    Well, as long as the actual sales that you're

12   using take into consideration an appropriate time

13   horizon.

14   Q.    You mentioned that companies often have rosy

15   forecasts that you really can't accept and use when

16   you're calculating damages.

17   A.    Yes, or at least you've got the assumptions in

18   them.

19   Q.    And these standard costs that Mr. Filler used for

20   the Cougar foil laminated container, there's nothing

21   inappropriate about a standard cost system; is there?

22   A.    No.

23   Q.    With respect to the refineries, I understand you

24   have no opinions on the simulation model or the

25   software; correct?

Fannon-Cross/Olafsen

1    A.    I have no opinions with respect to the simulation

2    model itself as a statistical model.  My report

3    commented on the inputs to the model.

4    Q.    Right, okay.  That's what I wanted to make clear.

5    You rely on Mr. Cowan for the testimony with respect to

6    the simulation model itself?

7    A.    Yes.

8    Q.    One of the things in your report that's mentioned

9    with respect to the refineries is there's no

10   documentation of a marketing plan by Packgen; correct?

11   A.    That's right.

12   Q.    And I assume, just like the long-term supplier

13   contract, you're not saying that a company can recover

14   damages only if it has a written market plan?

15   A.    No.

16   Q.    And Mr. Lapoint and Ms. Horton testified as to

17   marketing plans with respect to the list of refineries

18   before the product failure?

19   A.    Yes.  There was a marketing plan that we

20   discovered was not actually in writing.  It was a

21   marketing plan that Mr. Lapoint had come up with in his

22   head, but Ms. Horton didn't -- the salesperson didn't

23   know about.

24   Q.    They did say that there was a plan before the

25   product failure?

Fannon-Cross/Olafsen

1    A.    Yes.

2    Q.    And that they were implementing that plan?

3    A.    Yes, that's what they said.

4    Q.    And that in particular, they were trying to sell

5    this new foil laminated based catalyst container to the

6    refineries?

7    A.    Right.  So we -- so we can look and see how they

8    were actually doing, what was their actual track record

9    of success in selling to these refineries in 2007, as

10   well as all of the reasons why the refineries were

11   telling them they weren't buying.

12   Q.    You're aware that this foil based catalyst

13   container only came on the market in the fall of 2007;

14   correct?

15   A.    Yes.

16   Q.    And the refineries --  I'll withdraw that.  You

17   also mentioned that Mr. Filler, choosing a ten percent

18   chance of success, that you felt that wasn't reliable

19   with the refineries; do you recall that?

20   A.    Yes.

21   Q.    Do you recall testimony by Packgen's employees at

22   their depositions that they had gotten to the point

23   with these refineries that they felt orders would be

24   coming soon and sales were imminent before the product

25   failure?

Fannon-Cross/Olafsen

1    A.    I don't recall the specific words, but I do know

2    what -- we can look and see what their actual success

3    rate was in getting those customers and again, the

4    reasons why customers weren't buying.

5    Q.    Do you recall Ms. Horton testifying that once she

6    issues quotes, which is the stage she was at here, that

7    she has usually an 85 to 90 percent closure rate on

8    sales?

9    A.    Well, she didn't --  she didn't on the refineries

10   because they were not buying for a whole host of

11   reasons.

12   Q.    Okay.  Well, we've already talked about that.

13   Here's my point.  You criticize Mr. Filler for choosing

14   ten percent chance of success, but, in fact, the

15   customer, in this case the plaintiff, Packgen, believed

16   that it had a much higher rate of --  was going to have

17   a much higher rate of success if it wasn't for the

18   product failure; correct?

19   A.    I know that's what they said.

20   Q.    And he didn't blindly accept that; did he?

21   A.    What do you mean by that?

22   Q.    Well, he came up with a ten percent figure, which

23   is quite a bit less than what Packgen thought they

24   would get.

25   A.    Which he should have tested against their actual

Fannon-Cross/Olafsen

1    success rate.

2    Q.    In your report, you refer to prices with respect

3    to the refineries and I just want to ask you,

4    Exhibit 17, I don't know if you need to look at it now,

5    but that is the exhibit that refers to the 37

6    refineries, the quantities, the prices and all that

7    other information; do you recall that exhibit?

8    A.    Yes.

9    Q.    Would you agree that would be appropriate for a

10   damage expert such as Mr. Filler to rely on Exhibit 17

11   for those numbers?

12   A.    I want to look at Exhibit 17 because I want to

13   make sure I'm thinking of the right one.

14         Yes, so you're talking about relying on the

15   volume of catalyst?

16   Q.    And the price and the other information listed in

17   Exhibit 17.

18   A.    Well, in part.  I mean I understand that this was

19   a calculation to sort of backfill how many of these

20   catalyst containers could the refineries potentially

21   buy, but the prices on it, I think you need to go back

22   and look at what the actual prices were that they were

23   getting.

24   Q.    And Mr. Filler did testify, did he not, that they

25   were selling to other refineries at these prices and

Fannon-Cross/Olafsen

1    even for more than those prices?

2    A.    And even for less.

3    Q.    Are you aware that Packgen employees have

4    testified that those prices come from their standard

5    price list that they use for refineries?

6    A.    Yes, but I think it's probably more relevant than

7    what the prices they actually were getting were.

8    Q.    I just want to follow-up on that question.  Mr.

9    Filler testified that he did look at the actual prices

10   they were getting; did he not?

11   A.    Yes, he did.  He testified that some were even

12   more, but some were also even less.

13   Q.    You also testified today what you called the

14   complete destruction of a segment of Packgen's

15   business; do you recall that?

16   A.    Yes.

17   Q.    And because of that, Mr. Filler should have done

18   a business valuation analysis rather than a lost

19   profits analysis?

20   A.    Yes.

21   Q.    And isn't it true that Packgen did not have a

22   destruction of its catalyst container business;

23   correct?

24   A.    I understand what you're saying is that they were

25   still continuing to sell catalyst containers, but what

Fannon-Cross/Olafsen

1    Mr. Filler testified three times to last Thursday was

2    that they had a complete destruction of a segment of

3    their business, of the business related to CRI.

4    Q.    And what that meant was Packgen lost a customer,

5    Criterion, CRI, for its catalyst containers; correct?

6    A.    Yes.  According to Mr. Filler, that relationship

7    was completely lost.

8    Q.    So we've got a lost customer, not the destruction

9    of a segment of the business; correct?

10   A.    That's not what Mr. Filler said.  He said there

11   was a destruction of the segment of the business.

12   Q.    I understand and I'm not going to --  the

13   transcript will show exactly what he said and how he

14   used that information, but I'm just trying to establish

15   for you that there really wasn't a destruction of that

16   portion of Packgen's business.

17   A.    Well, if there wasn't a destruction of that

18   portion of his business, then where's the point in his

19   calculation in which he shows them recovering.  In his

20   lost profit calculation, he never demonstrates either

21   that business recovering through CRI or through any

22   other customer that might have bought and that would be

23   a requirement in a lost profit calculation.  Otherwise,

24   you don't have lost profits, you just have that

25   customer gone forever, which is a complete destruction.

Fannon-Cross/Olafsen

1    Q.    Okay.  But destruction of a customer

2    relationship, not the construction -- or destruction,

3    rather, of a portion of a business; correct?

4    A.    Yes.  That part of the business is completely

5    gone.  You never think you'll recover it so you've lost

6    that part of the value of your company.

7    Q.    But six years later, Packgen's still selling

8    catalyst containers; correct?

9    A.    Yes.

10   Q.    And they're selling them to customers such as

11   international refineries and even some of these North

12   American refineries; correct?

13   A.    Right.  So where is the point that he's saying

14   they're going to recover to what they are?  He's saying

15   they're never going to recover this piece of the

16   business, it's permanently lost.

17   Q.    You also referred to mitigation and it's true, is

18   it not, that in the refinery simulation, Mr. Filler

19   uses as mitigation actual sales to those refineries

20   during the last six years?

21   A.    During the first --  he uses actual sales for the

22   first 5 or 6 years and then he forecasts what they are

23   beyond that, but we don't know how much he forecasts

24   because he didn't provide that.

25   Q.    We are only six years down the road, but my point

Fannon-Cross/Olafsen

1    simply is he has mitigated the refineries damages by

2    decreasing those damages by the amount of actual sales

3    to these refineries?

4    A.    Yes.

5    Q.    And for the next four years in his model, he

6    reduces damages based on expected mitigating sales to

7    these refineries?

8    A.    Yes.  We don't know how much that is because

9    that's not an output of the simulation model so we

10   don't know what he's predicting mitigating sales would

11   be.

12   Q.    Okay.  Well, I disagree, it's right there in 13A,

13   but I would rather move on so we can finish up on time

14   today.

15          With respect to CRI then, the complaint is

16   there are no mitigating sales to CRI, but, of course,

17   as you understand it, there have been no sales to CRI

18   since the product failed?

19   A.    Exactly, which is a complete destruction in that

20   portion of the business.

21   Q.    You referred to Mr. Filler's testimony that one

22   factor he considered was that sales to CRI would -- had

23   credibility to the refineries and helped with refinery

24   sales if the product failure hadn't occurred?

25   A.    I heard him say that.

Fannon-Cross/Olafsen

1    Q.    He considered other factors as well; did he not?

2    A.    In sales to refineries?

3    Q.    That's correct.

4    A.    First of all, I want to again say if it can go

5    that way, it can go the other way as well.  In other

6    words, if the refineries saw him pulling up or saw CRI

7    pulling up with a Cougar bag, and that was his theory,

8    right, that if the refineries see them pulling up with

9    a Cougar bag, it would be a stamp of approval.  Well,

10   it could also be the opposite.

11         If the refineries are not buying for any

12   reasons, then saying CRI, we don't want that bag, but

13   we don't even know how many of those refineries were

14   buying from CRI to begin with.

15   Q.    My point simply is what Mr. Filler testified to

16   about the CRI bags being at the refineries was one of

17   the factors he said he considered.

18   A.    I don't remember what else he said he considered.

19   Q.    With respect to the Pratt's Stats database and

20   your testimony that those companies were inappropriate

21   companies to use, I think you did acknowledge that Mr.

22   Filler used the code from the Packgen tax return to

23   determine what types of companies to look at; correct?

24   A.    Yes.

25   Q.    And in fact, tax returns require a code to be put

Fannon-Cross/Olafsen

1    on identifying a company by certain categories that the

2    IRS has established?

3    A.    Yes.  I'll also add, though, that there's a great

4    deal of research that shows that selection of

5    comparable companies in transactions by SIC code alone

6    is not as effective -- or does not prove as effective

7    as selection of comparable companies by other metrics.

8    Q.    You heard him say he thought for not only the

9    reasons of the code, but other reasons as well, that he

10   thought those were appropriate companies to use?

11   A.    I don't recall what his other reasons were.

12   Q.    But you disagree with him and feel he should have

13   relied on other information?

14   A.    Well, I mean my main issue --  well, yes.  Yes, I

15   mean I think he should have considered companies that

16   had a more similar risk profile, but I also disagree

17   with his application of that multiple or his

18   interpretation of what that multiple means.

19   Q.    When you were referring to the -- what you call a

20   tense relationship between Packgen and CRI, were you

21   aware or are you aware that CRI actually had passed

22   along to Packgen that they were very pleased with the

23   new custom product that was being sold after October of

24   2007?

25   A.    I don't recall seeing that, but that doesn't

Fannon-Redirect/Dunitz

1   surprise me given the fact that they bought it for six

2   months.

3   Q.    And very systematic sales; correct?

4   A.    I don't know if I would call it systematic.

5   Q.    Consistent?

6   A.    Consistent for those six months.

7         MR. OLAFSEN:  No further questions.  Thank

8   you.

9         THE COURT:  Thank you.

10        MR. BIXBY:  Can we have just one moment?

11        THE COURT:  Sure.  Redirect?

12        MR. DUNITZ:  Yes.

13        MR. OLAFSEN:  I have one more trip to make,

14  sorry.

15                  REDIRECT EXAMINATION

16  BY MR. DUNITZ:

17  Q.    Ms. Fannon, on this issue of destruction of the

18  segment of the business, do you know whether the Cougar

19  that was being sold to CRI/Criterion was a different

20  type of Cougar than to the refineries?

21  A.    I know they were selling --  oh, yes, to the

22  refineries, yes.

23  Q.    And was one a spent catalyst Cougar and the other

24  a fresh catalyst Cougar?

25  A.    That's my understanding.

Fannon-Redirect/Dunitz

1   Q.    And do you recall last Thursday whether Mr.

2   Filler testified about mitigation regarding the fresh

3   catalyst Cougars to the ones sold to CRI?

4   A.    Yes, he did testify about that.  He indicated

5   that he had made no investigation into mitigation.

6   Q.    And so if they are not selling any fresh catalyst

7   Cougars any longer, the fact that they're selling other

8   types of Cougars to other industries, does that impact

9   whether the destruction is the appropriate --  the

10  destruction of a segment of the business is the

11  appropriate method?

12  A.    Well, even if they were selling --  even if they

13  were selling the same Cougar to other customers, the

14  issue was more the complete destruction of their

15  relationship with this particular customer.  It was

16  just completely gone now so that would lead you to a

17  conclusion of the loss of business value calculation.

18  Q.    And if it was --  I believe Mr. Filler testified

19  that he was not aware of any additional fresh catalyst

20  Cougars sold at all, so would that suggest that the

21  appropriate measure for the fresh catalyst is the

22  destruction of the -- of that segment of the business?

23  A.    That would additionally suggest that, yes.

24  Q.    Now, Mr. Olafsen asked you about the role of

25  experts resolving factual issues.  Is the lack of

Fannon-Redirect/Dunitz

1    mitigation regarding fresh catalyst Cougars a factual

2    issue or is it an issue that goes to what model of

3    damages to use?

4    A.    Well, it's an issue of model because if you

5    believe that the sales, that the loss of sales is going

6    to be mitigated, you eventually have two lines coming

7    together, your forecasted line and where they're now

8    going to get to.  So it's a methodology issue because

9    that second part of the calculation is just missing.

10   Q.    And you agree that --  you agree with Mr. Olafsen

11   that both the before and after and the sales projection

12   methods are accepted methods; is that correct?

13   A.    Yes.

14   Q.    Did Mr. Filler actually apply either of those

15   methods?

16   A.    Well, you know, again, this is a matter of

17   terminology.  He -- I would have said he used the

18   before and after method because he was relying on a

19   six-month before picture in order to make his ten-year

20   projection.

21   Q.    But if he was using that for a lost profits

22   analysis, wouldn't he need to show mitigating sales as

23   well?

24   A.    Yes.

25   Q.    So if he did use the before and after method, did

Fannon-Redirect/Dunitz

 1    he leave part of that method out?

 2    A.    Well, the part he left out was --  he relied on

 3    the prior six months to show what his sales would have

 4    been but for the alleged incident.  He would have then

 5    also needed to do a separate forecast that showed what

 6    he now expected the company to do.

 7    Q.    And without showing what he expected the company

 8    to do, is that a reliable lost profits model?

 9    A.    It's not.

10    Q.    You also -- Mr. Olafsen discussed with you your

11    interviewing company personnel and that is part of your

12    method; correct?

13    A.    Yes.

14    Q.    And do you always test against what the company

15    has told you?

16    A.    Yes.

17    Q.    And when you're interviewing the company, are

18    those intensive interviews?

19    A.    I mean, yes.  They are detailed examination with

20    company personnel about financial issues, the company's

21    business and so forth.

22    Q.    Do you rely on your memory when you take those?

23    A.    Never, never.  I mean, you know, you're

24    interviewing the company about, as Mr. Filler

25    testified, all of the things that affect your

Fannon-Redirect/Dunitz

1   calculation.  I can't keep it all -- all that in my

2   head.

3   Q.    The prices are different -- according to their

4   price schedule, prices are different for the Cougars

5   sold to CRI and the Cougars sold to the refineries; is

6   that correct?

7   A.    Yes.

8   Q.    And are those different products?

9   A.    Yes.

10  Q.    Did Mr. Filler at his deposition indicate whether

11  he knew the difference between those products?

12  A.    I'm not --

13          MR. OLAFSEN:  Your Honor, objection.  I'm not

14  sure why he gets to characterize what he said at the

15  deposition.  The deposition should speak for itself.

16          THE COURT:  Do you want to rephrase it?

17  BY MR. DUNITZ:

18  Q.    Do you have any evidence that shows Mr. Filler

19  knows the difference between the two products?

20  A.    Not at the time he issued his report.

21  Q.    If you're not qualified to render opinions

22  regarding patent and how that would impact the value of

23  a product, what would you do in that circumstance?

24  A.    Well, I think what I -- again, I didn't make

25  this calculation and I didn't do the additional

Fannon-Redirect/Dunitz                                          339

1    investigation because I was not asked to make my own

2    calculations, so my comments with respect to that were

3    that I would have investigated the importance of a

4    patent in this industry and, as Mr. Filler acknowledged

5    in his deposition, he acknowledged that there was a

6    risk that someone else could steal their design, so I

7    would have pursued that to see what kind of an affect

8    that might have had.

9    Q.    Mr. Olafsen asked you about the barriers to entry

10   and suggested that, I believe, that Mr. Lapoint could

11   identify the length of time that the barrier would be

12   in place.  Do you know what Mr. Filler's lost profit

13   damages are for this case?

14   A.    They're around -- I believe now they're around

15   six and a half million.

16   Q.    And that's over a ten-year period; is that

17   correct?

18   A.    Yes.

19   Q.    And do you have any opinion about whether -- how

20   that would impact the barrier's ability to earn

21   6.6 million over ten years?

22   A.    Well, I certainly think if the company thought it

23   could earn 37 percent profitability on this and make

24   that much money, I think there's a lot of incentive for

25   a company to get involved in this line of business.

Fannon-Redirect/Dunitz

1    Q.    And you were asked about if you were to find out

2    that Packgen quickly responded to the DOT issues,

3    whether you -- how that would impact your decision.

4          Is there any evidence that you've reviewed

5    that shows what happened with the DOT issue?

6    A.    No.  In fact, we specifically requested to know

7    if there was any further documents at all that would

8    give us an indication of how that issue was resolved.

9    We were told there was nothing other than what we had.

10   Q.    If this is a new product as was represented on

11   cross, the product they were selling to the refineries,

12   and would the prior sales success rates be relevant

13   even if it was a new product?

14   A.    Well, I mean what I would characterize this is a

15   continually evolving product because they had been

16   making changes and updates and upgrades to it since at

17   least as far back as 2004, so it was a continually

18   evolving product.

19   Q.    And if it is a new product, would a market survey

20   be an appropriate way to find out what the success rate

21   would be?

22   A.    Yes, it would certainly be one way to determine

23   how that product would be received and again, as I

24   commented earlier, I think with respect to refineries,

25   we had at least a part of what a marketing survey would

Fannon-Redirect/Dunitz

1   look like.

2   Q.    At the time of the incident, do we know what the

3   market share of Packgen was?

4   A.    I don't recall.  I only recall that with respect

5   to the refineries in the first year it was forecast, he

6   had forecast that it would be about eight percent of

7   the refinery revenues.

8   Q.    Assuming that Mr. Filler's calculation that once

9   they've got the 37 refineries, it would be four percent

10  of the market, is it safe to assume that at the time of

11  the incident, the market share was less than four

12  percent?

13  A.    Well, certainly because he has a rapidly

14  increasing amount of the market that they're going to

15  be capturing.

16  Q.    And even with less than four percent of the

17  market, how did Ms. Horton describe CHEP's competition

18  in this market?

19  A.    She described them as an extremely aggressive

20  competitor.  She complained about their marketing

21  tactics.  She talked about how they engaged in tactics

22  of contacting all of their customers at trade shows and

23  so forth, by slipping brochures under their doors,

24  pointing out the advantages of the flow bins over the

25  Cougar products.

Fannon-Redirect/Dunitz

1    Q.    So based on that, as Packgen attempted to

2    increase their market share, would you expect that the

3    competition would remain at least that aggressive?

4    A.    Most certainly.

5    Q.    Mr. Olafsen was discussing the costs with you and

6    the fact that this was -- the foil laminated Cougar was

7    a new product and so that the profitability of that

8    could increase.  You mentioned in your response that

9    they were losing money on other products?

10   A.    Well, they must have been.  If this one was so

11   profitable, that meant that they were losing money on

12   other products.

13   Q.    And how did you determine that?

14   A.    Well, because if the overall average is

15   49 percent to 54 percent costs and what's being used

16   for this product is only 40 percent costs, that means

17   that other products have to offset that and be 60 or 70

18   percent costs.

19   Q.    And if they're losing --  if the model you're

20   using suggests they're losing money on other products,

21   is there additional testing you would do to check on

22   the profitability of that product?

23   A.    Yes.  That's what I would investigate.  I'd want

24   to make sure that it tied back to the total.

25            MR. DUNITZ:  Nothing further, Your Honor.

Fannon-Recross/Olafsen

1                  THE COURT:  Mr. Olafsen?

2                  MR. OLAFSEN:  Thank you, Your Honor.

3                       RECROSS EXAMINATION

4       BY MR. OLAFSEN:

5       Q.    Ms. Fannon, do you believe that there are

6       separate catalyst containers manufactured by Packgen

7       that can be used only for fresh catalyst and others

8       that can be used only for spent catalyst?

9       A.    It's my understanding that they're two different

10      products for fresh and spent catalyst.

11      Q.    Would you be surprised to learn then that fresh

12      and spent catalysts can be used in these Cougars

13      regardless of the product being sold to Criterion or

14      being sold to the refineries?

15      A.    I didn't know that, but it would surprise me in

16      the sense that the costs of the two products was listed

17      as different costs.

18      Q.    Well, are you aware that the reason the cost was

19      different is that the refineries sold to the --  I'm

20      sorry, the Cougar catalyst containers sold to the

21      refineries were, in fact, significantly larger

22      containers?

23      A.    Okay, but then they're different products.

24      Q.    The point simply is there's no sharp line between

25      fresh catalyst and spent catalyst.  The difference is

1    size of product, not the use.

2    A.    Okay.

3    Q.    You mentioned the DOT issue, but no further

4    documents were forthcoming, but Mr. Lapoint did testify

5    at his deposition about that DOT issue being resolved;

6    did he not?

7    A.    I don't recall what he said.

8              MR. OLAFSEN:  No further questions.

9              THE COURT:  Anything further, Mr. Dunitz?

10             MR. DUNITZ:  All set, Your Honor.

11             THE COURT:  Thank you.  Thank you, ma'am.  You

12   may stand down.  How do we want to proceed?

