UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PACKGEN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:12-cv-00080-JAW |
| | ) | |
| BERRY PLASTICS | ) | |
| CORPORATION, et al. | ) | |
| | ) | |
| Defendants | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE THE EXPERT TESTIMONY AND
OPINIONS OF PLAINTIFF'S EXPERT, MARK G. FILLER**

# TABLE OF CONTENTS

I.   The Application of *Daubert* to Damages Experts …………………………….. 3

II.  Filler's Opinions Meet *Daubert* Standards ……………………………………… 7

   A. Packgen's claims ……………………………………………………….. 7

   B. Filler's investigation and methodology ……………………………………… 8

   C. The CRI damages model ……………………………………………….. 9

   D. The refineries damages model ………………………………………………… 10

   E.  Filler's opinions are reliable and are supported by sufficient facts
       and data, and therefore they pass muster under *Daubert* …………………… 11

III. Filler is Qualified to Use Statistical Tools in Lost Profits Analysis ……………. 11

   A. Linear regression is a basic statistical tool routinely used by
      damages experts such as Filler …………………………………………… 11

   B. Filler is qualified to use simulation in his refineries lost profits model ……… 15

IV.  Filler's Opinion that Packgen's Damages Extend for Ten Years
     after the Product Failure is Admissible …………………………………………… 19

   A. The CRI ten-year loss period is reliable ……………………………………… 19

   B. The refineries ten-year loss period is also reliable …………………………… 31

   C. Filler's lost profits opinions are admissible even if it is assumed for
      the sake of argument that one or both of the ten-year loss periods
      are barred by *Daubert* …………………………………………………….. 34

V.   The CRI Damages Analysis is a Proper Lost Profits Model …………………… 35

VI.  Filler's Ten Percent Success Rate for Projected Sales to Refineries
     is Supported by Sufficient Facts and Data ……………………………………… 37

VII. Filler Properly Relied on Information Provided by Packgen
     Identifying which Refineries did not Buy Cougars Because
     of the Product Failure …………………………………………………….. 41

Defendants seek to exclude the testimony of Plaintiff Packgen's damages expert, Mark Filler, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[1]  Defendants profess to limit their motion to issues within the proper scope of a *Daubert* inquiry: Filler's qualifications to use statistics, his alleged methodological shortcomings, and the purported absence of any facts or data supporting his opinions.  But Defendants' motion "is unpersuasive because it fundamentally confuses the credibility and accuracy of [Filler's testimony] with its reliability."[2]

Defendants' arguments touch upon only the weight of Filler's opinions, not their admissibility.  For example, his extensive qualifications as a damages expert include the use of statistical tools in lost profits calculations.  In addition, Filler employed an accepted lost profits methodology— the sales projection method—in a reliable manner, and Defendants merely quibble with his conclusions.  Moreover, the record reveals that Filler's opinions rest on a foundation of sufficient facts and data.  Defendants' arguments, at their core, challenge only the suitability of these facts and data and Filler's professional judgments as to how to use and interpret them.  These challenges, therefore, are properly tested by the adversary process and determined by the jury.  As the First Circuit has stressed, "the district court's gate keeping function ought not to be confused with the jury's responsibility to separate wheat from chaff."[3]  Because Defendants disregard this principle, this Court should deny their *Daubert* motion.

<u>Argument</u>

## I.   The Application of *Daubert* to Damages Experts

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  This rule provides that:

---

[1]  509 U.S. 579 (1993).
[2]  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (emphasis deleted).
[3]  *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The First Circuit interprets Rule 702 liberally in favor of admitting expert testimony.[4]

Under *Daubert*, trial judges act as gatekeepers to ensure that the requirements of Rule 702 are satisfied. The role of the court is "to screen the jury from unreliable nonsense opinions, but not [to] exclude opinions merely because they are impeachable."[5] The First Circuit emphasizes that the proponent of expert testimony need not prove that the expert's opinions are correct, nor is it the court's role to decide which of several experts is correct.[6] If an expert's opinion rests on good grounds, "it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."[7] Rejection of expert testimony remains the exception, not the rule.[8]

This principle applies with equal force to damages experts. "Relatively few economists serving as damages experts succumb to *Daubert* challenges, because most damages analyses operate in the familiar territory of measuring economic values using a combination of professional judgment and standard tools."[9] This is true despite the fact that "but for" damages calculations force experts to construct a hypothetical world that never existed, *i.e.*, an uncertain

---

[4] *See Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).

[5] *Alaska Rent-A- Car, Inc. v. Avis Budget Grp., Inc.,* 709 F.3d 872, 883 (9th Cir. 2013).

[6] *Milward v. Acuity Specialty Prods. Grp., Inc.,* 639 F.3d 11, 15 (1st Cir. 2011); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998); *see I4I L.P. v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (*Daubert* and Rule 702 are safeguards against unreliable opinions, not guarantees of correctness).

[7] *Ruiz-Troche,* 161 F.3d at 85.

[8] *See* Fed. R. Evid. 702 adv. comm. note, 2000 amend.

[9] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 431-32 (3rd ed. 2011).

and to some extent unknowable world in which the defendant's wrongful actions never occurred.[10]  Expert opinions creating this theoretical world must rely on assumptions and on information provided by the client.[11]  As the Eighth Circuit has observed, "[e]xpert opinion necessarily involves some speculation."[12]  But as long as a damages expert employs an accepted methodology in a reliable fashion, *Daubert* does not bar the expert's opinions.  Disputes over the expert's conclusions go to weight, not admissibility, and are best addressed through cross-examination and rebuttal expert testimony.[13]

A damages expert must, of course, rely on facts and data, not unsupported speculation. In its role as gatekeeper, the trial court examines the quantity—not the quality—of those facts and data.[14]  Moreover, if the damages expert emphasizes certain facts or disregards others, this goes to the weight of the opinions.[15]  Thus, the selection of data inputs for a damages model is not pertinent to the reliability of the methodology itself.[16]  The accuracy and propriety of the data and assumptions relied on by the damages expert is instead tested by the adversarial process and determined by the jury.[17]  As the Seventh Circuit has held, the reliability of damages opinions is "primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."[18]

---

[10] *See Alaska Rent-A-Car,* 709 F.3d at 881.

[11] *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *see WWP, Inc. v. Wounded Warriors Fam. Support, Inc.,* 628 F.3d 1032, 1040 (8th Cir. 2011).

[12] *The Weitz Co. v. MH Washington, LLC*, 631 F.3d 510, 528 (8th Cir. 2011).

[13] *See, e.g.*, *Manpower, Inc. v. Ins. Co. of the State of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013); *ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531-32 (6th Cir. 2008).

[14] *See, e.g., Manpower, Inc.,* 732 F.3d at 809; Fed. R. Evid. 702 adv. comm. note, 2000 amend. (quantitative, not qualitative, analysis); 29 Charles Wright & Victor Gold, FEDERAL PRACTICE AND PROCEDURE, § 6266 at 83 (2013 Supp.) (issue is whether expert "considered *enough* information" to make opinion reliable) (emphasis in original).

[15] *See, e.g., Manpower, Inc.,* 732 F.3d at 809; *Cummings v. The Std. Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001).

[16] *See, e.g., Manpower, Inc.,* 732 F.3d at 807; *I4I L.P. v. Microsoft Corp.*, 598 F.3d at 854 & 855-56.

[17] *See, e.g., Manpower, Inc.,* 732 F.3d at 807-08; *I4I L.P.,* 598 F.3d at 856; *Brown v. Wal-Mart Stores, Inc.*, 402 F.Supp.2d 303, 308-09 (D. Me. 2005).

[18] *Manpower, Inc.,* 732 F.3d at 806.

Courts exclude damages experts under *Daubert* only if the expert uses a flawed methodology or issues an opinion wholly unsupported by facts and data.  For example, the Eleventh Circuit excluded a damages expert who calculated lost profits using gross revenues without deducting any expenses, a methodology not accepted in the accounting profession.[19] Similarly, the Federal Circuit excluded a damages expert who made unsupported assumptions about an infringing product that were completely unjustified.[20]

The recent decision by Magistrate Judge Rich in *CRC Health Group v. Town of Warren*[21] illustrates the application of *Daubert* to damages experts.  In *CRC Health*, the plaintiff designated a former economics professor who had never calculated lost profits for a startup venture and who had no recent experience calculating lost profits even for established businesses.[22]  The expert conceded at his deposition that financial forecasts for a clinic such as the one that the plaintiff had intended to start were "only slightly connected to what I do as an economist."[23]  The defendant argued in its *Daubert* motion that the expert also uncritically accepted expense and revenue forecasts provided to him by his client and did no independent evaluation or testing of his client's opinions.  But the court nevertheless denied the *Daubert* motion, stressing that the claimed weaknesses went to the weight of the expert's opinions, not their admissibility.[24]  The court emphasized that "the line between weight and admissibility is crossed [only] when an expert's opinion is so insufficiently buttressed by factual underpinnings that it amounts to pure speculation."[25]

---

[19] *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.,* 362 F.3d 775, 780 (11th Cir. 2004); *see also Baldwin v. Bader*, 539 F.Supp. 443, 448 (D. Me. 2008) (damages expert did not use accepted methodology).

[20] *See Power Integration, Inc. v. Fairchild Semiconductor Int'l*, 711 F.3d 1348, 1373-74 (Fed. Cir. 2013).

[21] No. 2:11-cv-196-DBH (D. Me. March 31, 2014).

[22] *Id*. at 37-38.

[23] *Id*. at 40 (quotation marks omitted).

[24] *Id*. at 49.

[25] *Id*. at 49.

## II.   Filler's Opinions Meet *Daubert Standards*

### A.  Packgen's claims

Packgen manufactures intermediate bulk containers certified for the transportation and storage of catalyst, a hazardous chemical agent employed in refining crude oil into petroleum products.  In 2007, Packgen redesigned its Cougar catalyst container and began making it out of woven polypropylene bonded to aluminum foil.  Defendants agreed to supply this laminated fabric to Packgen and represented that they could meet Packgen's quality standards.

