PACKGEN,               )
                             )
          Plaintiff,       )
                             )
      v.                )      2:12-cv-00080-JAW
                             )
BERRY PLASTICS     )
CORPORATION, et al.,   )
                             )
          Defendants.    )

## ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY

In anticipation of trial, Berry Plastics Corporation and Covalence Specialty Coatings, LLC move to exclude the expert testimony of Packgen's damages expert on multiple grounds, including lack of qualifications, improper methodology, and lack of facts or data supporting his opinions. The Court denies the motion because Packgen has demonstrated that each of the arguments for exclusion go to the weight of the expert's testimony and should be tested by the adversary process.

## I.    STATEMENT OF FACTS

### A.    Procedural History

Packgen filed a five-count complaint against Berry Plastics Corporation and Covalence Specialty Coatings, LLC (Berry)[1] with the Court on March 7, 2012, alleging

---

[1]    Covalence Specialty Materials Corporation merged into Berry Corporation and Berry now owns Covalence Specialty Adhesives, LLC and Covalence Specialty Coatings, LLC; the Court refers to the Defendants collectively as "Berry." *See Defs.' Mem. of Law in Supp. of its Previously Filed Mot. [Doc. 54] to Exclude Pl.'s Expert, Mark G. Filler* at 1 (ECF No. 64); *Defs.' Mot. for Summ. J.* at 1 n.1 (ECF No. 33).

breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of merchantability, and negligence. *Compl.* (ECF No. 2-2). On May 24, 2012, Packgen designated Mark G. Filler as an expert witness. *Defs.' Mem.* Attach. 1 *Pl.'s Expert Witness Designation* 1-8 (ECF No. 54-1) (*Expert Designation*). On December 10, 2013, Berry moved to exclude Mr. Filler's opinions and testimony. *Defs.' Mot. and Incorporated Mem. of Law to Exclude the Expert Test. and Ops. of Pl.'s Expert, Mark G. Filler* (ECF No. 54). Packgen objected on December 19, 2013. *Pl.'s Objection to Defs.' Mot. to Exclude the Expert Test. and Ops. of Pl.'s Expert, Mark G. Filler* (ECF No. 55).

On February 27, 2014, and continuing on March 3, 2014, the Court held a testimonial hearing regarding Berry's motion. *Minute Entry* (ECF No. 57); *Minute Entry* (ECF No. 59); *Tr. of Proceedings, Vol. I* (ECF No. 62) (*Tr. Vol. I*); *Tr. of Proceedings, Vol. II* (ECF No. 63) (*Tr. Vol. II*). Berry filed its post-hearing memorandum of law in support of its motion to exclude on April 21, 2014. *Defs.' Mem. of Law in Supp. of its Previously Filed Mot. [Doc. 54] to Exclude Pl.'s Expert, Mark G. Filler* (ECF No. 64) (*Defs.' Mem.*). Packgen responded on May 28, 2014. *Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Exclude Pl.'s Expert, Mark G. Filler* (ECF No. 67) (*Pl.'s Opp'n*). Berry replied on June 13, 2014. *Defs.' Reply in Support of Mot. to Exclude Mark G. Filler* (ECF No. 70) (*Defs.' Reply*).

## B. Factual Background

Packgen manufactures intermediate bulk containers certified for the transportation and storage of catalyst, a hazardous chemical agent employed in

refining crude oil into petroleum products. *Pl.'s Opp'n* at 7. In 2007, Packgen redesigned its Cougar catalyst container and began making it out of a laminated fabric. *Id.* Berry agreed to supply this laminated fabric and represented that it could meet Packgen's quality standards. *Id.* Packgen and CRI/Criterion (CRI), a catalyst manufacturer and long-standing Packgen customer, worked together to modify the new Cougar to meet CRI's specialized requirements. *Id.* After a lengthy development process, CRI agreed that the customized Cougars met its needs and began purchasing large quantities of Cougars. *Id.*

Packgen maintains that, six months later, Cougars sold to CRI ruptured when they were loaded with Catalyst. *Id.* It states that this created an unsafe and dangerous situation at the many locations around the world where CRI had delivered catalyst in Packgen's containers. *Id.* CRI immediately cancelled all pending orders for the customized Cougars and terminated its business relationship with Packgen. *Id.* Packgen contends that because of the widespread negative fallout from the product failure, Packgen lost sales to CRI and 37 North American refineries. *Id.* Packgen sued Berry, claiming that the Defendant supplied it with laminated fabric of poor quality, that the Defendant failed to properly bond the aluminum foil to this fabric, and that the fabric was unsuitable for containers designed for catalyst. *Id.*

## C. Mr. Filler's Proposed Testimony

Mr. Filler, Packgen's damages expert, is a certified public accountant and certified valuation analyst who has written and lectured extensively in the area of

business valuation, business interruption claims, and lost profits damages. *Id.* at 51-55; *Pl.'s Opp'n* at 8.

Mr. Filler's expert designation states that he "will provide expert testimony concerning lost profits suffered by Packgen as a result of the actions of the defendants." *Expert Designation* at 1-2. To calculate net profits for lost sales to CRI, Mr. Filler used a "deterministic model"—a model that does not account for future contingencies. *Pl.'s Opp'n* at 9 (citing *Tr. Vol. I* 50:21-25). Packgen maintains that "[t]he CRI damages model shows the annual net present value of Packgen's lost profits for each of the ten years following the product failure." *Id.* at 9. To calculate lost profits for the 37 refineries, Mr. Filler used a probabilistic model instead of a deterministic model, which accounts for future contingencies such as changes in technology or competition by assigning probabilities to those contingencies. *Id.* at 10 (citing *Tr. Vol. I* 50:20-51:19). Packgen contends that this model also "depicts the annual net present value of lost profits for each year of the ten-year loss period for the refineries." *Id.* at 10-11 (citing *Tr. Vol. I* 75:20-76:3; *Ct. Ex.* 13A at 1 (ECF No. 60).

## II. THE PARTIES' POSITIONS

### A. Berry's Motion

Berry argues that Mr. Filler's opinions regarding the lost profits of Packgen are unreliable and irrelevant, and that the Court should exclude them under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1992), and its progeny. *Defs.' Mem.* at 9-37. It maintains that Mr. Filler's opinions on damages for both CRI and the 37

refineries must be excluded because Mr. Filler is not an expert in statistics. *Defs.'*
*Mem.* at 9-13. It notes that multiple regression analysis is "subject to misuse, [and
therefore] courts cannot be expected to accept at face value conclusions derived from
such a model absent expert testimony concerning the validity of the model itself."[2]
*Id.* at 9 (quoting *Wilkens v. Univ. of Houston*, 662 F.2d 1156, 1157 (5th Cir. 1981)).
Berry indicates that "Mr. Filler testified that he 'never said [he] was a statistics
expert,'" *id.* at 10-11 (citing *Tr. Vol. I* 157:19), and, based on this statement and his
limited education in the subject, that he is "not qualified to give opinions that rely on
or are based in statistics." *Id.*

With this backdrop, Berry contends that "despite acknowledging that he is not
a statistics expert, [Mr. Filler] embedded statistical calculations in each of his lost
profits opinions." *Id.* at 11. It explains that Mr. Filler used a linear regression model
to allocate Packgen's overhead costs for both CRI and the 37 refineries, and points
out—as further purported evidence that he is not qualified to use statistical
methods—that Mr. Filler relied on one or more coefficients from regressions that were
not statistically significant. *Id.* at 10 (quoting *Tr. Vol. I* 32:7-11) ("the regression
model, even though it's not statistically significant, it's still a 29 percent improvement
over the average [overhead cost] and it allowed me to break down overhead between
fixed expenses and variable expenses"). Quoting its own expert, Berry insists that
the use of information lacking in statistical significance "violates every statistical

---

[2]     Berry acknowledges that Mr. Filler used a linear regression model, while the precedent it relies
on discusses multiple regression analysis, which is more complex. *Defs.' Mem.* at 10 n.4. It argues,
however, that "[r]egardless of the complexity of the statistical model, Mr. Filler is not qualified to . . .
testify to the results that include statistical analysis." *Id.*

principle about why you're doing the test in the first place." *Id.* at 12 (quoting *Tr. Vol. I* 217:11-12). For all of these reasons, Berry claims that Mr. Filler made a choice "between a method for which he was qualified and one for which he is not," and therefore insists that "any of Mr. Filler's opinions that use statistics must be excluded." *Id.* at 13.

Berry next focuses on Mr. Filler's opinions regarding lost profits for CRI. *Id.* at 13-24. It contends that Mr. Filler was "wholly unable" to provide corroborating evidence at the hearing in support of the ten year timeframe for which he estimated damages. *Id.* at 13. In particular, it maintains the following testimony demonstrates that "ten years is merely a guess with no factual support," *id.* at 15:

> Q.    Mr. Filler, isn't it true that you have absolutely no evidence that that six month trajectory would continue?
> A.    That's true. I also have no evidence that it would stop. I went with what was.

*Id.* at 14 (quoting *Tr. Vol. I* 108:5-9).

