UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| PACKGEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:12-cv-00080-JAW |
| | ) | |
| BERRY PLASTICS CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

In this breach of contract case, Berry Plastics Corporation and Covalence Specialty Coatings, LLC (Berry) move for summary judgment, asserting that Packgen has failed to prove causation and that Packgen's claimed lost profit damages are not foreseeable as a matter of law. The Court denies Berry's motion for summary judgment because, viewed in the light most favorable to Packgen, there is sufficient evidence that the defective material caused the container failures and that the lost profits were foreseeable at the time of contracting to survive Berry's dispositive motion.

## I.    BACKGROUND

### A.    Procedural History

On March 7, 2012, Packgen filed with this Court a five-count complaint against Berry alleging breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, breach of implied warranty of

merchantability, and negligence.[1] *Compl.* (ECF No. 2-2).  On December 15, 2014, Berry filed a notice of intent to file a motion for summary judgment.  *Notice to Ct. Regarding Summ. J. Briefing Schedule* (ECF No. 77).  On January 16, 2015, Berry moved for summary judgment and filed a supporting statement of material fact. *Defs.' Mot. for Summ. J.* (ECF No. 78) (*Defs.' Mot.*); *Statement of Material Facts in Support of Def. Berry Plastics Corporation and Covalence Specialty Coatings' Mot. for Summ. J.* (ECF No. 79) (DSMF).  On March 6, 2015, Packgen responded to Berry's motion, filed a statement opposing Berry's statement of material facts, and provided its own statement of material facts.  *Pl. Packgen's Mem. in Opp'n to Defs.' Second Mot. for Summ. J.* (ECF No. 82) (*Pl.'s Opp'n*); *Pl.'s Responses to Defs.' Statement of Material Facts & Pl.'s Statement of Additional Material Facts* (ECF No. 83) (PRDSMF).  On March 20, 2015, Berry replied to Packgen's opposition and to its statement of additional material facts.  *Defs.' Reply to Pl.'s Opp'n to Mot. for Summ. J.* (ECF No. 87) (*Defs.' Reply*); *Defs.' Reply to Pl.'s Statement of Additional Facts* (ECF No. 86) (DRPSAMF).  On March 31, 2015, Packgen filed a response pursuant to Local Rule 56(e) to Berry's requests to strike certain of Packgen's statements of additional material facts.  *Pl.'s Responses to Defs.' Requests to Strike* (ECF No. 88) (*Pl.'s Resp.*).

## B.    Statement of Summary Judgment Facts[2]

---

[1]      Covalence Specialty Materials Corporation merged into Berry Corporation and Berry now owns Covalence Specialty Adhesives, LLC and Covalence Specialty Coatings, LLC; the Court refers to the Defendants collectively as "Berry".  *See Defs.' Mot.* at 1 n.1.

[2]      Keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to Packgen's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  In compliance with this obligation, the Court recites supported facts as true even if Berry disputes them.

2

Packgen was incorporated in 2001 and has manufactured and sold catalyst containers since then.  PSAMF ¶ 50; DRPSAMF ¶ 50.  Packgen manufactures intermediate bulk containers (IBCs), which are used by petroleum refineries for the transportation and storage of fresh and spent catalyst.  DSMF ¶ 1; PRDSMF ¶ 1. Berry supplied Packgen with woven polypropylene fabric that was chemically bonded to a layer of aluminum foil.  DSMF ¶ 2; PRDSMF ¶ 2.

In 2006 and 2007, Packgen redesigned its catalyst containers to be manufactured out of foil-laminated material because bonding foil to the polypropylene substantially increased the strength and the structural integrity of the container.  PSAMF ¶ 18; DRPSAMF ¶ 18.  As required by regulatory authorities, the redesigned foil-laminated "Cougars" were tested by an independent agency using six times the weight of the catalyst to be placed in the Cougars.[3]  PSAMF ¶ 30; DRPSAMF ¶ 30.  The testing included vibration, bottom lift, top lift, stacking, and dropping tests; the Cougars, made from foil-laminated material provided by Berry in 2007, passed all of these tests and were certified for use as catalyst containers.[4] PSAMF ¶ 31; DRPSAMF ¶ 31. John Lapoint, Packgen's president, said that one of

---

[3]      Berry denied Packgen's additional material fact paragraph 30 on the grounds that the statement that testing is required by regulatory testing and what occurred during testing are both inadmissible hearsay.  DRPSAMF ¶ 30.
          Berry's objection highlights the troublesome nature of evidentiary objections in the context of a motion for summary judgment.  There are various ways Packgen might be able to satisfy the demands of the Rules of Evidence and secure the admission of these matters at trial.  *See e.g.* FED. R. EVID. 803(6), (8).   Where Berry has not raised specific objections about the authenticity, trustworthiness, or the regularly conducted nature of the testing, or whether the public records exception applies, the Court will give the non-movant the benefit of the doubt and will not exclude the statements of material fact which rely on this evidence.  Nevertheless, Packgen should be on notice that the admissibility question is a close one.
[4]      Berry denied Packgen's additional material fact paragraph 31 on the ground that the testing, results, and certification are all inadmissible hearsay.  DRPSAMF ¶ 31.  The Court overrules Berry's objection for the same reasons as it did in footnote 3, above, and admits Packgen's statement.

3

Berry's sales representatives was "instrumental" in developing the foil-laminated material used to fabricate Cougars.[5]  PSAMF ¶ 41; DRPSAMF ¶ 41.

### 1.     Berry's Knowledge of the Cougar Design and Purpose

Berry's sales representatives visited Packgen's manufacturing plant in Auburn, Maine in June 2007.  During this visit, they watched Cougars being made, examined Cougar containers, and spoke with Packgen's engineers and manufacturing staff about many issues, including Packgen's requirements for the foil-laminated material, how the Cougars functioned, and how Packgen's customers would use these containers.  PSAMF ¶ 42; DRPSAMF ¶ 42.

Before July 2007, Packgen's president was very open in meetings and conversations with Berry's sales representatives about Packgen's catalyst containers and customers because he wanted the Berry sales representatives to have as much information as possible so that Berry would be better able to supply foil-laminated material that met Packgen's requirements for catalyst containers.  PSAMF ¶ 32; DRPSAMF ¶ 32.  Packgen's president informed Berry's sales representatives of the following:

(1) Berry's foil-laminated material would be the primary component of
     Cougar catalyst containers manufactured by Packgen, and
     companies in the catalyst and petroleum industries would use the
     containers to store and transport catalyst.

---

[5]     Berry interposed a qualified response to Packgen's additional material fact paragraph 23 on the grounds that "instrumental" is vague.  DRPSAMF ¶ 41.  The Court rephrased the statement to more clearly reflect that it represents Mr. Lapoint's opinion.

(2) The catalyst and petroleum industries are extremely safety conscious.

(3) Catalyst is a hazardous material and is self-heating if exposed to air; therefore, it is critical that catalyst be stored and transported in safe, secure, and reliable containers.

(4) Berry needed to supply foil-laminated material with strong and reliable bonds between all of the layers in order for the containers to have the strength and structural integrity needed to safely and securely store and transport catalyst.

(5) Packgen had a long-term customer that was a major seller of fresh catalyst; Packgen and the customer jointly developed a custom foil-laminated Cougar to meet the customer's needs; the customer planned to purchase approximately 15,000 custom Cougars a year beginning in the second half of 2007, and would increase its purchases in future years.[6]

---

[6]     Based on its prior familiarity with this case, the Court assumes that this "long term customer" must be CRI/Criterion (CRI), although this is not expressly stated in the statements of material fact. *Order on Mot. to Exclude Expert Test.* at 3 (ECF No. 71) (referring to CRI as "a catalyst manufacturer and long-standing Packgen customer").

Berry denied Packgen's additional material fact paragraph 37 because Packgen did not know CRI's product needs even as late as January 2008, and could not have told Berry before July 2007 that CRI would be purchasing 15,000 Cougars per year.  DRPSAMF ¶ 37.  Although Berry may be correct that Packgen did not know CRI's needs before January 2008, Berry has not effectively denied that Mr. Lapoint did not inform Berry sales representatives that CRI would be purchasing 15,000 Cougars per year.  Furthermore, although the Court accepts Berry's implicit assertion that CRI is the "long-term customer" referred to in paragraph 37, it is possible that Packgen is referring to a different customer.  Nevertheless, the Court finds record support for Packgen's statement and, viewing the evidence in the light most favorable to Packgen, the Court admits the statement without modification.

5

(6) Packgen had invested substantial labor and working capital to develop the custom Cougars, including purchasing and fabricating specialized manufacturing equipment and inventory items needed to produce the Cougars.[7]

(7) Packgen was marketing foil-laminated Cougars to refineries in North America and was already selling catalyst containers to Exxon Mobil; Packgen's credibility with the refineries would be enhanced because Packgen's long-term customer would be delivering fresh catalyst to the refineries in the custom Cougars; in 2008, Packgen would close deals with many North American refineries for the sale of Cougars for their spent catalyst needs; and, the market for Cougars was potentially very large because there were more than 125 refineries in North America.[8]

(8) Packgen's purchases of foil-laminated material from Berry would increase in the future.

PSAMF ¶¶ 33-40; DRPSAMF ¶¶ 33-40.

## 2. Packgen's Purchases of Material from Berry Between September 2007 and January 2008

---

[7]   Berry interposed a qualified response to Packgen's additional material fact paragraph 38, admitting Packgen's president made this statement, but not admitting the truth of the statement. The Court deems the statement admitted for the purposes of summary judgment.

[8]   Berry interposed a qualified response to Packgen's additional material fact paragraph 39, admitting Packgen's president made this statement, but not admitting the truth of the statement. The Court deems the statement admitted for the purposes of summary judgment.

On September 25, 2007, Packgen sent Berry a purchase order for 61-inch laminated polypropylene foil.  DSMF ¶ 3; PRDSMF ¶ 3.  Berry shipped the 61-inch material on December 22, 2007.  DSMF ¶ 4; PRDSMF ¶ 4.  On December 28, 2007, Berry sent Packgen an invoice for the 61-inch material.  DSMF ¶ 5; PRDSMF ¶ 5.  Attached to the December 28, 2007 invoice were Berry's Standard Terms and Conditions.  DSMF ¶ 6; PRDSMF ¶ 6.  The front of the invoice contained a notice that the order was subject to the attached terms and conditions.  DSMF ¶ 7; PRDSMF ¶ 7.