13             MR. BIXBY:  That's it for our two witnesses.

14   I think we should talk about briefing schedules and

15   page limitations and things like that.

16             MR. OLAFSEN:  We do have rebuttal testimony

17   from Mr. Filler.

18             THE COURT:  Okay.  Do you want to do that now?

19             MR. OLAFSEN:  I think that makes sense, Your

20   Honor.

21             THE COURT:  Okay.

22             MR. OLAFSEN:  The plaintiff calls Mark Filler

23   back to the stand.

24             (Witness Mark G. Filler previously sworn).

25             THE COURT:  You are still under oath.  Thank

Filler-Direct/Olafsen

1    you.

2                    DIRECT EXAMINATION

3    BY MR. OLAFSEN:

4    Q.    Good afternoon, Mr. Filler.

5    A.    Good afternoon, Mr. Olafsen.

6    Q.    You were present, of course, when Mr. Cowan

7    testified on Thursday?

8    A.    Yes, I was.

9    Q.    You have issues that you would like to respond to

10   Mr. Cowan's testimony?

11   A.    Yes, I do.

12   Q.    Could you tell us what those issues are.

13   A.    Well, first of all, Mr. Cowan is comparing apples

14   to oranges.  He's testifying -- he testified about the

15   use of simulation where there are a myriad of past data

16   points, in the hundreds of thousands, if not the

17   millions.  He said that because he had all this past

18   data and this huge amount of data, that he was able to

19   test and verify the results of his simulation because

20   he could compare it with this past data, but that's not

21   the only use of simulation.

22            As a matter of fact, the first time I ever saw

23   simulation was in a Brealey & Meyers corporate finance

24   text, which is one of the most widely known, most cited

25   corporate finance textbooks in the United States, and

Filler-Direct/Olafsen

1    20 years ago, Brealey & Meyers said that corporations

2    were using simulation because they had found out that

3    using simple point estimates to determine whether or

4    not they should invest in a project or not was causing

5    them problems because with that simple point estimate,

6    they then had to guess at what the discount rate would

7    be for each single project that they were going to

8    attempt to invest in.

9        When simulation came along, they could make

10   the inputs random variables and then take the result of

11   each project and discount it back to present value at

12   the company's average weighted cost of capital and then

13   make an investment decision on which projects had the

14   highest present value.

15       In those situations -- for instance, if an

16   airline is going to decide -- trying to decide whether

17   it should open a route from Portland to Montreal, what

18   they don't do is go ahead and do it and then see how

19   things work out.  They use simulation to account for

20   all of the uncertainty in the input variables and then

21   they make a decision.

22       In this case, that's exactly what I've done

23   with Packgen.  I've used the examples that I found in

24   Brealey & Meyers, I found the examples that I found in

25   the other books in my library, but that still leaves us

Filler-Direct/Olafsen

1   with the issue well, how do we know that the results

2   are accurate if we can't compare it with past data.

3          Well, simulation provides an answer to that.

4   My Exhibits 13, 14, 15 and 16A show the average output

5   for each year for unit sales, dollar sales and lost

6   profits and it also has the standard error, which is

7   the -- well, the average deviation, and if you wanted

8   to have a 95 percent confidence integral, you would

9   take the standard error and multiply it by two, or if

10  you wanted to state it in a percentage, we take the

11  standard error, divide it by the average and multiply

12  by two.  When you do that with unit sales, you get a

13  95 percent confidence integral of somewhere between 1

14  and 3 percent.

15  Q.   So that's a way of testing that Mr. Cowan did not

16  refer to?

17  A.    That's right.  He didn't refer to that and you

18  get the same 95 percent confidence integral for dollar

19  sales and what does a 95 percent confidence integral

20  say?  It says that I'm 95 percent confident that the

21  number that I'm predicting falls within this range and

22  that it has a two and a half percent chance of being

23  less than one and a two and a half percent chance of

24  being greater than three.

25          When we get to lost net profits, the

1    confidence integral is wider because instead of just

2    simulating one random variable, unit sales and dollar

3    sales, we're simulating six unit variables, unit sales,

4    dollar sales -- price and the for costs, so that makes

5    the confidence integral wider and for the appropriate

6    years, those confidence integrals range from 3 to

7    10 percent to the average is 5.  Another way of saying

8    that is that my conclusion of lost profits of

9    approximately a million 900 thousand dollar could vary

10   plus or minus 5 percent.

11           Now, I know that the Court wants a single

12   number, but just as value is always a range, so is

13   damages a range and the question is, is the model and

14   the calculations reliable and I think the answer is

15   yes, if the confidence integrals are narrow enough.

16   Q.    The types of simulations Mr. Cowan was saying he

17   did, do they involve many more data points than a

18   business profit type calculation?

19   A.    Oh, yes.  When you're using census data or

20   unemployment data, you're dealing with many, many years

21   and hundreds of thousands, if not millions of data

22   points within each year.

23           A simulation for a business that is talking

24   about whether or not it should make a decision to

25   invest in a project and wants to know the answers to

Filler-Direct/Olafsen

1   what's the worst that could happen, what's the

2   probability of success and what's the most important

3   variable, there is no past data.

4        When I said there was no past data, what I

5   meant was there is no prior sales history that you can

6   compare your forecast to.  We do have data in the

7   Packgen matter.  We have data concerning a hundred

8   percent needs of the 37 refineries.  We know what the

9   quoted prices were and we know what the for costs were.

10        So it's not like we are guessing at these

11   things.  Those are facts and data that we know and

12   those are the facts and data that I put into the model.

13   Q.   Do you recall that Mr. Cowan also talked about

14   your ten percent success rate as a method to determine

15   when the first year of sales begins to a refinery?

16   A.   Yes.  That's a nice way to put it and he also

17   said that the use of that model generated increasing

18   sales over time, so at the end of the tenth year, we

19   got to 50 percent and so you have to ask yourself well,

20   what's wrong with that?  Wouldn't -- the expectation

21   would be that in the first year, if you sold to two

22   refineries and kept them, the next year you would sell

23   to two more and two more and two more so that over

24   time, things would build up and get you to a point

25   where you, after ten years, it's not unreasonable to

Filler-Direct/Olafsen

1    think that you would capture 50 percent of that

2    particular market for the 37 refineries.

3           I did not forecast years 11 through 20.

4    They're not in evidence and I'm sure that I would have

5    used a different model to calculate what would have

6    happened after year ten.

7    Q.    Mr. Cowan referred to what you had done with the

8    simulation for the refineries as a straightforward

9    mathematical calculation; do you recall that?

10   A.    Yes and that's what I did with the aid of the

11   computer.  I didn't need XLSim software.  What I could

12   have done was calculate 5,000 deterministic models and

13   written it down on pencil and paper and gotten the

14   totals for each of the ten years and taken an average.

15          I might have used XL to help me choose which

16   unit sales within that range, what unit price within

17   that range and which each of the for costs within that

18   range I was going to use to calculate what the lost

19   profits would be for that trial and I would do that

20   again and again and again until I had done 5,000

21   trials.  If I could make two calculations a minute, it

22   would probably have taken me at least a year.  The

23   computer does it in 120 seconds.

24          So it's really just a straightforward math

25   calculation with a bit of assist from the computer as

Filler-Direct/Olafsen

1    to which random variable gets chosen for each of the

2    5,000 trials within the six random variables that are

3    in the model.

4    Q.    You recall Mr. Cowan's testimony about the

5    possibility of all 37 refineries placing an order

6    within the first year?

7    A.    Yes and he said if you calculated that by .1 to

8    the 37th power, well, that's -- when you write that

9    out, that's a decimal point, 36 zeros and a 1.  That's

10   a very small number.  The chance of an asteroid hitting

11   the earth, I understand, is a chance of 1 in a million.

12   That's a decimal point and seven zeros and then a 1.

13         So 1 to the 37th power is so small, it is so

14   remote, you wouldn't even consider it, just like we

15   don't plan our daily lives on the chance of 1 in a

16   hundred million that an asteroid would hit the earth

17   and wipe us out as it did the dinosaurs 65 million

18   years ago.

19         Even if it did happen, Packgen has the

20   capacity, in terms of floor space, machinery and

21   people, to meet that need.  It would be, I believe,

22   25,000 containers a year, which is double the rate that

23   they were selling to Criterion.  It's not a huge

24   number.

25   Q.    Dr. Cowan referred in his testimony to the wrong

1   parameters leading to the wrong opinions; do you recall

2   that?

3   A.    Yes and in his report, when you read it, he

4   refers to parameters as random variables and if you

5   change the random variables, that is, if you change the

6   unit sales, if you change the unit selling prices, if

7   you change the cost, you'll get a different answer.

8   That's all that he meant by the word parameter.

9         It doesn't refer to reliability, it doesn't

10  refer to probability distributions, it's just the

11  inputs, the random variables that go into those

12  probability distributions.

13  Q.    Mr. Cowan also testified about your use of a

14  regression model for calculating overhead.

15  A.    Yes.  I testified that I knew that the regression

16  model was not statistically significant, but I used it

17  to facilitate my computation or to facilitate my

18  allocation of overhead among the three broad sales

19  categories for Packgen, which was sales to Criterion,

20  sales of Cougars to refineries and all the other

21  products that Packgen made and sold which, for the six

22  months of October of '07 through March of '08, those

23  other products was a million dollars in sales in just

24  those six months.  So if I had just taken a simple

25  average of overhead and allocated it, the answer

Filler-Direct/Olafsen

1    wouldn't have changed.

2    Q.    Dr. Cowan also testified that you didn't account

3    for competition and other external factors; do you

4    recall that?

5    A.    Yes.

6    Q.    And do you agree with that testimony?

7    A.    No.  No, I don't agree with that

8    characterization.  The only -- the only competitor that

9    Packgen had was CHEP.  There was no other IBC

10   manufacturer then nor today.  So knowing what --  how

11   CHEP would push back, that's why my success rate was

12   only ten percent because I was accounting for that in

13   the ten percent factor.

14          Another thing we have to --  all the other

15   things he listed, you know, technology, et cetera,

16   that's what the discount rate is for.  There is no way

17   to put a number on those things and build them into the

18   model.  You know they're there and that's why your

19   discount rate is as high as it is because those are

20   everyday, ordinary business risks that any business

21   faces and that's where you account for them, in the

22   discount rate.  If there were no risk, the discount

23   rate would be five percent.  It would be the risk free

24   rate of a Treasury bond.

25   Q.    There was also testimony from Mr. Cowan about

Filler-Direct/Olafsen

1   your distribution in the refineries simulation model.

2   Can you explain what distribution rate you used and why

3   you used them.

4   A.    There are many, many distributions.  Typically

5   for simulations to businesses as I did with Packgen,

6   you would find, perhaps, four distributions; the normal

7   distribution, the triangular distribution, a uniformed

8   distribution and a discrete distribution and let me

9   explain briefly what each of those is.

10          A discrete distribution says that there's a

11   40 percent chance of this number, a 40 percent chance

12   of that number and a 20 percent of that number and

13   those percentages have to add to 100 percent and they

14   can be any combination of percentages, as long as they

15   add to 100 percent, so that's the discrete

16   distribution.

17          The continuous distributions are the uniform

18   distribution that says that any number between the

19   lower bound and the upper bound has an equal chance of

20   appearing.  The distribution looks like a rectangle.

21          The third distribution is the triangular

22   distribution, which we talked about last Thursday,

23   which answers the question what's the most likely

24   number, what's the best-case number, what's the

25   worst-case number and the distribution will provide a

Filler-Direct/Olafsen

1    number anywhere in between, but generally producing a

2    number closer to the most likely number.

3         And the fourth distribution is the bell-shaped

4    curve, the normal distribution, for which you need an

5    average and a standard deviation to compute.

6         In the Packgen model, I used two of those

7    distributions.  I used the triangular distribution for

8    unit sales, for unit prices and for three of the costs.

9    For the fourth cost for which I did have history, that

10   is, the overhead figure, I had six months of normalized

11   overhead numbers.  Those overhead numbers were normally

12   distributed so I used normal distribution to calculate

13   my overhead.

14   Q.    And just if you could quickly summarize why you

15   believe the triangular distributions were appropriate

16   to use in this situation.

17   A.    The triangular distribution was appropriate to

18   use because it deals with the fundamental question that

19   any competent business owner can tell you; what's most

20   likely to happen, what's your best-case scenario,

21   what's your worst-case scenario.  They can answer that

22   question.

23        They can't tell you how any number is normally

24   distributed, they can't tell you what is a discrete

25   distribution, but they can give you the information

Filler-Direct/Olafsen

1   that allows you to use a triangular distribution.

2   Q.    And Mr. Cowan criticized one of the

3   distributions, price distribution, because it wouldn't

4   allow a price lower than your worst-case scenario; do

5   you recall that testimony?

6   A.    Yes.

7   Q.    And do you believe his testimony, the testimony

8   of Mr. Cowan was appropriate?

9   A.    No, I don't think so.  I don't think he

10  understood what's going on here.  Once Packgen quotes

11  to a refinery $369.95, that refinery cannot pick up the

12  phone and call another IBC manufacturer and say I have

13  a price here, can you beat it.  There's no place to go

14  but to either accept Packgen's price and place the

15  order, or to continue to use the higher cost rental of

16  flow bins.

17      What I did with price was the best-case was

18  the quoted price.  The worst-case was a five percent

19  discount, which Mr. Lapoint told me he was willing to

20  do to close the sale, and the worst-case was another

21  five percent discount, which was as low as he was

22  willing to go to make a sale.  If he dropped any lower,

23  word would get out very quickly and everybody would

24  want that price.

25      So that's why there's no reason for prices to

Filler-Direct/Olafsen

1    be higher because those are the list prices and the

2    prices that were being quoted and there's no reason for

3    it to be any lower than what I used in my triangular

4    distribution for the reason I just said.

5    Q.    In his report, Mr. Cowan does an analysis of

6    certain material cost files; do you recall reading

7    that?

8    A.    Yes.

9    Q.    Do you agree with his analysis?

10   A.    No, no.  Those cost files are not real costs or

11   they don't come out of the general ledger.  They are

12   not the numbers from the general ledger that would say,

13   you know, we purchased this amount of material for this

14   product, we made so many of this product and here's our

15   average cost.

16        What Packgen does is it takes the standard

17   cost sheets and somebody plugs those in for information

18   purposes.  That's number one.  Number two, those sheets

19   went back to 2003, '4, '5, and '6 and into 2007 with

20   different older products, different products.

21        You remember, these Cougars changed from

22   single layer to double layer to laminated foil.  They

23   were a product in motion so you can't go back and look

24   at what was done 2, 3, 4, 5 years ago and say this is

25   what we're going to rely on.  What you've got to do is

Filler-Direct/Olafsen

1    take a snapshot of what was actually happening in those

2    six months and that's what I did.

3    Q.    Dr. Cowan's report also says that only the first

4    year of your simulation was actually simulated and then

5    the values were copied in file years; do you recall

6    that?

7    A.    Yes.

8    Q.    Do you agree with that testimony?

9    A.    Well, that testimony refers to something that's

10   not in evidence.  That was the Criterion simulation.

11   There was a reason for doing that, I won't get into it

12   because that opinion was withdrawn.  It's not directed

13   at the simulation for the refineries.

14   Q.    With respect to the refineries then, was that

15   actually simulated each year into --

16   A.    Yes.  Each year was simulated.  That criticism of

17   the refineries is invalid.

18   Q.    Thank you.  Ms. Fannon today testified about what

19   she described as the complete destruction of a segment

20   of Packgen's business; do you recall that?

21   A.    Yes.

22   Q.    And how that would affect how determination of

23   damages should be done; do you agree with her

24   testimony?

25   A.    No at all.

Filler-Direct/Olafsen

1    Q.    And would you explain why.

2    A.    My testimony last Thursday said that what was

3    destroyed was this customer relationship, not a segment

4    of the business, not a division of the business.  The

5    plant didn't burn down.  This customer relationship was

6    ended.  The loss became infinite and rather than take

7    it out to infinity, I simply cut it off ten years and

8    discounted it back to present value and there's no

9    reason -- there would be no reason to do it on an

10   after-tax basis because the loss was not to the

11   shareholders.  The loss was to the business.

12           If Packgen collects on this claim, it will pay

13   taxes on the proceeds.  If the cash flow has already

14   been made smaller by subtracting out taxes, that's a

15   double hit.  So lost profits is always on a before-tax

16   basis with an after-tax cash flow.  That's the way it

17   worked.  I treated this as lost profits from a

18   relationship that was no longer going to --  that

19   wasn't going to continue.  It was over, it was done.

20   Q.    When a business valuation is done, when a

21   business or a personal business is destroyed, what type

22   of situations are used for that type of business

23   valuation?

24           You referred to a plant burning down, is that

25   a --

Filler-Direct/Olafsen

1    A.    Oh, for instance, if -- let me make a

2    hypothetical situation.  A restaurant burns down,

3    there's no insurance, the arsonist is convicted,

4    there's a civil suit and in addition, the loss to the

5    shareholders, if that's what you want to calculate,

6    would be the value of the business.  But again, if

7    you've got a corporation and the loss is to the

8    corporation, it would still be on a before-tax basis.

9    The corporation would collect the proceeds, pay its

10   taxes and distribute the money to the shareholders.

11   Q.    There was also testimony from Ms. Fannon about

12   mitigation and I would like to ask you first about the

13   refineries.  Was mitigation used to the entire ten

14   years of your refineries model?

15   A.    Yes.  For the years that we had actual sales, I

16   plugged in the actual unit sales in dollars from sales

17   to those 37 refineries.  For future years, I calculated

18   and put in the model what was necessary to produce

19   expected mitigating sales so by the time we got to the

20   tenth year, lost profits was theoretically zero.

21   Q.    And with respect to CRI, was there any mitigation

22   to plug into that model?

23   A.    When I inquired as to mitigation, the only --

24   the answer that I got was adjust the refineries.

25   Q.    Does that mean there had been no sales to CRI or

Filler-Direct/Olafsen

1    other fresh catalyst companies, as you understand it?

2    A.    As I understand it, there had been no sales to

3    CRI, there had been no sales to any other fresh

4    catalyst producers or anybody who produced the same

5    kind of fresh catalyst that CRI made.

6    Q.    Ms. Fannon also testified about you relying on

7    Criterion purchases going to refineries and adding

8    credibility to Packgen; do you recall that testimony?

9    A.    Yes.

10   Q.    Can you explain what you meant when you testified

11   to that last Thursday?

12   A.    Well, yes.  This new Cougar, which was developed

13   in the summer of -- in 2007 and introduced to

14   Criterion in August of 2007 and proposed to the

15   refineries during the six-month period starting

16   October 2007 was foil laminated which made it look

17   stronger when compared to just the polypropylene.  It

18   looked like it was metal because it's competing against

19   flow bins which weigh 950 pounds and are made out of

20   steel.  So the foil laminate gave it the appearance of

21   greater strength.  That was expected to be a selling

22   point.

23          So when the Criterion truck shows up at the

24   refineries delivering fresh catalyst, a selling point

25   when Packgen calls on that refinery would be the fact

Filler-Direct/Olafsen                                    362

1    that they'd seen fresh catalyst arrive in a Packgen

2    container.

3    Q.    Was that the only factor you relied on?

4    A.    No, that was one factor.  The other factors are

5    the 25 to 50 percent cost savings.  I mean you just

6    can't ignore the economics.  I mean I think the

7    economics of -- those kind of savings is enormous and I

8    don't want to say it overrides everything else, but

9    it's really important.  It's not a ten percent savings,

10   it's not a five percent savings, it's not, you know, a

11   Plymouth versus a Chevy versus -- they don't make

12   Plymouth anymore -- but Ford versus Chevy.  It's an

13   enormous cost savings for those 37 refineries.

14          The other over a hundred refineries, you know,

15   yeah, maybe, maybe not, could be, I don't know, you

16   know, but those 37 that were targeted were going to

17   enjoy substantial savings.

18   Q.    And did you rely on any statements by Mr. Berman,

19   the catalyst industry expert, as to Packgen's presence

20   in the market?

21   A.    Yes.  He said that Packgen had exceptional market

22   presence and expertise, which really goes to preventing

23   competition from entering the market and, you know,

24   Packgen's been in this --  as Packgen has been in the

25   container business since it opened in 2002, but the --

1    you know, the original company's more than 30 years

2    old.  They have a great deal of experience in the

3    container industry.

4         MR. OLAFSEN:  No further questions.  Thank

5    you.

6         THE COURT:  Cross-examination.

7         MR. DUNITZ:  Briefly.  May I have a moment?

8         THE COURT:  Sure.

9              CROSS EXAMINATION

10   BY MR. DUNITZ:

11   Q.    Good afternoon, Mr. Filler.

12   A.    Good afternoon, Mr. Dunitz.

13   Q.    What percentage of the refinery industry does

14   CRI/Criterion sell fresh catalyst to?

15   A.    I don't know.

16   Q.    What percentage of the 37 refineries on the list

17   purchased their fresh catalyst from Criterion?

18   A.    I don't know.

19   Q.    So you don't actually know whether the Cougars

20   would even show up at these 37; do you?

21   A.    I was told that they would show up.  I wasn't

22   told which ones.

23   Q.    Well, do you know if any of them purchased --

24   A.    I can't identify which ones purchased it.

25   Q.    Do you know whether any of them purchased it from

Filler-Cross/Dunitz

1   CRI/Criterion?

2   A.    I was told that some of them purchased it.  I was

3   not given any numbers.

4   Q.    Also, you testified that the simulation models

5   are no longer -- for CRI are no longer your opinions?

6   A.    Correct.

7   Q.    And why is that?

8   A.    Because those models --  the latest CRI

9   simulation model had an expected --  had simulated the

10  selling prices and since there was no evidence to

11  support those increases, I dropped it.

12  Q.    You also did one, and I'm sure Mr. Olafsen will

13  say at my request, but you also did a simulation of the

14  196 price; isn't that correct?

15  A.    Well, I think in that one, the three inputs were

16  196.86 so it wasn't really a simulation.

17        MR. DUNITZ:  Nothing further, Your Honor.

18        THE COURT:  Mr. Olafsen?

19        MR. OLAFSEN:  Nothing further, Your Honor.

20        THE COURT:  Thank you, you may stand down,

21  sir.  How do we want to proceed?

22        MR. BIXBY:  I know you have something else at

23  2:30, so we can probably be very brief.  We can talk

24  scheduling, briefing and anything else Your Honor would

25  like to talk about.