Packgen and CRI/Criterion ("CRI"), a catalyst manufacturer and long-standing Packgen customer, worked together to modify the new Cougar to meet CRI's specialized requirements. After a lengthy development process, CRI agreed that the customized Cougars met its needs and began purchasing large quantities of Cougars.  But six months later, Cougars sold to CRI ruptured when they were loaded with catalyst.  This created an unsafe and dangerous situation at the many locations around the world where CRI had delivered catalyst in Packgen's containers. CRI immediately cancelled all pending orders for the customized Cougars and terminated its business relationship with Packgen.  Because of the widespread negative fallout from the product failure, Packgen lost sales not only to CRI, but also to 37 North American refineries.

Packgen sued Defendants, alleging breach of contract, breach of express warranty, breaches of the implied warranties of fitness for a particular purpose and merchantability, and negligence.  Packgen maintains that Defendants supplied it with woven polypropylene fabric of poor quality, that Defendants failed to properly bond the aluminum foil to this fabric, and that Defendants' laminated material was unsuitable for containers designed for catalyst.

**B. Filler's investigation and methodology**

Packgen retained Mark Filler to compute Packgen's lost profits damages, *i.e.*, "sales not made minus costs avoided." *Hearing Transcript ("Tr.")* 9:23-10:4.  Filler is well-qualified for this task.  He is a certified public accountant and an expert in business valuation, business interruption claims, and lost profits damages. *See Exh. 22; Defs.' Exh. 1* at Exh. 22.  Filler has served as an expert witness in over 100 cases. *Id*.  He also has written extensively about business valuation and lost profits damages and taught courses on these subjects. *Id*.

Filler first investigated Packgen's finances and operations.  He reviewed financial data, including CPA-reviewed financial statements, internal financial statements, sales history, and corporate tax returns. *Tr.* 11:18-25; 88:1-2; 191:4-7.  Filler also made three trips to Packgen's manufacturing plant, spending a total of 12 hours there. *Id*. 11:25-12:2.  During these trips, he observed Packgen's manufacturing process, interviewed the company president, John Lapoint (who has worked in the container industry for three decades), and questioned the bookkeeper on financial issues such as normalizing costs. *Id*. 11:25-12:12; 88:3-14.  Filler's interviews of Lapoint included an extensive list of topics such as (1) Packgen's manufacturing capacity; (2) the market for catalyst containers; (3) Packgen's competition; (4) costs; (5) the effect of the product failure; (6) the sales history for catalyst containers; (7) the company's expectations for sales to CRI and refineries; and (8) political, economic, social, technological, environmental, and legal factors that could affect Packgen's sales. *Id*. 12:19-13:21; 87:22-25; 92:6-23.

Filler also gathered information about the catalyst industry.  He researched the nature of catalyst and viewed a Packgen video showing how its containers are used to move catalyst. *Id*. 12:13-15.  In addition, Filler reviewed the expert designation of David Berman, Packgen's

catalyst industry expert.  *Id*. 13:22-24; 47:23-48:12.  He also consulted a data base of purchase and sale transactions of companies similar to Packgen.  *Id*. 14:1-7.

During his investigation, Filler used standard procedures for determining Packgen's losses.  *Id*. 14:8-14.  He did not go about his work any differently than he would have if this assignment had not involved litigation.  *Id*.  Filler devoted about 100 hours of professional time to arriving at his damages opinions.  *Id*. 14:15-17.

Filler chose the sales projection methodology as the most appropriate method to calculate Packgen's damages.  *Id*. 15:6-7; 15:23-16:11; 50:20-51:2.  This methodology is one of four accepted methodologies for computing lost profits, and Filler considered the appropriateness of all four.  *Id*. 15:9-16:11; 297:21-23; 336:10-13.  The purpose of the sales projection method is to project sales that would have occurred but for the incident in question.  *Id*. 15:7-12.

### C.  The CRI damages model

To calculate the damages stemming from lost sales to CRI using the sales projection method, Filler employed a deterministic model; that is, a model that does not include future contingencies.  *Id*. 50:20-25; Exh. *1A*.  He relied on actual sales to CRI, not internal sales forecasts.  *Tr*. 16:12-15.  In his damages model, Filler projected the sales to CRI that would have occurred but for the product failure by using the number of units sold and unit prices from the six-month sales history of the customized Cougars.  *Id.* 16:16-17:13;18:2-20:1; 47:5-19; *Exh. 1A*. He then analyzed material, freight, labor, and fixed and variable overhead costs, and he deducted those costs from the gross revenues to arrive at net profits.  *Tr*. at 20:2-34:6; *Exh. 1A*.  Filler also determined the appropriate discount rate and applied that rate to the net profits.  *Tr*. 34:7-44:25; 46:16-47:4; *Exh. 1A*.  The CRI damages model shows the annual net present value of Packgen's lost profits for each of the ten years following the product failure.  *Exh. 1A*.

### D.  The refineries damages model

Filler also used the sales projection methodology for the refineries, but he chose a probabilistic model instead of a deterministic model to account for future contingencies.  *Tr.* 50:20-51:3.  A probabilistic model allows for future contingencies such as changes in technology or competition by assigning probabilities to those contingencies.  *Id.* 51:3-19.  Filler picked this model because Packgen did not have a lengthy track record selling the new foil-laminated Cougars to refineries.  *Id.* 51:20-52:2.  To implement his probabilistic model, Filler used a simulation software program to run 5,000 trials with a broad range of potential outcomes based on the assigned probabilities.  *Id.* 54:6-55:19.  Using simulation software for this purpose is an accepted methodology for damages experts.  *Id.* 56:12-22.

Exhibit 17 lists the refineries for which Packgen lost sales as a result of the product failure and provides detailed information for each refinery, including the volume of catalyst consumed, the unit prices quoted by Packgen, and potential unit sales and revenues on an annualized basis.  *Id.* 57:3-16; *Exh. 17.*  Filler then assigned probabilities, by refinery, for the best case, most likely case, and worst case scenarios for unit sales, unit prices, and costs.  *Tr.* 57:17-58:3; 59:11-62:9.  He also determined what Packgen's success rate for sales to the listed refineries would have been if the product failure had not occurred.  *Id.* 63:7-70:2.  Filler reduced the simulated unit sales by actual unit sales through the end of 2013, or, for future years, by expected unit sales.  *Id.* 70:16-72:8; *Exh. 13A.*[26]  He then deducted material, freight, labor, and fixed and variable overhead costs.  *Exh. 13A.*  After applying the discount rate, the model depicts

---

[26]  Exhibit 13A shows a single trial for one refinery, except for the lines on the right-hand side of Exhibit 13A titled Simulated Unit Sales, Mkt Pntrtn, Simulated Net Profit, Present Value Factor . . ., Annual Net Present Value . . ., and Total Net Present Value . . . .  The numbers on these lines reflect the results of all 5,000 trials.  *See Tr.* 63:3-6.

the annual net present value of lost profits for each year of the ten-year loss period for the refineries. *Tr.* 75:20-76:3; *Exh. 13A.*

### E. Filler's opinions are reliable and are supported by sufficient facts and data, and therefore they pass muster under *Daubert*

Filler's expert opinions rest on a reliable foundation and are relevant to the issues in this case. He used an accepted methodology for damages experts, and his opinions rationally flow from this methodology. In addition, these opinions are supported by a sufficient quantity of facts and data. Accordingly, Packgen has met its burden of showing that Filler's opinions are admissible under *Daubert*.[27]

## III. Filler is Qualified to Use Statistical Tools in Lost Profits Analysis

### A. Linear regression is a basic statistical tool routinely used by damages experts such as Filler

Defendants seek to exclude the entirety of Filler's lost profits opinions because he used linear regression—a basic statistical tool—for a discrete part of his analysis, the allocation of Packgen's overhead costs. *Defs.' Mem.* at 9-13. They wrongly contend that Filler's admission that he is not a statistics expert demonstrates that he is not qualified to offer opinions "that rely in any way on statistics." *Id.* at 9. This Court should reject Defendants' argument because this sweeping generalization finds no support in either the case law or financial damages treatises.

Defendants' argument is akin to suggesting that a damages expert cannot use algebra equations unless he has a Ph.D. in mathematics. Linear regression is a simple statistical tool taught in introductory college statistics courses such as that taken by Filler.[28] *Tr.* 80:25-81:3.

---

[27] Defendants note that Filler issued a number of opinions, but they do not argue that this justifies excluding his testimony. *Defs.' Mem.* at 3. The differences relate to issues such as evidence of unit prices or correction of errors. *Tr.* 43:18-44:4; 78:15-79:1; 85:22-86:10; 112:18-23; 191:20-192:3.

[28] *See* LYMAN OTT & WILLIAM MENDENHALL, UNDERSTANDING STATISTICS (5th ed. 1990). The preface states that "[t]his text is designed for a one-quarter or one-semester introductory course in statistics . . . for students majoring in, or intending to major in, many different areas. The approach, examples, and exercises provide a basic knowledge

This statistical tool is an equation that employs only two variables: the dependent variable, which is examined to see if it can be explained by the other variable, known as the independent variable.[29]  The equation creates a straight line, or trend line, by plotting data points on a graph.[30]

Damages and business valuation experts like Filler routinely use this statistical tool in their work.  Treatises written for such experts explain linear regression and instruct them how to use it in damages and valuation analyses.[31]  Indeed, the lost profits treatise edited by Defendants' damages expert and counsel stresses that financial experts use a variety of statistical methods to establish costs, including regression analysis to "identify[ ] relationships between a cost and one or more variables, such as sales or production levels."[32]  This is precisely what Filler did.  *See Exh. 5 ("Total Costs vs Total Sales")*.  Nonstatisticians write these treatises for business valuation and damages experts, and the authors do not include any caveats that only statisticians can employ linear regression analysis.[33]

Case law also provides no support for Defendants' position.  "Numerous courts have held

---

of statistical concepts that will be useful in business and in the biological, social, and physical sciences."  *Id.* at *Preface*.  The authors devote chapter 13 of this textbook to linear regression.

[29]  *See ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 890 (7th Cir. 2011); ROMAN L. WEIL, et al., eds., LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT, p. 8.3 (5th ed. 2012) ("Regression analysis provides a statistical framework for understanding the relationship between two or more variables").

[30]  *See ATA Airlines, Inc.*, 665 F.3d at 890.