Berry rejects Mr. Filler's "position that ten years is an acceptable guess[,]" characterizing his reasoning that there is "no evidence that [the six month trajectory in which sales were strong] would stop" as "nonsensical." *Id.* at 15. It distinguishes the "lack of evidence that the [six-month] trajectory [of existing sales] would stop" from "evidence to support his affirmative position that CRI's six month volume of purchasing would continue for ten years," and argues that Packgen's burden of proof on admissibility "obligate[s] [it] to demonstrate that his opinion was supported by more than conjecture." *Id.* (citing *Atlantic Research Marketing Systems, Inc. v. Saco Defense, Inc.*, 997 F. Supp. 159, 167 (D. Mass. 1998)). It further argues Packgen has

ignored evidence that CRI could have stopped its buying pattern, explaining that "between 2003 and 2005 CRI increased purchases . . . , but in 2006 reduced purchases by almost 50% . . . ." *Id.* (citing *Tr. Vol. II* 289:12-21). Berry submits that "Mr. Filler's ten year projection based upon a mere six months of sales without any corroborating support is also inimical to Maine law," referring to a case in which the Maine Law Court rejected a claim of lost profits for a single year when it was based "merely on one year's past performance." *Id.* at 16 (quoting *Eckenrode v. Heritage Mgmt. Corp.*, 480 A.2d 759, 766 (Me. 1984) and citing *Reardon v. Lovely Dev., Inc.*, 2004 ME 74, ¶¶ 10-12, 852 A.2d 66, 69-70). It maintains that other jurisdictions have also concluded "that lengthy, but factually unsupported, damages periods are unreliable." *Id.* (citing *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 717 A.2d 724, 739 (Conn. 1998) (twelve years); *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1248 (M.D. Fla. 2003) (ten years)).

Berry also takes issue with Mr. Filler's forecasting methodology, arguing that he "improperly combines . . . lost profits and business valuation" and referring to his approach as a "unique, untested methodology that has no basis in accounting theory or legal precedent." *Id.* at 19; *see also id.* at 24-26. It also argues that Mr. Filler justified his ten-year term of damages as a "rule of thumb" but that "[t]he record has zero factual, legal or professional literature to support this purported rule . . . ." *Id.* at 22. Berry suggests that "Mr. Filler simply opted for the longest period he has 'seen,' without any explanation or any facts that can be evaluated by the finder of fact." *Id.* at 23. In sum of its position regarding CRI, Berry concludes that "the lack

of evidence to support the ten year period, the lack of any rule of thumb and the untested method are each an independent basis to exclude Mr. Filler's opinions." *Id.* at 26.

Next, Berry focuses on Mr. Filler's opinion regarding lost profits for the 37 other refineries, arguing that it is also inadmissible. *Id.* at 27-37. Berry notes that Mr. Filler used XLSim, a computer simulation program that incorporates statistical analysis, *see id.* at 3, to reach his conclusions on damages related to the 37 refineries. *Id.* at 28. Reiterating its earlier arguments about Mr. Filler's lack of qualifications as a "statistics expert," Berry contends that he must be barred from rendering this opinion because, by running a statistical simulation with XLSim, he "[s]imply plugg[ed] in numbers and let[ ] a program make calculations for which the witness is otherwise unqualified[, which] avoid[s] the threshold question of whether the expert is qualified." *Id.* at 27 (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004); *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004)). It claims that "[b]ecause Mr. Filler is wholly unqualified, there can be no 'vigorous cross-examination' of how XLSim works, the statistical validity of the model or the interpretation of the results." *Id.* at 27-28. They also point to testimony by their expert, who testified that a qualified statistician would not have used the computer simulation for that exercise, and that the very choice of data and parameters is so integral to the outcome[] that one without statistical experience cannot reliably make those choices. *Id.* at 28 (citing *Tr. Vol. I* 201:18-203:13).

Berry also criticizes Mr. Filler's assumption that Packgen had a one-in-ten chance of selling Cougars to each of the 37 refineries, insisting it is an inadmissible "guess" that is "not based on reliable or relevant facts, data or methodology." *Id.* at 29-34. Berry maintains that "this is not simply a matter of an expert exercising discretion as to . . . facts and data . . . .[,]" because the First Circuit has held that "where there is a gap in data related to the number of potential sales, experts must obtain relevant, reliable data, rather than base his or her opinion on surmise and conjecture." *Id.* at 30 (citing *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 195 (1st Cir. 2012)). It listed certain means for obtaining relevant, reliable data, such as information from customers, market research, and sales data from competitors, and noted that "while these endeavors can be 'difficult, time-consuming and expensive efforts . . . , without them [the expert's] report [is] merely a basis for jury speculation and his testimony [is] properly excluded." *Id.* (quoting *Paul*, 684 F.3d at 195) (alteration in original). Pointing to Mr. Filler's testimony that "[t]here is no empirical data" supporting his ten percent success rate, *id.* at 31 (quoting *Tr. Vol. I* 168:20), Berry argues that "the entire opinion is pure speculation and conjecture" and that "only Mr. Filler's *ipse dixit* connects the existing data to Mr. Filler's" ten percent estimation. *Id.* at 32, 34.

Last, Berry contends "the evidence shows that the 37 refineries were not purchasing cougars for reasons separate and distinct from the alleged issue with the Berry product." *Id.* at 34. It argues that "Mr. Filler avoided this obvious gap in the evidence by incorrectly assuming that the Berry product caused the 37 refineries not

9

to purchase Packgen's product[,]" and—after putting forth what it submits is evidence that some refineries had unrelated reasons for not purchasing Packgen's containers—argues that Mr. Filler's opinions are inadmissible on this ground. *Id.* at 34-36.

Summarizing its arguments related to Mr. Filler's lost profits analysis of the 37 refineries, Berry argues that "[a]s with CRI, any one of these issues is sufficient to exclude Mr. Filler because it will render the entirety of his opinion unreliable." *Id.* at 36-37.

## B. Packgen's Opposition

Packgen submits that the Defendants have disregarded the principle that "the district court's gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff." *Pl.'s Opp'n* at 3 (quoting *Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007)). It points out that "'but for' damages calculations force experts to construct . . . an uncertain and to some extent unknowable world in which the defendant's wrongful actions never occurred," *id.* at 4-5, that damages experts "must rely on assumptions and on information provided by the client," *id.* at 5, and that, therefore, expert opinion "necessarily involves some speculation." *Id.* (quoting *Weitz Co. v. MH Washington*, 631 F.3d 510, 528 (8th Cir. 2011)). Packgen acknowledges that "[a] damages expert must, of course, rely on facts and data, not unsupported speculation." *Id.* However, it maintains that "the trial court examines the quantity—not the quality—of those facts and data." *Id.* (citing *Manpower, Inc. v. Ins. Co. of Pennsylvania.*, 732 F.3d 796, 809 (7th Cir. 2013)). As such, "if the damages expert emphasizes certain facts or disregards others, this goes

to the weight of the opinions" and therefore "the selection of data inputs . . . is not pertinent to the reliability of the methodology itself." *Id.* (citing *Manpower*, 732 F.3d at 807, 809).

With this backdrop, Packgen explains that it retained Mr. Filler to compute Packgen's lost profit damages incurred as a result of the product failure, which Mr. Filler defined as "sales not made minus costs avoided." *Id.* at 8 (quoting *Tr. Vol. I* 10:4). It maintains that he is "well-qualified for this task"; his credentials include being "a certified public accountant and an expert in business valuation, business interruption claims, and lost profits damages" who has served as an expert witness in over 100 cases. *Id.* In the course of his work for Packgen, Mr. Filler "investigated Packgen's finances and operations" by reviewing financial data including both CPA-reviewed and internal financial statements, sales history, and corporate tax returns. *Id.* He made three trips to Packgen's manufacturing plant, where he questioned its bookkeeper and interviewed its company president on topics such as Packgen's manufacturing capacity, the market for catalyst containers and the many factors that could affect sales, and the impact of the product failure. *Id.* He also consulted a database of purchase and sale transactions in the industry for companies similar to Packgen. *Id.* at 9; *Tr. Vol. I* 14:1-7. Packgen then explains that Mr. Filler considered the "appropriateness" of each of the "four accepted methodologies for computing lost profits," and ultimately "chose the sales projection methodology as the most appropriate" for computing Packgen's damages. *Pl.'s Opp'n* at 9. It explains that

"[t]he purpose of [this] method is to project sales that would have occurred but for the incident in question." *Id.*

Next, Packgen explains the models Mr. Filler used to calculate lost sales for CRI and for the 37 refineries. For CRI, Packgen notes that Mr. Filler relied on "actual sales . . . , not internal sales forecasts" and that he projected sales that "would have occurred but for the product failure by using the number of units sold and unit prices from the six-month sales history of the customized Cougars." *Id.* It states that he then analyzed CRI's costs and deducted them from gross revenues to arrive at net profits, after determining and applying an appropriate discount rate. *Id.* The model "shows the annual net present value of Packgen's lost profits for each of the ten years following the product failure." *Id.*

For the refineries, Mr. Filler chose a "probabilistic model . . . to account for future contingencies," such as changes in technology or competition because "Packgen did not have a lengthy track record selling the new foil-laminated Cougars to refineries." *Id.* at 10. To implement this model, he "used a simulation software program to run 5,000 trials with a broad range of potential outcomes" given the possibility of contingencies—contingencies that he translated into estimates of "best case, most likely case, and worst case scenarios for unit sales, unit prices, and costs." *Id.* Packgen asserts that "[u]sing simulation software for this purpose is an accepted methodology for damages experts." *Id.* On the basis of these methods and procedures, Packgen contends that it has met its *Daubert* burden. *Id.* at 11.