Berry's Standard Terms and Conditions contained the following limited warranty / limitation of damages:

> THERE ARE NO WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY, COURSE OF DEALING, USAGE OF TRADE OR NON-INFRINGEMENT OR OTHERWISE ASIDE FROM THE LIMITED WARRANTED ABOVE AND THE DESCRIPTION OF THE GOODS, BERRY'S LIABILITY FOR BREACH OF CONTRACT, BREACH OF WARRANTY, STRICT LIABILITY, PRODUCT LIABILITY, RECALL LIABILITY, NEGLIGENCE OR OTHER CAUSE OR THEORY IS LIMITED TO REPLACEMENT OF DEFECTIVE GOODS OR REFUND OF THE PURCHASE PRICE UPON TIMELY RECEIPT OF NOTICE WITHIN ONE YEAR FROM THE DATE OF DELIVERY REGARDLESS OF WHETHER BERRY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR OTHER DAMAGES.  UNDER NO CIRCUMSTANCES WILL BERRY BE RESPONSIBLE FOR SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES REGARDLESS OF CAUSE.

DSMF ¶ 12; PRDSMF ¶ 12.  The 61-inch material is not at issue in this case; it was not tested by Packgen's materials expert and it was either returned to Berry or destroyed.  DSMF ¶¶ 16-18; PRDSMF ¶¶ 16-18.

On November 26, 2007, Packgen sent a purchase order to Berry requesting 48-inch laminated polypropylene. DSMF ¶ 8; PRDSMF ¶ 8. Berry shipped the 48-inch order on January 18, 2008. DSMF ¶ 9; PRDSMF ¶ 9. On January 21, 2008, Berry sent Packgen an invoice for the 48-inch order, which included Berry's Terms and Conditions. DSMF ¶ 10; PRDSMF ¶ 10. The value of the 61-inch and 48-inch materials Berry sold to Packgen was $115,000; this total consisted of $48,200 for the 61-inch material and $66,800 for the 48-inch material.[9] DSMF ¶ 13; PRDSMF ¶ 13.

On January 8, 2008, Packgen submitted a purchase order to Berry on January 8, 2008 for additional purchases totaling $85,800 of the 61-inch and the 48-inch foil-laminated materials. PSAMF ¶ 49; DRPSAMF ¶ 49. This purchase order was pending at the time of the Cougar failures at CRI's facility in early April 2008. *Id.*

In addition to the 48-inch foil-laminated material received in January 2008, Packgen purchased foil-laminated material on ten other occasions from Berry and Ludlow Coated Products, a company purchased by Defendant Covalence Specialty Coatings during the development of the foil-laminated material. PSAMF ¶ 48; DRPSAMF ¶ 48. The total purchase price for all eleven purchases of the foil-laminated material was $257,095.49. *Id.*

### 3.   Signs of Trouble and Subsequent Cougar Failures

---

[9]     Packgen interposed a qualified response to Berry's paragraph 13 clarify that in addition to the two purchases mentioned in paragraph 13, Packgen purchased foil-laminated material from Berry on nine other occasions prior to the product failure, and that the total for all eleven purchases was $257,095.49. PRDSMF ¶ 13. Berry's statement of fact is also supported by the record and does not concern the previous nine orders; therefore the Court overrules Packgen's qualification as it relates to the previous nine orders. Furthermore, the record citation Packgen provided does not support the $257,095.49 figure. However, for the purposes of clarity, the Court omitted the word "total" to reflect that the previous nine orders are not included in the figure, and slightly rephrased the statement to indicate which orders are included in the cost calculation.

On February 11, 2008, Donald Roberts of Packgen submitted two non-conformance reports identifying alleged defects in the products.   DSMF ¶ 11; PRDSMF ¶ 11.  Other than the non-conformance reports, Packgen did not receive any complaints about delamination or information about incidents of Cougar failures, either failures similar to those at CRI or failures of Cougars when used for their intended purpose.[10]  PSAMF ¶ 24; DRPSAMF ¶ 24.

CRI notified Packgen that, in early April 2008, Cougars filled with catalyst at CRI's Louisiana facility failed when the containers were lifted; these failed Cougars were from the last shipment of new Cougars to the Louisiana facility.[11]  PSAMF ¶ 25; DRPSAMF ¶ 25.   All Cougars shipped to CRI after February 11, 2008 were manufactured from the 48-inch material received from Berry in January 2008.  PSAMF ¶ 21; DRPSAMF ¶ 21.  Packgen shipped 2,158 Cougars to CRI after February 11, 2008.  PSAMF ¶ 22; DRPSAMF ¶ 22.  The last shipment of new Cougars to CRI's Louisiana facility was on February 26, 2008.  PSAMF ¶ 26; DRPSAMF ¶ 26.  All Cougars shipped to CRI's facility in Lafayette, Louisiana that had been manufactured from the 48-inch foil-laminated material received from Berry in August 2007 would

---

[10]     Berry interposed a qualified response to Packgen's additional material fact paragraph 24, noting the parties' prior agreement to Berry's statement of fact paragraph 11.  DRPSAMF ¶ 24.  The Court has rephrased Packgen's statement accordingly.

[11]     Berry denied Packgen's additional material fact paragraph 25 because Mr. Lapoint was not present for the alleged incident at CRI and cannot aver based on personal knowledge, and because the notification from CRI to Packgen constitutes inadmissible hearsay.  DRPSAMF ¶ 25.  Mr. Lapoint does not need to have been at the CRI facility to have gotten notice from CRI of an incident.  The statement is being offered to establish what Mr. Lapoint heard from CRI, not for the truth of what CRI told Packgen.  The Court admits Packgen's statement as written.

have been used by CRI for catalyst storage and transportation by the first half of March 2008.[12]  PSAMF ¶ 23; DRPSAMF ¶ 23.

Ron Silen of Berry told Packgen representatives that the alleged non-conformance in the 48-inch polypropylene material was isolated to certain rolls.[13] DSMF ¶ 14; PRDSMF ¶ 14.  Although Packgen is unable to precisely determine how many Cougars were made with the allegedly non-conforming 48-inch Berry material, it knows that it shipped 2,158 Cougars to CRI that were manufactured from that material.[14]  DSMF ¶ 15; PRDSMF ¶ 15.  Additionally, Packgen does not know which

---

[12]    Berry denied Packgen's additional material fact paragraph 23 because it is not based on personal knowledge, as required by Federal Rule of Civil Procedure 56(c)(4), and because it violates the rule against hearsay.  DRPSAMF ¶ 23.  Berry argues that Mr. Lapoint is not employed by or otherwise an agent of CRI and does not have personal knowledge of its operations sufficient to state what CRI would or would not have used by a certain date.  *Id.*  Mr. Lapoint's affidavit, however, states that his knowledge comes from "many visits" to CRI's facilities.  *Pl.'s Opp'n* Attach. 1, *Lapoint Decl.* ¶ 10 (ECF No. 83-1) (*Lapoint Decl.*).  This is sufficient to establish personal knowledge.  Additionally, the Court is unclear why Berry objects on hearsay grounds because Mr. Lapoint's declaration paragraph 10 contains no statement that could be considered hearsay.  *See Lapoint Decl.* ¶ 10.  The Court overrules both of Berry's denials and admits the statement.

[13]    Packgen denied paragraph 14 because Berry's statement only repeats what Mr. Silen, an account manager for Berry, told Packgen representatives; furthermore, the entire shipment of the 48-inch material Packgen received in January 2008 was defective.  PRDSMF ¶ 14.  Berry's statement is supported by record evidence.  Packgen cites statements from its expert witness, Dr. James Rancourt, to support its objection.  Some of the statements, which Packgen asserts are contained in Dr. Rancourt's deposition and declaration, are not included in the attachments to Packgen's opposition motion.  Those statements the Court has been able to reference do not indicate that Dr. Rancourt concluded that the entire shipment was defective.  Therefore, the Court overrules Packgen's objection.  However, the Court rephrases Berry's statement to reflect more accurately the source of the information included in the statement.

        Finally, the Local Rules require the non-movant to place additional facts into the summary judgment record "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule."  D. ME. LOC. R. 56(c).  If Packgen wished to submit a fact about the remainder of the 48-inch shipment, it should have done so under Local Rule 56(c).

[14]    Packgen interposed a qualified response to Berry's paragraph 15 because it knows that it shipped 2,158 Cougars to CRI that were manufactured using the 48-inch material.  PRDSMF ¶ 15.  As Packgen's qualification is supported by the record, the Court includes it.

of its customers other than CRI, if any, received Cougars manufactured with the allegedly non-conforming Berry material.[15]  DSMF ¶ 19; PRDSMF ¶ 19.

Packgen knew about both problems and potential problems with Cougars when not used for their intended purpose, including: (1) in 2009, some Cougars melted down when a refinery misused containers by improperly putting "very reactive material" into them, and that refinery did not purchase Cougars in 2008; (2) an end-user put incorrect material in the Cougar and started a fire on site; (3) a forklift punctured a Cougar and caused Cougars to melt down; (4) a catalyst handling company sucked air into the system and blew extremely self-heating pyrophoric catalyst, melting three or four Cougars; (5) "rips and holes" at the top plastic "neck" of the bags after Packgen ceased using Berry products; and, (6) concern about puncture susceptibility due to spaces between slats in the bottom.[16]  DSMF ¶ 29; PRDSMF ¶ 29.

---

[15]    Packgen denied Berry's paragraph 19 because it is unsupported by the record.  PRDSMF ¶ 19. It asserts that the portion of the transcript of the deposition of John Lapoint, which Berry relies on for paragraph 19, is focused on customers other than CRI, not customers in general.  *Id*.  The Court has reviewed the record and concludes that it supports Packgen's statement to the extent that the deposition testimony was focused on customers other than CRI.  Berry's statement, however, has record support and the Court rephrases it to clarify that the statement relates to customers other than CRI.

[16]    Packgen generally denied Berry's paragraph 29 because the record does not support the statement that Packgen was on notice of Cougar failures unrelated to the Berry product.  PRDSMF ¶ 29.  The record evidence it cites, however, supports the opposite conclusion.  Mr. Lapoint stated in a sworn declaration that "Packgen never received information at any time before or after the Cougar failures [in April 2008] of any other similar incidents or of any other failure of Cougars when used for their intended purpose."  *Lapoint Decl*. ¶ 16.  Because the Court must view supported facts in the light most favorable to the non-moving party, the Court rephrased the introduction to Berry's paragraph 29 to reflect the fact that the list identifies Cougar "problems" and not "failures", and to clarify that the types of problems Packgen was aware of were related to Cougars that were not used as intended.