1          THE COURT:  Sure.  Let's assume it's going to

2     take 30 days to get a full transcript --

3          MR. BIXBY:  That's fine.

4          THE COURT:  And assuming that the transcript's

5     available sometime at the end of the first week of

6     April, when --  when would you like to file your

7     memorandum?

8          MR. BIXBY:  I think the first week of April, I

9     think if we had six weeks, until mid-May, to file the

10    brief, and I would enter a request that the briefs be

11    longer than ten pages.  I would suggest maybe 20 or 25?

12         THE COURT:  I have no problem with the length,

13    but the length of time seems to be -- that would bring

14    us to --

15         MR. BIXBY:  I was suggesting mid-May.

16         MR. DUNITZ:  Your Honor, I'll be traveling a

17    lot in April.  I'll be gone for half of the first week

18    and the entire last week of April.

19         THE COURT:  You work at a pretty big firm;

20    don't you?

21         MR. BIXBY:  No one knows the stuff like he

22    does, Your Honor, that's why his schedule is relevant

23    to me.

24         THE COURT:  My concern is this is a precursor

25    to another motion.

1          MR. DUNITZ:  I understand.

2          THE COURT:  And it's gone on for a little

3     while.  You really need six weeks to file 25 pages?

4          MR. BIXBY:  Perhaps by the end of the first

5     week of May?  That would give us an extra week.  Would

6     that be helpful and be more reasonable instead of the

7     mid to third week of May?

8          THE COURT:  So you're thinking of May 2, which

9     would be Friday the --

10         MR. BIXBY:  That would be less than four

11    weeks, I think.

12         MR. DUNITZ:  I will be gone from the 23rd to

13    the 29th.

14         THE COURT:  So you want May 9th?

15         MR. BIXBY:  If the transcripts are issued the

16    first week of April, I think that would be between 28

17    and 35 days.

18         THE COURT:  Well, it would be five weeks.  Why

19    don't we do it this way.  I'm just getting a signal

20    that it might not be 30 days, but it may be less than

21    that.  Maybe two weeks from today, do you think?

22         MR. BIXBY:  Then we may be able to do May 2

23    instead of May 9th.  Hold on one second.

24         MR. DUNITZ:  If it is two weeks, then I think

25    April 22nd I could submit one before I leave.

1          THE COURT:  Well, if he manages to get the

2     transcript to you on the 17th, you're talking about

3     having five weeks still to get a 25 page brief?  Why

4     can't we do it by the 14th, which is 30 days?

5          MR. DUNITZ:  That would work, Your Honor.

6          THE COURT:  Okay.  So unless there's some sort

7     of complication, defendant's brief would be due by

8     April 14.  How long do you need to respond, Mr.

9     Olafsen?

10         MR. OLAFSEN:  I practice alone, but my biggest

11    problem then is I'm away overseas from April 17 to

12    April 28th, which means -- you said the 14th, which

13    means I won't have a chance to much more than look at

14    their's before I go, so if I could have 3 or 4 weeks

15    after I get back from overseas, I think that would be

16    enough, which would be May 19th.

17         THE COURT:  All right.  What am I going to do

18    about that, Mr. Dunitz, I mean it's his claim.  My

19    concern is always that the plaintiff is moving on

20    something -- the plaintiff is without the money that

21    he's hoping to get at the end of it.

22         MR. DUNITZ:  I mean if he needs until then,

23    that's fine.  I wonder if I can have until the 21st.

24         MR. OLAFSEN:  Since I'm going to be overseas

25    and returning on the 28th, I will say that I won't be

 1    doing anything on it until the 28th.

 2              THE COURT:  Okay.  So you get until the 21st

 3    and reply by the 19th of May.  He's going to file --

 4    you're going to file your memo by April 21st and he's

 5    going to file his response by May 19th.

 6              MR. OLAFSEN:  That would give me three weeks

 7    when I return, I think three weeks.

 8              MR. BIXBY:  And then maybe a reply after that?

 9              THE COURT:  I think you will pretty well

10    squeeze the sponge by that time.

11              MR. BIXBY:  You never know what you're going

12    to see in a brief.  I think even a limited right to

13    reply would be helpful.

14              THE COURT:  All right.  In that case, get it

15    in within a week, the 26th.  Anything else?

16              MR. DUNITZ:  How many pages?

17              THE COURT:  I'm not going to --  oh, the 26th

18    is Memorial Day.  How about the 27th?  I don't impose

19    page limits on something like that.  You take -- just

20    keep in mind two things.  One, although I do not impose

21    limits of that sort, the longer you go, the less

22    effective it is.

23              MR. DUNITZ:  Yes, Your Honor.

24              THE COURT:  And the longer you go, the more in

25    the way of --  with your situation, the more issues you

 1    raise, the more likely it is it's going to be an issue

 2    that will allow me to credit the testimony; in other

 3    words, every single issue you're going to have to win

 4    on; right?

 5              MR. DUNITZ:  Right.

 6              THE COURT:  Because if there's one issue in

 7    which I disagree with you and that he's an appropriate

 8    expert, then he's an expert; right?

 9              MR. DUNITZ:  Correct.

10              THE COURT:  Sort of like the summary judgment

11    so as I've analogized it at the Rule 56(h) conferences,

12    it's like putting out statements of material fact.  The

13    more statements of material fact you put up, the more

14    golf balls you've teed up and all he has to do is hit

15    one.

16         So there may be some reason to limit or maybe not,

17    and I understand that as well, but the more you go

18    on -- I mean I've heard it, I've heard the point, I've

19    heard the counterpoint, I've heard the response.

20              MR. DUNITZ:  Thank you, Your Honor.

21              THE COURT:  Okay?  Mr. Olafsen, same message

22    to you.

23              MR. OLAFSEN:  Yes, Your Honor.

24              THE COURT:  But I would like to thank counsel.

25    This is interesting and you've obviously had some very,

```
 1    very bright people.
 2              MR. DUNITZ:  Thank you, Your Honor.
 3              THE COURT:  Anything else?
 4              MR. OLAFSEN:  No, Your Honor.
 5              MR. DUNITZ:  No, Your Honor.
 6              THE COURT:  Court will stand in recess.
 7              (End of proceeding)
 8              C E R T I F I C A T I O N
 9    I, Dennis Ford, Official Court Reporter for the United
10    States District Court, District of Maine, certify the
11    foregoing is a correct transcript from the record of
12    proceedings in the above-entitled matter.
13    Dated:  March 7, 2014
14                    /s/  Dennis R. Ford
15                  Official Court Reporter
16
17
18
19
20
21
22
23
24
25
```

## $

**$100** [1] - 293:25
**$196** [2] - 278:4, 313:1
**$225** [1] - 277:25
**$270,000** [1] - 313:14
**$369.95** [1] - 356:11
**$500** [1] - 294:6

## '

**'07** [1] - 352:22
**'08** [1] - 352:22

## /

**/s** [1] - 370:14

## 1

**1** [7] - 347:13, 351:7, 351:9, 351:11, 351:12, 351:13, 351:15
**10** [1] - 348:7
**10,040** [1] - 289:14
**100** [2] - 354:13, 354:15
**10:30** [1] - 261:18
**11** [1] - 350:3
**120** [1] - 350:23
**13** [2] - 262:8, 347:4
**13A** [1] - 331:12
**14** [3] - 262:9, 347:4, 367:8
**14th** [2] - 367:4, 367:12
**15** [4] - 262:10, 295:14, 315:7, 347:4
**156** [1] - 261:17
**16** [1] - 289:12
**16A** [2] - 262:11, 347:4
**17** [6] - 262:7, 327:4, 327:10, 327:12, 327:17, 367:11
**17th** [1] - 367:2
**196** [4] - 294:6, 294:9, 294:13, 364:14
**196.86** [1] - 364:16
**19th** [3] - 367:16, 368:3, 368:5

## 2

**2** [4] - 293:23, 357:24, 366:8, 366:22
**20** [6] - 295:15, 315:7, 346:1, 350:3, 354:12, 365:11
**2002** [1] - 362:25

**2003** [2] - 289:13, 357:19
**2004** [2] - 289:13, 340:17
**2005** [4] - 289:14, 289:15, 291:10, 293:22
**2006** [1] - 289:14
**2007** [15] - 283:15, 291:13, 292:9, 292:20, 292:24, 293:24, 313:2, 316:17, 325:9, 325:13, 333:24, 357:19, 361:13, 361:14, 361:16
**2008** [3] - 291:23, 292:15, 292:25
**2009** [1] - 282:13
**2011** [2] - 282:12, 282:13
**2014** [2] - 261:18, 370:13
**21st** [3] - 367:23, 368:2, 368:4
**22nd** [1] - 366:25
**23rd** [1] - 366:12
**25** [4] - 362:5, 365:11, 366:3, 367:3
**25,000** [1] - 351:22
**263** [1] - 262:3
**26th** [2] - 368:15, 368:17
**270** [1] - 313:16
**27th** [1] - 368:18
**28** [1] - 366:16
**28th** [3] - 367:12, 367:25, 368:1
**297** [1] - 262:3
**29th** [1] - 366:13
**2:12-cv-80-JAW** [1] - 261:5
**2:30** [1] - 364:23

## 3

**3** [4] - 347:14, 348:6, 357:24, 367:14
**3,920** [1] - 289:13
**3.6** [2] - 270:6, 287:17
**30** [4] - 363:1, 365:2, 366:20, 367:4
**327** [1] - 262:7
**334** [1] - 262:3
**343** [1] - 262:3
**345** [1] - 262:4
**347** [4] - 262:8, 262:9, 262:10, 262:11
**35** [2] - 278:1, 366:17
**36** [3] - 282:20,

295:24, 351:9
**363** [1] - 262:4
**37** [20] - 270:1, 279:3, 280:9, 280:11, 282:21, 283:1, 287:16, 295:25, 296:7, 327:5, 339:23, 341:9, 349:8, 350:2, 351:5, 360:17, 362:13, 362:16, 363:16, 363:20
**37th** [2] - 351:8, 351:13
**3rd** [1] - 261:18

## 4

**4** [4] - 271:24, 357:19, 357:24, 367:14
**4.4** [1] - 284:15
**4.6** [1] - 272:2
**40** [2] - 278:6, 342:16, 354:11
**49** [2] - 321:9, 342:15

## 5

**5** [5] - 330:22, 348:7, 348:10, 357:19, 357:24
**5,000** [3] - 350:12, 350:20, 351:2
**5,706** [1] - 289:14
**50** [5] - 266:23, 277:23, 349:19, 350:1, 362:5
**500** [3] - 264:18, 301:8, 312:17
**51** [1] - 321:2
**54** [2] - 321:9, 342:15
**55** [1] - 277:23
**56(h** [1] - 369:11

## 6

**6** [2] - 330:22, 357:19
**6,688** [1] - 289:13
**6.6** [1] - 339:21
**60** [2] - 321:8, 342:17
**65** [2] - 321:8, 351:17

## 7

**7** [2] - 284:16, 370:13
**70** [1] - 342:17
**72** [1] - 286:9

## 8

**85** [1] - 326:7

## 9

**90** [3] - 270:13, 270:15, 326:7
**900** [1] - 348:9
**95** [5] - 347:8, 347:13, 347:18, 347:19, 347:20
**950** [1] - 361:19
**96** [1] - 313:1
**9th** [2] - 366:14, 366:23

## A

**a.m** [1] - 261:18
**ability** [2] - 274:23, 339:20
**able** [3] - 321:2, 345:18, 366:22
**above-entitled** [2] - 261:15, 370:12
**absolutely** [2] - 283:11, 315:2
**accept** [3] - 323:15, 326:20, 356:14
**accepted** [3] - 297:18, 297:22, 336:12
**according** [4] - 295:21, 317:9, 329:6, 338:3
**account** [3] - 346:19, 353:2, 353:21
**accountants** [1] - 278:23
**accounted** [1] - 295:2
**accounting** [3] - 263:24, 264:6, 353:12
**accounts** [1] - 285:12
**accuracy** [1] - 277:10
**accurate** [3] - 274:15, 286:9, 347:2
**accurately** [1] - 287:4
**accused** [3] - 280:21, 290:20, 292:6
**acknowledge** [1] - 332:21
**acknowledged** [2] - 339:4, 339:5
**acquired** [1] - 286:11
**action** [1] - 304:3
**ACTION** [1] - 261:4
**actual** [22] - 272:6, 273:16, 273:17, 277:18, 283:13,

284:4, 286:16, 301:19, 307:22, 323:2, 323:8, 323:11, 325:8, 326:2, 326:25, 327:22, 328:9, 330:19, 330:21, 331:2, 360:15, 360:16
**add** [5] - 276:22, 277:3, 333:3, 354:13, 354:15
**adding** [2] - 277:4, 361:7
**addition** [3] - 276:8, 282:10, 360:4
**additional** [4] - 265:23, 335:19, 338:25, 342:21
**additionally** [2] - 295:10, 335:23
**adjust** [1] - 360:24
**adjusted** [3] - 268:16, 269:16, 269:17
**admitted** [1] - 307:24
**advantage** [1] - 295:5
**advantageous** [1] - 295:3
**advantages** [3] - 314:5, 314:11, 341:24
**affect** [16] - 267:3, 269:12, 290:13, 304:25, 306:19, 306:22, 306:24, 307:12, 307:15, 309:8, 310:3, 317:1, 317:5, 337:25, 339:7, 358:22
**affected** [15] - 290:11, 291:4, 293:18, 306:6, 307:8, 307:23, 307:25, 308:7, 308:13, 308:14, 312:5, 317:4, 317:7, 319:18
**affects** [2] - 298:6, 301:25
**after-tax** [5] - 268:13, 269:15, 269:18, 359:10, 359:16
**afternoon** [6] - 297:11, 297:12, 345:4, 345:5, 363:11, 363:12
**agents** [1] - 264:14
**aggressive** [6] - 281:17, 281:25, 294:18, 294:19, 341:19, 342:3

**ago** [6] - 265:8, 265:24, 270:22, 346:1, 351:18, 357:24
**agree** [24] - 275:11, 287:11, 297:17, 297:21, 298:1, 298:4, 299:7, 301:20, 302:19, 307:1, 307:4, 314:24, 315:2, 315:3, 316:25, 323:8, 327:9, 336:10, 353:6, 353:7, 357:9, 358:8, 358:23
**agreed** [2] - 307:16, 307:17
**ahead** [1] - 346:18
**aid** [1] - 350:10
**aided** [1] - 261:25
**airline** [1] - 346:16
**al** [1] - 261:9
**alleged** [12] - 270:5, 270:25, 273:5, 277:22, 281:19, 282:23, 283:20, 290:12, 293:6, 304:3, 305:20, 337:4
**alleging** [1] - 288:3
**allocated** [1] - 352:25
**allocation** [1] - 352:18
**allow** [3] - 294:21, 356:4, 369:2
**allows** [1] - 356:1
**almost** [2] - 283:6, 313:14
**alone** [3] - 272:1, 333:5, 367:10
**alternative** [1] - 315:17
**American** [1] - 330:12
**amount** [5] - 299:4, 331:2, 341:14, 345:18, 357:13
**analogized** [1] - 369:11
**analyses** [1] - 265:9
**analysis** [16] - 271:16, 276:11, 277:8, 277:20, 277:24, 282:15, 282:18, 300:11, 305:9, 306:8, 321:22, 328:18, 328:19, 336:22, 357:5, 357:9
**analyst** [1] - 285:8
**analyzed** [1] - 321:25
**answer** [8] - 313:18, 316:21, 347:3,

348:14, 352:7, 352:25, 355:21, 360:24
**answers** [2] - 348:25, 354:23
**anyway** [2] - 288:5, 321:22
**appear** [1] - 300:21
**appearance** [1] - 361:20
**Appearances** [1] - 261:19
**appearing** [1] - 354:20
**apples** [1] - 345:13
**application** [3] - 284:9, 285:1, 333:17
**applied** [6] - 269:18, 275:5, 275:6, 275:11, 287:9, 297:13
**applies** [1] - 307:21
**apply** [4] - 268:16, 269:16, 308:24, 336:14
**applying** [1] - 275:3
**appropriate** [25] - 268:19, 269:9, 270:18, 272:10, 283:9, 285:19, 286:21, 288:8, 288:10, 303:2, 303:6, 303:9, 315:23, 323:12, 327:9, 333:10, 335:9, 335:11, 335:21, 340:20, 348:5, 355:15, 355:17, 356:8, 369:7
**approval** [2] - 279:13, 332:9
**April** [17] - 291:23, 292:15, 292:25, 309:12, 311:15, 311:16, 311:17, 365:6, 365:8, 365:17, 365:18, 366:16, 366:25, 367:8, 367:11, 367:12, 368:4
**arm** [1] - 297:11
**arrive** [3] - 298:25, 299:3, 362:1
**arrived** [1] - 269:21
**arsonist** [1] - 360:3
**ascertained** [1] - 322:1
**assess** [4] - 267:21, 276:3, 276:7, 286:4
**assessing** [1] - 315:18
**assets** [5] - 285:5,

285:11, 285:12, 286:11
**assist** [1] - 350:25
**assume** [8] - 283:23, 290:4, 290:12, 312:11, 312:14, 324:12, 341:10, 365:1
**assumed** [1] - 289:17
**assumes** [1] - 294:21
**assuming** [6] - 287:22, 300:2, 307:10, 321:1, 341:8, 365:4
**assumption** [5] - 283:25, 296:25, 299:24, 300:3, 300:4
**assumptions** [12] - 299:17, 299:19, 299:20, 300:7, 300:16, 300:17, 300:20, 300:21, 300:23, 301:13, 301:14, 323:17
**asteroid** [2] - 351:10, 351:16
**attempt** [1] - 346:8
**attempted** [1] - 342:1
**attempting** [1] - 280:10
**attention** [1] - 292:16
**attitude** [1] - 317:5
**August** [2] - 313:2, 361:14
**authored** [1] - 264:8
**available** [13] - 266:14, 266:21, 284:6, 298:2, 298:5, 299:12, 299:22, 303:18, 304:1, 304:6, 304:7, 311:3, 365:5
**average** [18] - 270:5, 271:12, 271:17, 271:21, 277:15, 284:13, 284:18, 289:25, 342:14, 346:12, 347:4, 347:7, 347:11, 348:7, 350:14, 352:25, 355:5, 357:15
**aware** [21] - 266:22, 291:5, 310:12, 310:14, 311:6, 311:11, 313:24, 314:2, 315:5, 316:2, 316:6, 316:18, 316:20, 317:16, 317:19, 325:12,

328:3, 333:21, 335:19, 343:18
**awnings** [1] - 284:22

## B

**backfill** [1] - 327:19
**background** [1] - 263:22
**backtesting** [3] - 288:23, 289:3, 302:2
**bag** [9] - 279:14, 279:19, 281:19, 281:21, 295:20, 332:7, 332:9, 332:12
**bags** [13] - 279:11, 279:17, 280:2, 280:23, 280:25, 281:3, 281:7, 281:9, 281:12, 282:4, 290:21, 296:1, 332:16
**balls** [1] - 369:14
**BAR** [1] - 262:12
**barrier** [1] - 339:11
**barrier's** [1] - 339:20
**barriers** [4] - 295:15, 295:17, 315:6, 339:9
**based** [16] - 264:4, 266:10, 268:25, 272:15, 275:24, 277:25, 288:21, 300:16, 303:18, 304:12, 310:20, 322:10, 325:5, 325:12, 331:6, 342:1
**basing** [1] - 288:13
**basis** [3] - 359:10, 359:16, 360:8
**beat** [1] - 356:13
**became** [1] - 359:6
**become** [1] - 287:13
**before-tax** [2] - 359:15, 360:8
**begin** [2] - 272:3, 332:14
**begins** [1] - 349:15
**believes** [2] - 268:1, 282:5
**bell** [1] - 355:3
**bell-shaped** [1] - 355:3
**Berman** [2] - 314:3, 362:18
**Berry** [7] - 266:4, 280:6, 281:1, 282:4, 317:20, 317:21, 318:24
**BERRY** [1] - 261:9
**best** [8] - 266:14,

266:21, 267:12, 299:12, 301:21, 354:24, 355:20, 356:17
**best-case** [3] - 354:24, 355:20, 356:17
**better** [1] - 266:23
**between** [16] - 267:18, 270:24, 285:18, 292:1, 292:24, 310:3, 317:3, 322:14, 333:20, 338:11, 338:19, 343:24, 347:13, 354:18, 355:1, 366:16
**beyond** [2] - 294:4, 330:23
**big** [2] - 292:11, 365:19
**biggest** [1] - 367:10
**bin** [2] - 314:6, 314:19
**bins** [5] - 315:16, 320:19, 341:24, 356:16, 361:19
**bit** [4] - 265:7, 288:19, 326:23, 350:25
**BIXBY** [13] - 334:10, 344:13, 364:22, 365:3, 365:8, 365:15, 365:21, 366:4, 366:10, 366:15, 366:22, 368:8, 368:11
**Bixby** [1] - 261:21
**blame** [1] - 272:8
**blindly** [1] - 326:20
**bond** [1] - 353:24
**book** [5] - 264:25, 265:2, 265:5, 265:11, 265:16
**books** [1] - 346:25
**boom** [1] - 274:21
**bottom** [2] - 275:3, 281:5
**bought** [6] - 282:17, 283:20, 285:14, 311:13, 329:22, 334:1
**bound** [2] - 354:19
**BP** [6] - 274:21, 282:12, 282:13, 282:19
**Brealey** [3] - 345:23, 346:1, 346:24
**brief** [5] - 364:23, 365:10, 367:3, 367:7, 368:12
**briefing** [2] - 344:14, 364:24

**briefly** [3] - 263:21, 354:9, 363:7
**briefs** [1] - 365:10
**bright** [1] - 370:1
**bring** [2] - 279:20, 365:13
**brings** [1] - 271:7
**broad** [1] - 352:18
**brochures** [1] - 341:23
**brought** [2] - 265:20, 311:2
**build** [2] - 349:24, 353:17
**bunch** [1] - 300:16
**burn** [1] - 359:5
**burning** [1] - 359:24
**burns** [1] - 360:2
**business** [81] - 264:1, 264:7, 264:11, 264:22, 267:11, 267:22, 267:23, 268:2, 268:4, 268:7, 268:8, 268:10, 268:14, 268:15, 268:17, 268:21, 269:1, 269:4, 269:8, 269:9, 269:23, 269:25, 270:18, 271:10, 271:13, 272:1, 272:9, 272:11, 272:12, 272:13, 272:15, 272:17, 284:14, 286:3, 286:20, 286:22, 287:13, 288:9, 288:10, 288:14, 290:9, 301:3, 302:9, 302:17, 302:22, 328:15, 328:18, 328:22, 329:3, 329:9, 329:11, 329:16, 329:18, 329:21, 330:3, 330:4, 330:16, 331:20, 334:18, 335:10, 335:17, 335:22, 337:21, 339:25, 348:18, 348:23, 353:20, 355:19, 358:20, 359:4, 359:11, 359:20, 359:21, 359:22, 360:6, 362:25
**businesses** [1] - 354:5
**businessman** [1] - 312:20
**buy** [15] - 279:14,