[31]  *See, e.g.*, WEIL, *supra* note 29, at pp. 4.19, 7.2-7.7, 8.3-8.5, & 26.21-26.22; JAY B. ABRAMS, QUANTITATIVE BUSINESS VALUATION: A MATHEMATICAL APPROACH FOR TODAY'S PROFESSIONALS (2d ed. 2010) (addressing regression analysis in chapter 3); SHANNON P. PRATT & ALINA V. NICULITA, VALUING A BUSINESS, 295 & exh. 11-2 and 297 & exh. 11-3 (5th ed. 2008).

[32]  NANCY FANNON & JONATHAN M. DUNITZ, eds., THE COMPREHENSIVE GUIDE TO LOST PROFITS AND OTHER COMMERCIAL DAMAGES, 232 (3rd ed. 2014).  The treatise edited by Fannon and Dunitz also flags a trend in the First Circuit to use regression analysis to establish fixed or variable overhead expenses in damages cases.  *Id.* at 773.

[33]  FANNON & DUNITZ, *supra* note 32, at 35 ("In this comprehensive *Guide*, we bring together the financial expert's knowledge of accepted methods and procedures with the attorney's knowledge of legal issues and insights"); WEIL, *supra* note 29, at xi ("a comprehensive guide for economists, accountants, and litigators involved with the analytic and damages issues in commercial litigation"); ABRAMS, *supra* note 31, at xxi ("I have written this book with the professional business appraiser as my primary intended audience, though I think this book is also appropriate for attorneys who are very experienced in valuation matters, investment bankers, venture capitalists, financial analysts, and MBA students");  PRATT & NICULITA, *supra* note 31, at xxxiii (book is designed for active business appraisers, beginning practitioners, and nonappraisers who use business appraisals, and as an introductory text on business valuation) & xxxi (foreword by Nancy Fannon: "The book is as useful to appraisers beginning their appraisal career, as I used it many years ago, as it is to seasoned appraisal professionals").

that regression analysis is a reliable method for determining damages and a mainstream tool in economic study."[34]  For example, in lost profits cases, nonstatisticians offer opinions predicated on linear regression.[35]  The cases cited by Defendants, on the other hand, are not germane. *Defs.' Mem* at 9-10.  These cases do not state that damages experts are unqualified to use linear regression.  In fact, they do not even discuss *Daubert*, lost profits damages, or linear regression. Defendants' cases instead involve sophisticated statistical analyses, such as multiple regression, that are utilized to prove causation from association in discrimination cases.  Multiple regression typically uses more than two variables to establish causation and is a significantly more complex statistical model than linear regression.[36]  Accordingly, the case law relied on by Defendants provides no support for their argument that Filler is unqualified to use linear regression to allocate overhead costs in a lost profits model.

Filler is particularly well-suited as a damages expert to use linear regression in lost profits analysis because he has extensive experience with statistical tools in this context.  Filler participates annually in continuing professional education that includes statistics.  *Exh. 22* at 1. He has completed a college statistics course, has an extensive library on the use of statistics, and employs statistical tools daily for business valuation, business interruption claims, and damages claims.  *Tr.* 80:25-82:14.  Filler also writes extensively on the role of regression models in lost

---

[34] *Johnson Elec. No. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 283 (S.D.N.Y. 2000) (quotation marks omitted); *see also Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1335, 1347 (S.D. Fla. 1999), aff'd, 333 F.3d. 1248 (11th Cir. 2003).

[35] *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 780 & 793 (6th Cir. 2002); *Honeywell Int'l Inc. v. Air Prods. & Chems., Inc.*, 858 A.2d 392, 426 & 428 (Del. Ch. 2004).

[36] *See, e.g., Wilkins v. Univ. of Houston*, 654 F.2d 388, 402-03 (5th Cir. 1981) ("Multiple regression analysis is a relatively sophisticated means of determining the effect that any number of different factors have on a particular vartiable."); REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra* note 9, 260-72 & 305-17.  Unlike linear regression, multiple regression is not routinely taught in introductory statistics courses. *See* OTT & MENDENHALL, *supra* note 28, at 424 (stating that multiple regression section of textbook is optional).

profits analysis and teaches courses on the use of statistical tools to calculate lost profits.[37]  Thus, under Rule 702, Filler is qualified by "knowledge, skill, experience, training, or education"[38] as an expert in the application of statistical tools such as linear regression to lost profits analysis. As the First Circuit has emphasized, "expert witnesses need not have overly specialized knowledge to offer opinions"[39] or be "blue-ribbon practitioners with optional certifications."[40]

Filler used linear regression solely for the limited purpose of allocating overhead, which is only one of the many components of his damages models.  He did not employ this statistical tool to project lost profits or to prove causation.  *Id.* 32:2-4.  Filler testified that he recognized that his linear regression test was not statistically significant.  *Id.* 31:23-32:4; 352:13-353:1.  For purposes of allocating overhead, however, he found this test helpful and an improvement over the simple average.  *Id.* 32:2-11.  Filler also emphasized that his overhead allocation would not have changed even if he had used a simple average instead.  *Id.* 352:24-353:1.

Given the lack of financial treatises and cases supporting the argument that Filler is not qualified to use linear regression, Defendants try to advance their novel argument by relying on their statistics expert, Charles Cowan.  But Cowan's report, which served as Defendants' expert witness disclosure, does not state that Filler is unqualified to use linear regression to allocate overhead or criticize his use of this statistical tool in this case.[41]  Accordingly, Defendants are precluded from relying on Cowan.  Moreover, Cowan did not testify at the *Daubert* hearing that Filler was not qualified.  Although he questioned Filler's reliance on linear regression instead of

---

[37]  *Defs.' Exh. 1* at exh. 22, p. 2 (Publications); Mark G. Filler & James A. DiGabriele, A Quantitative Approach to Commercial Damages: Applying Statistics to the Measurement of Lost Profits (2012) (chapters 2-6 and 8 use linear regression models); *Exh. 22* at 3-4 (Teaching Experience).
[38]  Fed. R. Evid. 702.
[39]  *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).
[40]  *U.S. v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006); *see Tuf Racing*, 223 F.3d at 591 (experts need not be academics or PhDs; notion that Rule 702 requires particular credentials is unsound).
[41]  *Defs.' Mot. and Incorporated Mem. to Exclude the Expert Test. and Ops. of Pl.'s Expert, Mark G. Filler*, at Exh. D, p. 8 (Cowan report).

14

a simple average, Cowan conceded that use of this regression might be a matter for Filler's

professional judgment. *Id.* 240:10-21. Cowan also admitted that he operates on the theoretical

level, *id.* 216:25-217:1, and that he has no opinion on whether Filler's overhead figures are

wrong, *id.* 240:22-241:3. Because Cowan failed to show that a simple average would lead to

different results, this Court should disregard his testimony.[42]

Filler is more than qualified to use linear regression to allocate overhead costs in a lost

profits analysis. Damages experts like Filler routinely perform this task. Defendants are free to

cross examine Filler on this issue and to argue to the jury that his overhead analysis is suspect,

but the fact that he does not have a Ph.D. in statistics goes, at the most, to the weight of his

testimony, not its admissibility.[43]

### B.  Filler is qualified to use simulation in his refineries lost profits model

Defendants' theory that Filler is not qualified to render opinions based on a simulation

model lacks merit for four reasons. *Defs.' Mem.* at 27-29. First, simulation software programs

are designed to be used by nonstatisticians and therefore do not require expertise in statistics.

Second, even if some degree of statistics expertise was required to run a simulation, Filler's

expertise is sufficient to qualify him as an expert in the use of simulation as a tool to calculate

lost profits. Third, contrary to Defendants' suggestion, Filler can explain not only how

---

[42] *See, e.g., Cummings v. The Std. Register Co.*, 265 F.3d 56, 65 (1st Cir. 2000) (*Daubert* challenge rejected because defendant did not show how information used by damages expert was incorrect; *Floorgraphics, Inc. v. News Am. Marketing In-Store Servs., Inc.*, 546 F.Supp.2d 155, 172 (D.N.J. 2008) ("When challenging the admissibility of . . . expert testimony, a party must move beyond empty criticisms and demonstrate that a proposed alternative approach would yield different results"); *see generally Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1416 (D.C. Cir. 1988) ("Mere conjecture or general assertions of inadequacies in the opponent's statistical case, without demonstrating their effect on the results, will not suffice.").

[43] *See, e.g., Tuf Racing*, 223 F.3d at 591 (rejecting argument that CPA could not testify as damages expert "because he does not have a degree in economics or <u>statistics</u> or mathematics or some other 'academic' field that might bear on the calculation of damages.") (emphasis added); *Mitchell v. U.S.*, 141 F.3d 8, 15 (1st Cir. 1998) ("The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.") (quotation marks omitted)..

simulation works but also how to interpret the results.  Fourth, the refineries lost profits model is a straightforward mathematical calculation that requires no statistical expertise.  For any one of these reasons, this Court should reject Defendants' argument.

### 1.  Users of simulation software programs do not need to be experts in statistics

Simulation software programs are designed for persons who are not statistics experts. These programs are widely used by businesses for many purposes, including projecting future profits.[44]  In addition, financial experts employ simulation for business valuation, which is predicated on calculating future profits.[45]  Defendants also do not dispute Filler's testimony that simulation is an accepted methodology used by damages experts.[46]  *Tr.* 56:12-22.

The sources cited by Packgen in footnotes 44-46 do not state, or even hint, that only statisticians can operate a simulation software program.  Indeed, the authors of these treatises gear their presentations to nonstatisticians such as businesspersons and damages experts.  This is not surprising given that the inputs for financial simulation models, such as sales, prices, and costs, fall within the bailiwick of financial and damages experts, not statisticians.  *Id.* 188:22-189:10.  This type of financial data, plus "[s]ubject matter knowledge and good judgment are . . . necessary ingredients for constructing good models."[47]  Simulation models simply do not require the level of expertise wielded by a Ph.D. in statistics.

Tellingly, Defendants' statistics expert did not claim in either his report or his testimony that statistical expertise is a prerequisite to running a simulation program.  Cowan challenged

---

[44] *See, e.g., Tr.* 345:22-346:25; ROBERT F. REILLY & ROBERT P. SCHEIHS, GUIDE TO INTANGIBLE ASSET VALUATION, 339-40 (2013); SAM L. SAVAGE, DECISION MAKING WITH INSIGHT, 20-26 (2003); RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE, 215 & 237-238 (4th ed. 1991).