Packgen asserts that Mr. Filler's opinions are admissible under *Daubert* and rejects Berry's contention that Mr. Filler "is not qualified to offer opinions 'that rely in any way on statistics,'" as a "sweeping generalization [that] finds no support in either the case[]law or financial damages treatises." *Id.* at 11 (quoting *Defs.' Mem.* at 9). Packgen contends that "linear regression is a simple statistical tool taught in introductory college statistics courses such as that taken by Filler," and by consequence that the "Defendants' argument is akin to suggesting that a damages expert cannot use algebra equations unless he has a Ph.D. in mathematics." *Id.* It also indicates that "[d]amages and business valuation experts like Filler routinely use this statistical tool in their work," and point out that treatises written for such experts—including a treatise edited by the Defendants' damages expert and counsel—explain linear regression and instruct experts on how to use such methods but do not include any caveats that only statisticians can employ such methods. *Id.* at 12 (citing NANCY FANNON & JONATHAN M. DUNITZ, eds., THE COMPREHENSIVE GUIDE TO LOST PROFITS AND OTHER COMMERCIAL DAMAGES, 35, 232 (3rd ed. 2014)). Packgen also contends that caselaw fails to support the Defendants' position, arguing that cases cited by Berry "do not even discuss *Daubert*, lost profits damages, or linear regression." *Id.* at 13. By contrast, Packgen cites lost profits cases where "nonstatisticians offer opinions predicated on linear regressions." *Id.* (citing *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 780 & 793 (6th Cir. 2002); *Honeywell Int'l Inc. v. Air Products & Chems., Inc.*, 858 A.2d 392, 426 (Del. Ch. 2004)).

With this backdrop, Packgen maintains that Mr. Filler "is particularly well-suited as a damages expert to use linear regression . . . because he has extensive experience with statistical tools." *Id.* He participates in annual continuing professional education that includes statistics, employs daily use of statistical tools and has an extensive library on statistical resources, and writes and teaches on the use of statistical tools in lost profits analysis. *Id.* at 13-14. Packgen also emphasizes the limited scope of Mr. Filler's statistical analysis, noting he used linear regression "solely" for the purpose of allocating overhead costs among the three broad sales categories for Packgen. *Id.* at 14; *Tr. Vol. II* 352:18-19. Acknowledging that the linear regression test was not statistically significant, Packgen maintains that Mr. Filler found the test "helpful and an improvement over the simple average," and emphasized that his overhead allocation would not have changed if he had used a simple average. *Pl.'s Opp'n* at 14. For these reasons, Packgen claims Mr. Filler is qualified as an expert by "knowledge, skill, experience, training, or education" under Federal Rule of Evidence 702 and points out that the First Circuit has emphasized that "expert witnesses need not have overly specialized knowledge to offer opinions." *Id.* (citing *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006)).

Packgen separately rejects the Defendants' theory that Mr. Filler is not qualified to render opinions based on a statistical simulation model. *Id.* at 15-19. It argues that simulation programs are designed for users lacking expertise in statistics, that Mr. Filler would be qualified even if statistical expertise were required, that he is qualified to explain the model and interpret its results, and that

his overall lost profits model is a straightforward mathematical calculation requiring no statistical expertise. *Id* at 15-16. Packgen points out that the First Circuit "demands only that 'a testifying expert should have achieved a meaningful threshold of expertise in the given area,'" *id.* at 18 (quoting *Levin*, 459 F.3d at 78), and insists that Mr. Filler "easily surpasses this requirement." *Id.*

Packgen next puts forth that Mr. Filler's opinion that damages regarding CRI should be calculated to extend for ten years is admissible.[3] *Id.* at 19-31. It argues that Berry's insistence that no data supports the ten-year period "ignores the facts and data to which Filler testified at the *Daubert* hearing . . . ." *Id.* at 20. Packgen submits that Mr. Filler looked carefully at its customer relationship with CRI—a "steady and sizable customer for six years." *Id.* Packgen redesigned its Cougar container in 2007 and worked to customize the new product for CRI's use through a "long back-and-forth process of design changes . . . to precisely fit CRI's needs." *Id.* at 20-21. Mr. Filler determined that this demonstrated CRI's commitment to the customized Cougar, which was confirmed when CRI proceeded to purchase "large numbers" of them—an average of 1,269 per month—for six months and had ordered 1,379 more for a seventh month. *Id.* at 21. Packgen contends Mr. Filler's damages model is actually relatively conservative insofar as it does not build in any increases in unit sales or unit prices "even though Packgen's revenues from CRI likely would

---

[3] Packgen also notes Berry's insistence that the entire lost profits opinion for both CRI and the refineries must be excluded if Mr. Filler's ten-year loss periods are inadmissible, but it argues that the "Defendants overreach" on this line of reasoning. *Id.* at 34-35. Packgen points out that Mr. Filler broke down damages year-by-year, and based on this method argues that "even if it is accepted for purposes of argument that Packgen has not met its burden as to one or more years of either loss period, the damages can be cut off accordingly." *Id.* at 34-35.

have increased" but for the product failure. *Id.* at 23. Packgen maintains that "[t]he product failure changed everything. After the containers assembled from Defendants' material ruptured, CRI immediately terminated its long-term business relationship with Packgen and cancelled the pending orders . . . ." *Id.* at 21. Packgen also submits that CRI has not purchased from Packgen since and has stated it will not do so in the future. *Id.*

With respect to the market for catalyst containers, Packgen explains that Mr. Filler noted that only two options were on the market in 2008 and determined that "CRI saved substantial amounts of money" by purchasing Packgen's new product. *Id.* at 21-22. Mr. Filler further relied on Packgen's industry expert's opinion that "Packgen has excellent market presence and expertise in the catalyst container industry." *Id.* at 22. Packgen also maintains that the events of the last six years informed Mr. Filler's loss period for the CRI damages. *Id.* Packgen "continues to successfully operate its business and to manufacture and sell catalyst containers" and "the competitive environment in which Packgen operated when it sold customized Cougars to CRI has not changed." *Id.* Finally, Mr. Filler considered and ruled out political, economic, technological, and other reasons why CRI would have stopped buying Cougars if the product failure had not occurred. *Id.* at 22-23.

Packgen argues that these facts and data "support [Mr. Filler's] opinion that Packgen would have continued to sell Cougar containers to CRI during the past six years in the same amounts and at the same prices as before the incident," and that those sales would have continued for at least the next four years. *Id.* at 23. It points

16

out that Mr. Filler was "forced to make assumptions where it was impossible to gather more concrete information because of the product failure," and that where he did so he properly based his assumptions on his assessment of Packgen's history with CRI and the potential for future sales in light of market conditions. *Id.* at 23-24. Further, Packgen rejects Berry's reliance on a temporary dip in purchases in 2006 as proof that Mr. Filler "ignored evidence that CRI could change its buying patterns," explaining that CRI was not purchasing the new, customized Cougars at that time, and arguing that even if a damages expert "emphasizes certain facts or disregards others, this goes to weight." *Id.* at 25. Packgen also disputes Berry's characterization of Mr. Filler's testimony regarding the ten year loss period as a "rule of thumb," insisting that he "merely observed that "[i]t depends on the situation, but I have generally never seen anything past ten years." *Id.* at 31.

Packgen likewise rejects Berry's interpretation of Maine law. It argues that Berry has confused the admissibility of expert opinions under the *Daubert* standard with the issue presented in the Maine Law Court cases that Berry cites; in those cases, Packgen submits, the issue was whether a plaintiff presented enough evidence to permit a factfinder to award damages. *Id.* at 25-26 ("Defendants shift from scrutinizing the quantity of the facts and data, which is the proper focus of a *Daubert* inquiry, to assessing the quality of the evidence"). Packgen argues that this issue "is the domain of summary judgment and post-trial motions, not *Daubert*." *Id.* at 26. It also argues these cases do not establish that the ten year loss period contravenes Maine law. *Id.* Packgen explains that in *Eckenrode*, the plaintiff sought future lost

profits from a golf pro shop he had operated for only one season and—without any damages expert—"presented no evidence whatsoever as to the profitability of the pro shop during the following year." *Id.* at 26 (citing *Eckenrode v. Heritage Mgmt. Corp.*, 480 A.2d 759 at 766 (Me. 1984)). Under these facts, the Law Court overturned the damages judgment in the plaintiff's favor. *Eckenrode*, 480 A.2d at 766. Packgen similarly rejects Berry's citation to *Reardon*, where the plaintiff "relied on evidence of profits from the first few days of the restaurant's operation" to justify a reward of lost profits, a "meager track record [that] was insufficient to support the judgment." *Pl.'s Opp'n* at 26 (citing *Reardon v. Lovely Dev. Inc.*, 2004 ME 74, ¶ 12, 852 A.2d 66, 70). By contrast, Packgen argues, it "is an established business with an extensive track record of sales to CRI, and the evidence shows that the circumstances generating those sales have not changed since the product failure." *Id.* Packgen further asserts that "cases in other jurisdictions allow damages periods of ten years," and that "the length of the damages period is a question for the jury." *Id.* at 27 (collecting cases).