Packgen specifically objected to paragraph 29, items (1) through (4) because the record citations do not establish failures of the Cougars themselves, and instead only show negligence by a third party.  PRDSMF ¶ 29. Another party's negligence is a legal conclusion generally not appropriate for a statement of material fact.  Items (1) through (4) have been slightly modified, however, to clarify that the problems with the Cougars were caused by third parties not using them for their intended use.

11

### 4.    Packgen Sends Material Samples for Lab Testing

Donald Roberts cut out samples of the following: (1) a roll of the 48-inch foil-laminated material received from Berry in January 2008; (2) two foil-laminated Cougars that CRI returned to Packgen after the Cougars failed at CRI's Louisiana facility; and, (3) a foil-laminated Cougar that Packgen manufactured in March 2007 from material provided by Berry.    PSAMF ¶ 1; DRPSAMF ¶ 1.    Mr. Roberts

---

Regarding item (1), Packgen states that the refinery put the wrong material into the containers, which caused the melting. *Id*. The record supports Packgen's statement, and the Court rephrased item (1) in accordance with its obligation to view the facts in the light most favorable to Packgen.

Regarding item (2), the record supports Berry's statement that an end-user put incorrect material in a Cougar and it caught on fire. The record citation, however, does not discuss purchases from 2007 to 2010, so the Court has omitted that portion of Berry's statement. Beyond that, it is clear from the statement that a third party's actions caused the problems with the Cougar, and the Court overrules Packgen's objection.

Regarding item (3), the record supports Berry's statement. Beyond that, from the statement, a third party's actions caused the problems with the Cougar, and the Court overrules Packgen's objection.

Regarding item (4), Packgen denied the statement because a catalyst company sucked air into the system and blew in extremely self-heating pyrophoric catalyst, which melted three to four Cougars. *Id*. The record supports Packgen's statement, and because the Court must view supported facts in the light most favorable to the non-moving party, the Court rephrased the statement to more accurately reflect the record. Beyond that modification, the statement requires the conclusion that a third party's actions caused the problems with the Cougars, and the Court overrules Packgen's objection. Finally, the Local Rules require the non-movant to place additional facts into the summary judgment record "in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule." D. ME. LOC. R. 56(c). If Packgen wished to submit a fact about the catalyst company's turnaround following the meltdown, it should have done so under Local Rule 56(c).

Packgen denied item (5) because the record citation Berry provided does not explain how or why the rips and holes occurred at the top of a container, or whether that is what caused it to fail. *Id*. The document Berry cited appears to be a partially-redacted undated email to Packgen that says "Packgen containers . . . experienced several 'rips & holes' at the top plastic 'neck' of the bags (required duct tape repairs) just below where the bag liner attaches . . . ." DSMF Attach. 6. *Aff. of Jonathan M. Dunitz*, at PageID # 1131 (ECF No. 79-6). The record supports Berry's statement of fact; the failure of the record to explain the cause of the problems does not mean the statement is incorrect. Regardless, the Court rephrased the statement, in accordance with its obligation to view the facts in the light most favorable to Packgen, to more accurately reflect the record.

Packgen denied item (6) because the record citation relays only concerns about potential punctures that an unknown person voiced, and does not state that any punctures actually occurred. PRDSMF ¶ 29. The record supports Packgen's statement, and the Court modified item (6) accordingly.

Packgen denied item (7) because the record citation refers to a Wrangler container, not to Cougars. *Id*. The record supports Packgen's statement, and the Court omits item (7) because it does not relate to Cougars.

immediately put these samples in separate envelopes, sealed the envelopes, and labeled each envelope with identifying information such as the sample number, sample taker, sample date, sample description, the recipient, and the date sent. PSAMF ¶ 2; DRPSAMF ¶ 2.  Packgen delivered the sealed envelopes to an attorney at Bernstein Shur, a firm representing Packgen at that time.  PSAMF ¶ 3; DRPSAMF ¶ 3.  Bernstein Shur sent the sealed envelopes to Polymer Solutions, Incorporated, an independent testing lab.  PSAMF ¶ 4; DRPSAMF ¶ 4.  Polymer Solutions received the sealed envelopes and assigned identification numbers to each sample.  PSAMF ¶ 5; DRPSAMF ¶ 5.

James Rancourt, CEO of Polymer Solutions and an expert in material failure analysis, tested the following samples[17]: (1) sample 7863-01, cut from the 48-inch material received from Berry in January 2008; (2) sample 7863-04, cut from a Cougar that Packgen manufactured in March 2007 from foil-laminated material supplied by Berry; and, (3) sample 7863-06, cut from a Cougar returned by CRI after it had failed at CRI's facility in Lafayette, Louisiana.  PSAMF ¶ 6; DRPSAMF ¶ 6.

He received the samples from Bernstein Shur; Dr. Rancourt does not know where the samples came to Bernstein Shur from, but each envelope had information about the sample including the sample number, the name of the sample taker, the

---

[17]   The parties provided conflicting information about the samples Dr. Rancourt tested.  Berry submitted a statement of material fact, which Packgen admitted, that Dr. Rancourt tested four samples.  DSMF ¶ 20; PRDSMF ¶ 20.  Packgen then submitted an additional statement of material fact, which Berry admitted, that Dr. Rancourt tested three samples.  PSAMF ¶ 6; DRPSAMF ¶ 6. Because Packgen's statement is supported by the record and is more specific than Berry's, the Court admits Packgen's statement of material fact.

sample date, and a description of the sample.[18]  DSMF ¶ 21; PRDSMF ¶ 21.  One of the samples was taken from a container "returned" by a customer.  DSMF ¶ 22; PRDSMF ¶ 22.  Dr. Rancourt did not have access to the "returned" container or know where it was located; he had access only to the samples.  DSMF ¶¶ 22, 23; PRDSMF ¶¶ 22, 23.

Dr. Rancourt does not know the burst or puncture strength of the material he tested.[19]  DSMF ¶ 24; PRDSMF ¶ 24.  Dr. Rancourt does not know how the burst or puncture strength of the samples he tested compares to non-defective samples, however, he does not need to know the burst or puncture strength to arrive at his

---

[18]    Packgen interposed a qualified response to Berry's paragraph 21 because Dr. Rancourt received the samples from Bernstein Shur in envelopes that had identifying information on the front. PRDSMF ¶ 21.  The record supports Packgen's qualification, and the Court rephrases Berry's statement regarding the information on the front of each envelope containing a sample because it is related to Dr. Rancourt's knowledge about where the samples came from, is supported by the record, and provides additional context for Berry's statement.

[19]    Packgen interposed a qualified response to Berry's paragraph 24, asserting that Dr. Rancourt did not need to know the numbers for burst or puncture strength to arrive at his opinions.  PRDSMF ¶ 24.  Dr. Rancourt testified in his deposition:

> Q. What are the necessary physical strength characteristics [of the multi-layer fabric used to manufacture the IBCs]?
> A. Well, I don't know the specifics, I mean if you mean like burst strength or puncture strength, but what's obvious from the analysis of these samples is the polypropylene fabric not being adhered to the underlying polymer film layers, that structure, the fabric has nothing holding the warp and weft direction yarns together, so it's impossible for that five-layer system not fully bonded to have the strength that it would have if those layers were integrally bonded.  And I don't need to know what the numbers are supposed to be to know that that's true.

*Defs.' Mot.* Attach. 2, *Dep. of Dr. James Rancourt* at 64:19-65:5 (ECF No. 79-2) (*Rancourt Dep.*).  The Court rejects Packgen's qualification because the record does not contradict Berry's statement; that is, Dr. Rancourt indeed states that he does not know burst or puncture strength of the material. Additionally, it is not clear from Dr. Rancourt's deposition testimony that he did not need to know the burst or puncture strength to arrive at his opinions.  The Court is unclear precisely which "opinions" Packgen references in its proposed qualification.  Dr. Rancourt stated a number of conclusions before saying that "I don't need to know what the numbers are supposed to be to know that that's true."  *Id.* at 65:4-5.

opinions.[20]  DSMF ¶ 25; PRDSMF ¶ 25; PSAMF ¶ 20; DRPSAMF ¶ 20.  He does not know how much force a Cougar can withstand.  DSMF ¶ 26; PRDSMF ¶ 26.  However, he did not need to test or examine a completed container to reach his opinions in this matter to a reasonable degree of scientific certainty.  PSAMF ¶ 19; DRPSAMF ¶ 19.

The physical structure of the multi-strand polypropylene woven layer of sample 7863-06 is similar to the physical structure of the multi-strand polypropylene woven layer of sample 7863-01.  PSAMF ¶ 9; DRPSAMF ¶ 9.  The physical structure of the multi-strand polypropylene woven layer of samples 7863-01 and 7863-06 is different from the physical structure of the multi-strand polypropylene woven layer of sample 7863-04.  PSAMF ¶ 10; DRPSAMF ¶ 10.

Berry's manufacturing specifications required that Dow Affinity 1450 resin be used to enhance the bonding of the polypropylene fabric to the underlying polymer film layers.  PSAMF ¶ 11; DRPSAMF ¶ 11.  Dow Affinity 1450 resin was not present in samples 7863-01 and 7863-06 but was present in sample 7863-04.  PSAMF ¶ 12; DRPSAMF ¶ 12.

Proper adhesion of the individual layers of the foil-laminated material tested by Dr. Rancourt is required for the material to have the necessary physical strength characteristics.  PSAMF ¶ 13; DRPSAMF ¶ 13.  The lack of adhesion between the multi-strand polypropylene woven layer and the underlying polymer film layer caused the container identified as "CRI Container Returned From Lafayette," which

---

[20]     Packgen interposed a qualified response to Berry's paragraph 25, asserting that Dr. Rancourt did not need to know the numbers for burst or puncture strength to arrive at his opinions.  PRDSMF ¶ 25.  The Court accepts Packgen's qualification because Berry subsequently admitted it for purposes of summary judgment.  *See* DRPSAMF ¶ 20.

is sample 7863-06, to fail adhesively between the multi-strand polypropylene woven layer and the underlying polymer film layer. PSAMF ¶ 14; DRPSAMF ¶ 14. Sample 7863-06 showed failure, but sample 7863-01 did not because it is the raw material. PSAMF ¶ 15; DRPSAMF ¶ 15. The insufficient adhesion in sample 7863-06 prevented the five-layer material from acting as a system and gaining the strength of the multi-strand polypropylene woven layer to support the loads applied to the underlying thin polymer films and aluminum layer. PSAMF ¶ 16; DRPSAMF ¶ 16. Without strong bonds, the layers of sample 7863-06 acted independently and the components did not benefit from the synergy of a fully bonded system as was required for the containers to perform properly. PSAMF ¶ 17; DRPSAMF ¶ 17.