279:20, 280:16, 280:18, 285:10, 285:11, 295:7, 296:11, 296:19, 296:20, 314:14, 318:5, 319:3, 327:21
**buying** [21] - 279:24, 280:8, 280:12, 280:14, 282:3, 282:9, 282:13, 282:18, 282:22, 283:17, 295:24, 295:25, 296:8, 317:11, 318:17, 325:11, 326:4, 326:10, 332:11, 332:14
**BY** [8] - 263:20, 266:3, 297:9, 334:16, 338:17, 343:4, 345:3, 345:10

# C

**calculate** [9] - 268:3, 271:18, 276:24, 278:20, 350:5, 350:12, 350:18, 355:12, 360:5
**calculated** [7] - 268:8, 271:12, 271:17, 277:25, 284:15, 351:7, 360:17
**calculating** [4] - 284:12, 284:14, 323:16, 352:14
**calculation** [60] - 267:15, 268:12, 268:18, 268:19, 268:23, 268:24, 269:3, 269:5, 270:15, 270:17, 270:19, 270:21, 270:23, 271:2, 271:10, 271:11, 271:23, 272:17, 272:18, 273:2, 273:8, 273:21, 274:25, 275:4, 278:11, 282:5, 286:21, 286:24, 287:1, 287:19, 287:25, 288:6, 290:8, 290:9, 293:20, 296:21, 298:11, 298:23, 300:10, 300:15, 306:7, 306:24, 307:3, 307:16, 307:25, 308:8, 308:18, 327:19,

329:19, 329:20, 329:23, 335:17, 336:9, 338:1, 338:25, 341:8, 348:18, 350:9, 350:25
**calculations** [15] - 267:13, 267:16, 287:22, 298:6, 300:7, 300:24, 305:4, 306:19, 307:12, 308:9, 310:4, 317:1, 339:2, 348:14, 350:21
**canceled** [2] - 311:9, 311:16
**cannot** [1] - 356:11
**canvas** [1] - 284:22
**capacity** [9] - 275:23, 276:3, 276:7, 276:11, 276:22, 276:25, 277:3, 277:4, 351:20
**capital** [9] - 269:14, 271:13, 271:17, 271:22, 284:13, 284:18, 285:10, 346:12
**capitalization** [1] - 286:1
**capture** [2] - 321:2, 350:1
**captured** [3] - 270:13, 286:23, 287:15
**capturing** [2] - 270:14, 341:15
**carry** [1] - 305:1
**case** [47] - 264:22, 266:5, 267:4, 267:25, 268:2, 277:6, 278:15, 283:6, 283:11, 284:3, 291:1, 298:6, 299:1, 299:9, 299:18, 299:22, 299:24, 299:25, 301:3, 301:6, 301:19, 302:8, 303:5, 303:11, 303:24, 305:3, 305:7, 305:14, 306:17, 307:8, 307:10, 310:4, 312:21, 321:13, 323:1, 326:15, 339:13, 346:22, 354:24, 354:25, 355:20, 355:21, 356:4, 356:17, 356:18, 356:20,

368:14
**cases** [4] - 266:22, 298:12, 302:4, 302:21
**cash** [11] - 268:11, 268:13, 269:13, 269:15, 269:18, 300:11, 300:13, 307:21, 359:13, 359:16
**catalyst** [46] - 279:24, 303:10, 303:14, 310:20, 314:3, 314:14, 316:4, 316:10, 317:14, 317:17, 317:22, 320:9, 320:12, 320:17, 321:14, 322:11, 325:5, 325:12, 327:15, 327:20, 328:22, 328:25, 329:5, 330:8, 334:23, 334:24, 335:3, 335:6, 335:19, 335:21, 336:1, 343:6, 343:7, 343:8, 343:10, 343:20, 343:25, 361:1, 361:4, 361:5, 361:24, 362:1, 362:19, 363:14, 363:17
**catalysts** [1] - 343:12
**categories** [2] - 333:1, 352:19
**causation** [3] - 272:8, 290:4, 290:18
**caused** [4] - 290:21, 290:24, 313:9, 317:11
**causes** [4] - 304:23, 304:24, 305:25, 306:5
**causing** [1] - 346:4
**census** [1] - 348:19
**certain** [7] - 267:13, 277:2, 283:23, 300:18, 300:20, 333:1, 357:6
**certainly** [10] - 295:16, 299:20, 303:21, 304:6, 309:5, 315:19, 339:22, 340:22, 341:13, 342:4
**certainty** [4] - 266:12, 266:13, 266:15, 266:20
**certify** [1] - 370:10

**cetera** [1] - 353:15
**CHAMBERS** [1] - 262:14
**chance** [11] - 325:18, 326:14, 347:22, 347:23, 351:10, 351:11, 351:15, 354:11, 354:19, 367:13
**change** [5] - 320:13, 352:5, 352:6, 352:7
**changed** [2] - 353:1, 357:21
**changes** [1] - 340:16
**chapter** [1] - 265:10
**characterization** [2] - 309:25, 353:8
**characterize** [2] - 338:14, 340:14
**charge** [2] - 263:23, 263:25
**charging** [1] - 294:7
**chart** [1] - 321:5
**check** [1] - 342:21
**checking** [1] - 302:2
**CHEP** [18] - 281:15, 281:16, 281:23, 282:7, 294:17, 294:21, 295:1, 295:16, 306:2, 314:6, 315:10, 318:22, 319:9, 320:19, 353:9, 353:11
**CHEP's** [1] - 341:17
**Chevy** [2] - 362:11, 362:12
**Chief** [1] - 261:16
**choose** [2] - 285:24, 350:15
**choosing** [2] - 325:17, 326:13
**chosen** [1] - 351:1
**circumstance** [1] - 338:23
**circumstances** [2] - 267:14, 283:22
**cited** [2] - 281:13, 345:24
**CIVIL** [1] - 261:4
**civil** [1] - 360:4
**claim** [7] - 269:10, 269:11, 269:12, 297:24, 304:9, 359:12, 367:18
**claiming** [2] - 268:21, 268:23
**clarified** [2] - 280:23, 281:15
**clarify** [1] - 313:5

**clear** [3] - 286:15, 295:17, 324:4
**clearly** [2] - 287:14, 296:20
**CLERK** [2] - 263:8, 263:13
**client** [2] - 283:5, 283:6
**close** [1] - 356:20
**closer** [1] - 355:2
**closure** [1] - 326:7
**code** [5] - 285:20, 332:22, 332:25, 333:5, 333:9
**codes** [1] - 285:21
**cogent** [1] - 286:16
**collect** [1] - 360:9
**collecting** [1] - 273:14
**collects** [1] - 359:12
**combination** [1] - 354:14
**coming** [2] - 325:24, 336:6
**commented** [2] - 324:3, 340:24
**comments** [1] - 339:2
**commercial** [2] - 264:3, 264:9
**common** [4] - 268:11, 281:13, 303:19, 304:13
**companies** [18] - 284:20, 284:21, 285:10, 285:11, 285:18, 296:19, 310:9, 310:25, 323:14, 332:20, 332:21, 332:23, 333:5, 333:7, 333:10, 333:15, 361:1
**company** [53] - 267:23, 268:20, 270:8, 271:8, 271:18, 271:20, 271:24, 272:3, 273:4, 274:10, 274:14, 274:18, 275:23, 276:3, 276:6, 284:24, 285:5, 286:4, 287:5, 287:10, 287:15, 288:1, 289:4, 289:16, 290:13, 295:7, 295:17, 301:8, 301:11, 301:20, 301:24, 302:5, 302:8, 302:15, 305:1, 307:17, 310:9,

312:21, 322:17, 323:10, 324:13, 330:6, 333:1, 337:6, 337:7, 337:11, 337:14, 337:17, 337:20, 337:24, 339:22, 339:25
**company's** [6] - 269:22, 277:10, 294:10, 337:20, 346:12, 363:1
**companywide** [3] - 321:4, 321:7, 321:11
**comparable** [2] - 333:5, 333:7
**compare** [7] - 267:17, 269:2, 277:18, 287:6, 345:20, 347:2, 349:6
**compared** [3] - 287:16, 321:25, 361:17
**comparing** [2] - 273:5, 345:13
**compete** [1] - 294:22
**competent** [2] - 299:3, 355:19
**competing** [1] - 361:18
**competition** [6] - 320:4, 320:5, 341:17, 342:3, 353:3, 362:23
**competitive** [2] - 320:11, 320:21
**competitor** [7] - 281:17, 294:17, 294:18, 306:3, 316:3, 341:20, 353:8
**competitors** [1] - 320:16
**complained** [3] - 281:4, 281:22, 341:20
**complaint** [1] - 331:15
**complete** [11] - 267:10, 267:22, 268:1, 270:15, 287:21, 328:14, 329:2, 329:25, 331:19, 335:14, 358:19
**completely** [7] - 276:13, 282:23, 290:16, 296:18, 329:7, 330:4, 335:16
**complication** [1] - 367:7
**computation** [1] - 352:17

**compute** [1] - 355:5
**computer** [4] - 261:25, 350:11, 350:23, 350:25
**concern** [5] - 291:11, 319:14, 319:16, 365:24, 367:19
**concerned** [1] - 315:20
**concerning** [1] - 349:7
**concerns** [1] - 281:3
**concludes** [1] - 306:21
**conclusion** [3] - 317:12, 335:17, 348:8
**conclusions** [1] - 299:4
**conducting** [1] - 277:8
**CONFERENCES** [2] - 262:12, 262:14
**conferences** [1] - 369:11
**confidence** [8] - 347:8, 347:13, 347:18, 347:19, 348:1, 348:5, 348:6, 348:15
**confident** [1] - 347:20
**conservative** [5] - 275:1, 275:3, 275:5, 275:18, 294:8
**consider** [14] - 271:4, 290:10, 294:24, 296:15, 304:6, 305:17, 305:19, 305:23, 305:25, 306:10, 306:12, 309:5, 314:10, 351:14
**consideration** [7] - 269:13, 290:14, 291:6, 310:7, 310:11, 322:21, 323:12
**considered** [14] - 304:1, 304:5, 306:2, 306:9, 307:7, 307:14, 307:20, 308:1, 313:20, 331:22, 332:1, 332:17, 332:18, 333:15
**considering** [1] - 320:5
**consistent** [3] - 271:14, 334:5, 334:6
**constraints** [1] - 275:23
**construction** [1] -

330:2
**contact** [1] - 293:14
**contacting** [2] - 280:9, 341:22
**container** [16] - 310:20, 310:23, 314:5, 314:14, 316:4, 317:14, 317:18, 317:22, 321:14, 323:20, 325:5, 325:13, 328:22, 362:2, 362:25, 363:3
**containers** [15] - 314:17, 314:21, 315:15, 316:11, 320:9, 320:13, 320:17, 327:20, 328:25, 329:5, 330:8, 343:6, 343:20, 343:22, 351:22
**contested** [1] - 309:22
**context** [1] - 265:7
**continually** [2] - 340:15, 340:17
**continue** [6] - 283:24, 289:6, 294:10, 312:4, 356:15, 359:19
**continuing** [1] - 328:25
**continuous** [1] - 354:17
**contract** [3] - 322:14, 322:19, 324:13
**conversations** [1] - 309:14
**convicted** [1] - 360:3
**copied** [1] - 358:5
**corporate** [2] - 345:23, 345:25
**corporation** [1] - 360:7, 360:8, 360:9
**CORPORATION** [1] - 261:9
**corporations** [1] - 346:1
**correct** [51] - 267:1, 276:16, 282:5, 285:20, 290:22, 297:15, 298:16, 300:7, 301:3, 303:3, 304:17, 308:5, 308:9, 308:10, 308:25, 310:17, 310:21, 313:2, 313:7, 313:11, 313:22, 315:11, 316:11, 316:15,

317:14, 318:2, 318:7, 319:19, 321:9, 321:14, 323:25, 324:10, 325:14, 326:18, 328:23, 329:5, 329:9, 330:3, 330:8, 330:12, 332:3, 332:23, 334:3, 336:12, 337:12, 338:6, 339:17, 364:6, 364:14, 369:9, 370:11
**correspondence** [2] - 291:11, 293:13
**cost** [23] - 271:12, 271:17, 271:21, 284:13, 284:18, 287:3, 287:5, 321:7, 321:16, 321:17, 322:3, 323:21, 343:18, 346:12, 352:7, 355:9, 356:15, 357:6, 357:10, 357:15, 357:17, 362:5, 362:13
**costs** [36] - 269:6, 269:7, 269:8, 275:7, 275:12, 275:13, 277:4, 277:12, 277:15, 277:17, 277:19, 277:22, 278:1, 287:3, 287:9, 287:10, 287:12, 287:15, 321:4, 321:11, 321:19, 342:5, 342:15, 342:16, 342:18, 343:16, 343:17, 348:4, 349:9, 350:17, 355:8, 357:10
**Cougar** [19] - 279:11, 295:3, 295:20, 295:25, 317:22, 321:14, 322:11, 323:20, 332:7, 332:9, 334:18, 334:20, 334:23, 334:24, 335:13, 341:25, 342:6, 343:20, 361:12
**Cougars** [12] - 280:5, 335:3, 335:7, 335:8, 335:20, 336:1, 338:4, 338:5, 343:12, 352:20, 357:21, 363:19

**counsel** [2] - 299:17, 369:24
**counterpoint** [1] - 369:19
**countervailing** [1] - 310:12
**country** [1] - 264:13
**couple** [4] - 265:18, 281:2, 283:12, 284:19
**course** [6] - 277:13, 278:24, 298:15, 302:6, 331:16, 345:6
**court** [2] - 263:1, 266:19
**COURT** [41] - 261:1, 263:2, 263:5, 263:18, 297:6, 334:9, 334:11, 338:16, 343:1, 344:9, 344:11, 344:18, 344:21, 344:25, 363:6, 363:8, 364:18, 364:20, 365:1, 365:4, 365:12, 365:19, 365:24, 366:2, 366:8, 366:14, 366:18, 367:1, 367:6, 367:17, 368:2, 368:9, 368:14, 368:17, 368:24, 369:6, 369:10, 369:21, 369:24, 370:3, 370:6
**Court** [12] - 261:17, 261:23, 263:22, 266:4, 267:6, 267:19, 286:5, 348:11, 370:6, 370:9, 370:10, 370:15
**Courthouse** [1] - 261:17
**courts** [2] - 266:19, 266:20
**covers** [1] - 288:19
**Cowan** [14] - 324:5, 345:6, 345:13, 347:15, 348:16, 349:13, 350:7, 351:25, 352:13, 353:2, 353:25, 356:2, 356:8, 357:5
**Cowan's** [3] - 345:10, 351:4, 358:3
**creating** [1] - 316:7
**credentials** [1] - 264:7
**credibility** [2] -

331:23, 361:8
**credit** [1] - 369:2
**CRI** [61] - 268:2, 272:1, 272:14, 272:21, 278:16, 278:17, 279:11, 279:19, 279:25, 280:1, 280:13, 280:15, 282:23, 289:5, 289:8, 289:16, 291:8, 291:12, 291:16, 291:19, 291:24, 292:1, 292:15, 292:25, 293:2, 293:6, 293:10, 293:13, 293:22, 293:25, 294:7, 294:11, 305:20, 312:5, 316:20, 316:22, 317:3, 319:21, 329:3, 329:5, 329:21, 331:15, 331:16, 331:17, 331:22, 332:6, 332:12, 332:14, 332:16, 333:20, 333:21, 335:3, 338:5, 360:21, 360:25, 361:3, 361:5, 364:5, 364:8
**CRI/Criterion** [3] - 334:19, 363:14, 364:1
**Criterion** [26] - 308:25, 309:20, 309:22, 310:3, 310:19, 310:21, 311:3, 311:12, 312:1, 312:25, 313:21, 313:25, 314:13, 319:11, 322:15, 323:1, 329:5, 343:13, 351:23, 352:19, 358:10, 361:7, 361:14, 361:23, 363:17
**Criterion's** [1] - 310:24
**criticism** [1] - 358:16
**criticisms** [1] - 304:21
**criticize** [1] - 326:13
**criticized** [1] - 356:2
**Cross** [1] - 262:2
**cross** [4] - 297:6, 298:7, 340:11, 363:6
**CROSS** [1] - 297:8, 363:9
**cross-examination** [2]

- 297:6, 363:6
**curve** [1] - 355:4
**custom** [1] - 333:23
**customer** [19] - 280:22, 280:25, 281:10, 283:23, 284:5, 288:3, 291:12, 297:1, 297:2, 310:16, 326:15, 329:4, 329:8, 329:22, 329:25, 330:1, 335:15, 359:3, 359:5
**customer's** [1] - 295:6
**customers** [25] - 281:3, 281:24, 282:3, 282:9, 282:10, 285:22, 285:23, 288:4, 292:5, 293:6, 295:24, 295:25, 304:20, 309:15, 311:22, 313:22, 314:1, 314:17, 315:13, 319:3, 326:3, 326:4, 330:10, 335:13, 341:22
**customized** [1] - 310:23
**cut** [1] - 359:7

# D

**daily** [1] - 351:15
**damage** [46] - 264:3, 267:13, 267:15, 275:4, 282:5, 297:19, 297:24, 298:1, 298:4, 298:6, 298:13, 298:20, 298:24, 299:3, 299:8, 299:13, 299:16, 300:2, 300:6, 300:22, 300:23, 301:1, 302:20, 303:2, 303:6, 303:9, 303:16, 305:3, 306:16, 306:19, 306:21, 306:22, 306:24, 307:12, 308:7, 308:8, 308:9, 310:4, 314:9, 314:24, 315:19, 317:1, 320:2, 327:10
**Damages** [1] - 262:8
**damages** [21] - 264:9, 264:12, 264:17, 264:20, 264:22,

265:10, 268:3, 273:10, 305:2, 307:8, 309:10, 322:18, 323:16, 324:14, 331:1, 331:2, 331:6, 336:3, 339:13, 348:13, 358:23
**damaging** [1] - 304:3
**data** [25] - 266:18, 272:23, 276:23, 284:19, 285:13, 288:15, 307:11, 308:17, 309:2, 309:4, 345:15, 345:18, 345:20, 347:2, 348:17, 348:19, 348:20, 348:21, 349:3, 349:4, 349:6, 349:7, 349:11, 349:12
**database** [4] - 284:12, 285:7, 285:16, 332:19
**Dated** [1] - 370:13
**days** [4] - 365:2, 366:17, 366:20, 367:4
**deadlines** [2] - 291:14, 291:15
**deal** [3] - 289:22, 333:4, 363:2
**dealing** [4] - 292:5, 298:18, 309:15, 348:20
**deals** [1] - 355:18
**dealt** [1] - 285:22
**debt** [1] - 271:20
**decide** [3] - 319:17, 346:16
**decimal** [2] - 351:9, 351:12
**decision** [6] - 265:14, 295:6, 340:3, 346:13, 346:21, 348:24
**decreasing** [1] - 331:2
**deduct** [1] - 269:9
**deducted** [1] - 269:6
**defective** [1] - 290:21
**defendant** [3] - 274:7, 282:6, 282:7
**defendant's** [1] - 367:7
**Defendants** [2] - 261:10, 261:21
**define** [2] - 266:13, 266:14
**definitely** [2] - 290:5, 317:2

**degree** [3] - 264:6, 266:12, 309:8
**delivering** [1] - 361:24
**demonstrate** [1] - 288:1
**demonstrates** [1] - 329:20
**Dennis** [3] - 261:23, 370:9, 370:14
**Department** [11] - 292:3, 292:7, 292:10, 292:13, 292:17, 292:21, 311:21, 316:13, 316:16, 316:18, 316:21
**deposition** [17] - 276:12, 281:11, 281:15, 282:1, 291:18, 294:19, 306:10, 307:13, 315:6, 318:15, 319:10, 319:24, 338:10, 338:15, 339:5, 344:5
**depositions** [2] - 318:1, 325:22
**describe** [3] - 263:22, 267:6, 341:17
**described** [3] - 279:10, 341:19, 358:19
**Description** [1] - 262:6
**design** [2] - 314:25, 339:6
**despite** [1] - 294:20
**destroyed** [3] - 269:24, 359:3, 359:21
**destruction** [23] - 267:10, 267:22, 268:1, 272:13, 286:22, 288:13, 328:14, 328:22, 329:2, 329:8, 329:11, 329:15, 329:17, 329:25, 330:1, 330:2, 331:19, 334:17, 335:9, 335:10, 335:14, 335:22, 358:19
**detail** [1] - 308:3
**detailed** [1] - 337:19
**determination** [3] - 296:22, 308:16, 358:22
**determine** [14] - 271:21, 272:20,

272:24, 278:18, 283:8, 299:10, 302:13, 310:2, 314:25, 332:23, 340:22, 342:13, 346:3, 349:14
**determined** [6] - 269:24, 271:13, 271:19, 271:23, 271:25, 300:19
**determining** [3] - 278:19, 286:17, 286:18
**deterministic** [2] - 278:17, 350:12
**develop** [1] - 310:20
**developed** [2] - 295:11, 361:12
**deviation** [2] - 347:7, 355:5
**difference** [5] - 267:18, 270:24, 338:11, 338:19, 343:25
**different** [25] - 276:8, 276:14, 277:15, 282:6, 282:7, 298:25, 299:4, 315:10, 315:11, 315:14, 317:12, 317:24, 321:19, 334:19, 338:3, 338:4, 338:8, 343:9, 343:17, 343:19, 343:23, 350:5, 352:7, 357:20
**dinosaurs** [1] - 351:17
**Direct** [1] - 262:2
**DIRECT** [2] - 263:19, 345:2
**direct** [1] - 269:6
**directed** [2] - 290:3, 358:12
**disagree** [7] - 298:1, 298:5, 298:8, 331:12, 333:12, 333:16, 369:7
**disagreed** [1] - 298:13
**discount** [13] - 286:1, 298:25, 308:15, 309:6, 309:9, 346:6, 346:11, 353:16, 353:19, 353:22, 356:19, 356:21
**discounted** [5] - 268:11, 300:11, 300:13, 307:21, 359:8
**discovered** [1] - 324:20