[45] *See, e.g.,* WEIL, *supra* note 29, at p. 4.19 ("Monte Carlo simulation is a well-accepted valuation technique . . ."); Toby Tatum, *Valuing a Business via the CAPM and Monte Carlo Simulation,* Bus. Appraisal Practice J., 20-36 (1st quarter 2014).

[46] *See also* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *supra* note 9, at 469 (damages experts often use simulation to generate thousands of possible outcomes; damages are the average of lost profits across all outcomes).

[47] Tatum, *supra* note 45, at 35.

neither Filler's testimony that expertise in statistics is not needed to determine the inputs to a lost profits simulation model, nor Filler's statement that these inputs are what he does as a damages expert, certified public accountant, business consultant, and teacher of management.[48]  *Id.* 188:22-189:6.  Expertise in statistics may be essential when designing a simulation software program, but no such expertise is required to run such a program because the statistics are embedded in the software program.  *Id.* 189:11-15.  In this respect, simulation software is no different than a spreadsheet program such as Excel, which has built-in statistical tools yet is designed to be used, and is used, by nonstatisticians.

Defendants try to avoid this conclusion by continually referring to Filler's refineries damages as a "statistical model."  This characterization is not accurate.  Filler calculated these lost profits in a probabilistic model that uses revenue and cost data.  This is not a statistical model such as the multiple regression models used in discrimination cases.  The simulation software program itself may be a statistical model, but Filler's lost profits model is not.  *Id.* 157:20-158:4.

*2.  Filler's knowledge of statistics is more than adequate for purposes of simulation*

Although users of simulation software programs do not need statistical expertise, Filler has extensive expertise and experience in employing statistical tools in lost profits calculations, teaching such use to others, and writing on this subject.  *See supra*, at 13-14.  Computer simulation is one of these tools.  Filler has completed a three-day course on financial modelling using simulation, reviewed six books on this subject, and used simulation in three cases to determine lost profits.  *Tr.* 55:20-25; 56:8-11; 157:20-23.  His inputs to the refineries simulation

---

[48]  Cowan alluded to both inputs and parameters.  He uses these words interchangeably to refer to inputs such as unit sales, prices, and costs.  *Tr.* 205:1-6; 351:25-352:12; *Defs.' Mot. and Incorporated Mem. to Exclude the Expert Test. and Ops. of Pl.'s Expert, Mark G. Filler*, at Exh. D, pp. 11, 14-15, 16, & 20 (Cowan report).

are restricted to unit sales, unit prices, and costs, all of which are within his expertise as a damages expert. Filler used these inputs in a triangular distribution, which merely sets the parameters for the best case, most likely case, and worst case scenarios for each of these categories, matters once again within his sphere. *Id.* 59:25-61:13; 62:4-9; 62:23-63:2; 355:14-356:1. Thus, Filler is qualified to use a simulation software program for lost profit calculations even if it is assumed for the sake of argument that such programs require some statistical expertise. The First Circuit demands only that "a testifying expert should have achieved a meaningful threshold of expertise in the given area."[49] Filler easily surpasses this requirement.

### 3. Filler can explain how simulation works and what the results mean

Defendants also assert that they will be disadvantaged at trial because Filler cannot explain how simulation works and Defendants cannot cross-examine the computer program. This assertion is a red herring: Defendants can cross-examine Filler about the accuracy of his explanations and call Cowan to counter Filler's testimony.

The record establishes that Filler is not an unqualified witness who merely parrots the results of a model he cannot explain. He described in detail how the XLSim program works. *Id.* 53:19-55:19; 63:18-65:1; 155:19-157:3; 354:2-355:13. Filler further explained not only the results of the simulation, but also tests establishing their validity.[50] *Id.* 66:14-68:12; 167:13-24; 347:1-348:15. Defendants can adequately attack this testimony through the adversary process. Therefore, their claim of prejudice is without merit.

The cases cited by Defendants are distinguishable. In *Lifewise Master Funding*, the court did not allow the plaintiff's president—who was not a damages expert and had never used the

---

[49] *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (quotation marks omitted); *see Tuf Racing*, 223 F.3d at 591.

[50] Although Cowan referred to the need for testing data inputs, he ignored the testing done by Filler, which showed a 95% confidence integral. *Tr.* 347:1-348:15.

methodology in question—to testify as an expert about a damages model he could not explain. Filler, on the other hand, is a qualified damages expert with extensive experience using statistical tools in lost profits analysis.[51]  Similarly, in *Chemipal*, the court excluded an expert witness because he uncritically adopted a marketing plan prepared by someone else without understanding its underpinnings or the methodology used.[52]  That is not the case here.

### 4. The refineries lost profits model is a straightforward mathematical calculation

Filler and Cowan agree that the refineries lost profits model embodies a straightforward mathematical calculation that could be done—albeit laboriously—with a pencil and paper.  *Tr.* 202:20-203:13; 204:7-13; 253:20-254:2; 350:7-351:3.  One way that simulation programs enable damages experts to model uncertainty is by calculating best, most likely, and worst case scenarios in a way that cannot, as a practical matter, be duplicated manually.  Defendants have not claimed, nor could they, that Filler is not qualified to perform mathematical calculations.  Accordingly, the fact that Filler's simulation is a mathematical calculation is yet another reason to reject Defendants' claim that he is not qualified to testify to this model because he does not have a Ph.D. in statistics.

## IV.  Filler's Opinion that Packgen's Damages Extend for Ten Years after the Product Failure is Admissible

### A.  The CRI ten-year loss period is reliable

#### 1. The extensive facts and data considered by Filler

In his CRI damages model, Filler calculated Packgen's damages for lost sales to CRI due to delamination of the Cougar containers manufactured from the defective material that Defendants supplied.  This product failure permanently destroyed Packgen's long-term customer

---

[51]  *See Lifewise Master Funding v. Telebank,* 374 F.3d 917, 928 (10th Cir. 2004).
[52]  *See Chemipal, Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 582, 590-92 (D. Del. 2004).

relationship with CRI.  Filler nevertheless capped Packgen's lost profits at ten years.  As will be explained below, this opinion is supported by sufficient facts and data and therefore is reliable.

Defendants' insistence that no data supports the ten-year loss period for the CRI damages is wrong.  *Defs.' Mem.* at 14-15.  This argument ignores the facts and data to which Filler testified at the *Daubert* hearing in support of his conclusion that but for the product failure in April 2008, sales to CRI would have continued during the past six years and for at least the next four years.  The facts and data available to Filler include: (a) Packgen's customer relationship with CRI; (b) the historical sales of customized Cougar containers to CRI before the product failure; (c) the effect of this failure on those sales; (d) the competitive environment in which Packgen operated and its strengths in this environment, and (e) the historical record of the six years that have passed since the incident.

a.  <u>Packgen's customer relationship with CRI</u>

Defendants do not dispute that CRI was a long-term customer of Packgen.  Filler relied on this fact in arriving at his loss period.  Before the product failure, CRI had been a steady and sizable customer for six years.  *Tr.* 14:21-15:3; 16:21-22; 107:20-108:4; 190:13-3:17; *Exh. 3*.  In addition, the evidence will show that Packgen's predecessor company had a customer relationship with CRI before 2002.

b.  <u>Sales of customized Cougars to CRI</u>

Defendants also do not dispute the facts and data relating to the new foil-laminated catalyst containers that CRI purchased in large quantities before the containers made with Defendants' defective material failed.  Packgen began manufacturing catalyst containers five years before the product failure and still does so.  In 2007, Packgen redesigned its Cougar container and developed a model fabricated with foil-laminated polypropylene supplied by

Defendants.  Packgen and CRI collaborated to customize this new container for CRI's use.  *Tr.* 16:21-17:6; 190:13-22.  The evidence will show that Packgen and CRI engaged in a long back-and-forth process of design changes and additions to the new Cougar to precisely fit CRI's needs.  For Filler, this showed CRI's commitment to the customized Cougar.  *Id.* 190:13-22.

After a two month ramp-up, CRI began purchasing large numbers of the specially adapted Cougars in October 2007.  *Exh. 2*; *Tr.* 17:7-13.  These sales took off during the following six months:  CRI purchased an average of 1,269 Cougars a month, and Packgen received total revenue from these sales just shy of $1.5 million in only half a year.  *Exhs. 1A & 2*.  Moreover, CRI had placed orders for the delivery of 1,379 more containers in April 2008, the seventh month.  *Tr.* 17:14-18:1.  This seven-month period shows that the customized Cougars met CRI's needs and quality requirements.  Filler also relied on this historical record to establish the quantities required by CRI, the unit prices it was willing to pay, and costs.  *Exhs. 1A, 2, 4, & 5*.  In addition, Filler considered that before the product failure, CRI had informed Packgen that it would be increasing its Cougar purchases.  *Tr.* 109:16-20.

c.  <u>The devastating effect of the product failure</u>

The product failure changed everything.  After the containers assembled from Defendants' material ruptured, CRI immediately terminated its long-term business relationship with Packgen and cancelled the pending orders for April 2008.  *Id.* 17:14-18:1; 76:19-24.  CRI has not purchased any products from Packgen in over six years and has informed Packgen that it will not do so in the future.  *Id.* 45:4-7; 359:2-6.

d.  <u>Packgen's competitive advantages</u>

Filler considered the competitive market for catalyst containers and the cost advantages of Cougars.  In 2008, catalyst manufacturers and refineries had only two options for the

transportation and storage of catalyst:  steel flow bins and Packgen's intermediate bulk catalyst containers.[53]  Relying on the opinions of David Berman, Packgen's catalyst industry expert, and on information from Packgen, Filler determined that CRI saved substantial amounts of money by purchasing customized Cougars instead of renting flow bins.[54]  *Id.* 13:22-25.  Filler stressed that unlike mass-market products such as cellphones or cars, CRI had no alternatives other than Cougars or more costly steel flow bins.  *Id.* 77:15-78:2; 314:12-22; 353:2-10.  Packgen also sold Cougars to CRI at a lower price than to other customers.  *Tr.* 313:20-314:2.  Filler further relied on Berman's opinion that Packgen has excellent market presence and expertise in the catalyst container industry.[55]  *Id.* 103:5-15; 362:18-363:3.

e. The events of the last six years informed Filler's loss period

The actual events of the past six years further support Filler's ten-year loss period for the CRI damages.  Packgen continues to successfully operate its business and to manufacture and sell catalyst containers.  The company (including its predecessor) and its president have 30 years' experience in the container industry.  *Id*. 362:24-363:3.  In addition, the catalyst container market remains unchanged since the product failure in April 2008:  Packgen has no new flow bin competitors, its intermediate bulk catalyst container remains the only one of its kind on the market, and no alternatives to flow bins and Cougars have entered the market.  *Id*. 77:15-78:14; 320:11-23.  Berman confirms that CRI is still a major player in the catalyst industry and that the amount of catalyst used by petroleum refiners continues to increase and will do so for the next four years.  *Id*. 101:21-102:17; *Defs.' Exh. 1* at 11.  Hence, the competitive environment in which Packgen operated when it sold customized Cougars to CRI has not changed.  Filler also looked

---

[53]  Packgen was, and still is, the only manufacturer of intermediate bulk containers approved for catalyst.  *Tr.* 77:19-21; 353:9-10.