Packgen insists that the Defendant has "wrong[fully] accuse[d] Filler of commingling lost profits and business valuation methodologies" with respect to Packgen's damages, and that even if Mr. Filler had blended the methods, it would not render his opinions inadmissible. *Id.* at 28. It argues that Mr. Filler "indisputably determined Packgen's lost profits," *id* at 30, and explains that this method was appropriate because Packgen "lost a substantial income stream when CRI stopped buying . . . . Lost profits are the proper measure of this income stream." *Id.* at 29. It

also argues that "[e]ven if [he] had commingled the methodologies—which he did not—this would not render his opinions inadmissible because they are two sides of the same coin: both calculate future profits, but they ultimately use this calculation for different purposes." *Id.* at 30. It notes that the Defendant has "ignore[d] the fact that the purpose of th[e] distinction [that lost profits and lost asset value are distinct damage categories] is to avoid duplicative damages, not to prescribe the methodologies that damages experts must unerringly follow." *Id.* at 30-31. Packgen claims that the "Defendants cite no cases holding that the purpose of the distinction between lost profits and business value damages is to dictate the methodologies that damages experts must employ." *Id.* at 31. It also maintains that Berry's theory "would incorrectly preclude an existing business from recovering damages if a third-party's wrongful actions nullified an income stream that the business could not—through no fault of its own—regain." *Id.* at 36.

Next, Packgen argues that "[a]s with the CRI damages, Defendants overlook the facts and data available to Filler," *id. at 32*, and submits that the facts and data reviewed, "plus Filler's professional judgment and experience as a damages expert, support the ten-year damages period for the refineries." *Id.* at 34. Packgen explains Mr. Filler learned it had actively marketed its new Cougar containers, concentrating on refineries that would reap significant cost savings from using them. *Id.* at 32. All refineries included in the damages model had informed Packgen's sales manager that they would be placing orders within a year, so Mr. Filler's calculations were limited "to the refineries [Packgen] lost as customers because of the product failure." *Id.* Mr.

Filler also considered the "substantial economic advantages of Cougars" and Packgen's business reputation, and he reviewed Packgen's actual sales of Cougars during the past six years, through which he confirmed the "validity of a ten-year loss period" on the basis that "it would take five years for the negative effects of the product failure to dissipate and then five years for refinery sales to recover to the level they would have reached if the product failure had not occurred." *Id.* at 33-34. Packgen also disputes the contention that it "cannot claim . . . as damages profits that [it] would not have earned in the first place because the product was new and in the process of ramping up," *Defs.' Mem.* at 18 n.16, insisting that the "Defendants apparently fail to understand that Filler's damages model for the refineries recognizes this fact: his 'but for' sales start with 8.2% of refineries' needs in year one and slowly build up to 51% in year ten." *Pl.'s Opp'n* at 34.

Based on much of the same data supporting Mr. Filler's conclusion as to the appropriate loss periods, Packgen also maintains that Mr. Filler's assumption of Packgen having a one-in-ten chance each year of selling the new Cougars "more than meets *Daubert* standards." *Id.* at 38. It notes that Packgen informed Mr. Filler it believed the success rate would have been "much higher than 10%," but Mr. Filler rejected his client's belief after finding no hard evidence to confirm a higher number. *Id.* It also notes that "[t]he flip side of Filler's success rate" is further evidence of a reliable opinion because it effectively assigns a 90% chance of not selling Cougars "even though Packgen expected to make sales to all these refineries within one year" but for the product failure. *Id.*

Rejecting the Defendants' argument that "no empirical data" supports the success rate, Packgen concludes that "[r]elying on the available information, Filler exercised his professional judgment to choose an appropriate success rate. This is what damages experts do." *Id.* at 39. It maintains that "Defendants' damages expert conceded that such experts need to make professional judgments when they quantify issues [for which] no data exists, such as the lack of patents or the quality of a customer relationship." *Id.* Packgen also explains how Berry "fault[s] Filler for not doing a market survey of the refineries," but argues the "Defendants make no effort . . . to show that a valid market survey would be feasible years after the large-scale failure . . . ." *Id.* It also argues the market survey issue is simply an argument that "[Mr.] Filler should have done more, which raises only a question of weight, not admissibility." *Id.* at 39-40. Similarly, Packgen puts forth that Mr. Filler did not consider its historical success rate with the 37 refineries only after applying his judgment based upon the facts—because the Cougar was a new product and "historical sales of a different product were not meaningful." *Id.* at 41. It insists that any opinion to the contrary is an issue for direct testimony and cross-examination that the jury must sort through. *Id.*

Finally, Packgen rejects Berry's contention that Mr. Filler's opinions are inadmissible for "overlook[ing] evidence that the refineries did not purchase Cougars for reasons unrelated to the product failure." *Id.* at 41 (citing *Defs.' Mem.* at 34-36). It insists that Berry has twisted, misunderstood, and selectively used the deposition testimony of Packgen's sales manager to manufacture such an inference from the

record, and maintains that "[r]egardless, Defendants' argument concerning the reasons for the lost sales is, at the most, more grist for the cross-examination mill. It has no bearing on the admissibility of Filler's opinions under *Daubert*." *Id.* at 42.

In conclusion, Packgen insists that Berry is disputing "the quality of the facts and data available to Filler and the propriety of [his] conclusions . . . ." *Id.* at 43. It submits that "[t]hese disputes go to the weight of Filler's testimony and are tested by the adversary process and determined by the jury." *Id.*

C.      **Berry's Reply**

Berry argues that Packgen "recast[s] speculation as fact and data, take[s] mutually exclusive positions on identical evidence, obfuscate[s] failed methodology and ignore[s] well-settled burdens." *Defs.' Reply* at 1. It insists that "Mr. Filler's alchemy . . . is patently unreliable, irrelevant, and inadmissible." *Id.*

Berry explains that "Plaintiff's claim that Mr. Filler's 10 year loss period for refineries is not speculative" is "a prime example" of Packgen's "attempts to recast speculation as facts and data." *Id.* Berry insists that "none of [Packgen's] evidence has anything to do with Mr. Filler's opinion that it will take 5 years for the harm to blow over and 5 years to recover." *Id.* at 2. It notes that the Supreme Court has addressed this issue in holding that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion offered." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Tying this comment to the ten-year loss

period, Berry argues "[n]othing cited by Plaintiff connects the cited data to the conclusion." *Id.*

Berry next takes issue with Packgen's statement that "sales to other catalyst manufacturers would not replace CRI sales, but would be in addition to them." *Id.* at 3 (quoting *Pl.'s Opp'n* at 36). It argues Packgen has no evidence to support such a statement, and the actual evidence shows "Mr. Filler cannot reliably establish that Plaintiff can meet even the volume of sales required by his opinions." *Id.* Looking at Mr. Filler's growth projections, Berry submits that the 2004 revenue for CRI and the 37 refineries totaled $550,552, while the 2017 projection for revenue "but for" the product defect is $7.7 million, a 1,400% increase before inflation. *Id.*

According to Berry, "[t]he question, therefore, is whether there is evidence to support Plaintiff's claim that it can both meet and exceed the volume of sales in Mr. Filler's opinions, including the sudden, steep, hockey stick of growth." *Id.* at 4. It insists Mr. Filler's opinion is not supported by such evidence. *Id.* First, Berry notes that Mr. Filler did not program total volume of sales as an output cell in his computer simulations, so that "there is obviously no way to tell if Plaintiff could meet that capacity." *Id.* Second, it maintains that "even if the volume was known, the capability of Plaintiff's production facility is unknown." *Id.* Berry provides a portion of Mr. Filler's testimony, *Tr. Vol. I* 123:16-22, 124:9-125:1, 125:21-126:3, and argues this testimony demonstrates that he "does not know how long it takes to make a Cougar." *Defs.' Reply* at 5. Berry contends that without knowing this information, Mr. Filler "cannot possibly know if Plaintiff can meet the demand he calculated." *Id.*

23

at 5.  Honing in on his statement that "it probably takes somewhere between three and four minutes to make a Cougar," *id.* (quoting *Tr. Vol. I* 125:24-25), Berry maintains that even a one minute difference in production time is "critical" because it translates to a difference in annual units of 31,200 and a corresponding difference in gross revenue of at least $6,142,032.  *Id.* at 5-6.  Berry thus contends there is no "reliable or relevant evidence that Plaintiff can meet the demand for [Mr. Filler's projected] growth rate."  *Id.* at 6.