Dr. Rancourt opined that one of the samples was a "badly manufactured laminate product." DSMF ¶ 27; PRDSMF ¶ 27. He determined that one sample was already falling apart when he received it and it was easy to delaminate. DSMF ¶ 28; PRDSMF ¶ 28. His expert opinion regarding samples 7863-01 and 7863-06 is that their individual layers were not well-adhered, whereas he found that the individual layers that comprise sample 7863-04 were well-adhered. PSAMF ¶¶ 7, 8; DRPSAMF ¶¶ 7, 8.

### 5. Packgen Conducts Tests of the Material

An examination by Packgen's president of Cougars returned by CRI revealed that they had failed because the material supplied by Berry had delaminated between the layers, which caused the foil-laminated material to pull away from the seams and

to split at the bottom of the containers when the Cougars were lifted.[21]  PSAMF ¶ 27; DRPSAMF ¶ 27.

After receiving the failed Cougars returned by CRI, Packgen manufactured a sample Cougar using a portion of the foil-laminated material received in January 2008 that Berry told Packgen was good material.  PSAMF ¶ 28; DRPSAMF ¶ 28. Packgen filled the container with the same amount of weight it would hold if it was filled with catalyst, and when this Cougar was lifted, it immediately failed in precisely the same way that the Cougars returned by CRI had failed: the material delaminated and it pulled away from the seams and split at the bottom of the container.[22]  PSAMF ¶ 29; DRPSAMF ¶ 29.

---

[21]     Berry denied Packgen's additional material fact paragraph 27 because it is not supported by the record and is not based on Mr. Lapoint's personal knowledge.  DRPSAMF ¶ 27.  The Court overrules Berry's objection because Mr. Lapoint's sworn declaration states that his conclusions were based on his own examination of the failed Cougars.  *See Lapoint Decl.* ¶ 13.

Berry further argues that the paragraph should be stricken in accordance with Local Rule 56(e) because Mr. Lapoint's conclusions constitute expert opinion outside of the scope of which he was designated an expert.  DRPSAMF ¶ 27.  Packgen responded pursuant to Local Rule 56(e) that the paragraph contains Mr. Lapoint's observations of factual occurrences that can be observed without the need for scientific knowledge or lay inferences.  *Pl.'s Resp.* ¶ 1.  Additionally, Packgen argues that Mr. Lapoint's conclusions regarding the cause of the Cougar failures are admissible as lay opinions because they are helpful and based on Mr. Lapoint's own perceptions, and because Mr. Lapoint was not required to employ scientific methodology, expertise, or reasoning in order to draw the conclusions he did.  *Id.*  Finally, Packgen argues, even if Mr. Lapoint relied on knowledge obtained from his experience in the catalyst container business, it does not convert his testimony into expert opinion.

The Court considers Mr. Lapoint's statements admissible for summary judgment purposes. Someone within a field may make statements based on specialized knowledge without being qualified as an expert, and the line between an expert in lay clothing and a layman in expert clothing is often difficult to draw.  *Morin v. State Farm Fire & Cas. Co.*, 453 F. Supp. 2d 173, 175 (D. Me. 2006). "However, a witness does not become an expert simply by testifying about 'the particularized knowledge that the witness has by virtue of his or her position in the business.'"  *Id.* (quoting FED. R. EVID. 701 advisory committee notes).  The Court accepts Mr. Lapoint's statements for purposes of the summary judgment motion only.

[22]     Berry denied Packgen's additional material fact paragraph 29 because it is not supported by the record and is not based on Mr. Lapoint's personal knowledge.  DRPSAMF ¶ 29.  The Court overrules Berry's objection because Mr. Lapoint's sworn declaration states he has personal knowledge of the test Packgen conducted.  *See Lapoint Decl.* ¶ 14.

Berry further argues that the paragraph should be stricken in accordance with Local Rule 56(e) because Mr. Lapoint's conclusions constitute expert opinion outside of the scope of which he was

### 6.   Impact of Cougar Failures on Packgen's Anticipated Sales to Thirty-Seven North American Refineries

Before the failure of the Cougars at CRI's Lafayette, Louisiana facility, Packgen had extensively marketed the new foil-laminated Cougar to refineries in North America; thirty-seven of the refineries, which comprise only one quarter of the refineries in North America, planned to order Cougars during the following year.[23] PSAMF ¶¶ 43, 44; DRPSAMF ¶¶ 43, 44.  CRI was doing business with "pretty much all" of the thirty-seven refineries.[24]  PSAMF ¶ 46; DRPSAMF ¶ 46.  As a result of the

---

designated an expert.  DRPSAMF ¶ 29.  Packgen's paragraph 29 is supported by the record.  The Court overrules Berry's objection for the same reasons as in footnote 21, above.

[23]    Berry interposed a qualified response to Packgen's additional material fact paragraph 43 on the grounds that Packgen admitted that it had no previous customer relationship with the thirty-seven North American refineries at issue.  DRPSAMF ¶ 43.  Because Packgen's admission is reflected elsewhere in the Court's recital of the facts, the Court admits Packgen's statement without qualification.

Berry denied Packgen's additional material fact paragraph 44 on the grounds that Packgen admitted it had no previous customer relationship with the thirty-seven refineries at issue, and further that the evidence Packgen offered to support its claim that the refineries planned to place orders to purchase Cougars, namely a recounting of what Celeste Horton and Mr. Lapoint were purportedly told by some of the refineries, is inadmissible hearsay.  DRPSAMF ¶ 44.  Whether Packgen is offering the statement for the truth of the matter asserted is a close question.  The Court assumes that Packgen offers the statement only to show that Ms. Horton was told by the refineries that they were planning to purchase Cougars in the next year.  The fact that the deals did not happen could allow a jury to make a logical inference that the deals fell through because of the allegedly defective product.  The Court admits Packgen's statement as written.

[24]    Berry denied Packgen's additional material fact paragraph 46 on the grounds that the evidence Packgen offered to support the fact, namely Ms. Horton's deposition testimony, is inadmissible hearsay because it is based a recounting of what Ms. Horton was told by some but not all of the thirty-seven refineries.  DRPSAMF ¶ 46.  The Court is unclear as to why Berry is making a hearsay objection to a fact that does not assert a statement made by a declarant.  The source of Ms. Horton's understanding of the business relationship between CRI and the thirty-seven refineries is not at issue.  Ms. Horton's personal knowledge of the business relationships between CRI, one of Packgen's long-time customers, and the refinery industry is sufficient to support this fact.  The Court overrules Berry's objection and admits the statement of fact.  Additionally, the Court notes that Packgen has not properly submitted Ms. Horton's deposition testimony as part of this summary judgment motion (i.e., it is contained elsewhere in the docket), but the Court considers the statement of material fact because Berry did not object to it on that basis.

18

failure of the Cougars at CRI's facility, Packgen lost sales of Cougars that the thirty-seven refineries would have placed.[25]  PSAMF ¶ 47; DRPSAMF ¶ 47.

Because of factors such as distance, time, and storage, the thirty-seven refineries would experience substantial cost savings by using Cougars instead of steel flow bins, which were the only alternative to Cougars for the transportation and storage of catalyst.  PSAMF ¶ 45; DRPSAMF ¶ 45.

### 7.   Packgen's Lost Profits

Packgen's lost profits arise out of allegedly lost sales to CRI/Criterion and anticipated sales to thirty-seven refineries with which Packgen had no previous customer relationship.  DSMF ¶ 30; PRDSMF ¶ 30.  Packgen claims lost profits of $4,606,405 related to CRI/Criterion and $1,957,202 related to the thirty-seven refineries.  DSMF ¶¶ 31, 32; PRDSMF ¶¶ 31, 32.  Packgen bases its lost profits on a ten-year loss period.  DSMF ¶ 33; PRDSMF ¶ 33.

## II.   THE PARTIES' POSITIONS

### A.   Causation[26]

#### 1.   Berry's Motion

---

[25]   Berry denied Packgen's additional material fact paragraph 47 because the supporting evidence, is inadmissible hearsay because it is based a recounting of what Ms. Horton and Mr. Lapoint were told by some but not all of the thirty-seven refineries.  DRPSAMF ¶ 47.  The Court overrules Berry's objection and admits the statement for the same reasons given in footnote 24, above. Additionally, the Court notes that Packgen has not properly submitted Ms. Horton's deposition testimony as part of this summary judgment motion (i.e., it is contained elsewhere in the docket), and some of Ms. Horton's cited testimony is not even in ECF, but the Court considers the statement of material fact because Berry did not object to it on that basis.

[26]   Berry has conceded for the purposes of summary judgment only that the material it provided to Packgen did not meet the specifications of the contract between Berry and Packgen.  *Defs.' Mot.* at 2 n.2.  Thus, Berry does not dispute that it owed Packgen a duty and that it breached its duty or contractual obligation, leaving causation and damages as the two issues in dispute for the purposes of this motion.

Berry's position is that Packgen has "failed to prove causation beyond the level of speculation." *Defs.' Mot*. at 2.   Berry says that Packgen cannot link the material sample that Dr. Rancourt tested to the defective material that was delivered in January 2008, and even if Packgen can establish that link, testing a material sample in isolation is not the same as testing a completed Cougar. *Id*. at 10-14.

First, Berry contends that Dr. Rancourt cannot link the material he tested to the defective material delivered to Packgen in January 2008. *Id*. at 10.   Berry asserts that Dr. Rancourt does not know the lot number, manufacture date, or chain of custody of the samples he tested. *Id*. at 10-11.   Because Dr. Rancourt does not know the origin of the samples, Berry argues, he cannot determine the material was from a section of a Cougar that allegedly failed. *Id*. at 11.   Additionally, Berry submits that the "gaps in Dr. Rancourt's testimony are compounded" by Packgen's "failed internal record-keeping". *Id*.   Berry says that Packgen has admitted that it cannot trace faulty material to certain bags, that it does not know how many Cougars were made with the Berry material, and that it does not know which of its customers received bags containing the faulty Berry material. *Id*.