**discrete** [4] - 354:8, 354:10, 354:15, 355:24
**discussed** [3] - 296:2, 312:25, 337:10
**discussing** [3] - 292:12, 292:15, 342:5
**discussions** [1] - 293:9
**dispute** [2] - 320:1, 320:2
**disputes** [2] - 299:8, 299:14
**distribute** [1] - 360:10
**distributed** [2] - 355:12, 355:24
**distribution** [22] - 354:1, 354:2, 354:7, 354:8, 354:10, 354:16, 354:18, 354:20, 354:21, 354:22, 354:25, 355:3, 355:4, 355:7, 355:12, 355:17, 355:25, 356:1, 356:3, 357:4
**distributions** [8] - 352:10, 352:12, 354:4, 354:6, 354:17, 355:7, 355:15, 356:3
**DISTRICT** [2] - 261:1, 261:2
**District** [4] - 261:16, 261:17, 370:10
**divide** [1] - 347:11
**division** [1] - 359:4
**Docket** [1] - 261:5
**document** [3] - 273:25, 292:12, 296:6
**documentary** [2] - 302:11, 305:21
**documentation** [1] - 324:10
**documented** [2] - 280:12, 291:22
**documenting** [1] - 291:11
**documents** [14] - 265:19, 265:23, 274:9, 277:6, 292:21, 292:23, 305:7, 305:8, 305:10, 305:13, 305:14, 305:15, 340:7, 344:4
**dollar** [5] - 347:5, 347:18, 348:2,

348:4, 348:9
**dollars** [6] - 271:25, 274:20, 294:6, 312:18, 352:23, 360:16
**done** [18] - 267:16, 267:17, 268:23, 270:21, 273:4, 273:19, 305:3, 309:12, 310:6, 328:17, 346:22, 350:7, 350:12, 350:20, 357:24, 358:23, 359:19, 359:20
**doors** [1] - 341:23
**DOT** [5] - 316:25, 340:2, 340:5, 344:3, 344:5
**double** [3] - 351:22, 357:22, 359:15
**doubling** [1] - 313:1
**doubt** [1] - 301:23
**down** [9] - 268:5, 302:15, 330:25, 344:12, 350:13, 359:5, 359:24, 360:2, 364:20
**Dr** [3] - 351:25, 353:2, 358:3
**dropped** [2] - 356:22, 364:11
**due** [1] - 367:7
**DUNITZ** [27] - 263:4, 263:6, 263:20, 265:25, 266:3, 297:5, 334:12, 334:16, 338:17, 342:25, 344:10, 363:7, 363:10, 364:17, 365:16, 366:1, 366:12, 366:24, 367:5, 367:22, 368:16, 368:23, 369:5, 369:9, 369:20, 370:2, 370:5
**Dunitz** [4] - 261:21, 344:9, 363:12, 367:18
**during** [5] - 311:5, 316:6, 330:20, 330:21, 361:15

---

# E

**e-mail** [5] - 291:10, 292:14, 305:13, 309:21, 309:22
**e-mails** [5] - 291:14,

291:22, 292:1, 293:4, 293:9
**early** [2] - 309:11, 311:16
**earn** [2] - 339:20, 339:23
**earnings** [1] - 269:13
**earth** [2] - 351:11, 351:16
**Economic** [1] - 262:8
**economic** [5] - 266:12, 294:12, 294:13, 314:5, 314:11
**economical** [1] - 312:7
**economically** [2] - 295:3, 295:5
**economics** [4] - 312:19, 313:9, 362:6, 362:7
**editor** [1] - 264:10
**Edward** [1] - 261:17
**effect** [2] - 308:17, 309:3
**effective** [3] - 333:6, 368:22
**effects** [1] - 320:14
**effort** [2] - 279:9, 279:10
**eight** [1] - 341:6
**either** [11] - 272:17, 273:6, 274:7, 286:19, 288:2, 291:5, 304:25, 307:20, 329:20, 336:14, 356:14
**elsewhere** [1] - 295:13
**emphasize** [1] - 302:20
**employ** [1] - 268:10
**employees** [2] - 325:21, 328:3
**End** [1] - 370:7
**end** [5] - 292:24, 349:18, 365:5, 366:4, 367:21
**ended** [2] - 293:2, 359:6
**endorse** [1] - 264:25
**engaged** [3] - 266:5, 266:6, 341:21
**engaging** [1] - 300:9
**enjoy** [1] - 362:17
**enormous** [2] - 362:7, 362:13
**enter** [1] - 365:10
**entering** [1] - 362:23
**entire** [5] - 264:4, 272:3, 285:16,

360:13, 365:18
**entirely** [1] - 272:9
**entitled** [2] - 261:15, 370:12
**entity** [1] - 301:21
**entry** [4] - 295:15, 295:17, 315:6, 339:9
**environment** [2] - 320:12, 320:21
**equal** [1] - 354:19
**equals** [1] - 298:19
**equity** [3] - 271:20, 271:24, 284:17
**errata** [1] - 276:13
**error** [3] - 347:6, 347:9, 347:11
**Esquire** [3] - 261:20, 261:21, 261:21
**establish** [2] - 288:15, 329:14
**established** [1] - 333:2
**estimate** [1] - 346:5
**estimates** [1] - 346:3
**et** [2] - 261:9, 353:15
**evaluate** [1] - 313:9
**evaluated** [1] - 312:6
**eventually** [3] - 288:4, 294:11, 336:6
**everyday** [1] - 353:20
**evidence** [45] - 273:14, 274:2, 275:24, 277:5, 277:13, 280:3, 280:7, 284:4, 291:1, 292:1, 296:14, 297:24, 297:25, 298:2, 298:6, 298:14, 299:11, 299:21, 300:21, 300:25, 301:5, 301:15, 301:19, 302:2, 302:10, 302:11, 302:13, 303:18, 303:23, 304:1, 304:6, 304:8, 304:11, 305:16, 305:21, 308:22, 310:13, 315:24, 316:24, 320:3, 338:18, 340:4, 350:4, 358:10, 364:10
**evolving** [2] - 340:15, 340:18
**exactly** [5] - 307:22, 313:16, 329:13, 331:19, 346:22
**examination** [3] - 297:6, 337:19, 363:6

**EXAMINATION** [6] - 263:19, 297:8, 334:15, 343:3, 345:2, 363:9

**example** [8] - 291:7, 298:24, 301:7, 303:5, 303:13, 305:13, 307:5, 320:16

**examples** [2] - 346:23, 346:24

**exceeded** [1] - 283:2

**exceptional** [1] - 362:21

**excluded** [1] - 264:23

**excuse** [1] - 312:12

**exercise** [2] - 298:16, 300:12

**exhibit** [3] - 271:16, 327:5, 327:7

**Exhibit** [4] - 327:4, 327:10, 327:12, 327:17

**Exhibits** [1] - 347:4

**exhibits** [1] - 265:24

**exist** [1] - 309:10

**existed** [2] - 305:22, 306:2

**expect** [4] - 273:7, 303:13, 312:20, 342:2

**expectation** [1] - 349:20

**expected** [8] - 267:24, 315:19, 331:6, 337:6, 337:7, 360:19, 361:21, 364:9

**expenditure** [1] - 269:14

**expenses** [1] - 286:23

**experience** [3] - 303:19, 304:13, 363:2

**expert** [32] - 264:17, 264:20, 267:21, 272:24, 283:4, 283:22, 290:3, 299:13, 300:2, 300:6, 300:23, 301:1, 303:2, 303:6, 303:7, 303:10, 303:14, 303:16, 306:16, 306:21, 306:22, 308:8, 314:4, 314:9, 314:24, 315:19, 320:2, 327:10, 362:19, 369:8

**expert's** [1] - 303:19

**expertise** [1] - 362:22

**experts** [14] - 266:17, 272:5, 273:13, 297:19, 298:1, 298:4, 298:13, 298:21, 298:24, 299:3, 299:8, 299:17, 303:3, 335:25

**explain** [9] - 267:12, 267:18, 273:1, 285:17, 286:5, 354:2, 354:9, 359:1, 361:10

**explained** [1] - 319:23

**explaining** [3] - 267:13, 319:5, 319:9

**explanation** [1] - 319:6

**express** [1] - 267:9

**expressed** [2] - 266:11, 281:3

**extended** [2] - 283:24, 291:9

**extent** [1] - 297:13

**external** [1] - 353:3

**extra** [1] - 366:5

**extremely** [1] - 341:19

**eye** [1] - 302:24

# F

**F-A-N-N-O-N** [1] - 263:17

**faced** [1] - 283:5

**faces** [1] - 353:21

**facilitate** [2] - 352:17

**facilities** [1] - 280:6

**facility** [3] - 277:9, 279:19, 280:5

**fact** [49] - 265:1, 268:22, 269:7, 269:16, 270:3, 271:15, 273:22, 274:10, 274:21, 275:15, 277:20, 279:12, 281:4, 281:20, 282:12, 289:9, 289:10, 291:8, 293:12, 294:9, 295:19, 296:12, 297:18, 300:6, 302:7, 305:22, 306:2, 310:7, 312:3, 313:3, 314:12, 316:10, 316:24, 317:4, 317:21, 321:16, 322:13, 326:14, 332:25, 334:1,

335:7, 340:6, 342:6, 343:21, 345:22, 361:25, 369:12, 369:13

**factor** [5] - 308:9, 331:22, 353:13, 362:3, 362:4

**factoring** [1] - 322:4

**factors** [4] - 332:1, 332:17, 353:3, 362:4

**facts** [8] - 290:17, 299:21, 299:25, 300:5, 301:5, 349:11, 349:12

**factual** [6] - 299:8, 299:14, 320:1, 320:2, 335:25, 336:1

**failed** [3] - 303:7, 317:17, 331:18

**failure** [23] - 296:15, 310:17, 311:7, 311:12, 312:9, 313:13, 316:3, 316:15, 318:11, 318:16, 318:17, 318:18, 319:1, 319:19, 320:13, 320:14, 320:22, 323:3, 324:18, 324:25, 325:25, 326:18, 331:24

**fairly** [1] - 321:19

**fall** [4] - 291:13, 293:24, 316:17, 325:13

**falls** [1] - 347:21

**Fannon** [15] - 262:3, 263:7, 263:16, 263:21, 266:4, 272:4, 274:24, 284:8, 297:11, 306:16, 334:17, 343:5, 358:18, 360:11, 361:6

**far** [3] - 292:8, 317:22, 340:17

**faulty** [2] - 280:22, 318:21

**Federal** [1] - 261:17

**felt** [5] - 295:14, 315:7, 319:1, 325:18, 325:23

**few** [5] - 280:14, 291:23, 311:19, 319:13, 319:14

**figure** [3] - 285:13, 326:22, 355:10

**figures** [1] - 275:12

**file** [7] - 358:5, 365:6, 365:9, 366:3, 368:3,

368:4, 368:5

**files** [2] - 357:6, 357:10

**Filler** [66] - 262:4, 265:8, 266:7, 267:9, 267:17, 267:25, 268:22, 269:3, 269:17, 270:20, 272:19, 274:25, 275:19, 277:14, 277:19, 279:22, 282:1, 283:12, 284:11, 291:5, 294:1, 294:7, 294:14, 294:20, 295:2, 297:13, 301:8, 303:13, 304:22, 305:16, 305:18, 307:7, 307:13, 311:25, 312:18, 313:20, 317:9, 320:5, 320:7, 321:16, 323:2, 323:19, 325:17, 326:13, 327:10, 327:24, 328:9, 328:17, 329:1, 329:6, 329:10, 330:18, 332:15, 332:22, 335:2, 335:18, 336:14, 337:24, 338:10, 338:18, 339:4, 344:17, 344:22, 344:24, 345:4, 363:11

**Filler's** [20] - 264:25, 265:22, 266:25, 277:24, 278:10, 278:14, 279:2, 282:15, 282:25, 284:9, 286:5, 286:17, 288:12, 303:24, 304:10, 305:9, 321:22, 331:21, 339:12, 341:8

**finance** [3] - 300:14, 345:23, 345:25

**financial** [4] - 274:9, 277:21, 302:18, 337:20

**fine** [2] - 365:3, 367:23

**finish** [1] - 331:13

**fire** [2] - 281:8, 281:20

**fires** [6] - 280:19, 280:20, 280:21, 296:2, 317:19, 318:21

**firm** [3] - 263:24,

368:4, 368:5

**first** [28] - 263:14, 265:1, 266:15, 267:8, 267:21, 273:1, 284:13, 284:20, 287:3, 304:4, 306:16, 309:20, 330:21, 330:22, 332:4, 341:5, 345:13, 345:22, 349:15, 349:21, 351:6, 358:3, 360:12, 365:5, 365:8, 365:17, 366:4, 366:16

**fit** [3] - 300:21, 300:25, 315:24

**five** [6] - 353:23, 356:18, 356:21, 362:10, 366:18, 367:3

**fixed** [7] - 269:7, 285:5, 285:11, 285:12, 287:3, 287:9, 287:12

**floor** [2] - 276:17, 351:20

**flow** [18] - 268:12, 268:13, 269:13, 269:15, 269:18, 300:11, 300:13, 307:21, 314:6, 314:19, 315:16, 320:19, 341:24, 356:16, 359:13, 359:16, 361:19

**foil** [12] - 310:20, 317:18, 321:13, 322:10, 322:11, 323:20, 325:5, 325:12, 342:6, 357:22, 361:16, 361:20

**follow** [1] - 328:8

**follow-up** [1] - 328:8

**following** [1] - 313:13

**follows** [1] - 261:18

**Ford** [4] - 261:23, 362:12, 370:9, 370:14

**forecast** [29] - 268:12, 269:21, 270:24, 274:18, 274:23, 283:9, 289:15, 290:6, 290:7, 290:8, 290:10, 290:11, 290:16, 290:24, 291:2, 291:4, 293:19, 304:25,

264:4, 365:19

307:22, 307:23,
307:24, 308:14,
323:2, 323:10,
337:5, 341:5, 341:6,
349:6, 350:3
**forecasted** [2] -
274:19, 336:7
**forecasting** [7] -
269:20, 270:6,
274:16, 276:4,
287:12, 287:14,
287:16
**forecasts** [10] - 272:5,
273:14, 274:11,
274:14, 274:17,
283:7, 322:23,
323:15, 330:22,
330:23
**foregoing** [1] - 370:11
**forever** [2] - 297:2,
329:25
**forklift** [1] - 281:6
**form** [3] - 284:1,
294:17, 296:13
**forth** [4] - 293:10,
302:12, 337:21,
341:23
**forthcoming** [1] -
344:4
**Fortune** [1] - 301:8
**forward** [1] - 273:7
**four** [9] - 270:4,
298:19, 320:9,
331:5, 341:9,
341:11, 341:16,
354:6, 366:10
**fourth** [2] - 355:3,
355:9
**free** [1] - 353:23
**frequently** [1] - 264:12
**fresh** [17] - 334:24,
335:2, 335:6,
335:19, 335:21,
336:1, 343:7,
343:10, 343:11,
343:25, 361:1,
361:3, 361:5,
361:24, 362:1,
363:14, 363:17
**Friday** [1] - 366:9
**full** [3] - 287:5, 311:8,
365:2
**fundamental** [1] -
355:18
**fuse** [3] - 291:19,
291:21, 310:8
**future** [4] - 302:23,
304:16, 304:19,
360:17

## G

**gather** [3] - 297:24,
302:10, 302:11
**gathered** [1] - 297:25
**gathering** [1] - 274:1
**general** [4] - 266:20,
323:9, 357:11,
357:12
**generally** [4] - 267:16,
267:20, 307:2, 355:1
**generated** [1] - 349:17
**Gignoux** [1] - 261:17
**given** [5] - 281:2,
299:24, 316:21,
334:1, 364:3
**God** [1] - 263:11
**golf** [1] - 369:14
**goods** [2] - 287:4,
287:5
**great** [4] - 279:9,
301:24, 333:3, 363:2
**greater** [3] - 270:7,
347:24, 361:21
**grounded** [1] - 278:8
**group** [1] - 283:19
**grow** [3] - 275:12,
275:13, 275:14
**grown** [2] - 275:7,
275:8
**guess** [2] - 283:9,
346:6
**guessing** [1] - 349:10
**guide** [1] - 266:16

## H

**half** [8] - 271:24,
289:19, 311:5,
313:6, 339:15,
347:22, 347:23,
365:17
**hand** [1] - 263:8
**handling** [1] - 293:1
**hands** [2] - 293:3,
316:23
**happy** [1] - 292:25
**Harrison** [1] - 263:25
**Haven** [1] - 264:5
**head** [2] - 324:22,
338:2
**hear** [3] - 305:24,
306:4, 306:12
**heard** [13] - 266:24,
267:8, 275:24,
275:25, 279:7,
306:1, 331:25,
333:8, 369:18,
369:19
**Hearing** [1] - 261:16

**hearing** [1] - 263:10
**heavy** [1] - 297:10
**held** [1] - 261:16
**help** [2] - 263:11,
350:15
**helped** [1] - 331:23
**helpful** [2] - 366:6,
368:13
**high** [2] - 312:17,
353:19
**higher** [4] - 326:16,
326:17, 356:15,
357:1
**highest** [1] - 346:14
**highly** [1] - 280:24
**himself** [3] - 307:24,
312:15, 312:22
**hired** [1] - 302:5
**historical** [11] -
269:22, 274:13,
277:18, 278:8,
279:8, 284:5, 287:7,
287:17, 289:25,
312:1, 321:25
**historically** [6] -
270:8, 274:19,
277:17, 289:5,
289:9, 297:4
**history** [2] - 349:5,
355:9
**hit** [3] - 351:16,
359:15, 369:14
**hitting** [1] - 351:10
**hold** [7] - 266:16,
278:25, 280:1,
291:24, 291:25,
309:11, 366:23
**Honor** [21] - 263:3,
263:4, 263:6, 297:7,
338:13, 342:25,
343:2, 344:10,
344:20, 364:17,
364:19, 364:24,
365:16, 365:22,
367:5, 368:23,
369:20, 369:23,
370:2, 370:4, 370:5
**HONORABLE** [1] -
261:16
**hoped** [2] - 312:2,
315:13
**hoping** [1] - 367:21
**horizon** [1] - 323:13
**Horton** [11] - 280:8,
281:10, 294:18,
296:6, 296:14,
318:19, 319:4,
324:16, 324:22,
326:5, 341:17
**Horton's** [1] - 281:13

**host** [1] - 326:10
**huge** [2] - 345:18,
351:23
**hugely** [1] - 296:17
**hundred** [4] - 264:21,
349:7, 351:16,
362:14
**hundreds** [3] - 302:20,
345:16, 348:21
**hypothetical** [1] -
360:2
**hypothetically** [1] -
276:21

## I

**IBC** [12] - 291:19,
310:9, 314:5,
314:14, 314:19,
314:21, 315:15,
316:4, 320:17,
353:9, 356:12
**ideas** [1] - 307:18
**identify** [4] - 265:20,
266:22, 339:11,
363:24
**identifying** [1] - 333:1
**ignore** [1] - 362:6
**ignored** [1] - 271:1
**II** [1] - 261:7
**immediate** [1] -
311:15
**immediately** [1] -
311:11
**imminent** [1] - 325:24
**impact** [9] - 287:22,
296:16, 296:17,
296:22, 296:24,
335:8, 338:22,
339:20, 340:3
**impacted** [3] - 267:7,
284:10, 291:2
**impacts** [1] - 286:6
**Imperial** [1] - 282:20
**implementing** [1] -
325:2
**importance** [1] - 339:3
**important** [7] -
295:18, 302:1,
302:14, 302:19,
314:12, 349:2, 362:9
**impose** [2] - 368:18,
368:20
**impossible** [1] - 276:7
**inaccurate** [1] -
286:25
**inappropriate** [2] -
323:21, 332:20
**incentive** [1] - 339:24
**incestuous** [1] -

281:23
**incident** [17] - 270:5,
270:25, 272:6,
273:5, 277:22,
281:9, 282:24,
283:20, 290:12,
293:6, 305:20,
318:10, 318:11,
319:11, 337:4,
341:2, 341:11
**incidents** [5] - 317:13,
318:1, 318:2, 318:3,
319:18
**include** [1] - 308:11
**including** [2] - 296:18,
306:5
**inconsistency** [1] -
271:16
**incorrect** [2] - 285:2,
321:22
**increase** [10] - 276:24,
278:3, 289:17,
293:23, 294:1,
294:3, 294:5,
309:23, 342:2, 342:8
**increased** [1] - 293:24
**increases** [6] - 311:24,
312:2, 312:4, 312:8,
312:12, 364:11
**increasing** [3] -
287:13, 341:14,
349:17
**incremental** [1] -
268:25
**independent** [1] -
302:12
**indicate** [2] - 275:17,
338:10
**indicated** [15] -
270:10, 270:12,
270:21, 272:16,
274:11, 274:14,
274:16, 275:2,
275:22, 285:4,
292:15, 294:14,
295:25, 312:17,
335:4
**indicating** [1] - 300:3
**indication** [2] -
274:22, 340:8
**industries** [1] - 335:8
**industry** [10] - 301:22,
302:9, 302:17,
303:10, 303:14,
314:4, 339:4,
362:19, 363:3,
363:13
**infinite** [1] - 359:6
**infinity** [2] - 289:18,
359:7

**inflation** [6] - 274:25, 275:3, 275:6, 275:7, 275:11, 275:14
**information** [19] - 266:11, 268:9, 276:19, 278:8, 284:6, 286:10, 298:10, 300:3, 301:10, 301:25, 302:25, 314:9, 321:17, 327:7, 327:16, 329:14, 333:13, 355:25, 357:17
**informed** [1] - 283:18
**initial** [1] - 277:24
**input** [1] - 346:20
**inputs** [4] - 324:3, 346:10, 352:11, 364:15
**inquired** [2] - 321:25, 360:23
**inquiries** [1] - 304:7
**instance** [2] - 346:15, 360:1
**instead** [6] - 272:6, 275:5, 323:2, 348:1, 366:6, 366:23
**insurance** [1] - 360:3
**intangible** [2] - 285:5, 285:11
**integral** [6] - 347:8, 347:13, 347:18, 347:19, 348:1, 348:5
**integrals** [2] - 348:6, 348:15
**intended** [1] - 312:4
**intensive** [1] - 337:18
**intention** [1] - 294:10
**interest** [1] - 301:24
**interested** [1] - 265:10
**interesting** [1] - 369:25
**internal** [4] - 271:15, 274:8, 292:12, 322:22
**international** [1] - 330:11
**interpret** [1] - 298:2
**interpretation** [2] - 298:9, 333:18
**interpretations** [1] - 298:19
**interpreted** [1] - 266:19
**interviewing** [5] - 302:5, 302:7, 337:11, 337:17, 337:24
**interviews** [1] - 337:18