[54]  *See Defs.' Exh. 1* at 13-16 for this portion of Berman's opinion.

[55]  *See id.* at 13.

at, and ruled out, any other political, economic, technological, social, environmental, or legal reasons why CRI would have stopped buying Cougars if the product failure had not occurred. *Tr.* 77:6-14; 92:6-21.

    *2. Filler's CRI loss period is supported by sufficient facts and data*

Because the product failure permanently destroyed Packgen's customer relationship with CRI, Packgen lost a substantial income stream.  Filler was tasked with the responsibility of determining the damages that replace these lost revenues.  The facts and data outlined above support his opinion that Packgen would have continued to sell Cougar containers to CRI during the past six years in the same amounts and at the same prices as before the incident.  This information also supports Filler's opinion that these sales would have continued for at least the next four years.  Despite the substantial cost savings enjoyed by CRI, its pre-incident statements that it would be increasing Cougar purchases, and the low price CRI was paying for Cougars compared to other customers, Filler's damages model does not build in any increases in either unit sales or unit prices.  He relies entirely on the historical sales record even though Packgen's revenues from CRI likely would have increased if the product failure had not occurred.[56]

The quantity of the facts and data supporting an expert's opinion, and not their quality, is the proper focus of a *Daubert* inquiry.  *See supra*, at 5.   Filler's CRI ten-year loss period passes muster under this test.  In addition, to the extent that Filler was forced to make assumptions where it was impossible to gather more concrete information because of the product failure, he properly based these assumptions on his assessment of Packgen's past history with CRI and the

---

[56] *See, e.g., Manpower, Inc.,* 732 F.3d at 809 (damages expert properly based damages on prior actual earnings and management's assessment of the future).  Defendants' damages expert acknowledged that actual sales are more reliable than pre-litigation projections.  *Tr.* 323:8-18.

potential for future sales in light of market conditions.[57]  Any such assumptions constitute a factual basis for Filler's opinions and go only to the weight of his testimony.[58]

Defendants ignore the facts and data set forth above, concentrating instead on Filler's testimony that he had no evidence that the historical CRI sales would continue and no evidence that they would not.  *Tr.* 108:5-12; *Defs.' Mem.* at 14-15.  Contrary to Defendants' contention, this testimony is not an admission by Filler that his opinion is not supported by facts or data. Indeed, immediately before the testimony cited by Defendants, Filler mentioned two of the facts that he relied on for his ten-year loss period—the long-term customer relationship with CRI and the six-month track record of buying customized Cougars.  *Tr.* 107:20-108:4.

Filler explained that his "no evidence" statement meant that there was "no hard evidence," but that he did have "intangible evidence" that the sales to CRI would continue.  *Id.* 190:9-22.  As a non-lawyer, Filler does not use the word "evidence" in the same way that lawyers do; that is, to refer to information with any tendency to make a fact more or less probable than it would be otherwise.[59]  The most reasonable interpretation of his statement is that he was referring, as an accountant and damages expert, to the absence of any mathematical equations or statistical formulas for calculating the length of a loss period.  As Defendants' damages expert conceded, this question is left to the sound judgment of the expert.  *Id.* 306:15-25; 308:2-309:6; *see id.* 297:25-299:6.  Regardless of what Filler meant, sufficient facts and data exist to support his opinion under *Daubert*.  Defendants can test Filler's "no evidence" statement using the tools of the adversary process.

---

[57]  *See Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1121 (8th Cir. 2006) ("assumptions were not the product of mere conjecture with no factual basis; they were estimates generated through consideration of . . . past performance and potential for future performance, given current accepted market conditions").

[58]  *See id.* at 1120-21.

[59]  Fed. R. Evid. 401(a).

Defendants also claim that Filler ignored evidence that CRI could change its buying patterns.  They point to CRI's temporary reduction of its purchases of catalyst containers in 2006.  *Defs.' Mem.* at 15.  But CRI was purchasing an earlier, generic version then, not the new customized Cougars that Packgen adapted for CRI's needs.  *Tr.* 16:21-25; 17:10-13.  Besides, if a damages expert emphasizes certain facts or disregards others, this goes to weight.[60]  Case law teaches that "arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury."[61]  Accordingly, the temporary lull in CRI's purchases of generic catalyst containers two years before the product failure does not undercut the reliability of Filler's opinion for purposes of *Daubert*.  Defendants' argument again amounts to nothing more than an issue for cross-examination or for the testimony of their damages expert.

### 3. *Filler's ten-year loss period for the CRI damages does not contravene Maine law*

Defendants also assert that the CRI ten-year loss period is "inimical to Maine law."  *Defs.' Mem.* at 16.  In support of this assertion, Defendants cite cases examining whether a damages award for a new business—not an established business like Packgen—is supported by the evidence.  Defendants' argument that these cases bar Filler from opining that Packgen suffered ten years of damages is incorrect for two reasons.

First, Defendants confuse the admissibility of expert opinions under *Daubert* with the issue of whether a plaintiff has presented sufficient evidence to permit the trier of fact to award damages.  By emphasizing the sufficiency of Packgen's evidence, Defendants shift from scrutinizing the quantity of the facts and data, which is the proper focus of a *Daubert* inquiry, to

---

[60] *See, e.g., Manpower, Inc.*, 732 F.3d at 807-09; *Cummings v. The Std. Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001).

[61] *Manpower, Inc.*, 732 F.3d at 808.

assessing the quality of the evidence, *i.e.*, whether it is legally sufficient to support a ten-year loss period.  The latter is the domain of summary judgment and post-trial motions, not *Daubert*. Neither the Maine cases nor the Connecticut case cited by Defendants address the admissibility of expert testimony under *Daubert* or any other legal standard.  Instead, they analyze whether evidence admitted at trial is sufficient to support a lost profits award.  Because the quantity of the facts and data available to Filler is sufficient, this ends the *Daubert* inquiry.  *See supra,* at 5.

Second, Defendants' cases do not establish that a ten-year loss period contravenes Maine law.  In *Eckenrode v. Heritage Mgmt. Corp.*,[62] the plaintiff was a former employee seeking future lost profits from a golf pro shop he had operated for only one season.  The plaintiff, who did not retain a damages expert, presented no evidence whatsoever as to the profitability of the pro shop during the following year.[63]  Consequently, the Law Court overturned the damages judgment in the plaintiff's favor.  Unlike the plaintiff in *Eckenrode*, Packgen is an established business with an extensive track record of sales to CRI, and the evidence shows that the circumstances generating those sales have not changed since the product failure and will not do so in the next four years.

The other Maine case cited by Defendants is *Reardon v. Lovely Dev. Inc.*[64]  The plaintiff in *Reardon* opened a fast-food restaurant but was illegally evicted by his landlord.  To justify the jury's award of lost profits, the plaintiff relied on evidence of profits from the first few days of the restaurant's operation.[65]  The Law Court held that this meager track record was insufficient to support the judgment.[66]  Packgen, on the other hand, has been in business for many years, had

---

[62]  480 A.2d 759 (Me. 1984).
[63]  *Id*. at 766.
[64]  2004 ME 74, 852 A.2d 66.
[65]  *Id*. at ¶ 12.
[66]  *Id*. at ¶¶ 12 & 14.

enjoyed a long-term customer relationship with CRI, and bases its lost profits on a seven-month period of sales and purchase orders for a jointly developed product.

Defendants also rely on a Connecticut case, *Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin*,[67] in which the central issue was whether a new or failing business can recover lost profits.  In addressing this issue, the Connecticut Supreme Court held that "there is nothing inherently improper about allowing damages for lost profits over a twelve-year period."[68]  The plaintiff in *Beverly Hills Concepts*, however, submitted no evidence that its business would have even survived for 12 years.[69]  Packgen, of course, remains in business six years after the product failure and still manufactures catalyst containers.  No evidence exists that it will not continue to do so for the remaining four years of Filler's loss period.[70]

The cases cited by Defendants do not establish that a ten-year loss period is improper under Maine law.  Although this issue apparently has not been the subject of a judicial decision in Maine, cases in other jurisdictions allow damage periods of ten years.[71]  Moreover, the length of the damages period is a question for the jury.[72]

Finally, Defendants cite one case in this section of their memorandum of law that does apply *Daubert*, but it fails to bolster their argument that Filler's ten-year loss period for CRI is

---

[67]  717 A.2d 724 (Conn. 1998).

[68]  *Id*. at 739.

[69]  *Id*.

[70]  Defendants further note that *Beverly Hills Concepts* cites cases purportedly holding that lost profits are frequently based on contracts with a fixed term.  The cases do not hold that lost profits can be recovered only in this situation.  Defendants' damages expert agrees that a fixed-term contract is not a prerequisite to recovery.  *Tr*. 322:17-21.

[71]  *See, e.g., PSKS v. Leegin Creative Prods., Inc.*, 171 Fed. Appx. 464, 469 (5th Cir. 2006) (10 years), rev'd on other grounds, 551 U.S. 877 (2007); *Oxford Furn. Cos. v. Drexel Heritage Furnishings, Inc.,* 984 F.2d 1118, 1128 (11th Cir. 1993) (5 and 10 years); *Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 533 F.2d 510, 519 (10th Cir. 1976) (10 years); *Van Riper v. Ford New Holland, Inc.*, 862 P.2d 47, 52 (Mont. 1993) (10 years).