Next, Berry disputes whether Packgen has provided evidence supporting Mr. Filler's use of a ten percent chance of selling to the refineries.  *Id.* at 7.  It argues that "facts and data related to the development of a new product and potential, though not closed sales, do not provide a reliable basis for arriving at a success rate for sales." *Id.* at 7.  It suggests Mr. Filler "had no idea why the refineries were purchasing at this time," and insists "we are left with only correlation that sales have picked up, and it is well-settled that correlation is not causation."  *Id.* at 8.  It argues "the hindsight suggestion that Mr. Filler's 1 in 10 success rate is anything but conjecture is belied by his admission that 'it still came down to something about – I wanted something that was small, but not inconsequential.'"  *Id.* at 8-9 (quoting *Defs.' Mem.* Attach 1 *Dep. of Mark G. Filler* 97:2-4 (ECF No. 64-1)).  *Id.* at 8-9.  It submits that the ten percent rate is inadmissible *ipse dixit*.  *Id.* at 9.  It also claims "[t]he suggestion that a market survey would not have been feasible is unsubstantiated," *id.* at 10 n.9, and argues the "decision to rely on Mr. Filler's guesswork rather than empirical data,

such as a market survey, to replace the data he excluded is fatal to Mr. Filler's opinion." *Id.* at 10.

Berry also reasserts that Mr. Filler's opinions on CRI damages are inadmissible. *Id.* at 11-13. Focusing first on sales volume, it characterizes Packgen's position as suggesting that "Mr. Filler's admitted lack of 'hard evidence' that the volume of sales would continue for ten years can be ignored because, among other things, he testified that CRI 'had a sales history dating back to 2003.'" *Id.* at 11. Berry maintains "the problem is that Mr. Filler did not consider the sales history in his calculation of the volume of sales" and that "[h]ad he done so, he would have seen that CRI purchase volume from Packgen was volatile and inconsistent . . . ." *Id.* Berry thus contends "there is no evidence that sales volume would remain consistent for 10 years." *Id.* at 12. Second, Berry disputes Packgen's argument that "lost profits and business valuation are [ ] interchangeable as two sides of the same coin." *Id.* at 12. It contends that "[w]here loss of future profits extends into perpetuity, the courts have found that loss of business value is the proper measure of the loss." *Id.*

Finally, Berry reiterates its argument that Mr. Filler's statistical analyses are generally inadmissible. *Id.* at 13-16. Repeating its argument that "if the overhead costs are inadmissible . . . , the entire opinion is inadmissible," Berry disputes Packgen's efforts "to downplay this issue." *Id.* at 13. It insists such an argument is akin to "saying 'it is just the foundation of the house; the rest will be fine if it crumbles.'" *Id.* at 13-14. It argues "the purported credentials cited by Plaintiff fail to qualify him," and offers Mr. Filler's "attempts to explain" his application of

statistics—namely, his use of a linear regression coefficient that was not statistically significant—as "[t]he proof that he is not qualified." *Id.* at 14.

Regarding XLSim, the computer simulation program, Berry argues that "merely having an accounting background is not sufficient to appropriately use or interpret the results of a simulation." *Id.* at 15. It insists that "Mr. Filler does not have the necessary econometric background" to use the simulation program, and contends that Packgen's response "wholly ignores Mr. Filler's ability to interpret, test and implement statistical solutions to any errors in the program." *Id.* "Without the expertise to identify and correct problems," Berry contends, "Mr. Filler's blind input of data is neither expert nor reliable." *Id.* It also argues "Mr. Filler's lack of expertise caused him to choose inputs and distributions in a manner that was inherently unreliable," and that he "failed to account for (or realize the model did not account for) variability that obviously exists and that clearly impacts the reliability of the model." *Id.* at 16. Berry concludes "Mr. Filler's use of XL Sim is based on pseudo-distributions with false inputs that are intended to look like science. This is precisely the type of evidence *Daubert* was intended to exclude." *Id.* at 16.

## III.    DISCUSSION

### A.    Legal Standard: Rule 702 and *Daubert* Motions to Exclude

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert*, the Supreme Court designated trial judges as gatekeepers responsible for determining whether Rule 702's requirements are met in any given case.[4] 509 U.S. at 589. "A judge exercising the gatekeeper role must evaluate whether the challenged expert testimony is based on reliable scientific principles and methodologies in order to ensure that expert opinions are not 'connected to existing data only by the *ipse dixit* of the expert.'" *Kirouac v. Donahoe*, No. 2:11-cv-00423-JAW, 2013 U.S. Dist. LEXIS 6331, at *5 (D. Me. Jan. 16, 2013) (quoting *Knowlton v. Bankers Life & Cas. Co.*, No. 1:09-cv-00334-MJK, 2012 U.S. Dist. LEXIS 1365, at *2-3 (D. Me. Jan. 6, 2012) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))). However, "[w]hen the adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Id.* (quoting *Zuckerman v. Coastal Camps, Inc.*, 716 F. Supp. 2d 23, 28 (D. Me. 2010)); *see Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

---

[4] The *Daubert* Court set out four non-exclusive factors that a trial judge may consider in determining the reliability of expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (listing the four factors)). However, the Supreme Court subsequently emphasized that the key word is "may": the Court has held that "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 152. Here, Berry lists the four factors in providing background on the governing legal standard. *Defs.' Mem.* at 5. However, neither party formally relies on these factors in explaining their respective positions on Mr. Filler's opinions. Heeding the guidance in *Kumho Tire*, this Court does not specifically consider the four factors from *Daubert* in its analysis. Instead, mirroring the arguments made by the parties, it draws upon caselaw that is more appropriate—for this particular case—in exercising the Court's gatekeeper role under Rule 702 as articulated in *Daubert*.

the traditional and appropriate means of attacking shaky but admissible evidence"); *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (same).

## B. Analysis

### 1. Mr. Filler's Qualifications

Under both Rule 702 and *Daubert*, Mr. Filler must be qualified to testify by "knowledge, skill, experience, training, or education," FED. R. EVID. 702; the First Circuit has commented that this means an expert "should have achieved a meaningful threshold of expertise in the given area." *Levin*, 459 F.3d at 78 (internal quotation marks omitted). Berry argues Mr. Filler is not qualified to testify to any opinions that embed statistical analysis because he lacks the expertise to use statistical methodologies and because this "lack of expertise" is "amply demonstrate[d]" by his use of statistics in this case. *Defs.' Mem.* at 12-13. It focuses particular attention on Mr. Filler's formal education in statistics. *See Defs.' Reply* at 14 n.14 ("All that Mr. Filler can point to is an introductory course in statistics").

Berry looks at Mr. Filler's qualifications too narrowly. The record amply demonstrates that Mr. Filler has achieved a meaningful threshold of expertise in lost profits calculations that use statistical analysis—including, more specifically, linear regression—through a combination of his "knowledge, skill, experience, training, [and] education" as set forth in Rule 702. Mr. Filler's curriculum vitae sets forth that he has been a certified public accountant since 1972, a certified valuation analyst since 1994, and a certified business appraiser since 1999. *Expert Designation* at 51; *Ct. Ex.* 22 at 1 (ECF No. 60). In addition to taking a college course in statistics, Mr.

Filler participates in continuing professional education that includes statistics each year, maintains an extensive library on the use of statistics, and employs statistical tools on a regular basis in his valuation practice. *Pl.'s Opp'n* at 13.

His extensive teaching and writing in the area further bolsters his overall "knowledge, skill, experience, [and] training" related to the use of statistics in lost profits calculations. For example, he has given many presentations in this area, such as "Lost Profits: Help Demonstrate Causation and Prove Damages with Statistical Analysis," which he presented to both a national continuing legal education conference and the National Association of Certified Valuation Analyst's "Litigation Boot Camp." *Expert Designation* at 53. Similarly, his published writings on the subject include an essay entitled "Economic Forecasting in a Lost Profits Case" and an article entitled "A Second Course in Regression Analysis as Applied to Valuation and Lost Profits." *Id.* at 52. Mr. Filler is well-qualified to testify as to lost profits calculations that use statistical analysis, including calculations based on use of the XLSim program.[5]

Berry relies on *LifeWise Master Funding v. Telebank* to support its argument that Mr. Filler is unqualified to render an opinion based on XLSim, *Defs.' Mem.* at 27-28 (citing 374 F.3d at 928). *LifeWise*, however, actually highlights the difference

---

[5] The Defendants' argument that he should not be permitted to use the XLSim program is, "[i]n short, [that] Mr. Filler should not be permitted to hide behind a computer program to avoid his admitted lack of expertise in statistics." *Defs.' Mem.* at 29. Because the Court concludes that Mr. Filler is qualified to use statistical analysis in lost profits calculations, it rejects Berry's argument as to XLSim on this basis and does not reach the issue of whether financial experts must always be qualified in statistics to issue opinions that employ simulation. *See Pl.'s Opp'n* at 15-19 (arguing that Mr. Filler's expertise is qualified to use simulation in his refineries damages model based on four grounds).

between an "unqualified" individual and Mr. Filler. In that case, the so-called expert confessed that he was "not a damages modeler." 374 F.3d at 928. The Tenth Circuit further noted that that he was "not an accountant . . . [,] took no accounting or finance courses, had no training in damage analysis, had never testified as a damages expert . . . , had never taught a course or lectured on damages, and has never been published in the field." *Id.* The appellate court therefore found the so-called expert to be "utter[ly] lacking of any familiarity, knowledge, or experience with damages analysis," and concluded the district court had not abused its discretion in ruling that he could not testify on "such a complex subject matter" as the damages model at issue. *Id.* at 928-29. By contrast, Mr. Filler's qualifications include all of the above-described professional experiences found lacking in *Lifewise*, including a forty-plus year career as a CPA and the proper formal and ongoing education required for this certification, extensive teaching and writing in the area of business valuation, and work as an expert witness in over one hundred cases. *See Expert Designation* at 51-58 (Mr. Filler's curriculum vitae). Thus, by analogy, *LifeWise* supports rather than casts doubt upon the sufficiency of Mr. Filler's qualifications.