Second, Berry claims, even if Packgen can link the material Dr. Rancourt tested to the defective material, testing a material sample in isolation is not the same as testing a fully-constructed Cougar. *Id*. at 11-12.   Berry says that it is "striking that Packgen did not test a completed Cougar to determine why it failed." *Id*. at 12.   It emphasizes that Dr. Rancourt does not know the burst or puncture strength of the samples he tested or how much force or pressure a Cougar can withstand; therefore,

20

Berry argues, Dr. Rancourt cannot identify the actual cause of the Cougar failure. *Id.* Moreover, Berry states, Cougars have previously failed for reasons other than faulty material including being punctured, being filled with inappropriate material, and experiencing rips and holes at the tops of their necks. *Id.* at 13. Finally, Berry claims there is evidence that the Cougars could have failed because of Packgen's faulty seam construction. *Id.*

### 2.   Packgen's Opposition

Packgen argues that Berry's claims have no merit and that it has presented sufficient evidence to show that the defective material caused the Cougar failures. *Pl.*'s *Opp'n* at 2. It contends that it can link the defective material to the tested samples, show that Packgen manufactured the failed Cougars from the defective material, prove which customers received the defective material, and eliminate other potential causes of the Cougar failures. *Id.* at 2-7.

First, Packgen rejects Berry's claim that it cannot link the defective material to a failed Cougar, and counters that it can link the tested samples to the defective material via chain of custody evidence and lab testing. *Id.* at 2. Packgen asserts that its purchasing agent cut samples from three Cougars and the defective material delivered by Berry in January 2008, put the samples in sealed envelopes labeled with identifying information, and delivered the envelopes to Bernstein Shur. *Id.* at 2-3. Bernstein Shur, Packgen says, sent the sealed envelopes to Dr. Rancourt's lab, which assigned identification numbers to each sample. *Id.* at 3.

Packgen insists that Dr. Rancourt's findings establish that Packgen manufactured the failed Cougars from the defective material. *Id*. Specifically, Packgen says Dr. Rancourt determined: (1) samples cut from the defective 48-inch rolled goods and from a failed Cougar had poor adhesion, whereas a sample from a Cougar fabricated from material supplied by Berry in March 2007 had strong adhesion; (2) the physical structure of the defective material's polypropylene layer matches the physical structure of the polypropylene layer of the failed Cougar returned by CRI, whereas the physical structure of the polypropylene layer of the material received from Berry in March 2007 is different from the defective material and the failed Cougar; (3) the defective material and the failed Cougar did not contain the specified bonding resin, whereas the Cougar made from the material received in March 2007 had this resin. *Id*. Packgen contends that Dr. Rancourt's findings, along with Packgen's own test of a Cougar after the product failure, reinforce the conclusion that Packgen manufactured the failed Cougars from the defective material. *Id*.

Packgen maintains that the following evidence establishes that CRI received Cougars constructed from the defective material: (1) the sample from the failed Cougar returned by CRI matches the defective material but is unlike the Cougar made in March 2007; (2) Packgen's post-failure test shows that CRI received defective Cougars; (3) CRI received large numbers of defective Cougars; (4) all Cougars shipped to CRI after February 11, 2008 were fabricated from the defective material; (5) Packgen shipped 2,158 of these Cougars to CRI; (6) prior to the product failure, CRI had used the Cougars shipped before February 11, 2008 and did not report any

problems with these Cougars; and, (7) CRI notified Packgen that Cougars filled with catalyst failed in early April 2008 when the containers were lifted and that these Cougars came from the last shipment of Cougars to CRI on February 26, 2008.  *Id.* at 4.

Second, Packgen denies Berry's claim that it cannot identify the actual cause of the Cougar failures.  *Id.*  Packgen counters that it indeed fabricated, filled, and tested a Cougar using material Berry supplied in January 2008, and asserts that the Cougar "immediately failed in precisely the same manner" as the Cougars returned by CRI had failed.  *Id.* at 4-5.  Next, Packgen states that Cougars fabricated with material supplied by Berry in 2007 passed extensive testing by an independent agency using six times the weight of catalyst, whereas the Cougar that failed at CRI was filled with no more than the normal weight it was designed to hold.  *Id.* at 5. Moreover, Packgen argues, Dr. Rancourt determined that the Cougars returned by CRI split because of lack of adhesion in the defective material, and he did not need to test a completed Cougar or know the burst or puncture strength of the samples to determine the cause of the failure.  *Id.*  Packgen also contends that it does not need to show that the sample Dr. Rancourt tested came from a section of a failed Cougar in order to establish causation, and even if it did, that the evidence demonstrates that the tested sample came from a section of a failed Cougar.  *Id.* at 6.

Third, Packgen argues, it has presented "ample evidence" that the defective material is to blame for the Cougar failures, whereas Berry has only presented evidence of failures "caused by the negligence of third parties".  *Id.*  Packgen submits

23

that the only failures of Cougars put to their intended use were those caused by Berry's defective material. *Id*.

### 3.     Berry's Reply

Berry takes issue with Packgen's "unempirical" Cougar experiment, and insists it is inadmissible because the cause of the Cougar failure is not something that jurors will encounter in their daily lives. *Defs*.' *Reply* at 1-2.  Berry argues that Mr. Lapoint's conclusions regarding causation that were drawn from conducting the experiment are undisclosed expert testimony. *Id*. at 2.  Berry claims that the only way for this Court to properly consider Mr. Lapoint's expert opinion would be through a *Daubert* motion and/or hearing. *Id*. at 2-3.

Even if Mr. Lapoint's Cougar experiment is admissible, Berry contends, it is "unscientific guesswork" performed by a "biased individual" and does not show how or why the Cougar failed. *Id*. at 5-6.  Berry argues that the experiment was flawed because (1) it was performed on a post-loss manufactured Cougar; (2) the testing conditions are unknown; (3) the substance used to fill the Cougar are unidentified; (4) there was no control group of Cougars using non-Berry product; (5) there was no side-by-side comparison of Cougars used by CRI to the post-loss manufactured Cougar; and (6) there is no evidence that the experiment was performed under same or similar conditions to those at CRI at the time of the alleged failure. *Id*. at 4.  Mr. Lapoint's experiment, Berry says, only shows that Cougars can fail and does not show how or why they fail. *Id*. at 6.

### B.     Damages

### 1.    Berry's Motion

Berry says that Packgen cannot recover lost profit damages because such damages were not foreseeable at the time of contracting, are grossly disproportionate to the value of the contract, and are speculative because the damages are based on business that did not exist at the time of the Cougar failures. *Defs.' Mot.* at 14-18.

First, Berry argues that its Standard Terms and Conditions, referenced on the invoice, show that the lost profit damages claimed by Packgen were not reasonably foreseeable at the time of contracting. *Id.* at 14-16. Berry points to the Terms and Conditions' "conspicuous" limitation of damages as the "best evidence of what was within the parties' contemplation at the time of contracting."[27]   *Id.* at 15. The Standard Terms and Conditions stated that Berry would not be responsible for "special, incidental or consequential damages regardless of cause." *Id.* at 16.

Second, Berry asserts that Packgen's claim of $1,957,202 in lost profit damages is unrecoverable because the claimed damages were associated with potential revenue from refinery customers, rather than from business that was in existence at the time of contracting. *Id.* at 16-17. Packgen had not sold any Cougars to refineries at the time of the incident, Berry states, and therefore the refineries represented "new business" for Packgen. *Id.* at 17. Berry contends that the anticipated refinery business was therefore too speculative to be foreseeable.

---

[27]    Berry clarified that it is not arguing that the Standard Terms and Conditions were part of the parties' contract, and instead asserts only that they are the best evidence of what Berry contemplated at the time it performed its obligation under the contract. *Id.* at 15 n.11.

Third, Berry argues that it could not have foreseen lost profit damages in excess of $6.5 million because the amount is "grossly disproportionate" to the value of the contract.  *Id*. at 18.  Berry says that the value of the contract was $115,000, of which $66,800 was the cost of the 48-inch defective material.  *Id*.  Berry argues that the "excessive disproportion" between the lost profit damages and the contract value, in addition to its damages disclaimer in its Standard Terms and Conditions, and the speculative nature of the refinery business all demonstrate that Berry could not have foreseen the lost profits at the time of contracting.  *Id*. at 14-18.

### 2.    Packgen's Opposition

Packgen argues that it is entitled to recover lost profits because Berry, at the time of contracting, knew of Packgen's requirements and needs, knew about Packgen's business relationship with CRI and anticipated business relationships with the refineries, and had reason to know that Packgen would suffer lost profits if the Cougars failed and that these damages would be substantial.  *Pl.'s Opp'n* at 7-19.

First, Packgen asserts that Berry's boilerplate terms and conditions "shed no light on what Berry knew or had reason to know when it contracted with Packgen because these terms were not part of the parties' contract", and that Berry had "extensive knowledge" of Packgen's particular requirements.  *Pl.'s Opp'n* at 7. Packgen says that Berry has overlooked the fact that Uniform Commercial Code (U.C.C.) section 2-715(2)(a) applies in this case and provides that a buyer can recover consequential damages for "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to

26

know . . ." *Id.* (citing Uniform Commercial Code § 2-715(2)(a)).  Packgen contends that section 2-715 "relaxes and liberalizes the common-law requirement that breach of contract damages be foreseeable." *Id.* at 7-8.

Packgen submits that it has presented evidence to show Berry knew of its particular needs and requirements at the time of the contract. *Id.* at 8.  Specifically, before Packgen's November 26, 2007 purchase order for the material that Berry delivered in January 2008, Packgen states that it explained to Berry's sales representatives that: (1) the foil-laminated material would be the primary component of catalyst containers; (2) catalyst is hazardous and self-heating; (3) the catalyst and petroleum industries are extremely safety conscious; (4) Berry needed to supply foil-laminated material with strong and reliable bonds to ensure that the containers would have the required strength and structural integrity; (5) Packgen had invested substantial labor and working capital to develop foil-laminated Cougars; and (6) Packgen had an expanding customer base for Cougars. *Id.* at 8-9.  Packgen also states that Berry's sales representatives visited its plant, observed Cougars being made, examined completed Cougars, and spoke with employees about Packgen's requirements, how the Cougars functioned, and how Packgen's customers would use these containers. *Id.* at 9.  Berry's knowledge of Packgen's requirements and needs at the time of the contract, Packgen contends, demonstrates that Berry knew both why Packgen ordered the material and the importance of providing material that met Packgen's specifications. *Id.*  Thus, Packgen insists, a rational seller in Berry's position would reasonably expect that supplying defective material would create an

27

opportunity for dangerous chemical spills and would jeopardize Packgen's customer relationships. *Id.* at 9. Furthermore, Packgen argues, Berry is deemed to know that the purpose of buying the material is to enable Packgen to generate profits. *Id.*

Second, Packgen argues that, at the time of contracting, Berry had reason to know that Packgen would lose sales to the refineries if Berry supplied defective material. *Id.* at 12. Packgen asserts that Berry knew: (1) that Packgen was marketing Cougars to North American refineries; (2) that Packgen was selling catalyst containers to a major refiner; (3) that CRI would be delivering to refineries fresh catalyst in Cougars; (4) that Packgen would be closing Cougar sales deals with many North American refineries in 2008; and, (5) that the refinery market had great potential because there were more than 125 refineries in North America. *Id.* Packgen maintains that it has submitted evidence that shows it would have sold Cougars to the refineries but for the failure of Berry's material, that Berry had reason to know at the time of contracting that Packgen would be selling large numbers of Cougars to refineries in the future, and that these sales would be lost if Berry supplied defective material. *Id.* at 13-14. Furthermore, Packgen submits, it is an established business that has manufactured and sold catalyst containers since 2001 and is not barred from recovering damages for profits lost in the refinery sector. *Id.* at 16.