**introduced** [1] - 361:13
**invalid** [1] - 358:17
**inventory** [1] - 285:12
**inverse** [1] - 286:1
**invest** [4] - 295:13, 346:4, 346:8, 348:25
**investigate** [3] - 294:14, 295:4, 342:23
**investigated** [1] - 339:3
**investigation** [5] - 308:19, 309:18, 310:6, 335:5, 339:1
**investment** [1] - 346:13
**involve** [1] - 348:17
**involved** [5] - 278:18, 293:9, 301:3, 302:21, 339:25
**involvement** [5] - 292:5, 293:5, 293:8, 293:11, 311:22
**involving** [1] - 321:13
**irrationally** [2] - 312:15, 312:22
**irrelevant** [2] - 279:4, 290:16
**IRS** [2] - 264:14, 333:2
**isolated** [2] - 318:2, 318:3
**issue** [33] - 270:23, 292:4, 293:4, 294:15, 294:16, 296:9, 305:17, 307:1, 308:4, 308:7, 308:20, 310:6, 316:6, 316:14, 316:17, 317:3, 316:10, 323:5, 333:14, 334:17, 335:14, 336:2, 336:4, 336:8, 340:5, 340:8, 344:3, 344:5, 347:1, 369:1, 369:3, 369:6
**issued** [2] - 338:20, 366:15
**issues** [31] - 265:13, 292:2, 292:6, 292:8, 292:22, 293:17, 293:21, 296:16, 304:24, 305:19, 305:22, 306:13, 306:18, 306:22, 309:14, 311:20, 311:21, 315:18, 316:18, 316:25, 319:22, 319:23,

326:6, 335:25, 337:20, 340:2, 345:9, 345:12, 368:25
**items** [1] - 269:13
**itself** [3] - 324:2, 324:6, 338:15

## J

**jaded** [2] - 308:25, 309:19
**job** [5] - 290:10, 299:10, 299:11, 299:13, 301:13
**JOHN** [1] - 261:16
**Jonathan** [1] - 261:21
**JR** [1] - 261:16
**Judge** [2] - 261:16, 272:4
**judges** [1] - 264:13
**judgment** [9] - 303:17, 303:18, 304:2, 304:12, 306:18, 306:23, 308:21, 309:8, 369:10
**judgments** [1] - 298:20
**jury** [1] - 319:17

## K

**keep** [2] - 338:1, 368:20
**kept** [2] - 294:9, 349:22
**key** [1] - 293:13
**kind** [4] - 284:2, 339:7, 361:5, 362:7
**kinds** [1] - 302:2
**knowing** [1] - 353:10
**known** [1] - 345:24
**knows** [4] - 265:19, 301:21, 338:19, 365:21
**Kurt** [2] - 261:20, 265:19

## L

**lack** [6] - 266:10, 287:21, 307:5, 307:7, 308:22, 335:25
**laminate** [1] - 361:20
**laminated** [7] - 317:18, 322:11, 323:20, 325:5, 342:6, 357:22, 361:16

**laminating** [1] - 321:13
**Lapoint** [12] - 291:18, 294:4, 295:12, 310:8, 312:3, 312:14, 312:21, 324:16, 324:21, 339:10, 344:4, 356:19
**Lapoint's** [3] - 295:21, 311:24, 312:2
**larger** [1] - 343:21
**last** [23] - 263:14, 265:2, 266:25, 267:8, 267:25, 268:22, 270:20, 271:3, 272:19, 276:14, 285:3, 288:12, 288:19, 305:24, 306:11, 316:6, 329:1, 330:20, 335:1, 354:22, 359:2, 361:11, 365:18
**late** [1] - 291:23
**latest** [1] - 364:8
**lawyer** [1] - 299:24
**lawyers** [1] - 264:13
**layer** [1] - 357:22
**lead** [3] - 267:14, 317:11, 335:16
**leading** [1] - 352:1
**learn** [1] - 343:11
**least** [12] - 264:18, 292:9, 292:19, 297:2, 303:19, 304:12, 304:18, 323:17, 340:17, 340:25, 342:3, 350:22
**leave** [2] - 337:1, 366:25
**leaves** [1] - 346:25
**ledger** [2] - 357:11, 357:12
**left** [2] - 288:5, 337:2
**legal** [2] - 306:5, 306:12
**length** [3] - 339:11, 365:12, 365:13
**less** [11] - 308:12, 313:21, 326:23, 328:2, 328:12, 341:11, 341:16, 347:23, 366:10, 366:20, 368:21
**level** [1] - 289:17
**levels** [1] - 277:2
**liabilities** [1] - 286:11
**liability** [1] - 290:20

**library** [1] - 346:25
**light** [1] - 269:22
**likelihood** [1] - 307:20
**likely** [6] - 283:18, 319:2, 354:23, 355:2, 355:20, 369:1
**limit** [1] - 369:16
**limitations** [1] - 344:15
**limited** [3] - 273:23, 289:1, 368:12
**limits** [2] - 368:19, 368:21
**line** [6] - 275:4, 277:14, 298:7, 336:7, 339:25, 343:24
**lines** [4] - 322:2, 322:6, 322:9, 336:6
**list** [14] - 280:11, 281:14, 282:11, 296:7, 318:6, 318:7, 318:11, 319:2, 319:13, 319:22, 324:17, 328:5, 357:1, 363:16
**listed** [10] - 280:13, 280:15, 282:8, 295:19, 295:20, 318:20, 319:15, 327:16, 343:16, 353:15
**listing** [2] - 280:8, 318:20
**litigation** [7] - 263:24, 264:3, 274:5, 274:6, 318:7, 322:22, 323:10
**lives** [1] - 351:15
**long-term** [3] - 311:13, 322:18, 324:12
**look** [25] - 269:20, 270:4, 276:18, 277:16, 277:20, 278:7, 285:13, 288:18, 289:4, 289:12, 302:12, 304:22, 307:5, 325:7, 326:2, 327:4, 327:12, 327:22, 328:9, 332:23, 341:1, 357:23, 361:16, 367:13
**looked** [7] - 283:12, 283:13, 283:16, 285:21, 306:4, 317:8, 361:18
**looking** [4] - 274:2, 297:4, 321:11, 322:3

**looks** [1] - 354:20
**lose** [2] - 272:2,
291:12
**losing** [6] - 322:6,
322:8, 342:9,
342:11, 342:19,
342:20
**loss** [32] - 267:20,
267:23, 268:4,
268:5, 268:7,
268:17, 268:21,
268:24, 269:9,
270:18, 270:23,
271:9, 272:1,
272:10, 272:11,
272:12, 272:15,
272:17, 286:20,
288:8, 288:10,
288:16, 290:9,
305:19, 335:17,
336:5, 359:6,
359:10, 359:11,
360:4, 360:7
**losses** [2] - 304:23,
305:25
**lost** [54] - 264:16,
268:18, 268:23,
268:24, 269:11,
270:21, 270:22,
271:7, 271:10,
272:11, 272:18,
272:21, 272:23,
272:24, 273:2,
273:7, 273:10,
277:8, 278:19,
283:4, 283:22,
286:24, 286:25,
287:18, 287:22,
287:24, 287:25,
288:3, 290:3, 290:7,
296:16, 299:4,
299:5, 328:18,
329:4, 329:7, 329:8,
329:20, 329:23,
329:24, 330:5,
330:16, 336:21,
337:8, 339:12,
347:5, 347:25,
348:8, 350:18,
359:15, 359:17,
360:20
**low** [1] - 356:21
**lower** [5] - 313:25,
354:19, 356:4,
356:22, 357:3

**M**

**ma'am** [1] - 344:11
**machinery** [1] -

351:20
**magnitude** [1] -
313:17
**mail** [5] - 291:10,
292:14, 305:13,
309:21, 309:22
**mails** [5] - 291:14,
291:22, 292:1,
293:4, 293:9
**main** [1] - 333:14
**MAINE** [1] - 261:2
**Maine** [3] - 261:17,
264:2, 370:10
**majority** [2] - 280:17,
281:17
**management** [3] -
315:20, 315:24
**manages** [1] - 367:1
**Manhattan** [1] - 264:5
**manual** [1] - 261:24
**manufactured** [2] -
314:16, 343:6
**manufacturer** [2] -
353:10, 356:12
**manufactures** [1] -
291:20
**manufacturing** [7] -
277:9, 277:11,
277:12, 277:17,
277:19, 277:22,
278:1
**March** [3] - 261:18,
352:22, 370:13
**Mark** [3] - 262:4,
344:22, 344:24
**market** [26] - 273:12,
281:18, 285:24,
285:25, 294:22,
312:15, 312:22,
316:4, 317:16,
320:9, 320:25,
321:2, 324:14,
325:13, 340:19,
341:3, 341:10,
341:11, 341:14,
341:17, 341:18,
342:2, 350:2,
362:20, 362:21,
362:23
**marketing** [11] -
279:4, 279:9,
279:10, 281:25,
294:19, 324:10,
324:17, 324:19,
324:21, 340:25,
341:20
**markets** [1] - 284:25
**material** [12] - 267:11,
280:22, 280:23,
280:24, 281:11,

317:24, 318:22,
319:8, 357:6,
357:13, 369:12,
369:13
**materials** [3] - 265:15,
265:16, 303:6
**math** [5] - 298:16,
300:9, 300:12,
300:13, 350:24
**mathematical** [2] -
307:2, 350:9
**matter** [10] - 261:15,
273:17, 277:13,
278:24, 293:2,
311:19, 336:16,
345:22, 349:7,
370:12
**matters** [1] - 306:6
**mean** [30] - 266:21,
268:13, 277:12,
285:18, 289:3,
299:10, 301:7,
301:13, 302:11,
303:21, 305:11,
305:18, 309:11,
310:15, 317:10,
319:21, 321:22,
326:21, 327:18,
333:14, 333:15,
337:19, 337:23,
340:14, 360:25,
362:5, 362:6,
367:18, 367:22,
369:18
**meaning** [1] - 318:11
**meaningless** [2] -
296:20, 298:11
**means** [5] - 300:19,
333:18, 342:16,
367:12, 367:13
**meant** [9] - 281:16,
319:10, 319:20,
319:23, 329:4,
342:11, 349:5,
352:8, 361:10
**measure** [4] - 268:3,
288:8, 288:10,
335:21
**measures** [1] - 286:2
**meet** [5] - 276:21,
292:10, 292:13,
292:17, 351:21
**meeting** [1] - 292:2
**melting** [2] - 281:9,
317:20
**memo** [1] - 368:4
**memorandum** [1] -
365:7
**Memorial** [1] - 368:18
**memory** [1] - 337:22

**mentioned** [12] -
265:2, 293:5,
294:25, 305:12,
312:24, 315:4,
315:9, 323:14,
324:8, 325:17,
342:8, 344:3
**message** [1] - 369:21
**metal** [1] - 361:18
**method** [26] - 272:20,
272:25, 273:2,
273:8, 273:11,
273:12, 273:16,
273:18, 274:1,
274:3, 277:9,
285:19, 286:16,
286:18, 300:13,
322:23, 323:7,
335:11, 336:18,
336:25, 337:1,
337:12, 349:14
**methodological** [1] -
283:21
**methodologies** [1] -
268:9
**methodology** [14] -
272:11, 273:9,
275:9, 284:10,
286:14, 286:19,
296:9, 297:14,
297:18, 297:22,
336:8
**methods** [3] - 336:12,
336:15
**metrics** [1] - 333:7
**Meyers** [4] - 263:24,
345:23, 346:1,
346:24
**mid** [3] - 365:9,
365:15, 366:7
**mid-May** [2] - 365:9,
365:15
**might** [9] - 282:6,
296:19, 308:13,
308:14, 329:22,
339:8, 350:15,
366:20
**million** [12] - 271:25,
272:2, 284:15,
311:5, 313:6,
339:15, 339:21,
348:9, 351:11,
351:16, 351:17,
352:23
**millions** [3] - 274:20,
345:17, 348:21
**mind** [1] - 368:20
**minus** [1] - 348:10
**minute** [1] - 350:21
**missed** [3] - 291:14,

291:15
**missing** [1] - 336:9
**mitigated** [2] - 331:1,
336:6
**mitigating** [9] - 271:6,
287:21, 288:2,
288:7, 331:6,
331:10, 331:16,
336:22, 360:19
**mitigation** [11] -
271:4, 271:5,
330:17, 330:19,
335:2, 335:5, 336:1,
360:12, 360:13,
360:21, 360:23
**model** [32] - 273:12,
278:17, 282:19,
286:7, 290:3,
296:16, 296:18,
323:24, 324:2,
324:3, 324:6, 331:5,
331:9, 336:2, 336:4,
337:8, 342:19,
348:13, 349:12,
349:17, 350:5,
351:3, 352:14,
352:16, 353:18,
354:1, 355:6,
360:14, 360:18,
360:22, 364:9
**models** [6] - 267:19,
278:14, 278:16,
350:12, 364:4, 364:8
**moment** [4] - 270:22,
286:13, 334:10,
363:7
**money** [9] - 295:13,
322:7, 322:8,
339:24, 342:9,
342:11, 342:20,
360:10, 367:20
**month** [5] - 288:24,
311:8, 313:13,
336:19, 361:15
**months** [14] - 273:24,
288:21, 294:2,
311:4, 311:5, 313:4,
323:3, 334:2, 334:6,
337:3, 352:22,
352:24, 355:10,
358:2
**Montreal** [1] - 346:17
**morning** [4] - 263:2,
263:3, 263:4, 263:21
**most** [10] - 268:11,
281:13, 304:20,
342:4, 345:24,
349:2, 354:23,
355:2, 355:19
**Motion** [1] - 261:16

**motion** [2] - 357:23, 365:25
**move** [3] - 265:18, 285:17, 331:13
**moving** [1] - 367:19
**MR** [61] - 263:3, 263:4, 263:6, 263:20, 265:25, 266:2, 266:3, 297:5, 297:7, 297:9, 334:7, 334:10, 334:12, 334:13, 334:16, 338:13, 338:17, 342:25, 343:2, 343:4, 344:8, 344:10, 344:13, 344:16, 344:19, 344:22, 345:3, 363:4, 363:7, 363:10, 364:17, 364:19, 364:22, 365:3, 365:8, 365:15, 365:16, 365:21, 366:1, 366:4, 366:10, 366:12, 366:15, 366:22, 366:24, 367:5, 367:10, 367:22, 367:24, 368:6, 368:8, 368:11, 368:16, 368:23, 369:5, 369:9, 369:20, 369:23, 370:2, 370:4, 370:5
**multiple** [8] - 284:16, 285:4, 285:15, 285:24, 285:25, 286:9, 333:17, 333:18
**multiply** [2] - 347:10, 347:11
**must** [1] - 342:10
**myriad** [1] - 345:15

## N

**name** [4] - 263:14, 263:15, 265:4, 265:7
**Nancy** [3] - 262:3, 263:6, 263:16
**NANCY** [1] - 263:16
**narrow** [1] - 348:15
**national** [1] - 264:2
**necessary** [3] - 295:12, 304:15, 360:18
**need** [11] - 273:25, 276:23, 304:8, 327:4, 327:21,

336:22, 350:11, 351:21, 355:4, 366:3, 367:8
**needed** [1] - 337:5
**needs** [7] - 269:14, 304:11, 310:24, 315:1, 349:8, 367:22
**net** [7] - 268:12, 268:13, 269:4, 269:15, 269:18, 269:21, 347:25
**never** [13] - 268:6, 271:7, 288:9, 304:16, 311:13, 312:8, 312:12, 329:20, 330:5, 330:15, 337:23, 368:11
**nevertheless** [1] - 302:24
**new** [15] - 279:4, 279:9, 310:20, 311:2, 313:7, 317:17, 317:21, 320:16, 325:5, 333:23, 340:10, 340:13, 340:19, 342:7, 361:12
**New** [1] - 264:4
**next** [6] - 273:24, 289:2, 289:16, 289:19, 331:5, 349:22
**nice** [1] - 349:16
**nobody** [1] - 314:21
**none** [1] - 295:8
**normal** [3] - 354:6, 355:4, 355:12
**normalized** [1] - 355:10
**normally** [2] - 355:11, 355:23
**North** [1] - 330:11
**noted** [1] - 278:15
**notes** [1] - 276:17
**nothing** [13] - 263:11, 273:3, 280:20, 280:25, 290:13, 297:5, 300:22, 318:23, 323:20, 340:9, 342:25, 364:17, 364:19
**notice** [2] - 261:15, 265:18
**Number** [1] - 262:6
**number** [23] - 264:8, 265:8, 285:6, 291:13, 305:12, 347:21, 348:12, 351:10, 351:24,

353:17, 354:11, 354:12, 354:18, 354:24, 354:25, 355:1, 355:2, 355:23, 357:18
**numbers** [6] - 289:11, 327:11, 355:11, 357:12, 364:3
**numerous** [2] - 264:11, 291:3

## O

**oath** [1] - 344:25
**objection** [3] - 265:25, 266:2, 338:13
**obtain** [1] - 301:10
**obtained** [2] - 284:16, 297:1
**obviously** [4] - 278:2, 301:9, 369:25
**occurred** [8] - 267:20, 280:19, 285:9, 304:16, 304:19, 318:21, 320:8, 331:24
**October** [3] - 333:23, 352:22, 361:16
**odds** [1] - 299:25
**OF** [1] - 261:2
**offered** [1] - 266:7
**office** [1] - 264:2
**Official** [3] - 261:23, 370:9, 370:15
**offset** [1] - 342:17
**often** [6] - 273:20, 273:21, 289:24, 298:25, 299:3, 323:14
**oil** [1] - 314:13
**Olafsen** [12] - 261:20, 335:24, 336:10, 337:10, 339:9, 342:5, 343:1, 345:5, 364:12, 364:18, 367:9, 369:21
**OLAFSEN** [21] - 263:3, 266:2, 297:7, 297:9, 334:7, 334:13, 338:13, 343:2, 343:4, 344:8, 344:16, 344:19, 344:22, 345:3, 363:4, 364:19, 367:10, 367:24, 368:6, 369:23, 370:4
**old** [1] - 363:2
**older** [1] - 357:20
**once** [8] - 283:23, 289:5, 296:25,

304:10, 309:2, 326:5, 341:8, 356:10
**one** [48] - 267:15, 267:20, 269:19, 271:3, 274:18, 276:12, 277:15, 280:13, 282:10, 282:11, 287:19, 288:22, 289:7, 290:25, 292:2, 292:4, 292:9, 293:17, 295:7, 296:9, 297:11, 302:10, 304:21, 317:6, 322:20, 324:8, 327:13, 331:21, 332:16, 334:10, 334:13, 334:23, 340:22, 342:10, 345:24, 347:23, 348:2, 356:2, 357:18, 362:4, 364:12, 364:15, 365:21, 366:23, 366:25, 368:20, 369:6, 369:15
**ones** [5] - 282:7, 318:4, 335:3, 363:22, 363:24
**open** [3] - 263:1, 302:24, 346:17
**opened** [1] - 362:25
**operated** [1] - 320:22
**opinion** [11] - 266:9, 266:12, 267:9, 272:15, 277:25, 278:10, 284:8, 286:17, 290:2, 339:19, 358:12
**opinions** [11] - 266:6, 267:4, 267:7, 271:14, 276:8, 278:14, 323:24, 324:1, 338:21, 352:1, 364:5
**opposite** [1] - 332:10
**opposition** [4] - 299:21, 301:5, 301:15, 301:16
**options** [1] - 312:6
**oranges** [1] - 345:14
**order** [6] - 276:21, 276:24, 313:17, 336:19, 351:5, 356:15
**orders** [7] - 291:24, 309:11, 311:8, 311:17, 313:14, 313:15, 325:23

**ordinary** [1] - 353:20
**original** [1] - 363:1
**otherwise** [2] - 290:15, 329:23
**output** [2] - 331:9, 347:4
**overall** [2] - 286:14, 342:14
**overhead** [11] - 278:11, 278:18, 278:20, 287:8, 352:14, 352:18, 352:25, 355:10, 355:11, 355:13
**overrides** [1] - 362:8
**overseas** [3] - 367:11, 367:15, 367:24
**own** [3] - 293:3, 316:23, 339:1
**owner** [3] - 302:22, 312:21, 355:19

## P

**package** [1] - 265:19
**PACKGEN** [1] - 261:4
**Packgen** [75] - 275:20, 276:22, 280:16, 280:18, 280:20, 281:19, 281:20, 281:22, 282:3, 284:24, 285:23, 291:7, 291:24, 292:1, 292:16, 293:7, 293:8, 294:21, 301:7, 304:3, 304:23, 309:15, 310:3, 310:19, 311:13, 311:14, 313:20, 313:24, 314:15, 315:13, 316:7, 316:10, 316:19, 316:20, 316:24, 317:3, 317:5, 317:14, 317:25, 319:1, 320:8, 320:12, 320:22, 321:21, 322:15, 324:10, 326:15, 326:23, 328:3, 328:21, 329:4, 332:22, 333:20, 333:22, 340:2, 341:3, 342:1, 343:6, 346:23, 349:7, 351:19, 352:19, 352:21, 353:9, 354:5, 355:6, 356:10, 357:16,

359:12, 361:8, 361:25, 362:1, 362:21, 362:24

**Packgen's** [21] - 267:10, 277:21, 278:11, 279:17, 283:1, 291:11, 292:4, 293:1, 293:5, 311:22, 315:5, 318:9, 318:14, 325:21, 328:14, 329:16, 330:7, 356:14, 358:20, 362:19, 362:24