[72]  *See, e.g., PSKS*, 171 Fed.Appx. at 469; *Miami Packaging, Inc. v. Processing Sys., Inc.*, 792 F.Supp. 560, 566 (S.D. Ohio 1991); JAMES R. HITCHNER, FINANCIAL VALUATION, 841 (2003) (damages period depends on the facts).

unreliable.  In *Sun Ins. Marketing Network, Inc. v. AIG Life Ins. Co.*,[73] the District Court for the Middle District of Florida excluded the opinions of a forensic accountant on two grounds: first, the accountant was not qualified to do a business valuation of an insurance agency, and second, he did not even purport to value the business.[74]  In reaching its decision, the court criticized the accountant for projecting income from premiums over a ten-year period, and 30 years of renewals, when the insurance policy in question was not even available for sale.[75]  The court also noted the "unreliability inherent in basing an opinion on a marketing estimate."[76]  Filler did not project lost profits for a product no longer being sold, and he relied on actual sales to CRI, not an internal marketing projection.  Accordingly, this case sheds no light on the *Daubert* issues before this Court.

### 4.  Filler did not conflate lost profits and business valuation methodologies when he chose a ten-year damage period for the CRI damages

Filler used an accepted lost profits methodology to determine Packgen's damages from the loss of CRI as a customer.  *See supra,* at 9.  In an effort to exclude his well-reasoned opinions, Defendants wrongly accuse Filler of commingling lost profits and business valuation methodologies when he limited Packgen's damages to ten years.  *Defs.' Mem.* at 19-21.  As discussed below, Filler did not employ an amalgamation of different methodologies.  Even if he had, this would not render his opinions inadmissible.

Lost profits methodology is the correct approach in this case because Defendants' wrongful actions did not destroy Packgen's business or its physical assets.  Although no case law in Maine exists, the majority rule in other jurisdictions is that when a business is completely

---

[73]  254 F.Supp.2d 1239 (M.D. Fla. 2003).
[74]  *Id*. at 1245.
[75]  *Id*. at 1244.
[76]  *Id*. at 1249.

destroyed, the measure of damages is the value of the business before its destruction.[77]  On the other hand, if a business does not cease operations because of a defendant's actions, it is entitled to recover lost profits.[78]  Packgen continues to operate successfully six years after the product failure, but it lost a substantial income stream when CRI stopped buying customized Cougars immediately after the containers made from Defendants' material ruptured.  Lost profits are the proper measure of this vanished income stream.  Filler's deterministic model tracks these lost profits and is entirely appropriate.

Defendants latch on to one portion of Filler's testimony to incorrectly argue that he applied an untested, blended methodology that is neither a lost profits methodology nor a business valuation methodology.  In particular, they cite Filler's testimony that the product failure destroyed Packgen's customer relationship with CRI, which it did.  Defendants try in vain to turn this testimony into something that it is not.

During the *Daubert* hearing, Filler contrasted the permanent loss of a customer relationship with the complete destruction of a business.  *Tr.* 45:3-19; 359:20-360:10.  As he correctly pointed out, when a business is destroyed, its value determines the plaintiff's damages.  *Id.* 45:8-11.  This assessment is made by valuing the loss of all future profits to infinity.  *Id.* 45:16-19.[79]  By way of analogy, Filler noted that the same situation existed here because the defective product supplied by Defendants permanently destroyed the customer relationship with

---

[77]  *See, e.g., Montage Grp., Ltd. v. Athle-tech Computer Sys., Inc.,* 889 So.2d 180, 193 (Fla. Dist. Ct. App. 2004); *Lively v. Rufus,* 533 S.E.2d 662, 668 (W.Va. 2000); *Achee v. Nat'l Tea Co.,* 686 So.2d 121, 124-125 ( La. Ct. App. 1996); *Sawyer v. Fitts,* 630 S.W.2d 872, 874-75 (Tex. App. 1982); *but see Indu Craft, Inc. v. Bank of Boroda,* 47 F.3d 490, 495-96 (2nd Cir. 1995) (recovery may be lost profits or value of business); *Serletic v. Noel,* 700 N.E.2d 1159, 1162 (Ind. Ct. App. 1998) (lost profits may be recovered if business destroyed).

[78]  *See, e.g., Montage Grp.,*889 So. 2d at 193; *Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499, 500 (Fla. Dist. Ct. App. 1997).

[79]  *See also Beverly Hills Concepts,* 717 A.2d at 734 (market value of business is the discounted present value of future earnings); HITCHNER, *supra* note 72, at 841 ("Business valuations are based on a value estimate as of a single, specific date and usually assume the business will operate into perpetuity.").

CRI, "so the same theory applies," *i.e.,* that lost profits extend to infinity. *Id.* 45:24-46:4. But unlike a business valuation, Filler did not take lost profits out to infinity; rather, he capped damages at ten years.[80] *Id.* 46:1-4; 359:2-11. He also calculated lost profits on a before-tax basis, unlike a business valuation, which is after taxes. *Id.* 45:11-19; 126:15-19; 359:9-360:10. These determinations correctly apply lost profits methodology. Defendants' contention that Filler calculated neither lost profits nor business value is flawed; he indisputably determined Packgen's lost profits. *Id.* 126:15-19; 359:17-19.

Contrary to Defendants' argument, Filler did not conflate business valuation and lost profits methodologies by contrasting Packgen's loss of CRI as a customer with the destruction of a business. Indeed, he demonstrated that he understood how each was distinct. Even if Filler had commingled the methodologies—which he did not—this would not render his opinions inadmissible because they are two sides of the same coin: both calculate future profits, but they ultimately use this calculation for different purposes.[81] Defendants point to differences between the methodologies, such as the discount rate, tax treatment, and valuation methods. *Defs.' Mem.* at 20 n.17. These issues, however, have nothing to do with their complaint about how Filler chose the ten-year damages period. Defendants can cross-examine Filler on how he chose the ten-year damage period and call their own damages expert to critique Filler's methods, but his opinions regarding the CRI damages are reliable and, therefore, admissible under *Daubert.*

Finally, Defendants correctly note that, although "the same kind of market-value proof may be used in establishing lost profits and the value of a lost asset,"[82] they are separate and distinct damage categories. This statement, however, gains Defendants nothing. They ignore the

---

[80] *See* HITCHNER, *supra* note 72, at 841 ("In a lost profits model, the damage calculation is made for a specific time period . . . .").
[81] *See* WEIL, *supra* note 29, at pp. 4.16 & 4.17 (future lost profits and business value should be equal).
[82] *Spectrum Sciences & Software Co. v. U.S.*, 98 Fed. Cl. 8, 14 (Fed. Cl. 2011).

fact that the purpose of this distinction is to avoid duplicative damages, not to prescribe the methodologies that damages experts must unerringly follow.  If a business recovers its market value, which is based on what a hypothetical buyer would pay for the opportunity to earn all future profits, a simultaneous award of future lost profits would result in double recovery.[83]  Here, Packgen does not claim, and could not claim, damages for the value of its business, so no possibility of double recovery exists.  Defendants cite no cases holding that the purpose of the distinction between lost profits and business value damages is to dictate the methodologies that damages experts must employ.  Thus, even if Filler had used a blend of lost profits and business valuation methodologies, his testimony would be admissible.

     *5.  Filler did not rely on a rule of thumb to determine the length of the CRI loss period*

Defendants claim that Filler used a rule of thumb to camouflage that he had no facts or data to support his opinion concerning the CRI loss period.  *Defs.' Mem.* at 22-24.  As we have seen, Filler had sufficient evidence.  In addition, when asked if a rule of thumb existed, he merely observed that "[i]t depends on the situation, but I have generally never seen anything past ten years."  *Tr.* 46:5-8.  That is, every situation is different and must be treated accordingly.

**B.  The refineries ten-year loss period is also reliable**

In a footnote, Defendants attack the admissibility of Filler's ten-year loss period for sales to refineries.  *Defs.' Mem.* at 18 n.16.  Defendants claim that Filler had no information justifying this damage period other than conversations with Packgen's president that—with respect to the refineries—it would take five years for the negative effects of the product failure to dissipate and

---

[83] *See, e.g., Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 424 (6th Cir. 1984) (because loss of business value is based on future lost profits, to allow both would be double recovery); *Farmington Dowel Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 (1st Cir. 1969) (same); *Knauf Fiber Glass v. Stein*, 615 N.E.2d 115, 128 (Ind. Ct. App. 1993), rev'd on other grounds, 622 N.E.2d 163 (Ind. 1993) (same); 1 ROBERT L. DUNN, RECOVERY OF DAMAGES FOR LOST PROFITS, § 6.23 at 540 (6th ed. 2005) (plaintiff who recovers the value of its business has in effect sold the business to defendant and should not expect to receive lost profits also).

five more years for Packgen to return to where it would have been if Defendants had not supplied defective material. *Tr.* 74:13-75:6. As with the CRI damages, Defendants overlook the facts and data available to Filler.

Filler based his refineries' loss period on the facts and data he gathered during his investigation into Packgen's losses. For example, he learned that in the six months leading up to the product failure, Packgen actively marketed its new foil-laminated Cougar containers to refineries for the transportation and storage of spent catalyst, *i.e.*, catalyst removed from petroleum reactors after use. *Id.* 53:6-12; 194:10-20. Packgen had concentrated these marketing efforts on those refineries that would enjoy substantial cost savings if they used Cougars due to their geographic location or operational needs. *Id.* 52:3-53:12; 58:21-59:6.

When the Cougars fabricated from Defendants' material ruptured, Packgen was on the verge of completing sales to these refineries. *Deposition of Celest Horton* ("*Horton Dep.*") at 20:6-11. Indeed, all of the refineries included in Filler's damages model had informed Celest Horton, Packgen's sales manager, that they would be placing orders during the next catalyst cycle, *i.e.*, within a year. *Id.* 9:17-23; 10:19-11:9; 17:17-24; 87:15-22. But as a result of the widespread product failure, Packgen lost these sales. *Id.* 9:17-23; 17:25-18:11; 20:6-11; 87:5-8.