The second prong of Berry's argument concerning Mr. Filler's qualifications is that Mr. Filler misapplied statistics in this case and this flawed analysis demonstrates his lack of qualification as to statistics; namely, using a coefficient from a linear regression that was not statistically significant to allocate overhead costs among Packgen's three broad sales categories. *See, e.g., Defs.' Reply* at 14; *Pl.'s Opp'n* at 14-15. Having concluded that Mr. Filler is qualified to offer opinions that

incorporate statistical analysis, the Court will not entertain this argument as "proof" that Mr. Filler is unqualified. Instead, it considers this as akin to arguing that some or all of Mr. Filler's opinions regarding damages should be excluded because his statistical calculations are not relevant or reliable. This argument goes beyond the Court's gatekeeping role and must be tested by the adversary process and resolved by a jury. While Berry insists Mr. Filler's use of the coefficients is unacceptable, Packgen counters that Mr. Filler recognized his test was not statistically significant but still found it "helpful and an improvement over the simple average" for purposes of allocating overhead. *Pl.'s Opp'n* at 14. Further, Mr. Filler testified that his answer would not have changed if he had used the simple arithmetic mean to allocate costs, *id.* (citing *Tr. Vol. II* 352:15-353:1), and that even the Defendants' statistics expert conceded that this usage might be a matter for Mr. Filler's professional judgment. *Id.* at 14-15 (citing *Tr. Vol. I* 240:10-21). These differences of opinion are properly placed before the factfinder; the Court finds that the issues raised by Berry as to Mr. Filler's use of statistics go to the weight of his testimony, not its admissibility.

### 2. Mr. Filler's Opinions on Damages Related to CRI and to the 37 Refineries

Berry's core argument regarding Mr. Filler's calculation of damages for CRI is that the ten-year loss period is "merely a guess with no factual support," *Defs.' Mem.* at 15, and that at the evidentiary hearing he "was wholly unable to provide any corroborating evidence to establish the ten year time period." *Id.* at 13. This assertion fails to account for the facts and data that Mr. Filler considered and relied upon in determining the damages period. He decided upon a ten year period after

reviewing Packgen's financial statements, sales history, and tax returns, consulting with Packgen's bookkeeper on financial issues, and gathering information from Packgen's company president regarding factors such as the company's manufacturing capacity and expectation of sales to CRI and refineries, the market for catalyst containers, and the impact of the product failure. *See Pl.'s Opp'n* at 8. He also considered important information, such as that CRI had been a steady and sizable customer for six years,[6] *see, e.g., Tr. Vol. I* 14:24-15:2, 190:13-22, and that CRI and Packgen had engaged in a "long back-and-forth process of design changes and additions" to customize the new Cougar for CRI's needs. *Pl.'s Opp'n* at 21. Thus, Mr. Filler's ten-year period was supported by both a detailed platform of factual information regarding Packgen's finances and its historical and current business relationship with CRI.

Further, Mr. Filler considered that CRI could have turned to only one other supplier for catalyst containers at the time of the alleged product failure, that the competitive environment for catalyst containers has not changed in the years following the failure, and that Packgen had "excellent market presence and expertise." *Tr. Vol. I* 77:15-78-14, 103:2-15; *Tr. Vol. II* 353:2-13. The benefit of "hindsight" with respect to the competitive environment warrants further emphasis: in some regards, Mr. Filler's loss period incorporates the systemic uncertainty of only four years' worth of market conditions and not ten, because he has the benefit of knowing the market conditions that actually took place during the first six years of

---

[6] Packgen notes that the evidence at trial will also show that "Packgen's predecessor company had a customer relationship with CRI before 2002." *Pl.'s Opp'n* at 20.

the damages period—from April 2008 until the present. "The actual events of the past six years" confirm that Packgen has "continue[d] to successfully operate its business" and that "the competitive environment in which Packgen operated when it sold customized Cougars to CRI has not changed." *Pl.'s Opp'n* at 22; *Tr. Vol. I* 103:2-15; *Tr. Vol. II* 353:2-13. Thus, his calculation is further strengthened by the simple fact that it is 2014—his ten-year "forecast" contains fewer unobservable variables than it would if he were responsible for looking ten years into the future.

Mr. Filler also considered that CRI saved "substantial amounts of money" by purchasing Packgen's customized Cougars. *Pl.'s Opp'n* at 22. Additionally, early indicators of a promising sales future with CRI were corroborated by a two-month ramp-up of actual sales followed by six months of robust sales and a seventh month with similar orders in place, until the orders were canceled shortly after the product failure. *Tr. Vol. I* 17:7-18. Finally, even considering all these factors suggesting that CRI could potentially increase its sales—as well as the direct statement from CRI informing Packgen that it would be increasing its purchases—Mr. Filler's damages model does not build in increases in revenue over time due to increased sales or prices. *Pl.'s Opp'n* at 23; *see Dep. Tr. I* 109:8-20.

These facts and data formed the basis for Mr. Filler's use of a ten-year loss period in calculating CRI damages. In effect, Berry argues that the only data supporting the ten-year loss period is Packgen's six-month sales history (and considers these months of sales in isolation), but this position ignores the wealth of foundational information taken into account by Mr. Filler. Although Mr. Filler made

assumptions based on the facts and data provided, his assumptions are permissible because, "[a]s in any damages case, the calculation had to address a hypothetical world that never existed, one in which other things remained the same but the breach had not occurred." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 709 F.3d 872, 881 (9th Cir. 2013).[7] Faced with the assignment of forecasting what would have happened but for the product failure, the Court finds that Mr. Filler used sufficient facts and data under Rule 702 in deciding upon a ten-year damages period. Although Berry raises sound reasons to doubt Mr. Filler's assumptions, the place to question the use of his properly supported assumptions is at trial. As the Court has noted, "[i]f the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of [the experts'] testimony." *Kirouac*, 2013 U.S. Dist. LEXIS 6331, at *5-6 (quoting *Payton v. Abbott Labs.*, 780 F.2d 147, 156 (1st Cir.1985)).

The same conclusion must be drawn with respect to Berry's argument that the ten-year damages period is an inadmissible "guess" in light of evidence that CRI "could stop its buying pattern." *Defs.' Mem*. at 15. Berry notes that CRI's historical purchase volumes were volatile, and relatedly that they decreased substantially in 2006 after increasing from 2003 to 2005. *See Defs.' Mem*. at 15; *Defs.' Reply* at 11-12. For the Court to find that Mr. Filler's ten-year period is inadmissible based upon such facts, however, it would be obliged to accept Berry's interpretation of the facts. "To express an opinion, an expert must typically assume some set of facts and assuming

---

[7]     The Ninth Circuit concluded that the moving party's challenges were "colorable, but none go to admissibility. They amount to impeachment." *Alaska Rent-A-Car, Inc.*, 709 F.3d at 882.

one party's version as opposed to another's is not grounds for exclusion." *Kirouac*, 2013 U.S. Dist. LEXIS 6331, at *6. Mr. Filler based his ten-year period on the facts set forth above. Berry has the right to challenge the assumptions that Mr. Filler has drawn from such information, but the evidence in support of its position goes to the weight and credibility of Mr. Filler's expert opinion, not its admissibility.

Berry also characterizes "Mr. Filler's ten year projection [of damages relating to CRI] based upon a mere six months of sales without any corroborating support" as "inimical to Maine law." *Defs.' Mem.* at 16; *see also Defs.' Mem.* at 16-18. Berry is correct insofar as Maine law requires "'credible evidence' sufficient to support a damages award for lost profits." *Reardon*, 2004 ME 74, ¶¶ 10, 14, 852 A.2d at 69-70; *see Eckenrode*, 480 A.2d at 766. However, in both cases cited by Berry, the Maine Law Court addressed the overall evidentiary threshold that would be sufficient to allow a jury to consider a lost profits claim. The legal sufficiency of the evidence supporting a ten-year loss period is an issue to be addressed during summary judgment as well as trial and post-trial motions, not *Daubert* motions.