Third, Packgen rejects Berry's claim that its $6.5 million lost profits calculation is "grossly disproportionate" to the contract price. *Id.* Packgen asserts that under section 2-715(2)(a), Berry need only to have reason to know that a breach could cause Packgen to lose profits; the provision does not require Packgen to apprise

Berry of the amount of potential profits.  *Id*. at 17.  The U.C.C., Packgen contends, defines consequential damages as "any loss" and entitles an injured party to recover all losses even if they are large in comparison to the contract price.  *Id*.  Moreover, Packgen submits, its lost profits calculation is not extremely disproportionate to $342,895.49, which represents the total of its purchase orders with Berry prior to the product failure.  *Id*. at 19.  Berry had every reason to foresee substantial lost profits damages, Packgen concludes.  *Id*.

### 3.    Berry's Reply

Berry argues that the evidence of Packgen's loss of business with the thirty-seven refineries is based upon hearsay and inadmissible.  *Defs.' Reply* at 6.  Ms. Horton and Mr. Lapoint each testified to what they were told by the refineries; Berry insists that those statements, offered for the truth that the refineries intended to do business with Packgen, are "classic" hearsay.  *Id*. at 6-7.  Berry points out that Packgen has offered no affidavits, deposition transcripts, or emails from refinery personnel supporting Ms. Horton and Mr. Lapoint's claims.  *Id*. at 7.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit."  *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W.*

*v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

"If the moving party has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. Appx. 328, 332 (1st Cir. 2007) (quoting *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal punctuation omitted)).  In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).

The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).  However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

The Supreme Court has stated that "the plain language of Rule 56(c) mandates the entry of judgment . . . against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The parties earlier agreed that Maine law governs the analysis of the contractual issues in this case. *See Packgen v. Berry Plastics Corp*, 973 F. Supp. 2d 48, 60 (D. Me. 2013).

### B.    Causation

"As the plaintiff and the nonmoving party, [Packgen] has the burden of establishing a prima facie case for each element of its negligence claim." *Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 8, 969 A.2d 935.  Because the parties do not dispute that Berry owed Packgen a duty of care or that Berry breached that duty, Packgen must present evidence that Berry's negligence was the cause of its damages. *See Walter v. Wal-Mart Stores, Inc.*, 2000 ME 63, ¶ 17, 748 A.2d 961 ("In order to establish liability a plaintiff in any negligence action must show that the defendant's negligence was the proximate cause of the plaintiff's harm").

Causation means "that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Wheeler v. White*, 1998 ME 137, ¶ 7, 714 A.2d 125 (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 41, at 263 (5th ed. 1984)).  Under Maine law, a causation determination requires the Court to analyze whether the defendant's negligence played a "substantial part in bringing about or actually causing the injury" and, if so, whether the injury was a "reasonably foreseeable consequence" of the defendant's negligence. *Crowe v. Shaw*, 2000 ME 136, ¶ 10, 755 A.2d 509.  "The

31

question of whether a defendant's acts or omissions were the proximate cause of a plaintiff's injuries is generally a question of fact, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757.  The plaintiff's evidence "need not be persuasive" at the summary judgment stage, but "must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cty.*, 2013 ME 13, ¶ 19, 60 A.3d 759.  Put otherwise, if the plaintiff produces "so little evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's injuries that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff", the defendant is entitled to summary judgment. *Merriam v. Wanger*, 2000 ME 159, ¶ 10, 757 A.2d 778.

Viewing the evidence in the light most favorable to Packgen and drawing all reasonable inferences in its favor, the Court concludes that Packgen has produced sufficient evidence on the issue of causation to survive Berry's motion for summary judgment.  With respect to the first part of the causation inquiry, the record contains an abundance of evidence that the defective material played a "substantial part" in causing the Cougar failures.  Packgen has presented evidence that Cougars made with Berry material passed independent agency tests in 2007 and were certified for use as catalyst containers.  Packgen did not receive any complaints about incidents involving Cougars made from this material.  Additionally, Packgen has presented evidence that the 2007 material would have been used up by CRI by March 2008,

32

leaving the 2008 material as that from which the failed Cougars were fabricated. Packgen has also presented evidence that the Cougars were being used as intended when they failed at CRI's facility in April 2008.

To further support its claim, Packgen has presented evidence of two tests it ran on the January 2008 material; both showed the material was defective and the defect caused the Cougar to fail. Packgen conducted the first test itself; it fabricated a Cougar from the material Berry claimed was good and loaded it with a normal amount of weight; the Cougar immediately failed.

The second test, actually comprised of a number of tests of material samples, was conducted by Packgen's materials expert and compared the physical structure of the defective material to the physical structure of the non-defective material. The expert determined that the defective material and the failed Cougar did not have the specified bonding resin, but the Cougar made from the March 2007 material had this resin. Further, Packgen has presented chain-of-custody evidence linking the defective material to a failed Cougar. Packgen's purchasing agent cut the samples from three Cougars and the defective January 2008 material and delivered them in labeled, sealed envelopes to Bernstein Shur; Bernstein Shur sent the envelopes to the expert's lab, which assigned identification numbers to them and tested them. In addition to the tests, Packgen offered evidence through its expert that the samples were from the failed Cougar and showed that delamination of the foil layers was the cause of the failure.

With respect to the second part of the causation inquiry, Packgen has presented evidence that the Cougar failures were a reasonably foreseeable consequence of the defects in the foil-laminated material. Berry's sales representatives observed Cougars being made, knew the containers were being designed to safely transport and store hazardous material, and were aware of the importance of Berry's material to the structural integrity of a completed Cougar. Furthermore, one of Berry's sales representatives helped to develop the material that was used to make Cougars. The Court concludes that this is sufficient to show that the Cougar failures were a reasonably foreseeable consequence of the defects in Berry's material.

Berry's argument – that other causes could be the source of the failure – is unpersuasive. The Court is required to view the facts in the light most favorable to Packgen at summary judgment, and Packgen has presented sufficient evidence to negate the possibility that faulty seam construction caused the Cougar failure. Berry has not suggested any other cause for Cougar failure when the container is being used as intended.

In sum, if proven, these facts would reasonably support a finding that Berry's breach caused Packgen's damages without needing to resort to speculation or conjecture. Packgen has submitted evidence that the defective material played a substantial part in the Cougar failures, and that the Cougar failures were a reasonably foreseeable consequence of the defects in the material. Therefore, the

Court concludes that there are genuine issues of material fact in dispute as to whether Berry's breach of its duty of care caused Packgen's damages.

### C.    Lost Profit Damages

Given the parties' agreement that Maine law should apply, and the fact that there is no true conflict between Indiana and Maine law,[28] the Court bypasses the choice of law issue and references Maine's U.C.C. to determine the foreseeability of lost profit damages.

Article 2 of the Maine U.C.C. applies to transactions in goods. *See* 11 M.R.S. § 2-102.  Part 7 of Article 2 addresses buyers' and sellers' remedies.  *See* 11 M.R.S. §§ 2-701—2-725.  Section 2-715(2) of the U.C.C. provides buyers with a consequential damages remedy following a breach by the seller:

> (2) Consequential damages resulting from the seller's breach include
>
> > (a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> > (b) Injury to person or property proximately resulting from any breach of warranty.

11 M.R.S. § 2-715(2)(a)-(b).[29]  Consequential damages may include, inter alia, "sums for lost profits, loss of goodwill, losses resulting from interruption of buyer's production process, lost interest, etc." JAMES J. WHITE, ROBERT S. SUMMERS &

---

[28]    Packgen is a Maine corporation, Berry is a Delaware corporation with its principal place of business in Indiana, and the parties acknowledge that the contract negotiations and contracting took place in both Maine and Indiana.  *See Packgen v. Berry Plastics*, 973 F. Supp. 2d at 60 n.23.  Indiana and Maine adopted the same relevant provision of the U.C.C., specifically, section 2-715, which the Court determined applies in this case.  *Compare* 11 M.R.S. § 2-715, *with* IND. CODE § 26-1-2-715.

[29]    Packgen asserted, and Berry did not dispute in its reply, that section 2-715 applies to this case.

ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE § 7:24 (hereinafter WHITE, SUMMERS & HILLMAN). Berry, the seller, has conceded for the purposes of summary judgment, a breach involving a transaction in goods; thus, the Court concludes that section 2-715 applies to its determination of the availability and foreseeability of lost profit damages.

Berry has offered three potential grounds for limiting Packgen's recovery of lost profit damages: (1) its Standard Terms and Conditions demonstrate that such damages were not foreseeable at the time of contracting; (2) the damages are speculative because they are based on business that did not exist at the time of the Cougar failures; and, (3) the damages are grossly disproportionate to the value of the contract. *Defs.' Mot.* at 14-18. Packgen argues that it is entitled to recover lost profits because Berry, at the time of contracting, knew of Packgen's requirements and needs, knew about Packgen's business relationship with CRI and anticipated business relationships with the refineries, and had reason to know that Packgen would suffer lost profits if the Cougars failed and that these damages would be substantial. *Pl.'s Opp'n* at 7-19.