**Page** [1] - 289:12

**page** [3] - 344:15, 367:3, 368:19

**Page/Admit** [1] - 262:6

**pages** [4] - 319:10, 365:11, 366:3, 368:16

**paid** [2] - 294:1, 313:3

**pallets** [1] - 281:6

**paper** [1] - 350:13

**parameter** [1] - 352:8

**parameters** [2] - 352:1, 352:4

**part** [14] - 271:2, 288:6, 302:25, 303:19, 304:12, 317:2, 327:18, 330:4, 330:6, 336:9, 337:1, 337:2, 337:11, 340:25

**participated** [1] - 264:11

**particular** [13] - 277:14, 286:2, 286:4, 307:11, 308:17, 309:2, 309:4, 314:25, 321:17, 322:4, 325:4, 335:15, 350:2

**particularly** [1] - 295:1

**parties** [1] - 263:1

**partner** [1] - 263:23

**passed** [2] - 316:2, 333:21

**passing** [1] - 281:18

**past** [8] - 273:6, 309:12, 345:15, 345:17, 345:20, 347:2, 349:3, 349:4

**patent** [7] - 295:11, 295:13, 295:18, 315:1, 315:18, 338:22, 339:4

**patented** [3] - 295:10, 295:20, 295:22

**patents** [8] - 307:6, 307:7, 307:14, 308:2, 308:4, 314:23, 315:20, 316:8

**pay** [5] - 313:5, 313:7, 313:8, 359:12, 360:9

**paying** [1] - 313:11

**peers** [1] - 264:13

**pencil** [1] - 350:13

**pending** [1] - 311:8

**people** [2] - 351:21, 370:1

**per** [2] - 299:23, 301:10

**percent** [58] - 266:23, 270:1, 270:6, 270:13, 270:15, 277:23, 278:1, 278:6, 282:18, 283:2, 283:10, 287:16, 287:17, 320:9, 320:25, 321:2, 321:8, 321:9, 325:17, 326:7, 326:14, 326:22, 339:23, 341:6, 341:9, 341:12, 341:16, 342:15, 342:16, 342:18, 347:8, 347:13, 347:14, 347:18, 347:19, 347:20, 347:22, 347:23, 348:7, 348:10, 349:8, 349:14, 349:19, 350:1, 353:12, 353:13, 353:23, 354:11, 354:12, 354:13, 354:15, 356:18, 356:21, 362:5, 362:9, 362:10

**percentage** [3] - 347:10, 363:13, 363:16

**percentages** [2] - 354:13, 354:14

**perhaps** [6] - 265:6, 311:19, 320:1, 321:20, 354:6, 366:4

**period** [9] - 269:5, 283:24, 288:13, 288:15, 289:1, 291:9, 310:15, 339:16, 361:15

**permanent** [2] - 268:5, 272:13

**permanently** [1] - 330:16

**permission** [1] - 265:4

**person** [1] - 293:13

**personal** [1] - 359:21

**personnel** [3] - 302:8, 337:11, 337:20

**perspective** [2] - 302:1, 302:16

**Phillip** [1] - 261:21

**phone** [1] - 356:12

**Pia** [1] - 263:25

**pick** [3] - 281:6, 304:4, 356:11

**picture** [4] - 270:16, 281:21, 302:23, 336:19

**piece** [4] - 302:10, 302:14, 302:19, 330:15

**place** [5] - 279:10, 314:13, 339:12, 356:13, 356:14

**placed** [1] - 309:11

**placing** [1] - 351:5

**plaintiff** [5] - 274:7, 326:15, 344:22, 367:19, 367:20

**Plaintiff** [2] - 261:5, 261:20

**plan** [8] - 279:4, 324:10, 324:14, 324:19, 324:21, 324:24, 325:2, 351:15

**planned** [1] - 311:24

**plans** [1] - 324:17

**plant** [2] - 359:5, 359:24

**Plastics** [1] - 266:5

**PLASTICS** [1] - 261:9

**pleased** [1] - 333:22

**plenty** [1] - 310:12

**plug** [1] - 360:22

**plugged** [1] - 360:16

**plugs** [1] - 357:17

**plus** [4] - 280:15, 298:18, 348:10

**Plymouth** [2] - 362:11, 362:12

**point** [25] - 271:8, 275:9, 287:12, 288:4, 293:12, 298:10, 300:8, 312:5, 319:25, 325:22, 326:13, 329:18, 330:13, 330:25, 332:15, 343:24, 346:3, 346:5, 349:24, 351:9, 351:12, 361:22, 361:24,

369:18

**pointing** [1] - 341:24

**points** [3] - 345:16, 348:17, 348:22

**polypropylene** [1] - 361:17

**pool** [1] - 296:19

**portion** [4] - 329:16, 329:18, 330:3, 331:20

**Portland** [3] - 261:17, 264:2, 346:17

**position** [1] - 304:10

**possibility** [1] - 351:5

**possible** [7] - 275:25, 276:2, 287:19, 304:22, 304:24, 305:25, 306:5

**potentially** [1] - 327:20

**pounds** [1] - 361:19

**power** [2] - 351:8, 351:13

**practice** [3] - 264:2, 278:20, 367:10

**Pratt's** [9] - 284:9, 284:11, 284:17, 284:19, 285:1, 285:3, 285:7, 286:6, 332:19

**pre** [9] - 269:21, 274:5, 274:6, 318:7, 318:10, 318:11, 322:22, 323:10

**pre-incident** [2] - 318:10, 318:11

**pre-litigation** [5] - 274:5, 274:6, 318:7, 322:22, 323:10

**pre-product** [1] - 318:11

**pre-tax** [1] - 269:21

**precursor** [1] - 365:24

**predict** [4] - 288:25, 289:1, 296:10, 304:16

**predicting** [2] - 331:10, 347:21

**prepare** [1] - 300:23

**prepared** [4] - 274:5, 274:6, 296:7

**Prepared** [1] - 261:24

**presence** [2] - 362:19, 362:22

**present** [4] - 345:6, 346:11, 346:14, 359:8

**present** [1] - 263:1

**presented** [1] - 302:22

**presents** [1] - 283:7

**president** [1] - 315:5

**pretty** [3] - 300:11, 365:19, 368:9

**preventing** [2] - 319:12, 362:22

**previously** [1] - 344:24

**price** [32] - 277:25, 293:23, 293:24, 293:25, 294:3, 294:9, 294:13, 295:1, 311:24, 312:2, 312:4, 312:8, 312:12, 312:15, 312:22, 313:1, 313:7, 313:14, 313:25, 327:16, 328:5, 338:4, 348:4, 350:16, 356:3, 356:4, 356:13, 356:14, 356:17, 356:18, 356:24, 364:14

**prices** [21] - 294:5, 294:10, 312:1, 327:2, 327:6, 327:21, 327:22, 327:25, 328:1, 328:4, 328:7, 328:9, 338:3, 338:4, 349:9, 352:6, 355:8, 356:25, 357:1, 357:2, 364:10

**pricing** [2] - 293:21, 294:15

**probability** [3] - 349:2, 352:10, 352:12

**problem** [2] - 365:12, 367:11

**problems** [2] - 316:7, 346:5

**procedures** [1] - 298:22

**proceed** [4] - 263:5, 263:18, 344:12, 364:21

**proceeding** [1] - 370:7

**Proceedings** [1] - 261:13

**proceedings** [1] - 370:12

**proceeds** [2] - 359:13, 360:9

**process** [2] - 277:11, 310:24

**produce** [1] - 360:18

**produced** [4] - 284:7, 296:14, 305:7, 361:4

**producers** [1] - 361:4

**producing** [1] - 355:1

**product** [82] - 276:10, 277:14, 280:6, 280:16, 280:18, 280:20, 280:21, 281:1, 282:4, 283:20, 284:24, 290:20, 292:6, 292:12, 292:17, 293:23, 293:24, 295:4, 295:7, 295:10, 295:11, 295:20, 295:22, 302:17, 303:7, 309:23, 310:17, 311:2, 311:7, 311:12, 312:9, 313:7, 313:13, 315:11, 315:14, 315:17, 315:21, 316:3, 316:15, 317:20, 317:21, 318:5, 318:11, 318:15, 318:17, 318:18, 318:24, 319:1, 319:19, 320:13, 320:14, 320:22, 321:18, 321:20, 322:4, 322:6, 322:8, 323:3, 324:18, 324:25, 325:24, 326:18, 331:18, 331:24, 333:23, 338:23, 340:10, 340:11, 340:13, 340:15, 340:18, 340:19, 340:23, 342:7, 342:16, 342:22, 343:13, 344:1, 357:14, 357:23
**production** [2] - 276:22, 277:2
**products** [21] - 284:22, 292:10, 301:21, 302:8, 316:8, 321:21, 338:8, 338:11, 338:19, 341:25, 342:9, 342:12, 342:17, 342:20, 343:10, 343:16, 343:23, 352:21, 352:23, 357:20
**professional** [8] - 298:20, 303:17, 304:2, 304:12, 306:17, 306:23, 308:21, 309:7
**profile** [7] - 284:23, 285:18, 285:22,

286:4, 293:19, 304:25, 333:16
**profit** [20] - 264:17, 269:22, 270:21, 270:22, 271:10, 272:18, 273:2, 273:8, 273:10, 274:6, 278:3, 286:24, 287:16, 287:24, 287:25, 290:7, 329:20, 329:23, 339:12, 348:18
**profitability** [6] - 269:25, 270:5, 270:7, 339:23, 342:7, 342:22
**profitable** [3] - 321:21, 322:1, 342:11
**profits** [36] - 268:18, 268:23, 268:24, 268:25, 269:4, 269:11, 271:7, 272:11, 272:21, 272:23, 272:24, 275:4, 277:8, 278:19, 283:4, 283:22, 286:17, 286:19, 286:25, 287:18, 287:22, 290:3, 296:16, 299:5, 328:19, 329:24, 336:21, 337:8, 347:6, 347:25, 348:8, 350:19, 359:15, 359:17, 360:20
**prognostications** [1] - 283:5
**project** [6] - 273:24, 288:20, 346:4, 346:7, 346:11, 348:25
**projected** [1] - 276:6
**projection** [17] - 272:20, 272:25, 273:2, 273:3, 273:6, 273:8, 273:11, 274:1, 274:3, 274:4, 274:6, 274:12, 283:1, 297:22, 322:23, 336:11, 336:20
**projections** [2] - 274:8, 301:25
**projects** [1] - 346:13
**proof** [3] - 266:14, 266:21, 299:12
**proper** [1] - 268:3
**properly** [1] - 272:18

**proportion** [2] - 275:13, 275:14
**proposed** [1] - 361:14
**protect** [1] - 315:10
**protected** [1] - 315:1
**protection** [3] - 295:15, 315:7, 315:21
**prove** [1] - 333:6
**provide** [6] - 265:6, 278:13, 282:21, 286:10, 330:24, 354:25
**provided** [7] - 299:17, 299:20, 300:17, 300:20, 301:14, 301:15, 316:20
**provides** [2] - 285:4, 347:3
**providing** [2] - 301:24, 319:16
**published** [1] - 265:17
**pull** [2] - 279:11, 280:1
**pulled** [2] - 305:7, 305:11
**pulling** [3] - 332:6, 332:7, 332:8
**puncture** [1] - 281:7
**puncturing** [1] - 281:4
**purchased** [6] - 357:13, 363:17, 363:23, 363:24, 363:25, 364:2
**purchases** [2] - 311:4, 361:7
**purported** [1] - 271:18
**purpose** [1] - 275:20
**purposes** [1] - 357:18
**Pursuant** [1] - 261:15
**pursued** [1] - 339:7
**push** [1] - 353:11
**put** [12] - 281:11, 291:24, 291:25, 305:15, 319:8, 319:21, 332:25, 349:12, 349:16, 353:17, 360:18, 369:13
**putting** [5] - 280:22, 280:25, 316:3, 318:21, 369:12
**pyrophoric** [2] - 280:24, 319:8

### Q

**qualified** [2] - 314:25, 338:21
**quantification** [1] - 309:17

**quantify** [6] - 306:24, 307:11, 308:17, 308:22, 309:3, 309:16
**quantities** [1] - 327:6
**questioned** [2] - 293:23, 309:24
**questions** [3] - 334:7, 344:8, 363:4
**quickly** [6] - 276:10, 316:19, 316:25, 340:2, 355:14, 356:23
**quite** [2] - 291:9, 326:23
**quoted** [3] - 349:9, 356:18, 357:2
**quotes** [2] - 326:6, 356:10

### R

**raise** [4] - 263:8, 294:10, 312:4, 369:1
**raised** [2] - 306:18, 307:1
**raising** [1] - 272:5
**ran** [2] - 277:22, 278:16
**random** [8] - 285:6, 346:10, 348:2, 351:1, 351:2, 352:4, 352:5, 352:11
**range** [8] - 277:23, 347:21, 348:6, 348:12, 348:13, 350:16, 350:17, 350:18
**ranged** [1] - 321:8
**rapidly** [1] - 341:13
**rate** [29] - 268:16, 269:16, 269:17, 275:8, 279:3, 283:13, 283:18, 286:1, 307:21, 308:15, 309:6, 309:9, 326:3, 326:7, 326:16, 326:17, 327:1, 340:20, 346:6, 349:14, 351:22, 353:11, 353:16, 353:19, 353:22, 353:23, 353:24, 354:2
**rates** [3] - 284:5, 298:25, 340:12
**rather** [5] - 312:1, 328:18, 330:3, 331:13, 359:6
**reach** [2] - 298:9,

300:8
**reached** [1] - 277:2
**reacted** [2] - 293:25, 313:1
**reaction** [1] - 294:3
**read** [1] - 352:3
**readily** [1] - 309:17
**reading** [1] - 357:6
**ready** [1] - 263:5
**real** [2] - 295:2, 357:10
**realistic** [1] - 294:23
**realized** [1] - 265:2
**really** [26] - 270:16, 273:3, 273:13, 273:17, 276:15, 285:24, 286:8, 287:2, 287:10, 287:24, 292:23, 294:2, 294:13, 295:2, 300:9, 308:3, 309:16, 312:18, 323:15, 329:15, 350:24, 362:9, 362:22, 364:16, 366:3
**reason** [17] - 279:7, 280:4, 280:14, 281:13, 282:3, 282:8, 282:17, 318:16, 319:1, 343:18, 356:25, 357:2, 357:4, 358:11, 359:9, 369:16
**reasonable** [11] - 266:13, 266:15, 266:19, 298:20, 303:16, 304:1, 304:11, 306:17, 306:23, 309:7, 366:6
**reasonably** [5] - 298:1, 298:5, 298:8, 298:13, 300:18
**reasons** [23] - 279:17, 280:12, 280:15, 280:17, 281:2, 282:21, 282:23, 283:16, 295:23, 295:24, 296:5, 296:11, 318:5, 318:20, 319:6, 325:10, 326:4, 326:11, 332:12, 333:9, 333:11
**rebuttal** [1] - 344:16
**receivable** [1] - 285:12
**received** [2] - 265:24, 340:23
**recess** [1] - 370:6
**record** [4] - 263:15,

269:23, 325:8, 370:11

**records** [1] - 302:18

**recover** [10] - 267:24, 268:6, 268:20, 288:1, 288:9, 322:18, 324:13, 330:5, 330:14, 330:15

**recovered** [1] - 271:8

**recovering** [2] - 329:19, 329:21

**recovery** [1] - 268:25

**Recross** [1] - 262:2

**RECROSS** [1] - 343:3

**rectangle** [1] - 354:20

**Redirect** [1] - 262:2

**redirect** [1] - 334:11

**REDIRECT** [1] - 334:15

**reduces** [1] - 331:6

**reducing** [1] - 308:11

**refer** [6] - 322:13, 327:2, 347:16, 347:17, 352:9, 352:10

**reference** [1] - 289:10

**referred** [15] - 307:6, 308:24, 309:19, 309:21, 316:13, 317:13, 318:1, 320:4, 321:4, 322:22, 330:17, 331:21, 350:7, 351:25, 359:24

**referring** [2] - 318:4, 333:19

**refers** [3] - 327:5, 352:4, 358:9

**refineries** [91] - 276:5, 278:17, 279:3, 279:8, 279:11, 279:13, 279:16, 279:24, 280:5, 280:8, 280:9, 280:11, 280:15, 280:17, 282:11, 282:16, 282:20, 283:2, 283:14, 283:15, 283:17, 283:19, 296:7, 296:25, 304:19, 314:14, 318:4, 318:7, 318:12, 318:16, 319:2, 319:3, 321:3, 323:23, 324:9, 324:17, 325:6, 325:9, 325:10, 325:16, 325:19,

325:23, 326:9, 327:3, 327:6, 327:20, 327:25, 328:5, 330:11, 330:12, 330:19, 331:1, 331:3, 331:7, 331:23, 332:2, 332:6, 332:8, 332:11, 332:13, 332:16, 334:20, 334:22, 338:5, 340:11, 340:24, 341:5, 341:9, 343:14, 343:19, 343:21, 349:8, 349:22, 350:2, 350:8, 351:5, 352:20, 354:1, 358:13, 358:14, 358:17, 360:13, 360:14, 360:17, 360:24, 361:7, 361:15, 361:24, 362:13, 362:14, 363:16

**refinery** [9] - 280:13, 330:18, 331:23, 341:7, 349:15, 356:11, 361:25, 363:13

**reflect** [1] - 287:5

**reflects** [1] - 270:17

**regard** [1] - 263:25

**regarding** [5] - 278:10, 284:8, 335:2, 336:1, 338:22

**regardless** [2] - 272:8, 343:13

**regression** [2] - 352:14, 352:15

**regulations** [2] - 292:11, 293:2

**regulatory** [7] - 292:3, 292:8, 292:13, 292:22, 306:5, 306:13, 309:14

**reject** [1] - 265:14

**rejecting** [1] - 279:17

**related** [8] - 264:7, 268:2, 286:2, 292:6, 292:21, 293:1, 321:17, 329:3

**relating** [1] - 318:18

**relationship** [16] - 281:23, 291:8, 291:9, 308:25, 309:20, 310:3, 310:14, 311:13, 311:18, 329:6, 330:2, 333:20,

335:15, 359:3, 359:5, 359:18

**relevant** [8] - 269:17, 279:1, 299:11, 303:22, 322:10, 328:6, 340:12, 365:22

**reliability** [5] - 274:22, 286:6, 290:2, 296:16, 352:9

**reliable** [8] - 266:18, 286:18, 288:15, 288:20, 323:9, 325:18, 337:8, 348:14

**relied** [6] - 273:23, 276:11, 305:10, 333:13, 337:2, 362:3

**rely** [6] - 273:22, 279:8, 299:17, 299:19, 299:23, 300:4, 301:2, 301:9, 301:10, 301:12, 301:16, 300:3, 303:6, 303:10, 314:9, 315:23, 324:5, 327:10, 337:22, 357:25, 362:18

**relying** [5] - 266:18, 300:23, 327:14, 336:18, 361:6

**remain** [2] - 297:1, 342:3

**remains** [1] - 272:9

**remember** [2] - 332:18, 357:21

**remote** [1] - 351:14

**render** [1] - 338:21

**renders** [2] - 287:24, 298:11

**rental** [1] - 356:15

**rephrase** [1] - 338:16

**reply** [3] - 368:3, 368:8, 368:13

**report** [22] - 265:22, 265:23, 277:24, 278:5, 279:23, 288:18, 289:8, 289:12, 305:15, 312:24, 314:3, 320:6, 321:5, 321:9, 322:13, 324:2, 324:8, 327:2, 338:20, 352:3, 357:5, 358:3

**Reporter** [3] - 261:23, 370:9, 370:15

**reports** [1] - 289:10

**representations** [1] -

301:2

**representatives** [4] - 302:15, 317:25, 318:9, 318:14

**represented** [1] - 340:10

**request** [2] - 364:13, 365:10

**requested** [1] - 340:6

**require** [2] - 266:17, 332:25

**requirement** [1] - 329:23

**requirements** [3] - 292:3, 292:14, 292:18

**research** [2] - 302:12, 333:4

**resolve** [3] - 299:8, 299:14, 320:2

**resolved** [4] - 316:19, 316:25, 340:8, 344:5

**resolving** [1] - 335:25

**respect** [7] - 292:7, 293:4, 295:1, 296:24, 304:18, 323:1, 323:23, 324:1, 324:5, 324:9, 324:17, 327:2, 331:15, 332:19, 339:2, 340:24, 341:4, 358:14, 360:21

**respond** [2] - 345:9, 367:8

**responded** [1] - 340:2

**response** [3] - 342:8, 368:5, 369:19

**responses** [1] - 293:1

**restaurant** [1] - 360:2

**result** [1] - 346:10

**results** [6] - 272:6, 275:16, 278:9, 287:7, 345:19, 347:1

**retained** [1] - 264:16

**retention** [1] - 284:5

**return** [2] - 332:22, 368:7

**returning** [1] - 367:25

**returns** [1] - 332:25

**revenue** [3] - 275:12, 275:14, 278:4

**revenues** [6] - 270:1, 275:13, 277:23, 278:2, 278:6, 341:7

**reverse** [2] - 279:15, 279:18

**review** [2] - 266:6, 274:9

**reviewed** [6] - 264:10,

265:12, 265:13, 277:6, 305:9, 340:4

**revised** [2] - 265:24, 271:17

**risk** [15] - 268:16, 269:16, 269:17, 284:23, 285:18, 285:22, 286:2, 286:4, 293:19, 304:25, 307:20, 333:16, 339:6, 353:22, 353:23

**risk-adjusted** [3] - 268:16, 269:16, 269:17

**risks** [1] - 353:20

**road** [1] - 330:25

**role** [3] - 299:8, 303:24, 335:24

**rosy** [5] - 283:5, 283:7, 301:25, 302:23, 323:14

**route** [1] - 346:17

**Rule** [1] - 369:11

**rule** [4] - 270:10, 270:11, 270:12, 323:9

**rumors** [6] - 281:14, 281:16, 281:19, 318:18, 318:22, 319:9

**run** [3] - 300:6, 300:10, 300:12

**running** [1] - 300:15

**runs** [2] - 264:1, 264:4

**S**

**safe** [1] - 341:10

**sale** [14] - 283:23, 309:23, 356:20, 356:22

**sales** [83] - 271:6, 272:9, 272:20, 272:24, 273:1, 273:3, 273:5, 273:8, 273:11, 274:1, 274:3, 274:4, 274:8, 274:12, 275:6, 275:8, 279:8, 280:10, 283:1, 283:24, 287:21, 288:2, 288:7, 288:20, 288:21, 289:4, 289:21, 289:23, 290:1, 297:21, 313:6, 319:18, 320:8, 321:7, 322:23, 323:3, 323:8,

323:11, 325:24, 326:8, 330:19, 330:21, 331:2, 331:6, 331:10, 331:16, 331:17, 331:22, 331:24, 332:2, 334:3, 336:5, 336:11, 336:22, 337:3, 340:12, 347:5, 347:12, 347:19, 348:2, 348:3, 348:4, 349:5, 349:15, 349:18, 350:16, 352:6, 352:18, 352:19, 352:20, 352:23, 355:8, 360:15, 360:16, 360:19, 360:25, 361:2, 361:3