Packgen provided Filler with a list of 37 refineries for which it had lost sales because of Defendants' defective material. *Tr.* 97:22-25; 158:5-14; 194:6-9; *Exh.* 17. These refineries comprise only one-quarter of the refineries located in North America. *Tr.* 70:3-5. This list was not prepared for this litigation: it existed at the time of the product failure because Packgen had targeted and actively solicited these refineries. *Id.* 53:6-12; 58:14-20; 158:18-159:4; 165:12-166:12. Packgen limited the list to the refineries it lost as customers because of the product failure. *Horton Dep.* 9:17-23; 10:19-11:9; 17:17-18:11; 20:6-11; 43:17-21; 87:2-22. With

additional information such as catalyst volumes, quoted prices, and annualized unit quantities, this pre-litigation list became Exhibit 17 of the damages model. Filler's calculations correctly include only these refineries.

Filler also considered the expert witness designation of Berman, the catalyst industry expert, who explains in great detail the substantial economic advantages of Cougars over flow bins when distance, time, or storage are key factors for refineries. *Defs.' Exh. 1* at 13-16. Because of these factors, the refineries listed in Exhibit 17 would enjoy huge cost savings over renting flow bins and therefore would be likely purchasers of Cougars. *Tr.* 52:3-21; 58:21-59:6; 158:8-14; 159:5-16; 362:3-17. Packgen was, and still is, the only source of intermediate bulk containers approved for use with catalyst. *Id.* 77:19-21; 353:9-10. Filler further relied on Berman's opinions that Packgen had excellent market presence and expertise and that catalyst use by refineries was continuing to increase. *Id.* 101:21-102:17; 362:18-363:3. He also considered that the burgeoning sales of foil-laminated Cougars to CRI would enhance Packgen's market presence and credibility with the refineries; CRI was delivering fresh catalyst loaded in Cougars to virtually all of the refineries identified in Exhibit 17. *Id.* 50:6-19; 361:6-362:2; *Horton Dep.* 42:9-22.

Filler further reviewed facts and data relating to actual sales to the refineries. Packgen sold some catalyst containers to the listed refineries before the foil-laminated Cougar came on the market, which means that some of the refineries were already Packgen customers. *Tr.* 168:21-23. As noted by Defendants, Packgen informed Filler that it would take five years for the negative effects of the product failure to dissipate and then five years for refinery sales to recover to the level they would have reached if the product failure had not occurred. *Id.* 71:18-22; 74:13-

75:6. Filler's analysis of actual sales of Cougars to the listed refineries during the past six years confirmed this pattern and the validity of a ten-year loss period. *Id*. 100:11-17; 170:4-10.

As with the CRI damages, Filler considered that Packgen and its predecessor company have 30 years of experience in the container business. *Id*. 362:18-363:3. Catalyst containers were not a new product for Packgen. *Id*. 58:4-13. Also, the company remains in operation six years after the incident and still manufactures catalyst containers.

These facts and data, plus Filler's professional judgment and experience as a damages expert, support the ten-year damages period for the refineries. *Id*. 75:7-11; *see id*. 297:25-299:6; 306:15-25; 308:2-309:6 (Fannon testimony). Thus, this loss period is supported by sufficient facts and data. The quantity—not the quality—of this information is at the heart of a *Daubert* inquiry. *See supra*, at 5. Moreover, the length of the loss period is a jury issue. *Id*. at 27.

Defendants also complain that Filler's refineries damages include lost profits that Packgen never would have received. *Defs.' Mem*. at 18 n.16. Defendants' theory is that if the product failure had not occurred, Packgen would have been ramping up refinery sales in the beginning years. Defendants apparently fail to understand that Filler's damages model for the refineries recognizes this fact: his "but for" sales start with 8.2% of the refineries' needs in year one and slowly build up to 51% in year ten. *Exh. 13A* ("Mkt Pntrtn"); *Tr*. 67:23-68:12.

**C. Filler's lost profits opinions are admissible even if it is assumed for the sake of argument that one or both of the ten-year loss periods are barred by *Daubert***

Defendants argue that if Filler's ten-year loss periods are not admissible, then his entire lost profits opinions must be excluded. *Defs.' Mem*. at 18. Defendants, however, disregard the fact that each of Filler's lost profits models breaks down damages by the year, with the annual present net value of lost profits shown for each of the ten years. *See Exhs. 1A & 13A*. This means that the jury will have ten options for calculating lost profits for both the CRI damages

34

and the refineries damages.[84]  Thus, even if it is accepted for purposes of argument that Packgen has not met its burden as to one or more years of either loss period, the damages can be cut off accordingly.  Defendants overreach by arguing that if even one year of the ten-year loss period is unreliable, then all years should be excluded.

### V.  The CRI Damages Analysis is a Proper Lost Profits Model

Defendants acknowledge that "lost profits analysis measures the difference between what a business was projected to earn 'but for' a loss and what it actually earned over the period of the loss." *Defs.' Mem.* at 24.  Filler's CRI model adheres to this methodology.  Defendants nevertheless argue that his analysis is not a proper lost profits model because the gap between "but for" earnings and actual and expected earnings does not close, and Packgen never recovers from its losses. *Defs.' Mem.* at 24-26.  They insist that Filler omitted the second half of lost profits methodology in his CRI model even though he included a full recovery in the refineries model.  But Filler considered that Packgen had no sales to CRI during the last six years and would not have any such sales in the future.  His damages model therefore does not include an offset for actual or expected earnings from sales to CRI during the ten-year loss period because the product failure permanently destroyed the customer relationship.  In both the CRI model and the refineries model, Filler applied the second half of the methodology, he just arrived at different conclusions based on the evidence.

Neither the law nor damages methodology dictates that a business fully recover its former income stream as a prerequisite to lost profits damages.[85]  Defendants cite no cases or treatises in

---

[84]  *See Shah v. Steam & Starch Corp.*, 2012 WL 1958868 (Cal. Ct. App. May 23, 2012) (denying motion to exclude because expert gave jury options for calculating lost profits, including 5 and 10-year projections).
[85]  *See, e.g.*, REILLY & SCHEIHS, *supra* note 44, at 201 (defining before and after and sales projection methodologies; no reference to full recovery as a prerequisite to damages); PRATT & NICULITA, *supra* note 31, at 1025 (regardless of the lost profits method, "the extent to which projected results exceed actual results represents the plaintiff's loss").

support of this novel proposition; rather, they rely on one "sample" diagram from the book edited by Defendants' damages expert and counsel. *Defs.' Mem.* at 24. This diagram depicts only "[a]n example" of how the before and after method works.[86] *Id.* Defendants' failure to unearth any support for their argument is not surprising: their theory would incorrectly preclude an existing business from recovering damages if a third-party's wrongful actions nullified an income stream that the business could not—through no fault of its own—regain. Here, this hypothesis would prevent Packgen from recovering not only lost profits, because the gap between "but for" earnings and actual earnings never closes, but also the value of the business, because Defendants' actions did not destroy Packgen and put it out of business. *See supra,* at 28-31. This illogical and inequitable outcome would contravene the well-established legal principle that the purpose of damages is to make a plaintiff whole.[87]

Defendants further assert that Filler should have factored in sales of Cougars to fresh catalyst manufacturers other than CRI. Defendants apparently believe that such sales would offset the CRI damages. But as Filler testified, during the six years since the product failure, Packgen has not sold Cougar containers to other fresh catalyst manufacturers. *Tr.* 191:4-13; 195:11-196:3; 360:21-361:5. Even if it had, these sales would not alter the CRI lost profits analysis because Packgen had the capacity to manufacture these containers in addition to those it would have sold to CRI if Defendants' material had not failed. Stated differently, sales to other catalyst manufacturers would not replace the lost CRI sales but would be in addition to them.

---

[86] Defendants claim that Filler must have used the before and after methodology because Packgen had no pre-litigation profit projections. *Defs.' Mem.* at 25 n.21. Whether he used this method or the sales projection method is of no consequence because both methods measure the difference between expected earnings and actual earnings. Defendants' damages expert testified that the differences between these methodologies are just a matter of terminology. *Tr.* 273:1-21; 323:1-7; 336:14-20.

[87] *See, e.g., Estate of Hoch v. Stifel,* 2011 ME 24, ¶ 41, 16 A.3d 137, 150; *Marchesseault v. Jackson,* 611 A.2d 95, 98 (Me. 1992); *Forbes v. Wells Beach Casino, Inc.,* 409 A.2d 646, 654 (Me. 1979).

Thus, any such sales would not offset the CRI damages even if they had occurred.  Moreover, Defendants' argument is nothing more than a dispute about the inputs to Filler's model, and therefore it affects only the weight of his testimony.  *See supra*, at 5.

Finally, Defendants posit that Filler's model reflects his belief that in year eleven, sales of Cougars to CRI will surge from zero to 100% of the sales before the product failure.  *Defs.' Mem.* at 25.  Defendants do not explain this puzzling statement or cite any support for it.  Simply put, they have mischaracterized Filler's damages model.  Filler testified that Packgen permanently lost CRI as a customer and that the lost sales extend to infinity.  *See supra,* at 29-30.

## VI.  Filler's Ten Percent Success Rate for Projected Sales to Refineries is Supported by Sufficient Facts and Data

The refineries damages model is based, in part, on the assumption that Packgen would have had a one-in-ten chance each year of selling the new foil-laminated Cougars to the refineries listed in Exhibit 17 if the product failure had never happened.  This success rate reflects Filler's professional judgment after reviewing the available facts and data.  As with Filler's ten-year loss period, Defendants argue that he had no facts or data to support his success rate for sales to the refineries.  *Defs.' Mem.* at 29-34.  Once again, Defendants' argument fails because it ignores the record before this Court.

As summarized in section IV(B) above, extensive facts and data support the refineries damages model.  These facts and data undergird not only Filler's ten-year loss period, but also his 10% success rate for refinery sales.  This information demonstrates that Packgen actively marketed the foil-laminated Cougars to the 37 refineries before the product failure, that these refineries were likely purchasers of the foil-laminated Cougars because of their location and needs, that the refineries would save substantial amounts of money by switching to Cougars, that CRI was delivering catalyst to these refineries in Cougars, and that Packgen was on the cusp of

selling Cougars to these refineries when the defective material supplied by Defendants failed. *See supra*, at 32-34.  The quantity of this information more than meets *Daubert* standards.