Notwithstanding the difference between a *Daubert* issue and a sufficiency-of-the-evidence issue, neither *Reardon* nor *Eckenrode* establishes that Mr. Filler's ten-year loss period would contravene Maine law. In *Eckenrode*, the plaintiff "relied heavily on his 1978 federal income tax return to predict his profits for the period in 1979 covered by his contract." 480 A.2d at 766. The plaintiff had income information from only this single year, retained no damages expert, and "produced no evidence as to the actual profitability . . . or volume of business" for the relevant period. *Id.* The

Law Court unsurprisingly concluded that the plaintiff's own opinion testimony about expenses and profits "was not an informed opinion based on relevant facts in evidence upon which the jury could rely in assessing damages for claimed lost profits." *Id.* Packgen's history, Mr. Filler's qualifications, and the facts and data he relied upon in forming an opinion render the instant case orders of magnitude different from *Eckenrode.*

Similarly, the lay plaintiff in *Reardon* himself testified that lost profits were to be estimated at $100 per day for ten months. 2004 ME 74, ¶¶ 10, 852 A.2d at 69. This opinion testimony, by itself, was found insufficient because the business at issue had been open for only "a few days" before the events giving rise to the lost profits lawsuit. *Id.* ¶ 12. The Law Court also found the testimony of the plaintiff's expert insufficient as a second basis to support a damages award. *Id.* ¶ 13. The *Reardon* Court noted that the witness who prepared the profit and loss statement documented an estimated daily profit of only nine or ten dollars per day; further, there were "additional reason[s] to question" whether "a finding of *any* amount of lost profits" was supported by her evidence because: (1) the profit and loss statement was prepared for use in the lawsuit; (2) it did not reflect certain debts; and (3) the witness prepared a tax return for the same timeframe that reflected a loss of $13,483 (compared to overall profits for the year of $2353 in her profit and loss statement prepared for litigation). *Id.* (emphasis in original). On this basis, the Law Court concluded that "[t]he evidence cited by Reardon is not the 'credible evidence' needed to support an award of lost profits." In contrast, Mr. Filler's ten-year loss period is

supported by an abundance of underlying facts and data, especially when compared to the Maine Law Court cases cited by Berry. Although Berry vehemently disagrees with the assumptions drawn from the facts that Mr. Filler used, Mr. Filler's opinion rests upon a factual foundation that incorporates many factors, such as competition in the market and the number of competitors, the opportunity for cost savings associated with the new Cougars, and the long-term customer relationship with CRI and seven-month sales record for the specific product at issue.

Next, Berry argues that Mr. Filler's damages calculation for CRI "improperly combines" forecasting methodologies by borrowing from the business valuation model to calculate lost profits. *Defs.' Mem.* at 19-21, 24-26; *see also Defs.' Reply* at 12-13. Berry relies on *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000), for the proposition that lost profits and "loss of value" are distinct methodologies, but that case does not support a finding that Mr. Filler's methodology was improper. The *Schonfeld* Court addressed whether the district court erred by failing to allow the plaintiff to seek recovery of the market value of certain supply agreements *in addition to* seeking recovery of lost profits.[8] *Id.* at 176. In contrast, this case does not involve any dispute over the overarching definition of what damages are being sought— Packgen seeks recovery for the present value of its lost profits, or "[s]ales not made minus costs avoided." *See Tr. Vol. I* 9:23-10:4.

---

[8]     The Second Circuit separately concluded that the plaintiff had not met the standard of proof required to survive summary judgment on the lost profits component of his case. *Schonfeld*, 218 F.3d at 172-75.

Similarly, Berry relies on a Court of Federal Claims case to support its argument that Mr. Filler's methodology is inadmissible, but that case, paradoxically, support's Packgen's position. *Defs.' Mem.* at 20 (citing *Spectrum Sciences & Software, Inc. v. United States*, 98 Fed. Cl. 8, 16 (Fed. Cl. 2011)). The *Spectrum Sciences* Court opined that the plaintiff was entitled to pursue its lost asset theory, as opposed to a lost profits theory, because "many lost profits limitations simply do not apply" to lost asset cases; the Court of Claims' purpose in making this distinction was to point out that the defendant had mischaracterized the plaintiff's position by invoking lost profits cases for the proposition that plaintiff's lost asset theory of recovery should be limited. *Spectrum Sciences & Software,* 98 Fed. Cl. at 16 ("Whether a case of mistaken identity or willful blindness, this mischaracterization of plaintiff's position is a prelude for defendant and its expert to invoke various lost profits cases"). Thus, the Federal Court of Claims' analysis does not stand for the proposition that Mr. Filler's methodology must be considered unreliable if it "borrows" from a related methodology in calculating lost profits. Instead, the *Spectrum Sciences* Court supports Packgen's position; the purpose of recognizing a conceptual distinction between a lost profits theory and other theories, such as business valuation, "is to avoid duplicative damages, not to prescribe the methodologies that damages experts must unerringly follow." *Pl.'s Opp'n* at 30-31; *see, e.g., Farmington Dowel Products Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 (1st Cir. 1969) ("it seems crystal clear to us that lost profits for that period could not be properly awarded . . . . To do so would result in a clear duplication: Farmington would get its present value . . . plus its

future profits, but the latter figure would be a major element in determining the former").

Here, the distinction between theories is without a difference: the parties do not argue that Packgen seeks "double recovery," nor does any such indication otherwise exist in the record before the Court. In characterizing Mr. Filler's lost profits methodology, Berry has not demonstrated that Mr. Filler's methodology is based on an improper method under Rule 702. The Court therefore rejects Berry's argument that Mr. Filler's lost profits methodology is contrary to appropriate damages calculation methodology.

The Court next considers Berry's arguments regarding the calculation of lost profits relating to the 37 refineries. Berry argues that Mr. Filler's assumption of Packgen having a one-in-ten chance each year of selling Cougars to the 37 refineries is inadmissible, as a "guess" not supported by "objective facts and data." *Defs.' Mem.* at 30. As with Berry's argument relating to the ten-year period for CRI damages, the "lack of evidence" regarding the one-in-ten success rate is more properly put forth as a subjective assessment of the evidence that Mr. Filler has offered in support of that rate. Therefore, based on the facts and data considered by Mr. Filler that are discussed below, this issue must also be sorted out before a jury.

Significantly, the list of 37 refineries was not generated in the context of this litigation. Instead, it effectively existed before the product failure because, at the time of the product failure, "all of the refineries included in [Mr.] Filler's damages model had informed . . . Packgen's sales manager[] that they would be placing orders

during the next catalyst cycle, *i.e.*, within a year." *Pl.'s Opp'n* at 32 (citing *Defs.' Mem.* Attach 3 *Dep. of Packgen (Celest Horton)* 9:17-23, 10:19-11:9, 17:17-24, 87:15-22 (ECF No. 64-3) (*Horton Dep.*)).   These commitments to buy were the result of marketing efforts during the six months before the product failure, when Packgen had actively marketed its new Cougar to these and other refineries (the list of 37 refineries comprise only one-quarter of North American refineries) and concentrated its efforts on refineries that would "enjoy substantial cost savings" from using the new product. *Id.* at 32, 37-38 (citing *Tr. Vol. I* 52:3-53:12).   The 37 refineries were not only targeted by Packgen's sales team—because of the cost savings Packgen believed they would obtain—but also had represented to Packgen's sales manager that they would be placing orders for the following catalyst cycle.

In conjunction with this information, Mr. Filler considered the opinion of Packgen's catalyst industry expert regarding the Cougars' "substantial economic advantages" over the products of competitors when distance, time, or storage were key components to their customers' refinery business. *Id.* at 33; *Tr. Vol. I* 52:3-21, 58:21-59:6.   More specifically, Mr. Filler based his analysis, in part, on data suggesting that the refineries would save between twenty-five and fifty percent on catalyst moving costs—a "significant savings." *Tr. Vol. I* 69:5-21.   Additionally, the industry expert forecasted demand for catalyst to increase three to five percent per year during the relevant time period, which is evidence that the demand for catalyst storage containers would at least be stable (and potentially benefit from modest growth) throughout that time period. *See id.* 101:21-102:23.

Given the nature of Packgen's list of 37 refineries, the potential cost savings associated with the use of Cougars, and the overall market conditions, a jury could find that Mr. Filler's ten percent success rate was a conservative estimate. In fact, Packgen informed Mr. Filler that the success rate for the 37 refineries would be "a lot higher than 10 percent," *id.* 68:13-21; Packgen's product manager testified that the relevant success rate for the 37 refineries was dramatically higher than Mr. Filler's estimate—eighty-five to ninety percent. *Horton Dep.* 47:3-22. Mr. Filler, however, "found no hard evidence to confirm this and rejected his client's belief." *Pl.'s Opp'n* at 38. Berry attempts to discredit Mr. Filler's use of such facts and data by insisting that "facts and data related to the development of a new product and potential, though not closed, sales do not provide a reliable basis for arriving a success rate for sales." *Defs.' Reply* at 7. As mentioned with respect to the ten-year damages period, Mr. Filler did not have a deep well of data-points to work from; instead, he was tasked with evaluating a hypothetical situation that never came to pass (profits that would have been realized but for the product failure) and that was based upon a relatively small competitive set (two suppliers in the relevant market). *See Alaska Rent-A-Car*, 709 F.3d at 881-82. Mr. Filler considered the facts and data available to him, drew inferences, and made assumptions based upon that information. Critiques of these assumptions go to "a matter affecting the weight and credibility of [his] testimony." *Kirouac*, 2013 U.S. Dist. LEXIS 6331, at *6.