Maine caselaw has not directly addressed how to analyze lost profit damages under section 2-715. However, under Maine law, lost profit damages are generally recoverable if "at the time the contract was formed they were or should have been reasonably foreseeable or contemplated by both parties as a probable result of a breach."[30] *Maine Rubber Intern. v. Envtl. Mgmt. Grp., Inc.*, 324 F. Supp. 2d 32, 35

---

[30]    Berry supports its assertion that "lost profit damages for future business are too speculative to be foreseeable as a matter of law" with a number of cases, none is dispositive or binding here. First,

(D. Me. 2004). The foreseeability requirement is an objective test that "speaks to what is 'reasonably contemplated by the parties . . . .'" *Hendricks & Assocs., Inc. v. Daewoo Corp.*, 923 F.2d 209, 214 (1st Cir. 1991) (quoting *Delano Growers Coop. Winery v. Supreme Wine Co., Inc.*, 473 N.E.2d 1066, 1075 (Mass. 1985)). Additionally, "[d]amages for loss of 'prospective profits are allowable only if they can be estimated with reasonable certainty.'" *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644, 650 (Me. 1993) (quoting *Ginn v. Penobscot Co.*, 334 A.2d 874, 887 (Me. 1975)). In sum, to recover lost profit damages, a plaintiff must establish causation, foreseeability, reasonably certainty as to amount, and that lost profits are not barred by applicable mitigation doctrines. Packgen bears the burden of proving the first three factors, whereas Berry bears the burden of establishing non-mitigation. *See Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1064 (S.D.N.Y. 1996).

---

the facts demonstrate that this is not a case involving a "new business" in the sense that Berry urges. Packgen has been in business since 2001, and can demonstrate a history of earnings. The refineries represented a new market for Packgen's business. Packgen has evidence of anticipated business with the thirty-seven refineries, and was already supplying Cougars to one refinery. Furthermore, Packgen presented evidence that it would have entered into contract with the refineries but for the Cougar failures. That does not render them a "new business" in the sense of the doctrine. Therefore, Packgen falls outside of the scope of the so-called "new business rule." *Cf., e.g.*, *Kiswani v. Phoenix Sec. Agency, Inc.*, 247 F.R.D. 554, 558 (N.D. Ill. 2008) (Claim for damages associated with two failed hotel deals barred by new business rule when Plaintiff failed to demonstrate the deals would have gone through but for his arrest, never signed a contract for either of the deals, and never received any assurances that he was awarded the project); *Vescio v. Merchs. Bank*, 272 B.R. 413, 437 (D. Vt. 2001) (Lost profits claim associated with grocery store in operation for about three months was barred because all profits alleged were "purely hypothetical").

Next, Berry knew about Packgen's plans to start selling to the refineries, and knew this at the time of contracting. *Cf., Car Wash Consultants, Inc. v. Belanger, Inc.*, 777 N.W.2d 128, at *7 (Iowa Ct. App. 2009) ("There was "no evidence that [the Defendant] was aware of the contemplated Johnson Avenue location at the time of contracting."). Nor is there evidence that the parties were planning to terminate their business relationship; to the contrary, Packgen was satisfied with Berry's product and both parties were anticipating future sales including those for material to make the Cougars for the refineries.

### 1. Causation

The Court has already concluded that Packgen has produced sufficient evidence to generate a triable issue as to whether causation exists. A jury could reasonably determine that the damages Packgen claims for lost profits in the refinery sector can be directly traced to Berry's breach.

### 2. Foreseeability of Lost Profits at the Time of Contracting

#### a. The Impact of Berry's Standard Terms and Conditions

The commentary to section 2-715 states that "[a]ny seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy." M.R.S. § 2-715 cmt. 3. Section 2-719, entitled "Contractual modification or limitation of remedy", provides that parties can by agreement limit or modify the remedies available to them, and may limit or even exclude consequential damages where not unconscionable. *See* 11 M.R.S. § 2-719.

Berry points to its Standard Terms and Conditions, referenced on the invoice that accompanied the shipments of material that Berry would not be responsible for "special, incidental or consequential damages regardless of cause", as representative of the best evidence of what was within the parties' contemplation at the time of contracting. Berry claims that this language indicates that lost profit damages were not reasonably foreseeable at the time of contracting. Packgen counters that the Standard Terms and Conditions were not part of the parties' contract and therefore have no bearing on what the parties contemplated at the time of contracting.

38

In this Court's ruling on Berry's first motion for summary judgment, it addressed the Standard Terms and Conditions.  The Court concluded that "Packgen did not expressly agree to Berry's terms and conditions", but "le[ft] open the possibility that Packgen did so implicitly."  *Packgen v. Berry Plastics Corp*, 973 F. Supp. 2d at 57 n.21.  Additionally, Berry stated in its current motion that it is "not arguing that the Terms and Conditions were part of the parties' contract" but asserts "only that its Standard Terms and Conditions are the best evidence of what Berry, the seller, contemplated at the time it performed its obligation under the contract." *Defs.' Mot*. at 15.  This implicit admission that the Standard Terms and Conditions are not part of the contract, made for the purposes of its current motion for summary judgment, further confirms there is a genuine dispute over whether the Standard Terms and Conditions are part of the contract.

Although the Standard Terms and Conditions may be some evidence of what was within the parties' contemplation, it is for the jury to determine the "best" evidence of what the parties contemplated at the time of contracting.  Packgen has presented evidence that shows Berry knew of its particular needs and requirements at the time of the contract.   Specifically, Packgen explained to Berry's sales representatives that: (1) the foil-laminated material would be the primary component of catalyst containers; (2) catalyst is hazardous and self-heating; (3) the catalyst and petroleum industries are extremely safety-conscious; (4) Berry needed to supply foil-laminated material with strong and reliable bonds to ensure that the containers would have the required strength and structural integrity; (5) Packgen had invested

39

substantial labor and working capital to develop foil-laminated Cougars; and (6) Packgen had an expanding customer base for Cougars. Berry's sales representatives also visited Packgen's plant, observed Cougars being made, examined completed Cougars, and spoke with employees about Packgen's requirements, how the Cougars functioned, and how Packgen's customers would use these containers. A jury could reasonably determine that this is better evidence of what the parties contemplated with regard to consequential damages.

The case Berry cites in support of its motion does not compel a different outcome. In *Turner Farms, Inc. v. Maine Central Railroad Company*, a poultry farm was allowed to recover for the railroad's failure to deliver poultry feed in a timely fashion. *Turner Farms, Inc. v. Maine Cent. R.R. Co.*, 486 F. Supp. 694 (D. Me. 1980). That action, however, was brought pursuant to the Carmack Amendment to the Interstate Commerce Act for breach of contract, and the bill of lading, which the parties agreed was part of the terms of the contract, imposed an express obligation on the carrier to deliver the feed with "reasonable dispatch." *Id.* at 697. The instant case does not involve the Carmack Amendment, and the parties have not agreed nor has the Court determined that the Standard Terms and Conditions are part of the contract. Furthermore, the outcome in *Turner Farms* does not lend much support to Berry's case. The poultry farm was allowed to recover lost profit damages in spite of the court's determination that there was "no question" that the parties did not contemplate the special damages the poultry farm claimed. *Id.* at 699.

The Court concludes that Berry's Standard Terms and Conditions are not, as a matter of law, conclusive evidence that lost profit damages were not within the parties' contemplation at the time of contracting.

> **b.    Whether the Lost Profit Damages Associated With Anticipated Sales to the Refineries Were Foreseeable**

Packgen contends that it would have sold Cougars to thirty-seven refineries but for the Cougar failures caused by Berry's defective material.  Berry asserts that Packgen's claim of $1,957,202 in lost profit damages associated with future sales to the thirty-seven refineries is unrecoverable as a matter of law because Packgen had not sold any Cougars to refineries at the time of contracting, and the damages are therefore too speculative to be foreseeable.  *Defs.' Mot.* at 16-17.

Packgen responds that Berry knew, at the time of contracting, that: (1) Packgen was marketing Cougars to North American refineries; (2) Packgen was selling catalyst containers to a major refiner; (3) CRI would be delivering fresh catalyst in Cougars to refineries; (4) Packgen would be closing Cougar sales deals with many North American refineries in 2008; and, (5) the refinery market had great potential because there were more than 125 refineries in North America.  *Pl.'s Opp'n* at 12.

Berry replies that Packgen's evidence of loss is based solely upon two paragraphs in Packgen's statement of additional material facts supported only by the deposition testimony of Ms. Horton and Mr. Lapoint in which they claim the refineries told them they would have placed orders with Packgen but for the Cougar

failures at CRI's facility.  *Defs.' Reply* at 6.  Berry argues that these statements are "classic" hearsay and that it is entitled to summary judgment "for any damages related to the purportedly lost sales to the 37 refineries."  *Id*. at 6-7.

The Court has already indicated its concern about Packgen's ability to prove the lost profits without additional evidence beyond Ms. Horton and Mr. Lapoint's statements about what the refineries allegedly told them.  Even assuming that Ms. Horton and Mr. Lapoint's statements about what the refineries are indeed inadmissible hearsay, however, that does not seal the fate of Packgen's entire lost profits claim as regards the thirty-seven refineries.

Berry and Packgen's expectations at the time the contract was formed are not precisely defined, but Packgen has presented evidence that generates a factual issue as to whether lost profit damages relating to the thirty-seven refineries were within the parties' contemplation at the time of contracting.  Although Packgen has not presented evidence that an agreement for lost profits was in fact reached, such "tacit agreement" is not required under the U.C.C.[31]  Simply because Packgen did not have executed contracts in place with the refineries for the Cougar sales at the time of the breach does not doom its lost profits claim.  *See Val Tech Holdings, Inc. v. Wilson Manifolds, Inc.*, 119 A.D. 3d 1327, 1329 (N.Y. App. Div. 2014).

---

[31]     The "tacit agreement" test, which allowed recovery of only the damages the defendant either consciously assumed or could reasonably be supposed to have assumed, was expressly rejected in the comments to the U.C.C.  *See* 11 M.R.S. § 2-715 cmt. 2; WHITE, SUMMERS & HILLMAN § 11:9.  Therefore, the parties do not have to actually discuss the buyer's special circumstances; it is sufficient that the seller knows of the buyer's general situation.  *See id*. § 11:9.

Berry had far more than a passing understanding of Packgen's Cougar business.  Berry representatives visited Packgen's plant, observed Cougars being made, and spoke with Packgen engineers about the Cougar material specifications, how Cougars functioned, and how Packgen's customers would use the containers. Furthermore, Packgen told Berry before July 2007 that Berry's material would be the primary component of the Cougars, that they were dealing with very safety-conscious customers, that the hazardous catalyst material must be transported in safe containers, that Berry's material needed to be strong enough to safely transport and store the catalyst, that Packgen had a long-term customer who purchased large amounts of Cougars, that Packgen had invested substantial resources to develop the custom Cougars. *See, e.g., Trs. of Iowa Laborers Dist. Council Health & Welfare Trust v. Ankeny Cmty. Sch. Dist.*, 860 N.W.2d 923, *6 (Iowa Ct. App. 2014) (Lost profits were reasonably foreseeable at the time of contracting when buyer's "future contracts with other customers, retention of existing customers, and acquisition of new customers could depend upon the quality of its work product . . . ."). Although this information did not pertain directly to the refineries, Berry had a sense of the scale of Packgen's existing operations, the importance of delivering safe and reliable products to Packgen's customers, and the significance of Berry's foil-laminated material to the production of Cougars.