**salesperson** [1] - 324:22

**satisfied** [1] - 316:22

**savings** [6] - 362:5, 362:7, 362:9, 362:10, 362:13, 362:17

**saw** [6] - 280:7, 315:25, 318:6, 332:6, 345:22

**scenario** [3] - 355:20, 355:21, 356:4

**schedule** [3] - 276:23, 338:4, 365:22

**schedules** [1] - 344:14

**scheduling** [1] - 364:24

**se** [2] - 299:23, 301:10

**seated** [1] - 263:13

**second** [4] - 271:2, 288:6, 336:9, 366:23

**seconds** [1] - 350:23

**see** [20] - 269:20, 274:15, 276:18, 276:23, 277:7, 277:20, 278:7, 279:11, 280:1, 280:3, 288:24, 300:2, 306:6, 306:8, 325:7, 326:2, 332:8, 339:7, 346:18, 368:12

**seeing** [2] - 300:22, 333:25

**segment** [20] - 267:10, 267:22, 268:15, 269:23, 269:25, 270:6, 270:17, 272:1, 272:9, 272:15, 288:14,

328:14, 329:2, 329:9, 329:11, 334:18, 335:10, 335:22, 358:19, 359:3

**selected** [2] - 282:19, 284:21

**selection** [2] - 333:4, 333:7

**sell** [8] - 274:20, 274:21, 276:6, 289:16, 325:4, 328:25, 349:22, 363:14

**selling** [28] - 279:3, 283:14, 283:15, 313:21, 313:24, 313:25, 315:15, 316:10, 320:12, 320:16, 320:19, 325:7, 327:25, 330:7, 330:10, 334:21, 335:6, 335:7, 335:12, 335:13, 340:11, 351:23, 352:6, 361:21, 361:24, 364:10

**sending** [1] - 281:18

**sense** [10] - 269:22, 270:3, 288:25, 294:12, 294:13, 303:20, 304:13, 322:8, 343:16, 344:19

**separate** [2] - 337:5, 343:6

**separately** [1] - 275:6

**September** [3] - 292:9, 292:20, 292:24

**series** [1] - 293:17

**served** [1] - 285:23

**services** [2] - 263:24, 264:15

**serving** [1] - 284:25

**set** [1] - 344:10

**seven** [1] - 351:12

**several** [2] - 264:7, 319:10

**sewing** [2] - 284:21, 285:18

**shaped** [1] - 355:3

**share** [6] - 281:18, 294:22, 320:9, 341:3, 341:11, 342:2

**shareholders** [3] - 359:11, 360:5, 360:10

**sharp** [1] - 343:24

**sheet** [2] - 276:13,

319:5

**sheets** [2] - 357:17, 357:18

**Shell** [1] - 282:19

**shifts** [1] - 276:22

**shipment** [1] - 291:16

**short** [3] - 291:19, 291:21, 310:8

**show** [6] - 329:13, 336:22, 337:3, 347:4, 363:20, 363:21

**showed** [1] - 337:5

**showing** [2] - 305:21, 337:7

**shows** [8] - 320:3, 329:19, 333:4, 338:18, 340:5, 341:22, 361:23

**SIC** [3] - 285:20, 285:21, 333:5

**SIDE** [1] - 262:12

**sign** [1] - 292:11

**signal** [1] - 366:19

**significance** [1] - 303:17

**significant** [12] - 280:7, 294:3, 294:17, 295:24, 302:11, 305:8, 319:14, 319:16, 319:22, 319:23, 322:6, 352:16

**significantly** [1] - 343:21

**similar** [3] - 284:23, 285:22, 333:16

**simple** [3] - 346:3, 346:5, 352:24

**simply** [5] - 319:25, 331:1, 332:15, 343:24, 359:7

**simulated** [4] - 358:4, 358:15, 358:16, 364:9

**simulating** [2] - 348:2, 348:3

**Simulation** [3] - 262:9, 262:10, 262:11

**simulation** [24] - 278:16, 323:24, 324:1, 324:6, 330:18, 331:9, 345:15, 345:19, 345:21, 345:23, 346:2, 346:9, 346:19, 347:3, 348:23, 350:8, 354:1, 358:4, 358:10, 358:13,

364:4, 364:9, 364:13, 364:16

**simulations** [2] - 348:16, 354:5

**single** [4] - 346:7, 348:11, 357:22, 369:3

**sit** [2] - 294:21, 302:15

**situation** [3] - 355:16, 360:2, 368:25

**situations** [2] - 346:15, 359:22

**six** [29] - 272:6, 272:10, 273:23, 288:21, 288:24, 294:2, 311:4, 311:5, 313:4, 316:2, 316:7, 323:3, 330:7, 330:20, 330:25, 334:1, 334:6, 336:19, 337:3, 339:15, 348:3, 351:2, 352:21, 352:24, 355:10, 358:2, 361:15, 365:9, 366:3

**six-month** [3] - 288:24, 336:19, 361:15

**six-months** [1] - 323:3

**size** [1] - 344:1

**slats** [1] - 281:5

**slice** [1] - 273:23

**slid** [1] - 281:5

**slipping** [1] - 341:23

**slower** [1] - 275:7

**small** [2] - 351:10, 351:13

**smaller** [1] - 359:14

**snapshot** [1] - 358:1

**software** [2] - 323:25, 350:11

**sold** [23] - 276:5, 282:13, 287:4, 289:8, 289:13, 289:19, 289:20, 310:21, 314:6, 314:21, 321:21, 333:23, 334:19, 335:3, 335:20, 338:5, 343:13, 343:14, 343:19, 343:20, 349:21, 352:21

**solemnly** [1] - 263:9

**solid** [1] - 281:5

**someone** [4] - 281:21, 296:11, 304:10, 339:6

**sometime** [1] - 365:5

**sometimes** [3] - 299:16, 299:19, 301:1

**somewhere** [1] - 347:13

**soon** [1] - 325:24

**sorry** [7] - 269:11, 281:23, 287:19, 313:23, 318:10, 334:14, 343:20

**sort** [6] - 305:14, 314:8, 327:19, 367:6, 368:21, 369:10

**space** [1] - 351:20

**specific** [2] - 273:25, 321:16, 326:1

**specifically** [4] - 274:10, 278:13, 305:18, 340:6

**spell** [1] - 263:14

**spend** [1] - 302:7

**spent** [5] - 334:23, 343:8, 343:10, 343:12, 343:25

**sponge** [1] - 368:10

**spread** [3] - 281:14, 318:18, 318:23

**Spreadsheet** [1] - 262:7

**squeeze** [1] - 368:10

**stage** [2] - 277:1, 326:6

**stamp** [2] - 279:13, 332:9

**stand** [4] - 344:12, 344:23, 364:20, 370:6

**standard** [8] - 323:19, 323:21, 328:4, 347:6, 347:9, 347:11, 355:5, 357:16

**standards** [2] - 266:16, 266:17

**standpoint** [1] - 283:21

**start** [2] - 267:12, 302:4

**started** [3] - 292:19, 297:10, 313:6

**starting** [1] - 361:15

**state** [2] - 263:14, 347:10

**statement** [4] - 267:11, 301:9, 304:4, 315:4

**statements** [6] - 277:21, 301:2, 301:4, 362:18,

369:12, 369:13
**STATES** [1] - 261:1
**States** [4] - 261:16,
261:17, 345:25,
370:10
**statistical** [4] -
278:11, 278:14,
282:19, 324:2
**statistically** [1] -
352:16
**statistician** [2] -
265:14, 278:25
**statistics** [5] - 264:25,
265:9, 278:18,
278:20, 278:24
**Stats** [12] - 262:9,
262:10, 262:11,
284:9, 284:11,
284:17, 284:19,
285:1, 285:3, 285:7,
286:6, 332:19
**steal** [2] - 307:17,
339:6
**steel** [2] - 315:15,
361:20
**stenography** [1] -
261:24
**step** [1] - 269:2
**still** [9] - 278:5,
316:10, 320:19,
328:25, 330:7,
344:25, 346:25,
360:8, 367:3
**stock** [1] - 268:4
**stop** [1] - 317:11
**stopped** [1] - 282:13
**straightforward** [3] -
300:12, 350:8,
350:24
**Street** [1] - 261:17
**strength** [1] - 361:21
**strike** [1] - 287:20
**stronger** [1] - 361:17
**strongly** [1] - 293:8
**studies** [1] - 266:20
**stuff** [1] - 365:21
**submit** [1] - 366:25
**subsequently** [2] -
265:16, 292:14
**substantial** [2] -
314:4, 362:17
**subtracting** [1] -
359:14
**success** [15] - 279:3,
283:13, 283:15,
283:18, 325:9,
325:18, 326:2,
326:14, 326:17,
327:1, 340:12,
340:20, 349:2,

349:14, 353:11
**sued** [3] - 282:12,
282:14, 310:9
**suffered** [2] - 268:21,
304:23
**sufficient** [2] - 299:11,
303:22
**sufficiently** [1] -
266:18
**suggest** [4] - 280:4,
335:20, 335:23,
365:11
**suggested** [1] -
339:10
**suggesting** [1] -
365:15
**suggests** [1] - 342:20
**suit** [1] - 360:4
**summarize** [1] -
355:14
**summary** [1] - 369:10
**summer** [1] - 361:13
**supplier** [2] - 322:18,
324:12
**supply** [1] - 322:14
**support** [5] - 273:14,
297:24, 300:5,
304:9, 364:11
**supporting** [1] -
301:18
**supposedly** [1] -
276:16
**surge** [4] - 288:24,
288:25, 289:1,
289:6, 289:9
**surprise** [3] - 265:3,
334:1, 343:15
**surprised** [1] - 343:11
**survey** [5] - 296:12,
296:13, 340:19,
340:25
**susceptible** [2] -
307:2, 309:17
**swear** [1] - 263:9
**sworn)** [1] - 344:24
**system** [1] - 323:21
**systematic** [2] - 334:3,
334:4

---

# T

**tactics** [2] - 341:21
**targeted** [1] - 362:16
**tax** [11] - 268:13,
269:12, 269:15,
269:18, 269:21,
332:22, 332:25,
359:10, 359:15,
359:16, 360:8
**taxes** [3] - 359:13,

359:14, 360:10
**teach** [1] - 264:12
**technically** [2] -
264:10, 265:13
**techniques** [2] -
281:25, 294:20
**technology** [3] -
315:1, 315:11,
353:15
**teed** [1] - 369:14
**temporary** [4] -
267:23, 268:20,
268:24, 270:23
**ten** [34] - 269:5, 270:7,
270:9, 270:11,
270:12, 270:13,
273:24, 282:18,
283:2, 283:9,
288:13, 288:15,
288:20, 289:2,
289:18, 297:2,
308:12, 325:17,
326:14, 326:22,
336:19, 339:16,
339:21, 349:14,
349:25, 350:6,
350:14, 353:12,
353:13, 359:7,
360:13, 362:9,
365:11
**ten-year** [8] - 269:5,
270:9, 270:12,
288:13, 288:15,
297:2, 336:19,
339:16
**tendency** [1] - 291:21
**tense** [6] - 291:7,
291:8, 291:13,
292:1, 309:13,
333:20
**tenseness** [1] - 317:3
**tenth** [2] - 349:18,
360:20
**term** [14] - 270:9,
289:25, 293:19,
296:23, 296:25,
297:3, 305:1,
308:12, 308:13,
309:5, 309:8,
311:13, 322:18,
324:12
**terminate** [1] - 309:13
**terminated** [4] -
291:25, 311:12,
311:16, 311:17
**terminology** [3] -
273:17, 323:5,
336:17
**terms** [3] - 270:9,
273:10, 351:20

**terse** [2] - 293:7,
293:11
**test** [8] - 270:3,
274:13, 274:17,
275:23, 276:19,
277:10, 337:14,
345:19
**tested** [2] - 297:4,
326:25
**testified** [49] - 264:19,
264:21, 267:25,
269:6, 270:22,
271:3, 272:19,
274:25, 275:19,
279:23, 281:10,
282:1, 282:2, 285:3,
287:8, 291:18,
294:1, 294:4,
294:18, 295:12,
306:9, 307:13,
310:8, 315:5, 317:9,
317:25, 318:9,
318:14, 320:24,
324:16, 328:4,
328:9, 328:11,
328:13, 329:1,
332:15, 335:2,
335:18, 337:25,
345:7, 345:14,
352:13, 352:15,
353:2, 358:18,
361:6, 361:10, 364:4
**testify** [7] - 305:24,
306:4, 306:12,
319:4, 327:24,
335:4, 344:4
**testifying** [3] - 264:23,
326:5, 345:14
**testimony** [30] - 263:9,
267:1, 267:3,
275:25, 279:2,
282:25, 288:12,
295:21, 311:24,
318:25, 324:5,
325:21, 331:21,
332:20, 344:16,
345:10, 351:4,
351:25, 353:6,
353:25, 356:5,
356:7, 358:8, 358:9,
358:24, 359:2,
360:11, 361:8, 369:2
**testing** [6] - 276:9,
284:1, 284:2,
300:17, 342:21,
347:15
**text** [1] - 345:24
**textbook** [1] - 264:9
**textbooks** [3] - 264:8,
264:12, 345:25

**THE** [45] - 261:16,
263:2, 263:5, 263:8,
263:12, 263:13,
263:16, 263:18,
297:6, 334:9,
334:11, 338:16,
343:1, 344:9,
344:11, 344:18,
344:21, 344:25,
363:6, 363:8,
364:18, 364:20,
365:1, 365:4,
365:12, 365:19,
365:24, 366:2,
366:8, 366:14,
366:18, 367:1,
367:6, 367:17,
368:2, 368:9,
368:14, 368:17,
368:24, 369:6,
369:10, 369:21,
369:24, 370:3, 370:6
**their's** [1] - 367:14
**themselves** [1] -
278:25
**theoretically** [1] -
360:20
**theory** [3] - 278:12,
279:25, 332:7
**thereto** [1] - 300:8
**they've** [4] - 303:21,
303:22, 321:1, 341:9
**thinking** [2] - 327:13,
366:8
**thinks** [2] - 265:7,
294:8
**third** [2] - 354:21,
366:7
**thousand** [3] - 294:6,
312:18, 348:9
**thousands** [2] -
345:16, 348:21
**three** [9] - 276:8,
320:25, 329:1,
347:24, 352:18,
355:8, 364:15,
368:6, 368:7
**thumb** [3] - 270:10,
270:11, 270:12
**Thursday** [21] -
266:25, 267:3,
267:8, 268:22,
270:20, 272:4,
274:24, 276:14,
279:2, 282:2,
282:25, 285:3,
288:19, 305:24,
319:1, 335:1, 345:7,
354:22, 359:2,

361:11
**tied** [2] - 290:16, 342:24
**today** [9] - 309:21, 312:25, 315:9, 321:8, 328:13, 331:14, 353:10, 358:18, 366:21
**together** [4] - 271:7, 310:19, 310:25, 336:7
**took** [2] - 265:18, 305:15
**total** [2] - 286:21, 342:24
**totaled** [1] - 311:4
**totally** [1] - 269:24
**totals** [1] - 350:14
**towards** [1] - 317:5
**track** [2] - 269:23, 325:8
**trade** [1] - 341:22
**training** [2] - 279:1, 300:13
**transaction** [3] - 284:12, 285:8, 285:9
**transactions** [4] - 285:6, 285:15, 286:12, 333:5
**transcript** [5] - 261:13, 329:13, 365:2, 367:2, 370:11
**transcript's** [1] - 365:4
**transcription** [1] - 261:25
**transcripts** [1] - 366:15
**Transportation** [11] - 292:3, 292:8, 292:10, 292:13, 292:17, 292:22, 311:21, 316:14, 316:16, 316:19, 316:22
**traveling** [1] - 365:16
**Treasury** [1] - 353:24
**treated** [1] - 359:17
**trial** [1] - 350:19
**trials** [2] - 350:21, 351:2
**triangular** [7] - 354:7, 354:21, 355:7, 355:15, 355:17, 356:1, 357:3
**trip** [1] - 334:13
**truck** [1] - 361:23
**true** [13] - 279:15, 279:16, 279:18, 280:1, 285:6, 299:16, 301:1,

303:20, 304:6, 311:25, 320:11, 328:21, 330:17
**truth** [3] - 263:10, 263:11
**trying** [10] - 285:25, 286:3, 289:15, 296:10, 304:15, 319:20, 325:4, 329:14, 346:16
**two** [25] - 267:19, 277:15, 292:2, 298:18, 321:19, 336:6, 338:19, 343:9, 343:16, 344:13, 347:9, 347:12, 347:22, 347:23, 349:21, 349:23, 350:21, 355:6, 357:18, 366:21, 366:24, 368:20
**type** [6] - 314:16, 317:17, 334:20, 348:18, 359:21, 359:22
**types** [4] - 314:17, 332:23, 335:8, 348:16
**typically** [8] - 268:8, 268:10, 272:23, 278:7, 278:24, 284:2, 298:23, 354:4

---

## U

**ultimate** [2] - 266:9, 317:10
**ultimately** [2] - 265:12, 311:9
**uncertainty** [1] - 346:20
**under** [3] - 283:22, 341:23, 344:25
**understood** [2] - 314:12, 356:10
**unemployment** [1] - 348:20
**unfortunately** [1] - 276:15
**unhappy** [1] - 291:16
**uniform** [1] - 354:17
**uniformed** [1] - 354:7
**unit** [13] - 313:25, 347:5, 347:12, 348:2, 348:3, 350:16, 352:6, 355:8, 360:16
**UNITED** [1] - 261:1
**United** [4] - 261:16,

261:17, 345:25, 370:9
**units** [3] - 276:4, 289:8, 289:13
**unless** [2] - 278:25, 367:6
**unreasonable** [5] - 298:10, 299:23, 300:3, 301:10, 349:25
**unrelated** [1] - 282:23
**unreliable** [1] - 296:18
**up** [26] - 265:19, 268:22, 276:9, 279:11, 280:1, 281:7, 285:7, 293:2, 294:5, 304:4, 319:17, 320:1, 324:21, 326:22, 328:8, 331:13, 332:6, 332:7, 332:8, 349:24, 356:11, 361:23, 363:20, 363:21, 369:13, 369:14
**updates** [1] - 340:16
**upgrades** [1] - 340:16
**upper** [1] - 354:19
**uses** [4] - 286:14, 311:25, 330:19, 330:21

---

## V

**valuation** [14] - 264:1, 264:7, 264:8, 264:11, 264:12, 264:22, 268:8, 268:10, 268:15, 269:19, 270:2, 328:18, 359:20, 359:23
**value** [32] - 268:4, 268:7, 268:17, 269:9, 269:12, 270:13, 270:15, 270:17, 270:19, 271:10, 271:13, 271:18, 271:20, 271:24, 272:3, 272:12, 272:17, 284:14, 285:4, 285:11, 286:20, 288:11, 290:9, 330:6, 335:17, 338:22, 346:11, 346:14, 348:12, 359:8, 360:6
**values** [1] - 358:5
**variable** [7] - 269:7,

287:3, 287:9, 287:13, 348:2, 349:3, 351:1
**variables** [7] - 346:10, 346:20, 348:3, 351:2, 352:4, 352:5, 352:11
**various** [4] - 296:4, 296:5, 319:6
**vary** [1] - 348:9
**vast** [1] - 280:17
**verify** [1] - 345:19
**version** [1] - 317:21
**versus** [8] - 261:7, 267:15, 287:3, 314:5, 319:19, 362:11, 362:12
**vet** [1] - 301:13
**view** [1] - 275:10
**vigorously** [3] - 293:22, 309:22, 309:24
**visit** [2] - 275:20, 276:3
**volatility** [1] - 289:21, 289:22
**volume** [2] - 287:11, 327:15
**Volume** [1] - 261:7

---

## W

**wants** [2] - 348:11, 348:25
**warning** [1] - 292:11
**ways** [1] - 297:23
**website** [1] - 295:18
**Wednesday** [1] - 265:3
**week** [14] - 265:24, 267:25, 271:4, 272:19, 288:12, 365:5, 365:8, 365:17, 365:18, 366:5, 366:7, 366:16, 368:15
**weeks** [12] - 291:24, 311:19, 365:9, 366:3, 366:11, 366:18, 366:21, 366:24, 367:3, 367:14, 368:6, 368:7
**weigh** [1] - 361:19
**weighted** [6] - 271:12, 271:17, 271:21, 284:12, 284:18, 346:12
**weighting** [2] - 271:21, 284:17
**whole** [6] - 263:10,

293:17, 315:10, 315:11, 315:14, 326:10
**widely** [1] - 345:24
**wider** [2] - 348:1, 348:5
**willing** [2] - 356:19, 356:22
**win** [1] - 369:3
**wipe** [1] - 351:17
**withdraw** [1] - 325:16
**withdrawn** [1] - 358:12
**WITNESS** [2] - 263:12, 263:16
**Witness** [1] - 262:2
**witness** [1] - 344:24
**witnesses** [1] - 344:13
**wonder** [1] - 367:23
**WOODCOCK** [1] - 261:16
**Woodcock** [1] - 272:5
**word** [2] - 352:8, 356:23
**words** [5] - 279:16, 300:10, 326:1, 332:6, 369:3
**worst** [4] - 349:1, 354:25, 355:21, 356:4, 356:18, 356:20
**worst-case** [5] - 354:25, 355:21, 356:4, 356:18, 356:20
**write** [1] - 351:8
**writing** [2] - 265:10, 324:20
**written** [3] - 322:14, 324:14, 350:13

---

## X

**XL** [1] - 350:15
**XLSim** [1] - 350:11

---

## Y

**year** [27] - 269:5, 270:4, 270:9, 270:12, 288:13, 288:15, 289:16, 289:19, 289:20, 297:2, 336:19, 339:16, 341:5, 347:5, 348:22, 349:15, 349:18, 349:21, 349:22, 350:6, 350:22, 351:6, 351:22,

358:4, 358:15,
358:16, 360:20
**years** [37] - 265:8,
270:4, 270:11,
270:13, 272:6,
272:10, 273:24,
288:20, 289:2,
289:18, 295:15,
295:19, 308:12,
315:7, 316:2, 316:7,
330:7, 330:20,
330:22, 330:25,
331:5, 339:21,
346:1, 348:6,
348:20, 349:25,
350:3, 350:14,
351:18, 357:24,
358:5, 359:7,
360:14, 360:15,
360:17, 363:1
**yourself** [3] - 305:4,
310:2, 349:19

## Z

**zero** [1] - 360:20
**zeros** [2] - 351:9,
351:12