Filler's success rate flows rationally from these facts.  For example, even though Packgen informed Filler that it believed the success rate would have been much higher than 10%, Filler found no hard evidence to confirm this and rejected his client's belief.  *Tr.* 68:18-70:2; *Horton Dep.* 47:3-22 (85-90% success rate).  The results of the probabilistic model and the pattern of actual sales to the refineries during the six years since the product failure also support the success rate.  *Tr.* 65:2-10; 66:14-68:12; 71:3-14; 167:13-24; 168:5-6; 170:7-10.

The flip side of Filler's success rate further demonstrates the reliability of this opinion: his model in effect assigns a 90% chance of **not** selling Cougars to the listed refineries each year even though Packgen expected to make sales to all these refineries within one year if the product failure had not occurred.  *Horton Dep.* 9:17-23; 10:19-11:9; 17:17-24; 87:15-22.  The 90% failure rate also factors in competition, refineries that begin buying and then stop, and other factors that could have limited sales.  *Tr.* 65:19-24; 172:13-174:7; 353:6-24.  Thus, the 10% success rate is not an "unreliable nonsense opinion"[88] and should not be excluded under *Daubert*.  Moreover, Defendants make no attempt to show that Filler's success rate is incorrect.  Their failure to do so bars them from challenging Filler's opinion on this issue.[89]

Defendants try to buttress their argument by pointing to Filler's testimony that he had "no empirical data" for the success rate.  *Defs.' Mem.* at 32.  They urge this Court to exclude his refineries opinions on the grounds that the 10% success rate therefore must be "pure speculation and conjecture."  *Id.*  As with Filler's "no evidence" statement for the CRI ten-year loss period, this testimony fails to demonstrate that his opinion should be excluded.  Filler explained that "no

---

[88] *Alaska Rent-A- Car, Inc. v. Avis Budget Grp., Inc.,* 709 F.3d 872, 883 (9th Cir. 2013).
[89] *See* cases cited *supra*, note 42.

empirical data" means that there "are no tables, there are no websites, there are no schedules, there is no one you can talk to." *Tr.* 167:25-168:4. In other words, no financial formulas or mathematical equations exist that a damages expert can employ to calculate a success rate for the purpose of "but for" lost profits. Filler's 10% success rate is supported by sufficient facts and data, and that is what matters under *Daubert*. *See supra*, at 5.

Relying on the available information, Filler exercised his professional judgment to choose an appropriate success rate. This is what damage experts do. Defendants' damages expert conceded that such experts need to make professional judgments when they quantify issues that are not readily susceptible to quantification because no data exists, such as the lack of patents or the quality of a customer relationship. *Tr.* 297:25-299:6; 303:16-304:20; 306:21-25; 308:2-309:18. The First Circuit has stated that similar "assumptions are ones that economists [make] with some frequency."[90] Cowan, who admitted that he operates on the theoretical level, apparently does not realize that damages experts must make such judgments. *Id*. 216:25-217:1; 241:24-242:5. In addition, Cowan's emphasis on testing and verification has no relevance given that the success rate is not based on thousands or millions of data points, unlike the theoretical work Cowan does. *Id.* 347:3-349:12. In any event, Filler tested the simulation model, which revealed a 95% confidence integral for the results. *Id.* 347:1-348:15.

Defendants also fault Filler for not doing a market survey of the refineries. *Defs.' Mem.* at 32. Defendants make no effort, however, to show that a valid market survey would be feasible years after the large-scale failure—at the listed refineries—of Cougars purchased by CRI. The evidence will show that this failure severely tarnished the reputation of Cougars (and Packgen) in this narrow market. Defendants' argument amounts to nothing more than a complaint that, in

---

[90] *Cummings v. The Std. Register Co.*; 265 F.3d 56, 65 (1st Cir. 2001) (quotation marks omitted).

their view, Filler should have done more, which raises only a question of weight, not admissibility.[91]  Also, Defendants were free to do a market survey if they thought one was essential.

In support of their market-survey argument, Defendants rely on two First Circuit cases. In *Fishman Transducers, Inc. v. Paul*, a trademark infringement case, the court held that an economist failed to establish causation as to why the plaintiff's sales of a consumer product declined and whether the defendant's infringement had anything to do with this decline.[92]  The First Circuit noted that economists can establish causation through means such as market surveys or competitors' sales data.[93]  Unlike *Fishman Transducers*, causation is not an issue here; rather, Defendants allege that Filler's success rate should be excluded because it is not supported by sufficient facts and data.  The purpose of this success rate is to calculate lost profits, not to prove causation for a mass market product, and therefore *Fishman Transducers* is not pertinent.

Defendants also cite *SMS Systems Maintenance Servs. Inc. v. Digital Equipment Corp.*[94] The plaintiff in *SMS Systems* asserted antitrust violations and retained an expert to opine that the defendant had monopoly power in the computer market.  The District Court granted summary judgment against the plaintiff.[95]  On appeal, the First Circuit found that the expert's opinions did not establish monopoly power because his report made intuitively obvious propositions, failed to discuss sources relating to the defendant's customer satisfaction ratings, and ultimately offered

---

[91]  *See I4I L.P. v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) (argument that more or different data might provide better estimate is question for the jury); *Floorgraphics, Inc. v. News Am. Marketing In-Store Servs., Inc.*, 546 F.Supp.2d 155, 169 (D.N.J. 2008) (whether expert should have more diligently researched the facts given to him by the plaintiff is a question of weight, not admissibility).
[92]  684 F.3d 187, 195 (1st Cir. 2012).
[93]  *Id.*
[94]  188 F.3d 11, 25 (1st Cir. 2001).
[95]  *Id.* at 13.

nothing more than a "bare conclusion."[96]  Filler's success rate, however, is not a bare conclusion, and his task, determining lost profits, is not in any way similar to the task of establishing monopoly power in the computer market, as the plaintiff's expert in *SMS Systems* tried to do.

Defendants further note that Filler did not use Packgen's historical success rate with the 37 refineries.  *Defs.' Mem*. at 32 n.28.  As Filler testified, although Packgen had actively marketed the new foil-laminated Cougars to the listed refineries, the product failure torpedoed those efforts before they could bear fruit.  *Tr*. 194:10-20.  Given the lack of sufficient time to establish a reliable track record with this new product, historical sales of a different product were not meaningful.  *Id*. 51:23-52:2; 169:5-18.  To the extent Defendants disagree, they may explore this issue on cross-examination and through the testimony of their damages expert.  Defendants again merely dispute what inputs to use in the damages model, which is an issue for the jury.

## VII. Filler Properly Relied on Information Provided by Packgen Identifying which Refineries did not Buy Cougars Because of the Product Failure

In a last-ditch effort to derail Filler's testimony, Defendants contend that he overlooked evidence that the refineries did not purchase Cougars for reasons unrelated to the product failure. *Defs.' Mem*. at 34-36.  To support this contention, Defendants highlight the deposition testimony of Packgen's sales manager, Celest Horton, regarding minor, unrelated issues with Cougar containers.  Yet Defendants inexplicably ignore her unequivocal testimony that the 37 refineries in Exhibit 17, which were selected out of the 137 refineries in North America, did not buy catalyst containers due to the failure of the defective material supplied by Defendants.

Horton testified at her deposition—in response to questions from Defendants' counsel— about incidents involving Cougars unrelated to the product failure.  These incidents arose out of customer misuse, such as a container punctured by a forklift and placing improper materials in

---

[96] *Id*. at 25.

containers. *Horton Dep*. 80:2-14; 83:9-12; 91:22-24. Horton also mentioned rumors spread by a competitor. *Id.* 37:13-38:5. But she testified repeatedly that the refineries for which Packgen lost sales because of the product failure were those on Exhibit 17. *Id.* 9:17-23; 10:19-11:9; 17:17-18:11; 20:6-11; 43:17-21; 87:2-22. Packgen excluded all other refineries. *See, e.g., id*. 88:6-10; 89:5-10. Moreover, Horton stressed that because the unrelated incidents involved customer misuse, Packgen was able to regain these sales, unlike the sales lost because of the product failure, which was a failure of the unit itself. *Id.* 92:3-9; 111:9-10.

Defendants also assert that Filler misunderstood notes written by Horton alluding to "faulty material." *Defs.' Mem.* at 35. The testimony cited by Defendants, however, does not show that Filler misunderstood anything; it is not clear what notes Filler refers to in this testimony. In addition, the testimony that Defendants claim makes clear what Horton meant by "faulty material" does not reference any notes. *Horton Dep.* at 91:20-24.

Regardless, Defendants' argument concerning the reasons for the lost sales is, at the most, more grist for the cross-examination mill. It has no bearing on the admissibility of Filler's opinions under *Daubert*.[97] Because Exhibit 17 lists only those refineries that did not buy containers from Packgen because of the product failure, Filler properly relied on this exhibit. As Defendants' damages expert conceded at the *Daubert* hearing, it is not the role of a damages expert to resolve factual disputes between the parties. *Tr.* 299:7-15. Besides, as this Court has emphasized, "an expert must typically assume some set of facts and assuming one party's version as opposed to another's is not grounds for exclusion."[98]

---

[97] *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (expert need not eliminate all other possible causes of damages); *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996) (possibility of other causes goes to accuracy of opinion, not the methodology); Daniel J. Capra, *The Daubert Puzzle*, 32 Ga.L.Rev. 699, 728 (1998) (requiring experts "to categorically rule out all other possible causes for an injury would mean that few experts would ever be able to testify") (cited in *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3rd Cir. 1999)).
[98] *Kirouac v. Donahoe*, 2013 WL 173475, at *2 (D.Me. 2013)

<u>Conclusion</u>

Defendants dispute the quality of the facts and data available to Filler and the propriety of the conclusions he drew from them.  These disputes go to the weight of Filler's testimony and are tested by the adversary process and determined by the jury.  Accordingly, Packgen requests that this Court deny Defendants' motion to exclude Filler.

May 28, 2014

/s/ Kurt E. Olafsen
Kurt E. Olafsen
OLAFSEN & BUTTERFIELD LLC
75 Pearl Street , Suite 215
Portland, ME 04101
207-615-0577
kolafsen@olafsenbutterfield.com

*Attorney for Plaintiff Packgen*

CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2014, I filed a copy of the foregoing document with the Court's ECF filing system, which will send an electronic notice to all counsel of record.

May 28, 2014

/s/ Kurt E. Olafsen
Kurt E. Olafsen