The Court also notes Berry's criticism of Packgen for failing to conduct a market survey or related method that could have gathered "empirical data." *Defs.'*

*Mem.* at 32-34. As with Berry's other concerns about the admissibility of the one-in-ten success rate, the market survey consideration properly goes to the weight of Mr. Filler's opinion. A market survey would attempt to procure information about the likelihood of any particular refinery purchasing Cougars. However, Packgen's list of 37 refineries speaks to the same issue and, furthermore, a juror could reasonably entertain whether the list—consisting of refineries that, during the actual course of business, had expressed an intent to purchase Cougars—was more or less credible evidence than any market survey. *Cf. Reardon*, 2004 ME 74, ¶ 12, 852 A.2d 66, 70 (finding insufficient evidence to support an award of lost profits because, *inter alia*, the expert's profit and loss statement was prepared specifically for use in the lawsuit). Such a survey would have to ask a hypothetical question—one that potential purchasers would know was hypothetical—that would concern a product from a supplier whose reputation may have been "severely tarnished" by the product failure. *See Pl.'s Opp'n* at 39 ("The evidence will show that [the product] failure severely tarnished the reputation of Cougars (and Packgen) in this narrow market."). Again, adopting Berry's proposed conclusion would require the Court to impermissibly evaluate the persuasive quality of the data that Mr. Filler relied upon. Berry's quarrel with Mr. Filler's assumptions underlying the ten percent success rate must be sorted out at trial.

Berry also argues that a recent First Circuit decision supports its contention that Mr. Filler's ten percent success rate is "base[d] . . . on surmise and conjecture." *Id.* at 30-34 (citing *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 195 (1st Cir.

2012). There are important differences between *Fishman*, where the First Circuit concluded that there was insufficient information to allow the jury to estimate trademark infringement damages, and the instant case. In *Fishman*, the plaintiff's expert noted only that although the plaintiff had projected revenues to increase from 2006 to 2007, revenues had actually decreased by $750,000 instead. *Id*. The First Circuit explained that "by limiting annual sales data to the period from 2005 to 2007, [the expert] does not address the possibility that Fishman's decline in sales was merely an ordinary year-to-year fluctuation." *Id*. The expert likewise provided no information whatsoever regarding the relationship between the defendant's supposed adverse action and the relevant decline in sales. *Id*. Finally, the report did not even provide information "about . . . profit margins or any financial information other than revenues that a jury could use to estimate lost *profits*, which is the ultimate measure of damages." *Id*. (emphasis in original). There is little to compare between the expert's excluded testimony in *Fishman* and Mr. Filler's proffered testimony. Mr. Filler used a ten percent success rate after considering all of the factors described above. He also reviewed a wealth of financial information relating to Packgen, in order to determine not only revenues but also the other components needed to reach a meaningful net profits figure, such as material, freight, labor, and fixed and variable overhead costs, and appropriate discount rate. *See Pl.'s Opp'n* at 9; *Tr. Vol. I* 20:2-34:6; *Ct. Ex.* 1A (spreadsheet of CRI damages model) and *Ct. Ex. 13A* (spreadsheet of lost sales to 37 refineries model) (ECF No. 60). The *Fishman* Court's conclusion that the expert's report "was merely a basis for jury speculation and his

testimony was properly excluded" is inapposite here.[9]  For all of these reasons, the Court concludes that Mr. Filler's ten percent success rate is based on sufficient facts or data under Rule 702.[10]

Berry also insists there is a causation problem with Mr. Filler's damages opinion for the 37 refineries.  *Defs.' Mem.* at 34-36.  Berry maintains that Mr. Filler assumed the product failure caused the 37 refineries not to produce Packgen's product and admitted his damages opinion would be inaccurate if refineries had reasons unrelated to the product failure for not buying from Packgen.  *Id.* (citing *Tr. Vol. I*

---

[9]     Packgen also argues that *Fishman* is not pertinent because the issue before that court was causation for a mass market product, and that "[t]he court held that an economist failed to establish causation as to why the plaintiff's sales of a consumer product declined and whether the defendant's infringement had anything to do with this decline." *Pl.'s Opp'n* at 40.  The Court does not reach the issue of whether *Fishman* is not pertinent on this ground, because the factual differences between *Fishman* and this case, as described above, make clear that *Fishman* does not compel this Court to exclude Mr. Filler's testimony.

[10]    In a footnote, Berry attacks the admissibility of Mr. Filler's ten-year loss period for sales to the 37 refineries.  *Defs.' Mem.* at 16 n.18.  It asserts that "Mr. Filler's opinion is based solely on his conversations with Mr. Lapoint during which they decided that the recovery period for the refineries should be ten years – five years for the incident to 'wear off' and five years to recover."  *Id.* (citing *Tr. Vol. I* 74:13-21).  It concludes that "[m]uch like the ten years for CRI there are no verifiable facts or data for a jury to review to evaluate the efficacy of the ten year period."  *Id.*

For largely the same reasons that the Court has concluded that Mr. Filler's ten percent success rate is admissible, it also concludes the ten-year loss period is admissible.  The following facts—many of which also form the basis for Mr. Filler's admissible loss period for CRI damages—contribute to Mr. Filler's opinion on the loss period for the 37 refineries: Packgen had actively marketed its new Cougar containers for six months to those who would enjoy substantial costs savings from doing so; Packgen had been informed that all 37 refineries included in Mr. Filler's damages model (a list that was not prepared for litigation) would place orders within the next year; the 37 refineries comprised only one quarter of North American refineries; shifting to the use of Cougars would save refineries between twenty-five and fifty percent on transportation costs; and the market for catalyst containers would not change significantly during the ten-year timeframe.  *See supra* pp. 31-33, 39-40.  Significantly, Mr. Filler also has the benefit of hindsight for the first six of these ten years—his estimate does not bear the uncertainty and unpredictability of forecasting market conditions ten years into the future because there is a historical record of the six years that have passed since the product failure in April 2008, confirming that the competitive environment in which Packgen operated in 2008 remains the same. *See supra* p. 32.  Further, Mr. Filler reviewed facts and data relating to historical sales to the refineries; some of the 37 refineries were already Packgen customers before the new Cougar came on the market.  *Tr. Vol. I* 168 21-23.  Based upon all these facts and data, and for the reasons indicated with respect to Mr. Filler's ten-year damages period for CRI, *supra*, the Court concludes that Mr. Filler's ten-year damages period for the 37 refineries is admissible.

99:18-22). Based on these two factors, Berry characterizes certain testimony of Packgen's sales manager as an "admission that some of the 37 refineries had unrelated reasons for not buying from Packgen," and concludes that "Mr. Filler's opinions are clearly unreliable, irrelevant and inadmissible" on this basis. *Id.* at 36 However, Packgen responds that this testimony "ignore[s] [Packgen's sales manger's] unequivocal testimony that the 37 refineries . . . did not buy catalyst containers due to the failure of the defective material supplied by defendant." *Pl.'s Opp'n* at 41; *see also Horton Dep.* 9:17-23, 10:19-11:9, 17:17-18:11, 20:6-11, 43:17-21, 87:8-22). Packgen's record citations support its position: Ms. Horton repeatedly testified that Packgen had lost sales for the 37 refineries because of the product failure. The Court agrees with Packgen that Berry's "argument concerning the reasons for the lost sales is, at the most, more grist for the cross-examination mill." *Id.* at 42.

In its reply, Berry raises the argument that "Mr. Filler cannot reliably establish that Plaintiff can meet even the volume of sales required by his opinions." *Defs.' Reply* at 3. Again, Berry has raised well-reasoned arguments, but such considerations go to the weight of Mr. Filler's opinion rather than its admissibility. In ruling on a *Daubert* motion, the Court's role is not to ensure that every single variable that could conceivably relate to lost profits has been considered by the expert; in addition to being impractical, such an approach would be "overly pessimistic about the capabilities of the jury and of the adversary system generally." *Daubert*, 509 U.S. at 596; *cf. Manpower*, 732 F.3d at 808 ("arguments about how the selection of data inputs affect the merits of the conclusions produced by an accepted

methodology should normally be left to the jury"). Packgen's production capacity can be determined following robust cross-examination, presentation of competing evidence, and proper instruction on the burden of proof. *See Daubert*, 509 U.S. at 596. Further, Mr. Filler considered this issue. During the evidentiary hearing, Mr. Filler repeatedly mentioned and discussed the issue of production capacity at Packgen's plant, demonstrating an awareness that his lost profits calculations needed to reflect Packgen's capacity constraints. *See Dep. Tr. I* 13:2-21, 66:22-68:12 and *Dep. Tr. II* 351:19-24. For these reasons, Mr. Filler's testimony cannot be excluded based upon the alleged uncertainty surrounding Packgen's production capacity.

## C.  Summary

In *Ruiz-Troche*, the First Circuit stated:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert*, 509 U.S. at 590, (internal quotation marks omitted), it should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

*Ruiz-Troche*, 161 F.3d at 85. An observation in *Daubert* itself captures the essence of the Court's view of this motion:

> [R]espondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Daubert*, 509 U.S. at 596. The Court is not convinced that Mr. Filler's testimony is "shaky", but the Court is confident that if Mr. Filler's testimony is as woefully

inadequate as Berry contends, Berry's fine attorneys are fully capable of making that point to a jury. The Court concludes that the issues Berry has raised go to the weight of Mr. Filler's testimony and are questions to be tested by the adversary process and determined by the jury. The Court therefore denies Berry's motion.

## IV. CONCLUSION

The Court DENIES Berry's Motion and Incorporated Memorandum of Law to Exclude the Expert Testimony and Opinions of Plaintiff's Expert, Mark G. Filler (ECF No. 54).

SO ORDERED.

John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 12th day of September, 2014