Against that backdrop, Berry also knew at least generally, if not specifically, about Packgen's plans vis-a-vis the thirty-seven refineries.  Packgen's president told Berry's sales representatives that Packgen would be closing deals with many North

American refineries in 2008.[32]  Berry knew that Packgen was already selling catalyst containers to a major refiner and was marketing Cougars to other North American refineries, that Packgen would be closing Cougar sales deals with many North American refineries in 2008, and that the refinery market had great potential because there were more than 125 refineries in North America.  Significantly, Berry was aware of the importance of the Cougars to that planned expansion.  The parties did not anticipate a one-time purchase of material from Berry – they anticipated a business relationship to continue for some time into the future.  *See PEI Export, Inc. v. Laidlaw Transit, Inc.*, 1999 WL 528801, at *5 (W.D.N.Y. Jul. 6, 1999).  This is evidenced by, inter alia, a purchase order that Packgen placed with Berry in January 2008 that was pending when the Cougars failed in April 2008.  Additionally, the large quantities of material purchased by Packgen gave Berry reason to know Packgen was buying the material to manufacture Cougars and generate profits.

Berry has not presented sufficient evidence to demonstrate that there is no genuine issue of material fact as to whether the lost profit damages were unforeseeable as a matter of law.  First, Berry has not presented any evidence that it knew the refinery sales would not happen.  Second, Berry's Standard Terms and Conditions do not demonstrate that the parties contemplated that Berry would be excused from liability for profits lost as a consequence of Berry's failure to provide Packgen with a conforming product.  Third, the case Berry cites in the body of its

---

[32]      Berry notes that it did not admit the truth of the statement; it did not have to, however.  The lost profits analysis focuses on reasonable foreseeability and what was within the parties' contemplation.

motion, although helpful, does not carry the day.  In that case, a court held that a buyer could not recover lost profits for prospective business opportunities because the buyer failed to raise a factual issue as to whether the prospective business was within the parties' contemplation at the time of contracting, and also failed to raise a factual issue as to whether the loss of profits was the probable result of the seller's breach. *Robotic Vision Sys., Inc. v. Cybo Sys., Inc.*, 17 F. Supp. 2d 151, 160-61 (E.D.N.Y. 1998). The buyer presented evidence in the form of meeting notes and an affidavit in which it described potential contracts to the seller during contract discussions; the court found that was insufficient as a matter of law to demonstrate the prospective business opportunities were within the parties' contemplation. *Id.* at 160.  The *Robotic Vision* court emphasized that the purchase price of $537,000, all allocated to the robotic welding system rather than to goodwill or third party sales, indicates that neither party contemplated $10 million in future profits as part of the deal. *Id.*  In the instant case, however, Packgen has submitted more evidence than mere notes from a meeting where it described the refinery business.  Furthermore, Packgen's request for $1,957,202 in lost profits stemming from a business relationship that totaled $342,895.49 before the product failure is closer by orders of magnitude and is not a clear indication that neither party contemplated future profits as part of the deal. Finally, Packgen has presented sufficient evidence to at least generate a factual issue as to whether it would have sold Cougars to the refineries but for the defective material.

Packgen has presented sufficient evidence from which a fact-finder could reasonably determine that Berry had reason to know, at the time of contracting, that Packgen would lose profits from sales to the thirty-seven refineries if the Cougars failed.  Therefore, there is a genuine issue of material fact regarding whether the lost profit damages were either "reasonably foreseeable" at the time of contracting or "contemplated by both parties as a probable result of a breach",  and the Court cannot conclude as a matter of law that the lost profits were not foreseeable consequences of the Cougar failures.

### c.   Whether the Lost Profit Damages Are Grossly Disproportionate to the Value of the Contract and Therefore Unforeseeable

Berry argues that lost profit damages in excess of $6.5 million are "grossly disproportionate" to the value of the contract.  *Defs.' Mot.* at 18.  According to Berry, the contract value was $115,000, of which $66,800 was the cost of the 48-inch defective material.  *Id.*  Packgen asserts that under section 2-715(2)(a), consequential damages include "any loss" even if large in comparison to the contract value, and Berry need only to have reason to know that a breach could cause Packgen to lose profits; the provision does not require Packgen to apprise Berry of the amount of potential profits.  *Pl.'s Opp'n* at 17.  Additionally, Packgen submits, its lost profits calculation is not extremely disproportionate to $342,895.49, which represents the total of its purchase orders with Berry prior to the product failure.[33]  *Id.* at 19.

---

[33]     The parties dispute which number should be used as the contract value in order to determine proportionality between the contract value and the lost profits.  Packgen argues the contract value should be $342,895.49, whereas Berry suggests a lower figure of $115,000.  Neither party has cited authority for their calculations.  For the purposes of deciding this motion, however, the Court need not

Additionally, the Maine statute applicable here does not expressly require that lost profit damages be proportionate to the value of the original contract. *See* 11 M.R.S. § 2-715. Although there is a dearth of caselaw interpreting proportionality requirements for U.C.C. cases, the scant caselaw available suggests that the foreseeability of damages depends not on the amount of damages suffered as a result of the breach, but on whether the seller had reason to foresee, based on its knowledge of the buyer's circumstances, that the buyer would suffer damages due to the seller's breach. *See, e.g., Harmon Cable Commc'ns of Nebraska Ltd. P'ship v. Scope Cable Tel., Inc.*, 468 N.W.2d 350, 362 (Neb. 1991).

Berry cites the Restatement (Second) of Contracts for the proposition that a court may limit damages as a matter of discretion if there is "extreme disproportion between the loss and the price charged." *Defs. Mot.* at 18 (citing RESTATEMENT (SECOND) OF CONTRACTS § 351). Although some Maine cases refer to section 351, the parties have not cited and the Court has not found a Maine case expressly adopting section 351. Furthermore, the Court has determined that the U.C.C. governs the motion before it, and notes that the formulation of section 2-715 differs from section 351. *Compare* 11 M.R.S. § 2-715 *with* RESTATEMENT (SECOND) OF CONTRACTS § 351.

Berry cites no applicable caselaw demonstrating that Packgen's request lost profits stemming from a business relationship that totaled $342,895.49 before the product failure is grossly disproportionate as a matter of law. Berry's citation to *Robotic Vision* is not persuasive because *Robotic Vision* is not binding on this Court

---

decide upon a final figure. Proportionality is not required under the U.C.C., and even if it were, Berry has not shown that the contract value is grossly disproportionate to the lost profits calculation.

and was not a U.C.C. case. As noted, foreseeability of damages depends not on the amount of damages suffered as a result of the breach, but on whether the seller had reason to foresee, based on its knowledge of the buyer's circumstances, that the buyer would suffer damages due to the seller's breach. *See Harmon Cable Commc'ns of Nebraska Ltd. P'ship v. Scope Cable Tel., Inc.*, 468 N.W.2d 350, 362 (Neb. 1991).

This is not to say that Packgen's position is air tight. Packgen relies on cases that involve parties doing business together for much longer than Berry and Packgen. *See M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 572 F.3d 532 (8th Cir. 2009) ("Between 2002 and 2006, Silta purchased hundreds of items from the mine . . . ."); *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1285 (2nd Cir. 1994) ("The parties had a business relationship that involved hundreds of . . . transactions."). Indeed, in *International Ore*, the longstanding business relationship of the parties factored into the analysis of the foreseeability of lost profits following a breach. The parties in those cases appear to have known more about each other's operations and seem to present stronger cases for lost profits than the facts in this case.

However, Packgen has presented evidence that Berry had a detailed understanding of the design and production of the custom Cougars. Furthermore, the sophistication of the parties played a role in the outcomes in both *M.M. Silta* and *International Ore*. *See M.M. Silta, Inc.*, 572 F.3d at 540 ("Cliff is a sophisticated commercial entity that entered into hundreds of contracts like the one here."); *Int'l Ore*, 38 F.3d at 1284 ("SGS and Interore are sophisticated repeat players in a

competitive market for inspection services."). Here, both parties are sophisticated commercial entities.

Finally, the damages claimed here are much closer to the contract price than other damages awards upheld on appeal. In *M.M. Silta*, the Eighth Circuit upheld a damages award that was 2,750 times the contract price, and in *International Ore*, the Second Circuit upheld a damages award that was 4,750 times the defendant's fee.

Given the dearth of Maine caselaw and the caselaw from other jurisdictions suggesting the availability of damages far in excess of the proportions Packgen has requested, the Court concludes that Berry has not demonstrated that the lost profits damages claimed are disproportionate as a matter of law. Therefore, the jury must weigh and consider the extent of Packgen's damages, if any.

Finally, once a jury determines the damages in this case, it may well find damages far less than what Packgen has claimed and indeed in an amount that would obviate Berry's "grossly disproportionate" argument. Accordingly, because the premise of Berry's position depends upon a factual finding of a jury, summary disposition is necessarily unavailable.

### 3. Reasonable Certainty of Lost Profits

Packgen has offered the testimony of a damages expert demonstrating the legitimacy of the lost profit damages calculation, which is sufficient to support a non-speculative award of consequential damages. The expert's qualifications and his analysis of the lost profit damages were the subject of extensive briefing by the parties. *See Order on Mot. to Exclude Expert Testimony* (ECF No. 71). Furthermore,

Berry has not argued in this motion that the damages are not capable of being determined with reasonable certainty. Therefore, the Court concludes that Packgen has met its burden on this element.

### 4.    Mitigation of Damages

Consequential damages can be unavailable under section 2-715 if the buyer could have reasonably prevented the loss by cover or otherwise. *See* 11 M.R.S. § 2-175(2)(a). Neither party has taken a position regarding cover or mitigation of damages. Because there is no evidence in the record before the Court that Packgen could have avoided the damages, and because Packgen did not send Berry a non-conformance report identifying problems with the material until a month after its last purchase order was placed with Berry, the Court concludes that not only has Berry failed to meet its burden on this issue, but also that Packgen has presented sufficient evidence to at least generate a factual issue as to whether it could have reasonably prevented the damages by cover or otherwise.

## IV.    CONCLUSION

The Court DENIES the Defendant's Motion for Summary Judgment (ECF No. 78).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of June, 2015

50